UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____     Civil Action No.
LINDSEY M. BESHAI TORRES PPA, JT, a minor )
      Plaintiff                             )
                                                   )
v.                                            )
                                                     )
OFFICER JOHN R. ALERS, FORMER POLICE        )
OFFICER PAUL P. MCARTHY and the CITY         )
OF WORCESTER                                 )
      Defendants                            )
                                                     )
_____)

## COMPLAINT AND REQUEST FOR JURY TRIAL

## <u>INTRODUCTION</u>

1.     This is an action in civil rights and tort to recover for severe physical and emotional injury two Worcester police officers inflicted on a 10-year old autistic boy.  His mother had called for an ambulance after he threw a tantrum and hurled a plastic beverage container inside her car.  He'd stayed up the night before and she believed something was wrong with his medications.  When the officers got there, shortly before the ambulance arrived, the child had calmed down and was sitting quietly in his mother's car. The officers knew he was autistic and that this was a medical call.  But when the child responded to their queries by tossing a small bag of potato chips from the car, without further ado the officers dragged him from the vehicle, and put him face down to the pavement with knees on his neck and legs.  When his mother begged them to let her take over and try to calm the child they told her to back off, and as the child screamed in pain she watched helplessly as they twisted the right arm into an unnatural position during handcuffing and fractured his elbow.

2.     Beside the hospitalization, surgery, and scar for treatment of his arm injury, the impact of the trauma on this boy proved devastating.

3.     Besides claims on the child's behalf for harms arising from the officers' conduct, his mother brings a claim in civil rights against the City of Worcester for its failure to train officers in means of dealing with autistic persons and for its policy, or custom and usage, of tolerating, condoning, and failing to require accountability for the use of excessive force by officers, and for other forms of officer misconduct, including failure to accurately report the use of force.  These policies created a climate of impunity allowing officers to violate the rights of citizens without fear of repercussions.  The City took no corrective action regarding the officers involved in this incident.

4.    Additionally because of the City's abject failure, by its agents, to allow a reasonable accommodation for the needs of a person they knew to be disabled, the victim's mother brings a claim for him under the Americans with Disabilities Act, 42 U.S.C. §§ 12131-65.

## JURISDICTION AND VENUE

5.    This action is brought under 42 U.S.C. § 1983 and § 1988 for violation of rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution. Title 28 U.S.C. § 1331 and § 1343 provide jurisdiction over all federal claims, and 18 U.S.C. § 1367 provides supplemental jurisdiction over state law claims. It is also brought pursuant to Title II of the American with Disabilities Act (ADA), of 1990, 42 U.S.C. §§ 12131-65.  Plaintiffs' bring common law claims and statutory claims under the Massachusetts Public Records Law M.G.L. c. 66 § 10.

6.    Plaintiff, Lindsey M.S Beshai Torres, ("Ms. Beshai Torres") lives on Edgeworth Street in Worcester, Worcester County, Massachusetts.

7.    She is the mother of JT, a 10-year old autistic boy.  The initials JT are being used in this complaint to protect his identity.

8.    Defendant Officer John R. Alers, ("Officer Alers") was at all pertinent times a duly appointed and sworn Worcester police officer.   Officer Alers resides on Wellington Street in Marlborough, Middlesex County, Massachusetts.

9.    Defendant retired police Officer Paul P. McCarthy, ("Officer McCarthy") was at all pertinent times a duly appointed and sworn Worcester police officer.  Officer McCarthy on Grafton Street, Worcester, Worcester County, Massachusetts.

10.   Defendant City of Worcester ("the City") is a duly chartered municipal corporation of the Commonwealth of Massachusetts with a place of business abode at 455 Main Street, Worcester, Worcester County, Massachusetts.

11.   Officers Alers and McCarthy are being sued in their individual capacities.

## FACTS

12.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

13.   At all times material to the complaint, the City of Worcester and its police department employed Officer Alers as a duly appointed and sworn officer of the Worcester Police Department ("WPD").

14.   At all pertinent times the City employed Officer McCarthy as a as a duly appointed and sworn officer of the WPD.

15.     At all pertinent times officers Alers and McCarthy acted as alleged in this Complaint under color of the laws, statutes, ordinances, and/or regulations of the Commonwealth of Massachusetts and/or of the City of Worcester**.**

### JT' s Autism

16.     On the date of the subject incident, September 25, 2017, JT was 10-years old.

17.     On that JT was a passenger in his mother's vehicle as she dropped off another child of hers at Gates Lane Elementary School in Worcester.

18.     JT has autism spectrum disorder (ASD), which was diagnosed when he was three years old.

19.     JT has been in special education at the Worcester public schools since pre-school.

20.     ASD, according to the National Institute of Mental Health, is a developmental disorder that affects communication and behavior.

21.     According to the Diagnostic and Statistical Manual of Mental Disorders (DSM-5) of the American Psychiatric Association, people with autism have difficulty communicating and interacting with others, restricted interests and repetitive behaviors and symptoms that impair a person's ability to function properly in school, work and other areas of life.

22.     The Center for Disease Control and Prevention (CDC) estimates that an average in 1 in 68 children in the U.S. have a diagnosis of ASD that can cause significant social, communication and behavioral challenges.

23.     ASD is a disability.

24.     The American with Disabilities Act (ADA) protects individuals with disabilities from being discriminated against in numerous facets of their lives including education, employment, and public accommodations.

25.     Title II of the ADA specifically protects disabled persons from discrimination in services, programs and activities provided by local governments.

26.     Law enforcement is a service provided by local governments. Thus, the police must comply with Title II of the ADA.

27.     In order to comply with the ADA, police departments cannot discriminate against those with a qualifying disability or deny them services.

28.     The ADA defines a disability as a "physical or mental impairment that substantially limits one or more life activities of such individual."

29.   JT had a disability that is covered and protected by the ADA because his ASD substantially limited one or more life activities.

30.   ASD is characterized as a brain development disorder that results in impairment in communication and social interaction.

31.   Autistic children often engage in restrictive and repetitive behavior.

32.   Often, their response to stress may be a melt-down, acting out, ritualistic behavior, inappropriate verbal statements, or other actions that may be viewed by some, mistakenly, as an indication of hostility, criminal intent or some other external form of behavior.

33.   There were many children attending the Worcester public schools during the fall of 2017 that were diagnosed with Autism Spectrum Disorder ("ASD").

34.   By way of example, according to Kay C. Seale, Manager for Special Education & Intervention Services Worcester Public Schools reporting during a Central Massachusetts Autism Summit in January 28, 2014 in her presentation entitled "Increasing Prevalence of Autism: Trends and Implications for School Districts" that in 2013 the Worcester Public Schools serviced and educated 440 autistic children.

35.   That presentation noted 50% of those students classified ASD were eight years old or less, while 78% of those ASD students were twelve years old or less.

36.   Years before this incident the City of Worcester and its police department had knowledge of the need for specialized training on law-enforcement officers' encounters with autistic members of the community and with other disabled individuals.

37.   The City of Worcester had acquired this knowledge through, among other sources, through its Chief of Police, who is the final policymaker and authority on all matters relating to training that Worcester police officers receive or don't' receive.

38.   Long before the incident between JT and the police its current Chief and past Chiefs knew that ASD was a developmental disability and that this developmental disability was not the same as a mental illness.

39.   Prior to September 25, 2017 Chief Steven M. Sargent and the City had received specific notice, through from the Worcester public schools and their police liaison, through Google alerts, through training, through the Police Executive Research Forum (PERF), Autism Law Enforcement Education Coalition and its Awareness Training for First Responders (ALEC), Meet the Police: A Guide to Introducing Children & Adults with ASD to Local Law Enforcement (National Autism Association) and updates or events in the media that law enforcement contact with autistic persons posed a unique risks to autistic members of the community.

40.     Upon information and belief, prior to this incident involving JT, Chief Sargent and other officers from his department and its police trainers personally viewed (but failed to disseminate) training videos or materials that highlighted, in more detail the special risk that law-enforcement contacts pose to the safety of autistic members of the community.

41.     Prior to this incident, Chief Sargent and the City understood that autism was becoming more of a problem in society in general and with law enforcement in particular.

42.     Chief Sargent, his employees and the City knew before the incident involving JT that developmentally disabled people were 7 times more likely to come into contact with law enforcement.

43.     Chief Sargent, the City and its employees knew before this incident the possibility of his/her officers coming in contact with a young or adult person with ASD was significant.

44.     If a police officer is not trained to recognize ASD and has no resources with which to understand the situation, he/she may misinterpret the encounter with an ASD child and interpret as unusual or criminal in nature their behavior.

45.     An improperly trained police officer to recognize and react accordingly to signs of ASD not only potentially and unnecessarily places an ASD individual at a much greater risk of the use of force but also creates a risk of danger for the officer.

46.     An ASD child or adult when overwhelmed with sensory information may try to flee, become combative or shut down.

47.     A child with ASD can easily become frustrated or confused and sometimes develop tantrums that escalate out of the control of caregiver and parents.

48.     The presence of police lights, uniforms, loud and unfamiliar voices or difficult situations contribute to the sensory overload of a child with ASD.

49.     When police officers are not properly train to deal with children or adults with ASD traditional law enforcement techniques for controlling or containing a situation are ineffective and can and do lead to further escalation with the person with ASD.

50.     Instead of using force an appropriately trained officer calms or contains the situation that will usually lead to de-escalation or to defusing the situation, i.e., use a quiet and non-threatening voice, the use of simple language, avoid touching, or allow the agitated person to calm down without intervention, if possible or providing them with extra personal space.

51.     Consequently, it is not unusual that the more force police apply to gain control of an ASD individual the more dangerous and out of control the situation likely becomes.

52.     Although Chief Sargent and the City prior to this incident had specific knowledge that children or individuals with ASD injured by police during encounters and had knowledge of the need for additional training, the City did not have – and still does not have any kind of training program to help officers interact with ASD members of the community safely.

**The detention and handcuffing of JT**

53.     On September 25, 2017 at approximately 8:51 in the morning, JT accompanied his mother as Mrs. Beshai Torres drove one of her other children to Gates Lane Elementary School.

54.     JT who had not been taking his medication at the time because of a reaction to one of his medications, and he had been up most of the night before, unable to sleep.

55.     After a minor argument between Mrs. Beshai Torres and her children JT apparently became upset at his mother.

56.     While sitting in the back seat of the car, he threw a plastic bottle of Gatorade into the dashboard and yanked the rear view mirror out of position.

57.     Concerned over her son's medication issues and behavior, Mrs. Beshai Torres did something she never done before with JT, she called 911 to ask for medical assistance.

58.     She told the 911 operator that her son was disabled, had autism and needed assistance.

59.     After asking a number or questions the dispatcher told her an ambulance would be on its way.

60.     Mrs. Beshai Torres, expecting JT would be transferred to the ambulatory unity of UMass Memorial Medical Center, told her son she had called 911 so he could speak with a doctor.

61.     But two Worcester police officers, the defendants Agers and McCarthy, also responded to the call, and they arrived before the ambulance.

62.     By the time of the officers' arrival JT had calmed down and was sitting quietly in the front passenger seat of his mother's car.

63.     Mrs. Beshai Torres recognized Officer McCarthy whom she knew and was friendly with.

64.     Officer McCarthy had interacted with JT before and knew he was an autistic and disabled child.

65.    When the officers arrived to the parking lot next to the school, Mrs. Beshai Torres explained she had never before called for emergency help for JT, reminded them of his disability and asked them to deal with him calmly.

66.    The officers initially approached JT and they tried to talk to him to figure out what was wrong.

67.    McCarthy was on the driver's side and Alers was at the front passenger door.

68.    JT, who did not like making eye contact with people, had his head down.

69.    When the officers attempted to speak with him, he acknowledged them with a grunt.

70.    As the officers continued speaking with him JT became frustrated; he grabbed a small bag of potato chips from the front seat and threw it from the car to the pavement outside.

71.    The bag of potato chips did not make contact with Officer Alers.

72.    Both officers knew JT had been diagnosed with autism, had been up all night, and that an ambulance was on the way to provide medical assistance

73.    Upon information and belief neither Alers nor McCarthy had received any training on how to deal with autism.

74.    But as JT sat in the front passenger seat of his mother's car, the officers could see that he posed no reasonably perceptible risk of imminent harm to himself or to any other person.

75.    Common sense dictated that there was no need for precipitate action, that the officers should give JT room to calm down while waiting for the ambulance, that in any event they should do nothing to alarm or upset JT and there was no need to touch or detain him.

76.    Instead the officers escalated the encounter in ways his Mrs. Beshai Torres never anticipated.

77.    Officer Alers grabbed JT by his arm and began pulling him out the car to place him face down on the ground with the assistance of Officer McCarthy.

78.    In shock Mrs. Beshai Torres screamed to the officers, reminding them JT was an autistic 10-years- old, to stop so she could try to calm him down.

79.    Officers Alers and McCarthy told her to "back-off" and to let them do their job.

80.    JT screamed hysterically as he was taken from the car to the pavement and Officer McCarthy placed his knee on JT's neck while Officer Alers put a knee on the boy's legs as they forced his arms behind his back.

81.     As he lay face down and the officers raised and twisted his arms behind the back, JT screamed in pain, "Mommy help me.  Ouch! My Arm! My Arm!"

82.     Mrs. Beshai Torres screamed and watched helplessly as she saw her son's right arm twisted into an unnatural and deformed position at the elbow as he was handcuffed.

83.     Both Officers participated and assisted one another forcing JT to the ground and handcuffing him.

84.     The defendants' remained on top of JT for a number of minutes.

85.     When the ambulance arrived the EMT's found JT screaming inconsolably on the ground.

86.     As they rolled JT to his back and brought him to a seated position the EMTs noted a "slight deformity to [the] proximal humeral head" of the right arm.

87.     He was taken to the UMass Emergency Department, where an x-ray showed a lateral epicondyle avulsion fracture with soft tissue swelling and joint effusion.

88.     **Ex. 1** is a fair and accurate photocopy an X-ray of JT arm and of the fracture, which required three days hospitalization, and surgery.

**The police report prepared by Alers**

89.     Officer Alers stated in his report that when he spoke to Mrs. Beshai Torres, she was out of her car and crying.

90.     Officer Alers stated Mrs. Beshai Torres told him her son was out of control.

91.     Officer Alers reported he found JT seated in the front passenger seat with the door already open.

92.     Alers wrote JT was "visibly upset and crying."

93.     He wrote JT had been diagnosed with autism and was a disabled child.

94.     Alers wrote he attempted to talk to JT but claimed (untruthfully) JT began to yell profanities at him and began pounding on the seat and arm rest with his fist.

95.     Alers also reported JT threw a "bag of trash" and began pounding the seat and arm rest with his fist.

96.     None of this happened.

97.     Alers also reported JT began to pull out wires of the rear view mirror of the car – something JT had done before the arrival of the officers.

98.    According to Alers, as a result of JT's behavior, and his weight, he opted to approach and restrain him.

99.    Alers also alleged in his report that JT got out of the car and tried to get away from him by moving toward the street.

100.   That did not happen.

101.   According to Alers' report "At this time, I grabbed [J] and brought him to the ground. Once he was on the ground, he continued to struggle and try to free himself. Officer McCarthy assisted in restraining him and I then placed him in handcuffs for his safety and ours until he calmed down. Once he calmed down, the handcuffs were removed. WEMS paramedics then arrived on scene and placed him on a stretcher. I then informed the paramedics that I would be filing Section 12 paperwork and would follow them to the hospital. Upon arrival to UMass Hospital on Lake Ave., I filled out the Section 12 paper work and advised the medical staff of the situation. A copy of the paper work has been attached to this report."

102.   Upon his arrival by ambulance at the emergency department at UMass Memorial Medical Center, JT was only treated for his injuries and not admitted or evaluated for a Section 12 commitment.

103.   A "Section 12" is a provision of Massachusetts statute, M.G.L. c. Chapter 123 § 12, providing for an individual to be brought against his or her will to a hospital for evaluation and for admission to a psychiatric unit for up to three days.

104.   Doctors and health care workers at UMass that came in contact with JT were shocked at the nature of his physical injuries, but more importantly that police had brought a 10-year old autistic boy for a psychiatric evaluation; autism is not a psychiatric condition.

105.   Neither Mrs. Beshai Torres nor her son did anything to deserve the unreasonable escalation of force that the officers used against JT.

106.   Neither Officer Alers or McCarthy had any basis to believe that JT's conduct met any of the policy criteria that could justify the use of such force on a child accused or suspected of no crime, not fleeing, and whose conduct could not be reasonably perceived as assaultive or threatening in any way, shape or form as to any officer.

107.   Officer Alers and McCarthy knew to a certainty that their actions would result in injury and trauma to both JT and his mother.

108.   There was no legal justification for Alers and McCarthy's actions and no reasonable officer would have employed the unreasonable level of force during their encounter with JT.

109. The assault and battery of JT was unprovoked, was egregious and an unreasonable and unnecessary use of force in violation of JT's well established constitutional rights.

110. Alers and McCarthy's unreasonable use of force and their assault on JT resulted in injury to him and his mother.

111. Because Alers interacted with paramedics and drove to the hospital and reported the incident to medical staff (what he thought was a Section 12) he knew that JT had sustained a serious musculoskeletal injury, a fracture.

112. Yet he said nothing about JT's injuries in his police report.

113. Both Alers' and McCarthy had a duty to prepare reports and to explain what level of force they used and what injuries, if any, JT had sustained.

114. JT's injuries were not trivial or *de minimis*.

**<u>The impact on JT</u>**

115. Ambulance personnel who transported JT to UMass Memorial Medical Center wrote that during a scuffle the patient began to complain of pain to right humeral area.  They noted "R/arm with slight deformity to proximal humeral head."

116. JT complained to doctors of pain on the right humeral area and right elbow.

117. An emergency x-ray showed a lateral epicondyle avulsion fracture with soft tissue swelling and joint effusion.

118. JT was admitted to a pediatric surgical floor and kept for few days at UMass. During his stay at the hospital, he underwent surgery: for an open reduction/internal fixation of the right medical epicondyle fracture.

119. He was treated until October 2017.

120. JT has an unsightly scar as result of his orthopedic surgery. **<u>Ex. 2.</u>**

121. JT lost time from school as a result of cast he had to wear for a month from his shoulder to his hand.

122. He incurred reasonable medical bills of approximately $23,505.12.

123. Since then, JT developed a number of issues that flowed from this grotesque police encounter.

124. He became a different child.

125.   He suffers from severe depression and anxiety.

126.   JT no longer likes to go to school.

127.   JT doesn't' like to drive in any car because of his fear of being stopped by police.

128.   Before being hurt JT always talked about wanting to be a police officer.

129.   Now he's terrified of police officers.

130.   He has a visible deformity in his right arm and has pain in his right arm.

131.   Mrs. Beshai Torres was injured as well.

132.   Mrs. Beshai Torres suffered from severe depression which manifested itself by lack of sleep, nightmares, panic attacks.

133.   She sustained severe emotional distressed from witnessing the police hurting her son.

134.   JT's detention and his injuries would not have raised any suspicious at all at the WPD had it not been for the fact that Mrs. Beshai Torres previous counsel wrote a letter to the Worcester Police Dept. on January 25, 2018 stating they represented his family.

135.   That's when two officers from the Worcester police Department Bureau of Professional (WPD BOPS) Standards first reached out to Mrs. Beshai Torres and her lawyers.

136.   Mrs. Beshai Torres cooperated with the WPD BOPS, which included Sgt. Avedian and provided a description of what happened to JT, during a recorded interview.

137.   Mrs. Beshai Torres was informed by the BOPS investigators that the incident should have never happened or been handled in the manner it was.

138.   They repeatedly apologized to Mrs. Beshai Torres about the incident.

139.   They asked Mrs. Beshai Torres what, if any, she wanted to happen in the aftermath of the police encounter between the officers and JT.

140.   She told them she wanted officers trained on how to deal with kids who suffered from ASD.

141.   They admitted to her none of their officers were trained on how to handle children or adults with ASD.

142.   They told her that hopefully the WPD could use her son's case to train officers in the future.

143.    No such training has occurred and no such training is contemplated as of present.

144.    Other police departments had policies and procedures on how to deal with children or adults with ASD.

145.    Officer Alers nor McCarthy were ever interviewed by members of the WPD BOPS as part of their investigation.

146.    Neither was admonished, disciplined or retrained.

147.    There were no policy changes effected by the City to correct the harm they caused to JT and his family.

148.    The pep talk given to Mrs. Beshai Torres by WPD BOPS investigators was nothing more than lip service to placate her into thinking something would be done by the City to fix the problem and to prevent future similar incidents from happening in the future.

149.    On or about August 14, 2018 counsel for Mrs. Beshai Torres made a public records request to the City of Worcester.  **Ex. 3**.

150.    The letter was addressed to the City Manager Edward Augustus and to Chief Steve Sargent. It requested any policies and procedures on the handling of autistic persons, copy of the transcript of the interview of Mrs. Beshai Torres or the interviews of percipient witnesses.

151.    The letter alerted City Manager Edward M. Augustus, the hiring and firing authority of the police department and Chief Sargent that as a result of the encounter JT suffered bad injuries, had surgery and to provide public records including but not limited to radio transmissions, interviews, the internal affairs investigation and a letter to Mrs. Beshai notifying her of the outcome of the investigation.

152.    **Ex. 3** is a fair and accurate copy of the City's responsive letter dated on September 6, 2018 response to the Beshai Torres' public records request signed by John Martunas, Records Access Officer.

153.    The September 6, 2018 letter written by Martunas was reviewed and signed with the blessings of City Manager Edward M. Augusts, Jr., who employed him.

154.    The City's denied Beshai Torres access to these records even though it knew none of the information requested was not exempted or privileged under the Massachusetts Public Records law.

155.    The City Manager and Martunas knew that in 2003 the Massachusetts Appeals Court
        ruled in Worcester Telegram & Gazette Corp. v. Chief of Police of Worcester, 58 Mass.
        App. Ct. 1, 8 (2003) that Internal affairs procedures is supposed to foster "the public's
        trust and confidence in the integrity of the police department, its employees, and its
        processes for his investigating complaints because the department has the integrity to
        discipline itself."

156.    The City through its City Manager ignored the core principles enunciated in the
        Worcester Telegram & Gazette case that the purpose of the law was to allow citizens to
        make a "full and fair assessment of a police department's internal investigation of its
        officers actions" and to preserve "… the trust between citizens and police essential to law
        enforcement and protection of constitutional rights."

157.    The City Manager refused to turn over the public records requested because it did not
        want Beshai Torres or the rest of the world to know what police did to JT, or that they
        had not taken corrective actions against Officers Alers and McCarthy.

158.    To add insult to injury, to date, Mrs. Beshai Torres has no idea whether her complaint
        was sustained, not sustained, or whether it followed some other bureaucratic or
        administrative disposition.

159.    On September 18, 2019 Plaintiff's counsel mailed a formal notice and presentment letter
        to the City of Worcester under the Massachusetts Tort Claims Act, M.G.L. c. 258 § 4.
        The letter of notice and presentment consisted of medical records, X-ray images,
        ambulance notes, police reports and photographs of JT's deformed right arm demanded
        relief from the City.  **Ex. 4**.

160.    The letter was mailed to the City Clerk and to City Manager Edward M. Augustus, Jr,
        both who had an opportunity to review it and apprise himself of the situation.  *Id.*

161.    On September 24, 2019, Marie Simone, Claims Agent for the City acknowledged
        receiving the notice regarding her son's claim and advising "…[w]e will commence an
        investigation. When this process is completed, you will be notified of our findings."  See,
        **Ex. 5**.

162.    Under the Massachusetts Torts claim Act, the City of Worcester had up to a six month
        period to evaluate the claim.

163.    No one contacted Mrs. Beshai Torres' counsel to advise them of the City's investigation
        and/or the findings.

164.    So what did City Manager Edward M. Augustus, Jr, or Chief Sargent do once they
        learned their officers handcuffed and broke the right arm of an autistic 10-year old boy
        who was in need of medical attention?  Nothing.

165.   The City and the City Manager's actions demonstrate deliberate indifference to the rights of citizens.

**The City of Worcester policies:**

166.   The City of Worcester and the WPD allowed a policy and custom to exists in the Worcester Police Department that allowed officers including Officers Alers and McCarthy to employ unreasonable force, violate civil rights and to engage in misconduct.

167.   The WPD had a policy and custom of failing to discipline officers who violated the rights of its citizens.

168.   The WPD Bureau of Professional Standards in charge of investigating violations to the policies and procedures of the police department including those of excessive force invariably favored police testimony over civilian testimony.

169.   The BOPS, the Chief of Police and the City Manager largely and often ignored credible allegations and evidence of police misconduct.

170.   The WPD BOPS, its Chief or City Manager, rarely, if ever, affirmed or sustained citizen complaints of unreasonable force by members of the WPD**.**

171.   In the lion share of investigations in which citizens alleged unreasonable force the officers were exceptionally cleared of any wrongdoing.

172.   The investigatory process and practices to investigate citizen complaints is flawed and does not comply with acceptable and professional police practices.

173.   By way of example, the WPD BOPS investigatory policy allowed police officers to submit written statements without participating in any in-person interviews while complainants were subjected to adversarial interrogation by WPD investigators.

174.   The net effect of this policy results in automatically clearing officers of excessive force complaints where complainants would not submit to personal interrogation, even when criminal charges were pending against them.

175.   Acceptable investigatory practices require that all interviews of police officers accused of violations to the WPD policies and procedures should be conducted in person, that they be recorded and transcribed other than for minor procedural violations.

176.   Without in person interviews of officers accused of misconduct the City and police administrators cut-off an important investigatory avenue to get and collect all relevant facts.

177. The policy that allows investigations to proceed without requiring in person interview of officers allowed officers investigated of misconduct to respond in vague or general terms about their use of force.

178. In turn, the lack of face to face interview during internal investigations impeded substantive review of officers' conduct by police administrators.

179. When determining the discipline to be meted against offending officers, Chiefs of Police, present and past, including City Managers, have for the most part consistently given a choice to WPD officers --even those who can be potentially charged with criminal conduct, to quietly retire from the police department, preserve their police pension.

180. City Manager Augustus and all of his predecessors have maintained a hands-off attitude towards the investigations and discipline of officers who use unreasonable force against the City's civilian population.

181. As a result of an informal custom and practice that has existed for decades in the City, with the blessings of the City Manager, the Chief of Police in Worcester is not required to inform or consult City Manager Augustus regarding any unlawful or unconstitutional police conduct unless the Chief intends to suspend a police officer for more than five days.

182. By way of example and not of limitation, under this longstanding "five-day" the City Manager is insulated or oblivious from reports in which officers are alleged to have assaulted citizens but suspended for less than five days.

183. Under this existing custom and practice, the City Manager never hears about any kind of investigation alleging police abuse, no matter how serious, when an officer is not disciplined or when a police officer is exonerated of a misconduct complaint.

184. The City Manager did not conduct any formal written evaluations of either Chief Gemme or Chief Sargent.

185. These policies, custom or practices led police officers including Officers Alers and McCarthy to believe they were the above the law, that they could violate the rights of citizens because they knew they would not be disciplined.

186. Upon information and belief, the City of Worcester permitted an unconstitutional policy, custom and practice that allowed the unreasonable use of force and took no steps to monitor and regulate such unlawful use of force.

187. The City of Worcester failed to adequately train, supervise, control, monitor and discipline officers, including Officers Alers and McCarthy in their use of force to apprehend persons.

188. Upon information and belief, the City of Worcester failed to track use of force or

apprehension against disabled individuals.

189.   The City of Worcester failed to properly train or instruct Officers Alers and McCarthy on acceptable police practices and the proper use of force.

190.   At all times pertinent hereto the City of Worcester observed a policy, custom, and usage of failing to exercise discipline and control over the use of force by its police officers, with deliberate indifference to the rights and well-being of person, including the plaintiff.

191.   The aforesaid policies effectively allowed officers to operate in the field with little supervision and without effective monitoring and at all times pertinent hereto the defendant officer was aware that this was the case.

192.   These policies, customs and practices of the City of Worcester were the moving force behind the violations of JT and his mother's constitutional rights committed by Officers Alers and McCarthy.

**<u>Other recent incidents that have occurred</u>**

193.   Recently a number of lawsuits and events have been captured on phone and in other type of video surveillance systems that have raised serious questions about how Worcester officers frequently use unreasonable force in the field.

194.   On August 1, 2020, Christopher Ayala Melendez sued two police officer and the City of Worcester alleging a Worcester police K-9 Officer without legal justification allowed a police K-9 to bite him and charged the victim with serious criminal charges which included assault on a police officer, resisting arrest on a fictional account of riotous conduct. *Christopher Ayala Melendez v. Officer Shawn G. Tivnan, et al*, Case No. 1:20-cv-11453, Dkt. 1 (D. Mass. Aug. 1, 2020).

195.   Ayala Melendez' criminal defense counsel provided video surveillance of the incident to the Office of the Worcester District Attorney's Office which contradicted Tivnan's report and his false police narrative.

196.   On June 16, 2020, the Office of the Worcester County District Attorney's office filed a motion to dismiss with the Worcester District Court.

197.   The District Attorney's Office moved to dismiss the criminal complaint against Ayala Melendez without prejudice claiming "The Commonwealth makes this request after a review of the currently available evidence in this case, including police reports and video surveillance tapes."

198.   Without the existence of this highly exculpatory video Ayala Melendez faced the possibility of being found guilty and possibly of jail time.

199.   The District Attorney's Officer provided the WPD copies of the video surveillance

recording that cleared Ayala Melendez from any wrongdoing.

200.  Upon information and belief, Officer Tivnan was not disciplined and continues to work in the WPD operations division as a patrol albeit, without his police K-9.

201.  Ayala Melendez case presents a textbook case for why officer body worn cameras are so critical to police accountability in Worcester.

202.  Other recent events in the City of Worcester underscore the need to require the use by WPD of body worn cameras.

203.  By way of example and not limitation, on June 1, 2020 members of the WPD arrested a group bystanders that were observing or filming the interactions between protesters and the WPD in the aftermath of a downtown Black Lives Matter demonstration.

204.  Despite the deployment of police suited in riot gear none of the WPD officers that participated in the operation wore body worn cameras.

205.  The live stream video of one of the individuals shows a Worcester police officer purposely stomping on that person's phone to destroy any evidence from her arrest or the arrest of her boyfriend.  https://www.telegram.com/news/20200627/video-appears-to-show-police-stomping-on-clark-grads-smartphone-after-riot-arrest

206.  Another cell phone video taken by a photojournalist who had the right to film the police contradicted in large part the City of Worcester and police narrative by demonstrating that the WPD escalated their use of force by firing a large volley of so called "less-lethal" weapons.

207.  The photojournalist was arrested and told by the arresting officer he was going to break his "Fucking arms" and called him a "Fucking faggot…".  The arresting officer told him that on his ride to the police station in the police wagon he would have to deal with bunch of angry "Spics" that were going to harm him.

208.  His phone was seized and an important portion of his video surveillance was erased by the police.

209.  A white female who participated in the earlier Black Live Matters protest was beaten by members of the WPD.  She was called a "Nigger lover" by officers that came in contact with her.

210.  Her boyfriend was also beaten, their arrest reports were described with opaque description of the officer's use of force.

211.  Another individual JA was livestreaming inside of a vehicle when a group of officers forcefully extricated him from the inside of a vehicle after uttering words that constitute protected speech.

212. JA phone was confiscated and placed in the pocket of one of the arresting officers who never returned the phone to Worcester police.  The audio from JA phone continues for close to eleven minutes and demonstrates conversations between police officers and other civilians they arrested. https://www.telegram.com/news/20200630/two-arrested-at-june-1-protest-allege-police-improperly-seized-phones

213. The WPD officer who stole JA's phone never returned it as evidence and investigators have not made any efforts to interview any of the officers that came in contact with JA and stole and/or destroyed his phone.

214. More recently a civilian phone video showed what appeared to be a Worcester police officer slapping a man tied up in an ambulance stretcher. https://www.masslive.com/worcester/2020/07/video-showing-what-appears-to-be-worcester-police-officer-slapping-man-in-stretcher-part-of-an-internal-investigation.html

215. An officer body worn camera would have deterred any such conduct on the part of the officer in all if not most of those instances.

216. Despite these shocking revelations the reaction by City of Worcester, its Chief of Police and the City Manager have been astonishing.

217. On July 11, 2020 Chief Sargent gave a statement to the local paper supportive of body cameras claiming they "increase transparency, resolve complaints, de-escalate volatile situations, and improve our training." https://www.telegram.com/news/20200711/why-do-area-police-departments-lack-body-cams-cost

218. Less than nine days later Chief Sargent told another local reporter in a press release that although body worn cameras are an effective tool to document civilian vs. police interactions that increased police transparency he also decried the downside to body cameras. https://www.telegram.com/news/20200721/worcester-pursues-police-body-cameras-and-way-to-pay-for-them

219. Chief Sargent stated in a report to the City "Some officers felt pressure to maintain the demeanor of someone testifying in court."

220. Chief Steven M. Sargent wrote about body cameras "This has the potential to hurt officers' enjoyment of their jobs, and to reduce community engagement."

221. Chief Sargent claimed "Some officers might be less willing to engage in proactive policing when they are afraid that every mistake they make has the potential to subject them to public criticism."

222. Chief Sargent told the press some officers might also be hesitant to use necessary force

because they do not want to be portrayed negatively in the media.

223.   All of these additional deficiencies were also the moving force behind the violation to JT's and his mother's constitutional rights.

## COUNT I
### Excessive Force 42 U.S.C. § 1983
### Officer Alers and McCarthy -Individually

224.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

225.   Officer Alers and McCarthy acting under color of law used unreasonable force against JT depriving him of his clearly established right to be free from the use of unreasonable force under the Fourth Amendment and Fourteenth Amendment to the United States Constitution.

226.   Officer Alers and McCarthy acted jointly and violated JT's constitutional rights.

227.   Alers and McCarthy use of force was egregious, it involved an unarmed child with ASD who was unarmed, and made no threat by word or act to either Alers or McCarthy.

228.   As a direct and proximate result of Defendants' actions, JT suffered damages.

## COUNT II
### Assault & Battery
### Officers Alers and McCarthy

229.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

230.   Officer Alers and McCarthy committed an assault and battery against JT without right, cause or privilege.

231.   The assault and battery occurred while JT was on the ground causing a fairly serious injury.

232.   As a direct and proximate result thereof, JT suffered damages.

## COUNT III
### Conspiracy
### Officers Alers and McCarthy

233.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

234. Defendants Officer Alers and McCarthy conspired to concoct and report a false story regarding the circumstances of the unreasonable amount of force that they used to detain and handcuff JT in an effort to conceal evidence of constitutional violations and thereby violated rights to due process.

235. As a direct and proximate result thereof, JT and his mother suffered damages.

COUNT IV
*Monell*, 42 U.S.C. § 1983
City of Worcester,

236. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

237. The violation of plaintiffs' constitutional rights were caused by the policies and customs of the City of Worcester including its failure to train, supervise, discipline in key areas of law enforcement as described above.

238. As a direct and proximate result thereof, JT and Mrs. Beshai Torres suffered damages.

COUNT V
42 U.S.C. § 12131, 1232 et seq: American with Disabilities Act
City of Worcester

239. Each of the foregoing paragraphs is incorporated by reference.

240. At all times relevant to this complaint, Defendant officers acted within the scope of their employment with the City of Worcester.

241. JT had a history of ASD within the meaning of the ADA.

242. JT and his mother were otherwise qualified to participate and receive the benefits of the City of Worcester services and programs including police services and response to medical emergencies.

243. JT was denied the benefits of Worcester's programs and services by because of or by reason of his disability.

244. Worcester failed to provide a reasonable accommodation for JT's disability when Officers Alers and McCarthy employed unreasonable force, handcuffed, detained or arrested JT without taking into account his condition, ASD.

245. The Defendant officers used unreasonable force, assaulted, handcuffed, detained or arrested JT because of his conduct that was related to his condition/disability, ASD.

246.    Instead of employing unreasonable force Alers and McCarthy should have tried to calm, defuse and contain the situation by using quiet and non-threatening voice or using simple language.

247.    Instead of assaulting and battering JT, Alers and McCarthy should have avoided touching him, allowing him to calm down without intervention or provide JT with extra personal space until medical assistance arrived.

248.    By reason of his disability, JT was excluded from participation in, or denied the benefits of the services, programs or activities the City offered, or was subjected to discrimination by the City of Worcester.

249.    As a direct of the City's actions, plaintiffs' suffered damages described above.

## COUNT VI
## VIOLATION OF THE MASSACHUSETTS PUBLIC RECORDS LAW
## M.G.L. c. 66 § 10

250.    Plaintiffs' reallege and incorporate by reference the allegations above.

251.    Under the Public Records Law, M.G.L. c. 66, § 10, public entities of the Commonwealth and its political subdivisions must "at reasonable times and without unreasonable delay permit inspection or furnish a copy of any public record."

252.    The City of Worcester is subject to the Public Records law.

253.    The Plaintiff made a request for public records from the City as stated above.

254.    No exemption to the Massachusetts Public Records Law permitted or allowed the City to refuse to provide access and copies of the requested records.

255.    The City's failure to provide these records violates the Massachusetts Public Records Law.

## DEMANDS FOR RELIEF

The Plaintiff hereby respectfully requests the following relief:

1.    All compensatory damages recoverable;
2.    Injunctive relief;
3.    All punitive damages recoverable;
4.    All attorney's fees, costs and expenses allowable;
5.    Joint and severally liability as to all defendants;
6.    Strict liability against the owner and handler of the dog for the injuries caused;
7.    All remedies available according to the law of damages for the plaintiff;
8.    Any and all other relief as the Court deems just and proper.

PLAINTIFF DEMANDS A JURY TRIAL AS TO ALL COUNTS IN THE COMPLAINT

Respectfully submitted,
Lindsay Beshai Torres, PPA, JT, Plaintiffs
By his attorneys,

*/s/ Hector E. Pineiro*

_____
Hector E. Pineiro, BBO # 555315
Robert A. Scott BBO # 648740
Law Office of Hector E. Pineiro, P.C.
807 Main Street
Worcester, MA 01610
Tel. (508) 770-0600
hector@pineirolegal.com
robin@pineirolegal.com

DATED: September 8, 2020