1

2

3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CA NO. 20-11453
4:20-CV-40115TSH

4

5

6

7

CHRISTOPHER AYALA-MELENDEZ,
                    Plaintiff,
            vs.
OFFICER SHAWN G. TIVNAN, OFFICER BRETT J. KUBIAK,
the CITY OF WORCESTER, and City Manager
EDWARD M. AUGUSTUS,
                    Defendants.
_____

8

9

10

11

LINDSEY M. BESHAI TORRES PPA OF JT, a minor,
                    Plaintiff,
            vs.
OFFICER JOHN R. ALERS, FORMER POLICE OFFICER PAUL
P. MCCARTHY and the CITY OF WORCESTER,
                    Defendants

12

DEPOSITION of STEVEN SARGENT, called

13

as a witness by and on behalf of the Plaintiff,

14

pursuant to the applicable provisions of the

15

Federal Rules of Civil Procedure, before Linda

16

Dunlop, Certified Shorthand Reporter No. 134193

17

and Notary Public within and for the Commonwealth

18

of Massachusetts, at the offices of Hector E.

19

Pineiro, 807 Main Street, Worcester,

20

Massachusetts, on Monday, January 31, 2022,

21

commencing at 10:06 a.m.

22

23

**BAY STATE REPORTING AGENCY**
**69 BRAEBURN LANE**
**ASHLAND, MA 01721**
**(508) 753-4121**

24

1      **<u>APPEARANCES:</u>**

2


3      <u>FOR THE PLAINTIFF:</u>
       LAW OFFICE OF HECTOR E. PINEIRO, P.C.
4      807 Main Street
       Worcester, Massachusetts 01610
5      (508) 770-0600
       hector@pineirolegal.com
6         BY:  HECTOR E. PINEIRO, ESQ.


7


8      <u>FOR THE DEFENDANTS TIVNAN, KUBIAK, CITY OF</u>
       <u>WORCESTER, AUGUSTUS, MCCARTHY:</u>
       CITY OF WORCESTER LAW DEPARTMENT
9      City Hall, Room 301
       455 Main Street
10     Worcester, Massachusetts 01608
       (508) 799-1161
11     quinnwl@worcesterma.gov
          BY:  WENDY L. QUINN, ESQ.
12             JARED J. MADISON, ESQ.


13


14     <u>FOR THE DEFENDANT ALERS:</u>
       REARDON, JOYCE & AKERSON, P.C.
15     4 Lancaster Terrace
       Worcester, MA 01609
16     (508) 754-7285
       jvigliotti@rja-law.com
17        BY:  JOHN K. VIGLIOTTI, ESQ.

18

19

20

21

22

23

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**I N D E X**


DEPONENT:  STEVEN SARGENT    <u>PAGE</u>


EXAMINATION BY MR. PINEIRO     5

1                        **E X H I B I T S**

2      EXHIBITS           DESCRIPTION              PAGE

3         1         Settlement Agreement            21

4         2         Complaint                       31

5         3         Disclosure Form                 41

6         4         Notice of Hearing               44

7         5         Photographs                     82

8         6         Incident Report                 82

9         7         Criminal Docket                 91

10        8         Incident Card                  144

11        9         Investigation                  157

12       10         Medical Records                183

13       11         Last Chance Agreement          190

14       12         Docket                         190

15       13         BOPS Investigation             196

16       14         Incident Narrative Report      219

17       15         Complaint                      223

18           EXHIBITS RETAINED BY ATTORNEY PINEIRO

19

20

21

22                                     PAGE

23        Certificate of Reporter      242

24

```
 1                    S T I P U L A T I O N S
 2                    It is agreed by and between counsel
 3          for the respective parties that the deponent
 4          shall read and sign the deposition transcript
 5          within thirty (30) days from receipt of
 6          transcript or the deposition will be deemed to
 7          have been signed.  Signature before a notary
 8          public is waived.
 9                    It is further agreed that all
10          objections, except as to form, and motions to
11          strike are reserved for the time of trial.
12                    STEVEN SARGENT, having been
13          satisfactorily identified and duly sworn by the
14          Notary Public, was examined and testified as
15          follows to direct interrogatories
16   BY MR. PINEIRO:
17   Q.    Good morning, Chief.
18   A.    Good morning, sir.
19   Q.    Can you tell us your full name and what is your
20          position in the police department?
21   A.    Steven with a "V," Steven Michael Sargent, Chief
22          of Police in the City of Worcester.
23   Q.    How long have you been a police officer in
24          Worcester since?
```

```
1    A.    1986, April of '86.

2    Q.    A long time.

3    A.    In Worcester.  Right.  I was an MP prior to

4          that.  Forty years of this.

5    Q.    What, the Army?

6    A.    Yes.  Frankfurt, Germany.

7    Q.    How long have you been chief of police?

8    A.    This is my sixth year.  I'll have six in May.

9          Six full in May.

10   Q.    Your predecessor was Chief Gemme?

11   A.    Yeah.

12   Q.    And he served a little longer than you?

13   A.    I think he did 12 years.

14   Q.    Bless him, huh?

15   A.    Yeah.

16   Q.    Being chief of police is probably not an easy

17         position?

18   A.    I would agree with that.

19   Q.    Especially in these times?

20   A.    It has its challenges.

21   Q.    I'm sure it does.  Especially in these times.

22   A.    Agree.

23   Q.    There's been all sorts of changes going on in

24         the policing.
```

```
 1    A.    Uh-huh.

 2    Q.    Changes in the General Laws in Massachusetts;

 3          yes?

 4    A.    Yes.

 5    Q.    How have the changes in the Massachusetts

 6          General Laws impacted your policies and

 7          procedures?

 8                    MS. QUINN:  Objection.

 9    Q.    If any?

10                    THE WITNESS:  I still answer?

11                    MS. QUINN:  Yes.

12    A.    That's in court, I wait for something.  You have

13          to forgive me on that.

14                    So we, you know, there's -- we go

15          through our policies.  We try to mirror -- we do

16          mirror what the state government has made law,

17          deemed law.

18    Q.    Do you know what the POST Commission is?

19    A.    Yes, sir.

20    Q.    For somebody that doesn't know anything about

21          the POST Commission, how would you describe the

22          POST Commission?

23                    MS. QUINN:  Objection.

24    A.    I don't think they know what it is right yet.  I
```

```
 1           think what it is, they can do investigations.

 2           They can investigate officers, so any complaints

 3           that we receive need to be sent to POST.

 4    Q.     They could be sent to POST?

 5    A.     Has to be sent to POST.

 6    Q.     And is there any date when -- does that mean

 7           open complaints or does it mean complaints from

 8           the time that the POST was constituted?

 9    A.     It's right now, it's just since it's been

10           constituted.

11    Q.     How many complaints -- have any complaints been

12           sent from the Bureau of Professional Standards

13           to the POST Commission?

14    A.     I don't have that, sir.

15    Q.     I'm sorry.  You said you have none?

16    A.     I do not have that number.  The Bureau of

17           Professional Standards would have that number.

18    Q.     But they share that information with you from

19           time to time?

20    A.     He does.  The Bureau of Professional Standards

21           certainly does a presentation each quarter,

22           each -- probably have, like, every six months.

23    Q.     When you say that they do a presentation each

24           quarter, does that mean --
```

```
 1    A.    They present to the community and they also
 2          present to us at the command staff.
 3    Q.    So you meet with them four times a year or do
 4          you meet with them with more frequency?
 5    A.    The Bureau of Professional Standards?
 6    Q.    Yes.
 7    A.    We meet quite often.
 8    Q.    What type of things where you and the Bureau of
 9          Professional Standards together?
10                   MS. QUINN:  Objection.
11    A.    Complaints, policy changes, training, numerous
12          meetings.
13    Q.    Can you mention one complaint that has been
14          referred to the POST Commission since that group
15          was put together?
16                   MS. QUINN:  Objection.
17    A.    I don't have the names of the --
18    Q.    Do you know what the circumstances are?
19    A.    I would have to confer with Bureau of
20          Professional Standards.
21    Q.    When you meet with the BOPS, who else meets with
22          them besides you?
23    A.    It could be anybody.  Anybody in the command
24          staff, within that command staff.  It could be
```

```
 1              myself, just myself, but it could be other

 2              members of the Bureau of Professional Standards

 3              other than Captain Davenport.  It could be, like

 4              I said, command staff.

 5     Q.    Last year the city manager talked about some

 6              changes to how investigations were going to be

 7              conducted.  Do you recall that?

 8     A.    Yes.

 9     Q.    Can you tell me, has -- what recommendations did

10              the city manager make and have they been

11              implemented as it relates to his office being --

12              involving investigations?

13     A.    We work with the City's human resource

14              department on our investigations also.

15     Q.    So how does that work?  Can you explain what the

16              mechanisms are?

17     A.    It's the same process for us.  We just -- we

18              have a number of human resources who sits in and

19              they can also, you know, they're involved with

20              the investigation.

21     Q.    And is there one point person at human resources

22              that is involved in investigations?

23     A.    There's been Bill Bagley who is the head of

24              resources now.
```

1    Q.   Beth Bagley?

2    A.   Bill Bagley as he is the head of human resources

3         now.  And I don't know their last names, but

4         there's another attorney who deals -- who works

5         with -- who works with Bureau of Professional

6         Standards and I guess it could be any of the

7         human resource personnel.

8    Q.   So if any complaint is made to the police

9         department today, say on discourtesy and maybe

10        an unreasonable use of force, how is human

11        resources involved in the processing and

12        handling of that complaint?

13   A.   They would be informed of the complaint and we

14        would keep them informed of the status of the

15        complaint and if they thought they should get

16        involved, you know, face to face, then that

17        meeting would occur and they would do interviews

18        if need be.

19   Q.   Have the policies of the Bureau of Professional

20        Standards been updated to reflect the

21        involvement of the human resources department?

22   A.   You would have to be more specific.

23   Q.   Yeah.  I think the last policy that I looked at

24        from the Bureau of Professional Standards dates

1          to February of 2021.  Is there any rule and

2          regulations that talks about the role of the

3          human resources department?

4                  MS. QUINN:  Objection.  Are you

5          talking about rules and regulations or are you

6          talking about policies and procedures?

7                  MR. PINEIRO:  I'm talking about both.

8          Thanks.

9    A.    This is a mandate from the city manager so it's

10         just, you know, it comes from the city manager's

11         office that they'll be working hand to hand with

12         us.

13    Q.    To your knowledge, have they been involved in

14         any -- you have a staff on the Bureau of

15         Professional Standards; right?

16    A.    Yes.

17    Q.    Uh-huh?

18    A.    Yes.

19    Q.    And your staff is primarily sergeants?  Do you

20         have sergeants?

21    A.    Yes.

22    Q.    And are there people that have investigative

23         skills?

24    A.    Yes.

1    Q.    Whom are the sergeants in the Bureau of
2          Professional Standards?
3    A.    Sergeant Cravedi, Sergeant Kevin Pageau,
4          Sergeant Elise Miranda.
5    Q.    What experience does Mr. Cravedi and Elise
6          Miranda have in internal investigations?
7    A.    Well, as far as their training, I would have to
8          look at the -- I don't know the names of the
9          seminars that they've been to, certifications,
10         but Elise just moved in, so I don't know if
11         she's received the training, but they're all,
12         you know, Elise was an investigator for our
13         regular investigatory unit for many years.
14   Q.    What unit did she work in?
15   A.    She worked in the detective bureau.  She worked
16         for what we call crime scene and she also worked
17         in licensing for a short period of time, I
18         believe.
19   Q.    Any lieutenants in the Bureau of Professional
20         Standards?
21   A.    Not right now, no.
22   Q.    So would I be correct that about four sergeants
23         in the Bureau of Professional Standards right
24         now?

```
1    A.   Yes.  I'm sorry.  Sergeant George also.

2    Q.   So five sergeants?

3    A.   Four sergeants.

4    Q.   And then Captain Davenport?

5    A.   Yes.

6    Q.   Before you sign today, given the involvement of

7         the city manager, before you sign an

8         investigation agreeing with the reasoning and

9         logic of the investigation, does the city

10        manager get to see the investigation?

11   A.   He certainly is allowed and he certainly is

12        involved if need be.  He's informed by both

13        human resources and the police department to his

14        office to certain investigations, but most of

15        the investigations unless it's, you know,

16        there's all that intake.

17   Q.   If you suspect that an officer -- if you

18        recommend a suspension of an officer for less

19        than five days, is the city manager involved in

20        any way, shape or form since he announced the

21        changes?

22   A.   Yes.  We still -- I still run it by him and

23        human resources, yes.  We still discuss it.

24   Q.   What cases have you discussed with the city
```

| | | |
|---|---|---|
| 1 | | manager since he announced those changes? |
| 2 | A. | Well, since he announced the changes? |
| 3 | Q. | Yes. |
| 4 | A. | So I'm not sure if the Tivnan case was before or |
| 5 | | after the changes, the material case.  Like I |
| 6 | | said, I would have to -- there's a list that I |
| 7 | | could speak that the Bureau of Professional |
| 8 | | Standards would have as far as the officers that |
| 9 | | have been investigated and work with the city |
| 10 | | manager and human resources on. |
| 11 | Q. | So besides the Tivnan case, which other cases |
| 12 | | that the city manager or the office of human |
| 13 | | resources have been involved in? |
| 14 | A. | The Delasantos case. |
| 15 | Q. | What -- |
| 16 | A. | Rodriguez. |
| 17 | Q. | I'm sorry.  What is the Delasantos case? |
| 18 | A. | They were in the emergency room.  They had to go |
| 19 | | to the emergency room. |
| 20 | Q. | Okay.  And these are two -- is it Delasantos or |
| 21 | | is it the D'Aquila? |
| 22 | A. | D'Aquila.  I'm sorry. |
| 23 | Q. | Why was he in the emergency room? |
| 24 | | MS. QUINN:  Objection.  I'm going to |

```
 1            instruct you not to answer.  That being, you're

 2            requesting medical information.

 3     Q.    Is the E'Aquila a police officer today?

 4     A.    Yes, he is.

 5     Q.    And is he on any type of restricted status?

 6     A.    At this time, yes.

 7     Q.    And what is the nature of his restricted status?

 8     A.    He's on administrative leave.

 9     Q.    And for how long has he been on administrative

10            leave?

11     A.    Since six months, give or take.  I'm not sure

12            100 percent of the date, but since the incident

13            that he went to the emergency room.

14     Q.    And what was he -- so I take it there's an

15            administrative investigation at the police

16            department right now?

17     A.    It's complete.

18     Q.    And when did you complete that investigation?

19     A.    Probably a month ago, give or take.

20     Q.    Was the city manager involved in that

21            investigation?

22     A.    Yes, he was.  His office was involved.

23     Q.    How was his office involved?

24     A.    Determining -- he's the appointing authority so,
```

```
 1          you know, the decisions made on discipline, he
 2          was a part of.
 3     Q.   Got it.  What decision did he make on
 4          discipline?
 5     A.   He -- one of the officers was terminated.  The
 6          other was still -- we're still working on what
 7          the discipline would be.
 8     Q.   What findings -- let's start with the D'Aquila.
 9          What findings did your office make as it relates
10          to the D'Aquila?
11     A.   I don't have the exact language in front of me.
12     Q.   What was the nature of the complaint?
13     A.   Conduct unbecoming.
14     Q.   And the conduct unbecoming was because of what?
15               MS. QUINN:  I'm going to instruct you
16          not to answer to the extent that it reveals any
17          privileged protected information.
18               MR. PINEIRO:  I reserve my right.
19     Q.   Besides conduct unbecoming, what else was he
20          charged with?  Was he charged with criminal
21          conduct?
22     A.   No.
23     Q.   Why was he not charged with criminal conduct?
24     A.   It was not -- it was not considered a crime.
```

```
 1     Q.    Did he participate in the investigation?  Was

 2           there an investigation conducted by the Bureau

 3           of Professional Standards?

 4     A.    Yes.

 5     Q.    Was he interviewed?

 6     A.    And human resources.

 7     Q.    Was he interviewed?

 8     A.    Yes, he was.

 9     Q.    And did you review the interview that he gave?

10     A.    Yes.

11     Q.    Did you -- what other matters did you sustain as

12           it relates to the D'Aquila and Officer -- is it

13           Oliveira?

14     A.    Rodrigo Oliveira.

15     Q.    Rodrigo Oliveira?

16     A.    Yes.

17     Q.    Were they together when this violation occurred?

18     A.    Yes.

19     Q.    Were they at Oliveira's house when this

20           violation occurred?

21     A.    Yes.

22     Q.    Did your office, as part of the investigation,

23           review multiple complaints that neighbors have

24           made to the police department regarding
```

```
 1         activities at Mr. Oliveira's house?
 2    A.   Yes.
 3    Q.   How many calls do you recall were made to the
 4         Oliveira house?
 5    A.   I don't have that information.
 6    Q.   Got it.  Why was -- was Mr. Oliveira terminated?
 7    A.   Yes.
 8    Q.   Did he grieve the issue or has he grieved the
 9         issue?
10    A.   I have not heard of any grievance.
11    Q.   Why was he terminated?  What were the grounds
12         for the termination?
13    A.   There was conduct unbecoming, progressive
14         discipline mainly and he was actually on the
15         Last Chance Agreement also.
16    Q.   Oliveira was in a Last Chance Agreement because
17         of what?
18    A.   There was an incident on Lincoln Street.
19    Q.   When you say on Lincoln Street, at Community
20         Health Link?
21    A.   Yes.
22    Q.   Did that case involve a juvenile?
23    A.   I believe it was, yes.
24    Q.   Did that case involve a juvenile that was being
```

| | | |
|---|---|---|
| 1 | | Section 12? |
| 2 | A. | Yes. |
| 3 | Q. | So did it involve a juvenile that had mental |
| 4 | | health problems? |
| 5 | A. | Yes. |
| 6 | Q. | Did you -- and you were the chief of police when |
| 7 | | that matter came up to head? |
| 8 | A. | No. |
| 9 | Q. | Was that under Chief Gemme? |
| 10 | A. | Yes. |
| 11 | Q. | Was he given a Last Chance Agreement? |
| 12 | A. | Yes. |
| 13 | | THE WITNESS:  Do you have a water? |
| 14 | | MR. PINEIRO:  I do. |
| 15 | | (Short recess.) |
| 16 | Q. | So I think you indicated that Chief Gemme was |
| 17 | | the chief of police when the Oliveira incident |
| 18 | | took place? |
| 19 | A. | Yes. |
| 20 | Q. | Looking through one of the Bureau of |
| 21 | | Professional Standards, it said that the |
| 22 | | incident occurred on July 15, 2015 and the |
| 23 | | investigation seems to have concluded around |
| 24 | | January of 2016.  Does that sound right to you? |

```
 1    A.    It's possible, yes.

 2    Q.    When did you become chief?

 3    A.    May of '16.

 4    Q.    Do you remember what was the discipline that was

 5          issued to Oliveira?

 6    A.    I do not.  Suspension, I believe.

 7                    MR. PINEIRO:  I thought I had made

 8          three copies.  Let me circulate it around real

 9          quick and I can run and make a copy, but I'm

10          going to -- probably easiest for me to run and

11          copy it.

12                    I'm going to mark this.

13                    (Settlement Agreement marked

14                    Exhibit No. 1.)

15    Q.    What is a Last Chance Agreement?

16    A.    A document that is agreed upon between the

17          officer and the administration to use it to save

18          their job.

19    Q.    So a Last Chance Agreement is some type of

20          contract or agreement when an officer has

21          violated rules and regulations of the

22          department?

23                    MS. QUINN:  Objection.

24    A.    Yes.  It's an agreed upon ending to whatever the
```

```
 1           situation is.
 2   Q.   Are they -- what are the advantages of Last
 3           Chance Agreements and the disadvantages?
 4                   MR. VIGLIOTTI:  Objection.
 5                   MS. QUINN:  Objection.
 6   Q.   Can you tell us what the advantages of the Last
 7           Chance Agreement are?
 8                   MR. VIGLIOTTI:  Objection.
 9                   MS. QUINN:  Objection.
10   A.   It keeps the young person -- if they have
11           redeeming qualities, it keeps them on the job.
12           It also holds them accountable.
13   Q.   How many Last Chance Agreements have you been
14           involved in?
15   A.   I think it's only the one.
16   Q.   And who would that person be?
17   A.   Escobar case.  As far as chief?
18   Q.   Yes.
19   A.   Yes.  Escobar case.
20   Q.   What was the Escobar case all about?
21   A.   He was arrested for OUI.
22   Q.   What was he doing that he got arrested for OUI?
23   A.   He was on private property down at the railroad
24           tracks and drove his vehicle over the tracks.
```

```
1    Q.   Was he by himself?

2    A.   No.

3    Q.   Who was he with?

4    A.   I do not know.

5    Q.   And what did he do with -- with the train

6         property?

7    A.   Yes.  The railroad.

8    Q.   What did he do?

9    A.   That's it.  He drove his truck onto the property

10        and then onto the train tracks.

11   Q.   And did you ever learn why he did that?

12   A.   He was just -- -- I have no idea.  To trespass.

13   Q.   Was he drunk?

14   A.   He was arrested for OUI.

15   Q.   He was arrested by Worcester officers for OUI?

16   A.   Yes.

17   Q.   Who was the officer that arrested him?

18   A.   Lieutenant Early.

19   Q.   Matt Early?

20   A.   Yes.

21   Q.   And was Matt Early the supervisor of Escobar?

22   A.   I don't believe so.  I don't know what shift

23        Escobar was on at the time.

24   Q.   Did you ever look at his booking tape?
```

```
 1    A.    I don't recall.

 2    Q.    Presumably, I believe Internal Affairs would

 3          have looked at the booking tape to see if he

 4          appeared sober or impaired?

 5                    MR. VIGLIOTTI:  Objection.

 6                    MS. QUINN:  Objection.

 7    A.    Yes.

 8    Q.    Was a field sobriety test done on him by

 9          Lieutenant Early?

10    A.    No.

11    Q.    Was there any reason why a field sobriety test

12          wasn't done by a supervisor?

13                    MS. QUINN:  Objection.

14    Q.    Was he trying to help him out?

15                    MS. QUINN:  Objection.

16    A.    The weather conditions.  He was unstable on his

17          feet.

18    Q.    Was he brought to the station and given an

19          opportunity to do a field sobriety test?

20    A.    Yes.

21    Q.    Did he do the field sobriety test?

22    A.    I don't believe so.

23    Q.    Did he refuse or was he incapable of doing it?

24                    MS. QUINN:  Objection.
```

```
 1    A.    I don't recall.

 2    Q.    So Escobar was a person that was given a Last

 3          Chance Agreement?

 4    A.    Yes.

 5    Q.    You said that Last Chance Agreements are given

 6          sometimes when officers have redeeming

 7          qualities?

 8    A.    Uh-huh.

 9    Q.    Yes?

10    A.    Yes.

11    Q.    What redeeming quality did Escobar have?

12    A.    He was a young police officer.  He did a good

13          job when he was on the street.  He made a

14          mistake.

15    Q.    And the mistake was that he drove drunk?

16                   MS. QUINN:  Objection.

17    A.    Well, I don't believe he was convicted.  I don't

18          know what the outcome was.  I'm thinking of the

19          criminal investigation.

20    Q.    Was he charged with criminal conduct as part of

21          administration?

22    A.    Criminal conduct?

23    Q.    Yes.

24    A.    Not administratively, no.
```

```
 1    Q.   One of the -- administratively if an officer
 2         uses unreasonable force that rises to the level
 3         of criminal, he can be charged with criminal
 4         conduct, can they not?
 5    A.   Rephrase.
 6    Q.   In other words, I'll give you an example.  If
 7         you see an officer hitting a handcuffed
 8         prisoner, can you charge him with criminal
 9         conduct as part of administratively?
10    A.   We can charge him with a crime, yes.
11    Q.   Do you know if he took the Breathalyzer?
12    A.   I do not recall.
13    Q.   People are not required to take a Breathalyzer;
14         right?
15    A.   Correct.
16    Q.   Can you take a look at that document?  So
17         normally do chiefs of police sign the Last
18         Chance Agreement?
19    A.   I believe the city manager signs it.
20    Q.   But you don't sign them at all?
21    A.   We read them.  There's a possibility I sign it.
22         It's not the agreement.  The agreement is with
23         the union and the appointing authority.
24    Q.   And the appointing authority is the city
```

1       manager?

2   A.  Yes.

3   Q.  Got it.  So this one here was executed around

4       June 10, 2016?

5   A.  According to this.

6   Q.  Yes.  This is the Oliveira?

7   A.  Yes.

8   Q.  By that time, you were chief of police?

9   A.  When was it signed?

10  Q.  Second page, it seems to be June.

11  A.  June 13th.

12  Q.  June 13th, the city manager and June 10th, Mr.

13      Oliveira?

14  A.  Uh-huh.  Yes.

15  Q.  And Paragraph 2, he accepted what, 40 work day

16      suspension without pay; is that right?

17  A.  Yes.

18  Q.  After the second page there's a settlement

19      agreement/last chance.  This is what he was

20      charged with; right?  Discourtesy, conduct

21      unbecoming an employee?

22              MS. QUINN:  What page are you

23      referring to?

24              MR. PINEIRO:  Page 3.

```
 1                    MS. QUINN:  Page 3 of Exhibit 1.
 2      A.   No.  This is the last chance.  This isn't the --
 3           this is the -- this is the Last Chance
 4           Agreement.
 5      Q.   So there seems to be two documents.  One is
 6           Amendment/Change to Settlement Agreement.  It's
 7           a two-page document signed by the city manager
 8           on June 13th; right?
 9      A.   Let's see.  According to this, yeah.
10      Q.   And then there's a fourth page document called
11           Settlement Agreement/Last Chance Agreement and
12           Release and it's four pages and it was signed by
13           the city manager on May 23rd, 2016?
14      A.   I'm checking.
15      Q.   Sure.  Yes?
16      A.   Yes.  It's dated May, yep.
17      Q.   Right.  If you go to the second page of that
18           document, it states that this was a ten-year --
19           Paragraph 6, it's a ten-year Last Chance
20           Agreement?
21      A.   Yes.
22      Q.   And he was charged with the violations to the
23           rules and regulations involve lying; right?
24                    MS. QUINN:  Objection.
```

1    A.    This is -- this is not the -- these are just any

2          violation of the following department rules and

3          regulations.  This isn't necessarily what he was

4          found responsible for.

5    Q.    I understand.  So he was warned if there were

6          any problems with truthfulness, unnecessary

7          force, Worcester Police Policy and Procedure on

8          Use of Force, he could be let go; right?

9    A.    Yes.

10                   MS. QUINN:  Objection.

11   Q.    And then in Paragraph 7, if he engaged in any

12         type of discourtesy or conduct unbecoming, that

13         part of the agreement would last for about two

14         and a half years?

15                   MS. QUINN:  Objection.

16   Q.    Yes?

17   A.    Yes.

18   Q.    Do you know what is it that he did to -- how old

19         was the boy that he came in contact with?

20                   MS. QUINN:  Objection.

21   A.    He's a juvenile.

22   Q.    And what is it that he did?

23                   MS. QUINN:  Objection.  Who?

24                   MR. PINEIRO:  Oliveira.

```
 1    A.    He was -- he had hit the young individual.

 2    Q.    And was that individual handcuffed when Oliveira

 3          hit him?

 4    A.    I know he was on a gurney and he was -- I

 5          believe he was handcuffed.  He was definitely

 6          restrained.

 7    Q.    And did he punch or slap him?

 8    A.    I believe it was a diversion.  It was, you know,

 9          open hand.

10    Q.    Did the police department consider that action

11          appropriate?

12    A.    No.

13    Q.    Did the department consider that action an

14          unreasonable use of force?

15    A.    Yes.

16    Q.    Did -- when Oliveira was -- that was a civilian

17          complaint.  Somebody, a civilian, complained

18          about Oliveira's conduct that day and your

19          police department investigated it?

20    A.    I don't know who actually filed a complaint, but

21          it was investigated, yes.

22    Q.    And were you deputy chief when the Oliveira

23          matter came to head?

24    A.    Yes.
```

1    Q.   And were you involved in the investigation of

2         Oliveira, reviewing the reports in Oliveira?

3    A.   No.

4    Q.   Were you discussing the case of Oliveira with

5         Chief Gemme?

6    A.   Yes.

7    Q.   And what do you recall about your discussions

8         with Chief Gemme then?

9    A.   I don't recall.

10   Q.   When Oliveira was investigated, was he with

11        another police officer?

12   A.   I don't recall.

13                  MR. PINEIRO:  We can mark that.

14                  (Complaint marked

15                   Exhibit No. 2.)

16                  MS. QUINN:  Is there a question?

17                  MR. PINEIRO:  Yes.

18                  THE WITNESS:  I don't touch anything

19        that is not mine.

20                  MR. PINEIRO:  That's okay.

21   Q.   If you can take a look at the front page and the

22        signature page by the chief?

23   A.   Uh-huh.

24   Q.   If you go to Page 21, do you see your signature

```
 1            there?
 2   A.   Yes.
 3   Q.   And your signature appears when?  What date does
 4        your signature appear?
 5   A.   January 14th.
 6   Q.   2016?
 7   A.   Uh-huh.
 8   Q.   Maybe four or five month before you became
 9        chief?
10   A.   Yes.
11   Q.   Do you remember if Officer Marcotte was the
12        other officer who was involved?
13   A.   I do not recall.
14   Q.   Let's see if you can take a look at --
15   A.   It says --
16   Q.   There was a report.  Who is Sergeant David
17        Doherty?
18   A.   He's a member of the Worcester Police
19        Department.
20   Q.   If you go to Page 9.  Do you see Paragraph 2,
21        The following is the BOPS report submitted by
22        Sergeant David Doherty relative to this
23        incident?
24   A.   Uh-huh.
```

```
 1                    MS. QUINN:  Yes?

 2    A.   Yes.

 3    Q.   When you go to page -- in response to -- he was

 4         asked to respond to a series of questions by the

 5         Bureau of Professional Standards?

 6    A.   Yes.

 7    Q.   Describe in detail the specific conversation

 8         that you had with Officer Marcotte about this

 9         incident; correct?

10    A.   Where is that?

11    Q.   Right here.  Page 9.  Question 2.

12    A.   Okay.  Yes.

13    Q.   And then if you go to Page 10, second paragraph,

14         let me see if I read this correctly.

15                    Officer Marcotte went on to say that

16         he was concerned because this male was in

17         handcuffs at the time and it did not look good

18         to the present staff.  Officer Marcotte advised

19         me that the staff was upset over the force used

20         by Officer Oliveira and he wanted to make me

21         aware of this in case someone from the staff

22         came to the station to file a complaint.  I then

23         explained to Officer Marcotte that, based on his

24         account of the incident, I felt that the force
```

```
 1            used by Officer Oliveira was a justified
 2            response to the assault and battery committed
 3            against him.
 4                      Do you see that?
 5     A.     Uh-huh.  Yes.
 6     Q.     If an officer hits another individual who is
 7            handcuffed, does that other officer -- the
 8            officer that doesn't use force, does he have an
 9            obligation to report that in writing to the
10            police department that his partner used
11            excessive force?
12                      MS. QUINN:  Objection.
13     A.     He has an obligation to report it.
14     Q.     Do you know in this case if Officer Marcotte
15            reported the incident?
16     A.     Yes, he did.
17     Q.     He reported it to the supervisor?
18     A.     Yes.
19     Q.     Did he put anything in writing?
20     A.     I don't recall.
21     Q.     Do you know if in this instance, Oliveira
22            admitted punching or slapping whoever this boy
23            was, this 15-year old boy was?
24     A.     I don't recall.
```

```
 1    Q.    Do you know if the boy had any physical
 2          injuries?
 3    A.    I don't recall.
 4    Q.    Page 18 where it says, Medical/Dental Treatment
 5          Records of blank.  Do you see that at the very
 6          bottom?  Do you see where it says, Blank claims
 7          his tooth was chipped from the force of the
 8          punch.  Blank reports that this required his
 9          dentist to file the chipped left front tooth.
10                    Do you see that?
11    A.    Yes.  I see that.
12    Q.    And then there's a summary of the investigation
13          on Page 19 and 20.
14    A.    Is that a question?
15    Q.    There's a summary of the investigation between
16          Pages 19 and 20.
17    A.    That's a statement.  Do you want me -- are you
18          asking me?
19    Q.    Yes.
20    A.    Yes.
21    Q.    Do you know if Oliveira initially reported
22          striking this boy in the face?
23    A.    I don't recall.
24    Q.    Do you see where in the upper part of Page 20,
```

1     do I read this correctly, Officer Oliveira

2     adamantly denies punching blank.  He admits that

3     he made contact with blank's face but says that

4     he, quote, reactively pushed blank's face away

5     using my left hand with minimum force necessary

6     to prevent a further assault.  I did not close

7     my fist, but used an open palm maneuver.

8            Did I read that right?

9  A.   Yes.  Yes.

10  Q.   The last paragraph, shortly after this incident

11     according to investigator Pageau or Sergeant

12     Pageau, Oliveira requested a criminal complaint

13     issued against the juvenile for assault and

14     battery on a police officer with a dangerous

15     weapon.

16  A.   Yes.

17  Q.   And on July 29th, at the behest of Chief Gemme,

18     the District Attorney prosecuting the charges

19     asked that the Court dismiss the charges.  They

20     were dismissed?

21  A.   Yes.

22  Q.   Did I read that right?

23  A.   Yes, you did.

24  Q.   Do you remember why -- did you ever speak with

```
 1              the chief why he decided to call the prosecutor

 2              to dismiss the charges?

 3     A.   I do not know.

 4     Q.   Did he ever say to you that he didn't believe

 5              what -- that the criminal charges were proper in

 6              this case?

 7     A.   I don't remember the discussion that we had.

 8     Q.   Here the former commanding officer of the Bureau

 9              of Professional Standards agreed with the

10              sufficiency and logic of the investigation and

11              so did you?

12     A.   Yes.  I reviewed -- yes.  And agreed.

13     Q.   And then there's a section on Page 22 where the

14              chief reviewed the file.  He was charged with

15              conduct unbecoming an officer or employee of the

16              department; yes?

17     A.   I'm reading.  Yes.

18     Q.   The chief alleged is the second paragraph right

19              here, That Officer Oliveira violated this

20              regulation by failing to tell the truth about

21              the incident.  That Officer Oliveira violated

22              this regulation because he was untruthful to Dr.

23              Blank, Director of the BFC, when Dr. Blank

24              confronted him about punching blank.  He
```

```
 1            defended his contact with blank as his right to

 2            defend himself and also told her that he would

 3            not be pressing charges against blank.  The next

 4            day he filed criminal charges against blank.

 5                      Did I read that right?

 6   A.   Yes.

 7   Q.   And so that was sustained?

 8   A.   Yes.

 9   Q.   And then there's another charge on Page 22

10            through 23 that was sustained having to do with

11            unnecessary use of force and violation of the

12            use of force policy of the department; yes?

13   A.   Yes.

14   Q.   On top of Page 23, That Officer Oliveira used

15            excessive force when he punched blank in the

16            side of the face in reaction to blank spitting

17            on him.

18                      And that was sustained?

19   A.   Yes.

20   Q.   Were there ever -- and No. 4, he was also -- a

21            complaint was also sustained on truthfulness

22            grounds; right?

23   A.   Yes.

24   Q.   Oliver didn't tell the truth about the incident,
```

```
 1            including denying that he punched blank; yes?
 2    A.    That was sustained, yes.
 3    Q.    Your department could have charged Oliveira
 4          criminally if they wanted for assaulting a
 5          person that was handcuffed?
 6    A.    Yes.
 7    Q.    Why did that not happen, if you know?
 8                    MS. QUINN:   Objection.
 9    A.    I was not part of the investigation, so -- I
10          reviewed, but I was not part of the
11          investigation.
12    Q.    But at that point in time you were deputy chief.
13          Of what units were you deputy chief?
14    A.    Operations, patrol.
15    Q.    Operations and so he fell under your purview?
16    A.    Yes.
17    Q.    He was your subordinate?
18    A.    Yes.
19    Q.    Is that something that you discussed with him?
20          Do you have a memory of talking about that to
21          Chief Gemme?
22    A.    I do not recall any conversations we had about
23          this case.
24    Q.    What other Last Chance Agreements have resulted
```

```
 1        in termination?
 2                   MS. QUINN:  Objection.
 3   A.   I'd have to go back and check the file.
 4   Q.   And the D'Aquila, have you made any verbal
 5        recommendations to the chief as to how much time
 6        you want for the suspension?
 7   A.   To the chief?
 8   Q.   I'm sorry.  To the city manager.
 9   A.   We've had that conversation, yes.
10   Q.   What have you discussed with him?
11   A.   Being consistent with other similar cases,
12        40-day suspension.
13   Q.   Is that something that the city manager wanted
14        or is that something that you wanted?
15                   MS. QUINN:  Objection.
16   A.   I don't know about wanting.  It's just that it
17        was appropriate.
18   Q.   Did you initiate that recommendation to the city
19        manager or is that something that he suggested
20        to you?
21   A.   It's still in discussion with the human
22        resources department and his office, yes.
23   Q.   Has this Officer D'Aquila been asked to do any
24        kind of counseling during the period that he's
```

1        been out of work?

2                    MS. QUINN:  Objection.  To the extent

3        that he reveal information or treatments, I

4        instruct you not to answer.

5                    MR. PINEIRO:  Let me reserve.

6    Q.  Has he been sent to do a fitness for duty test?

7    A.  Not at this time.

8    Q.  Not at this time.  Do you anticipate that a

9        fitness for duty would be ordered for D'Aquila?

10   A.  Yes.

11   Q.  On what grounds of fitness for duty exam would

12       be ordered under D'Aquila?

13                   MS. QUINN:  Objection to the extent

14       that you reveal medical or protected

15       information, I instruct you not to answer.

16                   MR. PINEIRO:  Let me reserve.

17   Q.  I want to shift gears and talk a little bit

18       about the Tivnan Case.

19                   MR. PINEIRO:  Mark this as the next

20       exhibit.

21                   (Disclosure Form marked

22                    Exhibit No. 3.)

23   A.  Let me show you a document that Attorney

24       Hennessy who is a part of this case got in

```
 1            another case called Commonwealth versus Roberto

 2            Zayas, a pending criminal matter.

 3                      MS. QUINN:  Marking this as Exhibit

 4            3?

 5                      MR. PINEIRO:  Yes.

 6    Q.    And what I want to show you is a Witness Conduct

 7          Disclosure Form that appears to have your

 8          signature dated or received by the District

 9          Attorney's office on October 12th or 2021.  Do

10          you see that?

11    A.    I do.

12    Q.    Can you tell us what a Witness Conduct

13          Disclosure Form is?

14    A.    It's the -- sent from Joe Early's office, the

15          District Attorney's office.

16    Q.    This comes from Litigation Integrity Division?

17    A.    I don't know what division it is.  I know it

18          comes from his office.

19    Q.    When you first got this paper, did you share

20          this paper with the city manager?

21    A.    I believe human resources.

22    Q.    Who did you speak with?

23    A.    I did not speak to anybody.  BOPS brought this

24          to me.
```

```
 1    Q.    Who brought it to you, Captain Davenport?

 2    A.    Yes.

 3    Q.    Did you sit and discuss how to fill out this

 4          form?

 5    A.    It was just check a box.

 6    Q.    What did you check off in connection with Shawn

 7          Tivnan's Witness Conduct Disclosure Form?

 8    A.    Lied about a defendant's conduct and thereby

 9          allowed a false or inflated criminal charge to

10          be prosecuted.

11    Q.    And this bears your signature?

12    A.    Yes, it does.

13    Q.    And you feel comfortable about having checked

14          that box?

15                    MS. QUINN:  Objection.

16    A.    Meaning?

17    Q.    Did you sign this form?

18    A.    Yes.

19    Q.    This category without any reservation?

20    A.    Comfortable is not -- it's not something that we

21          like to do.  It's something that is accurate.

22    Q.    I just wanted to find out if you signed it

23          without any reservations?

24    A.    No reservations.
```

```
1    Q.   And is this something that you discussed with

2         the city manager before you signed it?

3    A.   I did not.  I did not consult the city manager.

4    Q.   The city manager, I show you the next exhibit?

5                   MR. PINEIRO:  Let's mark this.

6                   (Notice of Hearing marked

7                   Exhibit No. 4.)

8    Q.   Have you seen Exhibit No. 4, Chief?

9    A.   This particular -- no.  This doesn't look

10        familiar to me.

11   Q.   Do you see --

12   A.   I see it.

13   Q.   You've seen it?

14   A.   I'd read it, yes.

15   Q.   Before today?

16   A.   Hold on a second.

17   Q.   Take your time.

18   A.   I've read numerous documents similar, so I'm not

19        sure if this is the document, no.

20             I've read numerous documents about

21        this case, so the -- I don't remember receiving

22        this particular -- this particular document from

23        the city manager.

24   Q.   Can you go to the last page?
```

```
1    A.    Uh-huh.

2    Q.    Do you know who signed that document?

3    A.    No.

4    Q.    The letter where -- the previous last bears a

5          signature of the city manager; yes?

6    A.    Yes.

7    Q.    Do you know if this would be Mr. Tivnan's

8          signature?

9    A.    I do not know.

10   Q.    And in the first paragraph, the city manager

11         writes to Mr. Tivnan, According to the

12         provisions of the general laws.  He's giving him

13         notice of a hearing to determine whether there

14         is just cause to suspend you from your position

15         for a period of up to and including 40 work days

16         based on the allegations set forth below.

17                   Do you see that?

18   A.    Uh-huh.

19   Q.    Yes?

20   A.    Yes, sir.

21   Q.    And have you -- did you ever recommend in

22         discussions with the city manager that the

23         suspension or that the penalty against Tivnan

24         should be less than 40 days?
```

```
 1   A.   That, I don't recall.  We had numerous

 2        conversations about time and what is

 3        appropriate.  I don't know what -- I don't

 4        remember what my recommendation was, you know.

 5        We discussed it and this is what we came up

 6        with.

 7   Q.   Got it.  How did you come up with this number,

 8        40 days?

 9   A.   It was just trying to be consistent.  It was

10        similar to similar cases.

11   Q.   Did you -- I mean, there's an investigation on

12        this case; yes?

13   A.   Yes.

14   Q.   And the investigation was concluded around

15        August of 2020?

16   A.   I don't know the exact date.

17   Q.   I'll show it to you in a minute.  But do you

18        recall if the findings of the investigation were

19        amended?

20   A.   The finding?

21   Q.   Yes.  The conclusions by the Bureau of

22        Professional Standards?

23              MS. QUINN:  Objection.

24   A.   I don't recall.
```

```
1    Q.   Let me see if we can go through this letter

2         here.  You see at the bottom it says, With

3         regard to the October 26th in which you were

4         involved, you reported as follows.

5                   Can you take a look at that?

6    A.   Uh-huh.

7    Q.   It goes from page --

8    A.   Yes.

9    Q.   Page 2 all the way into -- Page 1 to 2.  Do you

10        see that?

11   A.   Uh-huh.  Yes.

12   Q.   Let me read you what the city manager --

13   A.   Do you want to read it?  Are you going to read

14        it?

15   Q.   I'll read it and you let me know if I read it

16        correctly.  The last paragraph of Page 2.  In

17        your report, you assert that -- asserted that

18        during the incident on October 26th, 2019,

19        Mr. Ayala-Melendez pushed past officers.

20        However, the video does not depict

21        Mr. Ayala-Melendez pushing past officers.  Mr.

22        Ayala-Melendez can be seen approaching from

23        Portland Street with a female with his left hand

24        in his pocket.  As he's approaching, PO Michael
```

1        Sullivan steps forward towards Franklin Street,

2    in turn, creating a lane of travel behind the

3    officers.  Other patrons can be seen walking in

4    this area.  There is no longer a perimeter that

5    was created by officers and the wall of the

6    building.  Mr. Ayala-Melendez continued on

7    course to a location a couple feet behind you

8    and directly in front of PO Edwin Guzman.  Mr.

9    Ayala-Melendez can be seen pointing with his

10   right hand in the direction that he was walking.

11   And at that moment, you are shown grasping Mr.

12   Melendez -- Ayala-Melendez's left arm, with his

13   hand still in his pocket, and pulling him across

14   in front of your body.  With regard to this

15   interaction, you reported the following:

16            I gave him a lawful order to leave

17   the area and he refused.  I was able to gain

18   control of his upper right arm with my right

19   hand to stop him from interfering with officers

20   attempting to restore order.  I then attempted

21   to escort Ayala-Melendez away from the affray.

22   Ayala-Melendez broke free from my grasp and came

23   towards me and K-9 Mattis aggressively and

24   assaulted me by pushing me with his hands on my

1    right shoulder.

2              It cannot be seen in the video when

3    Mr. Alaya-Melendez broke free from your grasp

4    until after K-9 Mattis bit him.  What can be

5    seen in your -- is you pulling him across your

6    body and then pushing him towards Franklin

7    Street?

8              As you further reported in your

9    intradepartmental correspondence:

10             Christopher Ayala resisted my efforts

11   by countering my push and broke free from my

12   grasp, and positive control.  Christopher

13   Ayala-Melendez then came back towards me.

14   Christopher Ayala-Melendez counter to my push

15   and him coming back towards me is what I

16   perceived to be assaultive.

17             Then there's a response by the city

18   manager, It is clear from reviewing the video

19   that your reporting of your interaction with

20   Mr. Ayala-Melendez is not accurate.  Once you

21   pushed Mr. Ayala-Melendez toward Franklin

22   Street, K-9 Mattis engaged Mr. Ayala-Melendez by

23   biting his lower back.  Mr. Ayala-Melendez did

24   not, as you assert, come back toward you.

1              When provided with an opportunity to

2         amend your report in light of the video, you

3         stood by your original account.

4              Conclusion.  If the allegations

5         contained herein are true, the 40-day tour

6         suspension is warranted?

7              Do you see that?

8              MS. QUINN:  Objection to the extent

9         that it's inaccurate with some of the words in

10        that document.

11   A.   Yes.

12   Q.   Do you agree with the assessment that the city

13        manager has made about the initial report and

14        Officer Tivnan made to this part of his incident

15        report and what his response was to IDC -- to

16        the Bureau of Professional Standards?

17              MS. QUINN:  Objection.

18   Q.   My question is, do you agree with the analysis

19        that the city manager made in this letter asking

20        for a disciplinary hearing dated January 26,

21        2021?

22              MS. QUINN:  Objection.

23   A.   Yes.

24   Q.   Is there anything that you think he's wrong

```
 1              about -- that is inaccurate about the analysis

 2              that the city manager has made?

 3                        MS. QUINN:  Objection.

 4    A.   Can you be more specific, please?

 5    Q.   Yeah.  I mean, is there anything that he said,

 6              that the city manager said here that's wrong?

 7    A.   Wrong?

 8    Q.   Yes.

 9                        MS. QUINN:  Objection.

10    A.   I agree with the city manager.

11    Q.   Do you believe you've told the District

12              Attorney's office that Officer Tivnan lied in

13              his report?  Yes?

14                        MS. QUINN:  Objection.

15    A.   It was inaccurate.

16    Q.   You didn't call it inaccurate.  You said that he

17              lied.

18                        MS. QUINN:  Objection.

19    A.   It says -- it's check the box, but I just said

20              it was inaccurate.

21    Q.   The box --

22    A.   Lied about a defendant's conduct and thereby

23              allowed a false or inflated criminal charge to

24              be --
```

```
 1    Q.    You didn't cross the word lie and say
 2          inaccurate?
 3    A.    No.  I did not.
 4    Q.    Do you think based on the findings that your
 5          department made, could Tivnan have been charged
 6          with making a false statement, filing a false
 7          report, criminally charged?
 8    A.    Criminally charged, no.
 9    Q.    Is filing a false report a crime in
10          Massachusetts, to your knowledge?
11    A.    Yes.
12    Q.    Do you feel comfortable, as you sit here today,
13          that Tivnan filed a false report?
14    A.    An inaccurate report.
15    Q.    They're different things?
16    A.    I believe he believed what he wrote.  I believe
17          he believed it.
18    Q.    What do you mean by that?
19    A.    I'm not a psychologist.  It's just, you know, I
20          believe it was a mistake of the head.  Not a
21          mistake of the heart.  If it was intent, I
22          believe it would have been different charges.
23    Q.    So what do you need to have -- do you need to
24          have different intent in order to be charged
```

```
 1              with a false police report or what do you need?
 2      A.      Like I said, I believe he believed that that's
 3              how it occurred.
 4      Q.      What matters, does he believe?  What matters is
 5              what is on that tape and you disagreed with what
 6              he thought he saw?
 7                      MS. QUINN:  Objection.
 8      A.      Right.  Like I said, I believe it was a mistake
 9              of the head and not of the heart.  I don't think
10              he wrote a false report intentionally, but it
11              was not accurate.  It was not an accurate report
12              to what happened that I could see.  We didn't
13              have the opportunity to interview the
14              complainant.
15      Q.      I take it --
16      A.      The complainant.
17      Q.      I take it from the reaction, what happened after
18              this case became known, that Shawn Tivnan is
19              somebody who is well liked in the police
20              department?
21                      MS. QUINN:  Objection.
22      A.      I don't know.
23      Q.      You've never spent time with him?
24      A.      Never.
```

```
1    Q.   You've never spoken with him?

2    A.   I spoke with him.

3    Q.   You've spoken about this case?

4    A.   I have not spoken with him about this case, no.

5    Q.   So you never heard from him whether, you know,

6         he was simply mistaken and he didn't really have

7         the intent to do what he did?

8                   MS. QUINN:  Objection.

9    A.   The investigation, of course, I've reviewed the

10        investigation and I reviewed the tape a number

11        of times and that's how I feel.

12   Q.   There's a lot of people in the department that

13        did not want Tivnan to be disciplined; yes?

14                  MS. QUINN:  Objection.

15   A.   I don't know that.

16   Q.   One of the supervisors doesn't want him to be

17        disciplined, Carl Supernor.  Have you ever

18        spoken with him about this case?

19                  MS. QUINN:  Objection.

20   A.   Not that I recall.  Not me personally.

21   Q.   Did he express from the investigation that the

22        tape is of such poor quality that you can't

23        really make any negative conclusions about what

24        Tivnan did or did not do?
```

```
1    A.   That had been brought to our attention by the

2         then lieutenant or captain and he might have

3         been captain at the time, and yes.

4    Q.   And did you consider that as part of your

5         investigation?

6    A.   We considered everything.

7    Q.   And was Supernor the director supervisor of the

8         chain of command?

9    A.   I don't -- I don't believe he was at the time.

10   Q.   You know there's an administrative hearing that

11        is in progress right now to discipline Officer

12        Tivnan being conducted by the human resources?

13   A.   Yes.

14   Q.   Do you know that my client has testified at that

15        hearing?

16   A.   I'm not aware of that.

17   Q.   On behalf of the City, you didn't know that?

18   A.   I'm not aware of that.  I didn't interview him.

19   Q.   Now, I've been told that the City is hiring --

20        designating two employees of the City as experts

21        in this civil case?

22             MS. QUINN:  Objection.

23   Q.   That the City is designating Daniel Pennellatore

24        and Sergeant Watts as possible expert witness on
```

1       behalf of Officer Tivnan in the civil rights

2       case.  Have you ever heard that before?

3                   MS. QUINN:  Objection.

4    A.  Not from the administration.  I didn't hear that

5       from --

6                   MS. QUINN:  To the extent that you're

7       being asked about attorney/client

8       communications, you're not to discuss that.

9                   MR. PINEIRO:  That's perfectly

10      understood.

11   Q.  Aside from, you know, we're not interested in

12      any attorney/client communications.  Has anybody

13      in the department told you that they're going to

14      go to potentially a federal district court to

15      say that Officer Tivnan's actions complied with

16      acceptable policies and procedures of the

17      department?

18                  MS. QUINN:  Objection as to that

19      representation.  That is not accurate, Attorney

20      Pineiro.  There has been no such --

21                  MR. PINEIRO:  So the objection is as

22      to the form.  I'm asking --

23                  MS. QUINN:  That question is

24      completely inappropriate because there's been no

```
1            such disclosure.

2                    MR. PINEIRO:  Okay.

3   Q.   So do you know -- aside from any communications

4        from your attorneys, have you heard from anybody

5        in the department that Sergeant Watts or

6        Pennellatore are going to go and testify on

7        behalf of Mr. Tivnan?

8                    MS. QUINN:  Objection.  To the extent

9        that you have learned any sort of information

10       from the attorney/client privilege

11       communications, you're not to answer.

12  Q.   You don't have to answer if you've heard from

13       attorney/client.  I didn't ask you that.  I'm

14       asking if you've heard from anybody within the

15       department.

16  A.   That those two officers were testifying?

17  Q.   Yes.  On behalf of Tivnan?

18  A.   No.

19  Q.   Do you think it's appropriate for Sergeant Watts

20       or Officer Pennellatore to testify on behalf of

21       Officer Tivnan in a civil lawsuit?

22                   MS. QUINN:  Objection.

23  Q.   As expert witnesses?

24                   MS. QUINN:  Objection.
```

```
 1    A.    You would have to rephrase that.  I mean,

 2          there's so many -- they --

 3    Q.    Do you think -- let me keep it simple.  Do you

 4          think it's okay for Pennellatore and Sergeant

 5          Watts, who is the direct supervisor of Tivnan,

 6          to go to a federal court and testify on his

 7          behalf?

 8                 MS. QUINN:  Objection.

 9    A.    I'm not going to answer that.

10    Q.    Why is that?  I asked you if you thought it was

11          okay and you have to answer.  You have no choice

12          but to answer questions.

13                 MS. QUINN:  Objection to the

14          inappropriate statements and inaccurate --

15                 MR. PINEIRO:  It's the form that you

16          object.

17    Q.    Tell me why is it that you're not going to

18          answer that question?

19    A.    I haven't -- be more direct on which case, what

20          the case is --

21    Q.    On this case.

22    A.    Which side?  Whose side?  I don't get it.

23    Q.    Do you think it's okay for Sergeant Watts and

24          Pennellatore to come to this case, this civil
```

```
 1              case that we have here, and testify as his

 2              experts?

 3                        MS. QUINN:  Objection.

 4    A.   No.  Do I think it's inappropriate?

 5    Q.   Yes.

 6    A.   Yes.

 7    Q.   Why is it that you think it's inappropriate?

 8    A.   It's the same department.

 9    Q.   Do you think it's okay for them to go and

10              testify in the administrative hearing that the

11              City has -- the discipline hearing that the City

12              has filed against Officer Tivnan?

13                        MS. QUINN:  Objection.

14    A.   Is it inappropriate that they go?

15    Q.   Yes.  If they went to testify to this hearing as

16              his expert?

17                        MS. QUINN:  Objection.  It's calling

18              for speculation.

19    A.   For them?

20    Q.   Yes.

21    A.   For Tivnan, you mean?

22    Q.   Yes.

23    A.   Yes.

24    Q.   Why is that, can you tell us?
```

```
1    A.   It's the same department and he's a supervisor.

2         One is his supervisor.  The other is his

3         colleague.

4    Q.   Would you consider that to be a conflict of

5         interest?

6                   MR. VIGLIOTTI:  Objection.

7                   MS. QUINN:  Objection.

8    A.   Yes.

9    Q.   Have you -- you've worked in -- you've worn many

10        hats in the police department?

11   A.   Yes.  You should ask questions as opposed to --

12        ask a question so I know that you're done.

13   Q.   I'm trying to.  You've been chief.  You've been

14        deputy chief?

15   A.   Yes.  Yes.

16   Q.   You've worked in the vice squad?

17   A.   Yes.

18   Q.   You've been a SWAT team member?

19   A.   Yes.

20   Q.   You've been a patrolman?

21   A.   Yes.  Do you want my resume?

22   Q.   No.  I'm just trying to get the cover --

23   A.   Private investigator.  I'm just kidding.

24   Q.   You've worked details?
```

```
 1    A.    I have.

 2    Q.    And have you ever worked in a K-9 unit?

 3    A.    No.

 4    Q.    Do you have any experience with K-9s?

 5    A.    No.

 6    Q.    For how long has Worcester had a K-9 unit?

 7    A.    About five years.  We had one prior.  Five

 8          years.  This K-9 group, about five years, give

 9          or take.

10    Q.    But dating back to the 1990s, the police

11          department had K-9s?

12    A.    Yes.

13    Q.    Dan Sullivan had a K-9 years ago?

14    A.    Yes.

15    Q.    When he was younger?

16    A.    Yes.

17    Q.    Steve Cortis and Cortis's dog was a what, a drug

18          detection dog?

19    A.    Yes.

20    Q.    Do you know what a tracking dog is?

21    A.    I don't know how it works, but I know what a

22          tracking dog is, yes.

23    Q.    You said that the new team was formed about five

24          years ago?
```

1    A.    Yes.  After I became chief.

2    Q.    You did an interview with one of the local news

3          outlets and they interviewed you?

4    A.    Yes.

5    Q.    And --

6    A.    I'm pretty sure.

7    Q.    Do you remember that you were excited that there

8          was a new K-9 team?

9    A.    Yes.

10   Q.    And if memory serves you correct, one of the

11         reasons you gave was because before you needed a

12         K-9, you had to rely on other departments for

13         assistance; yes?

14   A.    Yes.

15   Q.    Sometimes you have to call -- your officers have

16         to call the state police?

17   A.    Yes.

18   Q.    Sometimes they have to call other departments,

19         Shrewsbury, Auburn, whoever it was?

20   A.    Yes.

21                    MS. QUINN:  Objection.

22   Q.    And so what is the funding of the K-9, you know,

23         has the funding of the K-9 unit changed since

24         2017?

```
1    A.   Has it changed?

2    Q.   Yeah.  How many officers does it have and what

3         is the funding?  I mean, how much does the

4         department invest in having a K-9 unit?

5    A.   I don't know what the line item is right now.

6    Q.   Who is the head supervisor of that unit?  Is it

7         Tim Watts?

8    A.   Tim Watts is the sergeant supervisor in charge,

9         yes.

10   Q.   And he has a K-9?

11   A.   Yes, he does.

12   Q.   And then Tivnan is one of the officers?

13   A.   No longer.

14   Q.   Why is he no longer in the K-9 unit?

15   A.   He was transferred.

16   Q.   That's a decision that you made?

17   A.   Yes.

18   Q.   When did you make that decision to transfer him?

19   A.   Shortly after the regarding incident.

20   Q.   This was before the investigation was completed?

21   A.   Yes.

22   Q.   And why did you feel you had to transfer him?

23   A.   I felt his judgment was questionable.

24   Q.   Why did you feel his judgment was questionable?
```

```
 1    A.    I didn't believe that the K-9 should have been
 2          in the middle of that melee and, you know,
 3          for -- yeah.  The K-9 shouldn't have been in the
 4          middle of that melee.
 5    Q.    So it's Sergeant Watts a member and
 6          Pennellatore; right?
 7    A.    Yes.
 8    Q.    And Tivnan at some point in time?
 9    A.    Yes.
10    Q.    Who else is in the unit?
11    A.    Pennellatore.
12    Q.    Tommy Bishop?
13    A.    Tom Bishop.  Officer Francese.
14    Q.    Is it Joseph Francese?
15    A.    Joseph Francese.
16    Q.    That's five.  And I believe --
17    A.    I believe four officers and the sergeant.
18    Q.    What type of dogs did the department purchase?
19          How much did it spend buying these dogs?
20    A.    I don't recall what we spent for each dog.  We
21          did get -- we got a grant from Senator Moore's
22          office through the state for a car.
23    Q.    So like an SUV to carry the dogs?
24    A.    A vehicle that is specialized for the safety of
```

1        the K-9.

2    Q.   A special cage and everything in the back?

3    A.   Yes.

4    Q.   Do you know how much the department spent on

5         these dogs purchasing them?

6    A.   I do not.

7    Q.   Did the department buy green dogs or fully

8         trained dogs?

9    A.   As far as the dogs aren't fully trained.  We

10        have -- they're trained with the officer.

11   Q.   And have you ever gone to the training that the

12        officers went to?

13   A.   I seen the training.  I didn't go to their

14        particular training in Boston.

15   Q.   You never went to any of the training to see

16        what it was like?

17   A.   No.

18   Q.   But you saw some of the demonstrations that they

19        do when they do bite work?

20   A.   When they do work.

21   Q.   You mean, when they track or did you ever see

22        them doing any demonstrations where they bite

23        and hold somebody?

24   A.   Yes.

```
1    Q.   What type of dogs did the department have?  Do

2         they have, like, Collies or --

3    A.   I believe Malinois and I think we still have a

4         German Shepherd.

5    Q.   Do you know what type of traits police officers

6         look for when they get these types of dogs?

7                   MS. QUINN:  Objection.

8    A.   I do not pick the dogs, so --

9    Q.   Who picks the dog?

10   A.   The individual officers that goes through the

11        sergeant.  I think the sergeant and Officer

12        Pennellatore is very good at that.  Officer

13        Cortis used to help out quite a bit too.

14   Q.   But he's retired?

15   A.   Yes.

16   Q.   How long ago did he retire?

17   A.   A couple of years.  Five even.

18   Q.   Do you know what type of -- when these dogs were

19        purchased, what type of qualities Pennellatore

20        or Sergeant Watts wanted in their dogs?

21                   MS. QUINN:  Objection.

22   A.   I do not.

23   Q.   You do not.  Who is Sergeant Watts responsible

24        to as far as the chain of command on the K-9
```

```
 1          unit?
 2    A.    Well, it falls under, I believe, Matt D'Andrea,
 3          the captain, and Deputy Chief Saucier also.
 4          He's the deputy chief.
 5    Q.    And what type of experience does Matt D'Andrea
 6          have with the K-9s?  Has he been a K-9 handler?
 7    A.    Not that I'm aware of.
 8    Q.    Does he do any sporting -- any dog sporting with
 9          any type of Malinois or Shepherds?
10    A.    Not that I'm aware of.
11    Q.    Do you know what sporting with Malinois is?  Do
12          you know what that is?
13    A.    No.
14    Q.    I'm just asking.  Do you know if he has a pet?
15    A.    I do not know one way of the other.
16    Q.    So what type of experience does he have with
17          dogs besides the fact that he's a captain?
18                   MS. QUINN:  Objection.
19    A.    He's the captain in charge of numerous
20          divisions.  Numerous smaller divisions.
21    Q.    What does -- is it Paul Saucier?
22    A.    Yes.
23    Q.    Hes he ever been a K-9 officer?
24    A.    Not that I know of.
```

```
 1    Q.   Has he owned any of these dogs?

 2    A.   I do not know.

 3    Q.   What do you know about Malinois and what type of

 4         qualities police officers look for them?

 5    A.   I leave it to the experts.

 6    Q.   Do you know that most departments hire these

 7         dogs because of their aggressive qualities?

 8                   MS. QUINN:  Objection.

 9    A.   I do not know that.

10    Q.   Have you ever heard what people refer to in the

11         police K-9 world as full bite mouth?

12    A.   I'm not familiar with any of the language used.

13    Q.   Do you know that full mouth biting means that

14         the dogs bite with 42 of his teeth?

15    A.   Like I said earlier, I don't know the language

16         used.

17    Q.   Were --

18    A.   Or the training.

19    Q.   Got it.  When I deposed you in 2018, I believe

20         you said that you tracked the use of force when

21         K-9s were involved.  Do you recall saying that?

22    A.   Say that again?

23    Q.   When I deposed you in 2018, I believe that I

24         asked you about what type of things the
```

```
 1          department tracks and I asked you whether K-9s
 2          was something that your department tracked as
 3          far as the use of force.  I asked you that.  Do
 4          you remember that?
 5                    MS. QUINN:  Objection.
 6     A.   I don't remember you specifically asking me
 7          that, but it is -- we do track -- you said
 8          bites, is that what you said in your question?
 9     Q.   Yes.
10     A.   They do track their bites, yes.
11     Q.   Who tracks their bites?
12     A.   I would assume the K-9 unit.
13     Q.   I've looked at the use of force policy, the
14          latest iteration, when does the use of force
15          policy as defined at the Beer Garden and even
16          today doesn't say anything about K-9s, the use
17          of force policy?
18     A.   Correct.
19     Q.   Why is that?
20     A.   We're actually in the process of upgrading
21          the -- and we're in the process of incorporating
22          new rules and policies.
23     Q.   Whom is working on that?  Are you working on
24          that?
```

1    A.    I'm not working on it.  It's actually Sergeant

2          Watts and the unit with guidance from my office.

3    Q.    Have you seen any of the drafts in terms of what

4          this policy is going to look like?

5    A.    I have.

6    Q.    What does it look like?  How is it different

7          from what you have now?

8                    MS. QUINN:  Objection.

9    A.    It will be more specific.

10   Q.    Tell me how?

11   A.    Well, I would have to see between the two.  I

12         would have to have them side by side.

13   Q.    Just give me a general sense?

14                   MS. QUINN:  Objection.

15   A.    Just like I said, be more specific on what they

16         can and what they cannot do.

17   Q.    Are you going to be able to use dogs for crowd

18         control?

19   A.    Yes.

20   Q.    Do you think that's a good idea?

21   A.    If done appropriately.

22   Q.    How appropriately?

23   A.    Some of it is common sense.

24   Q.    What is common sense?

```
 1    A.    Not to have the dog at crowd control.  It

 2          shouldn't be in the middle of the crowd.  It

 3          would be more perimeter.  We're going to be very

 4          specific on what their duties are and as far as

 5          crowd control is concerned.

 6    Q.    When I looked at the policy, the K-9 policy

 7          requires that whenever a person gets bitten or

 8          scratched by a dog, somebody, crime scene

 9          services had to go and take pictures of that;

10          yes?

11    A.    Yes.

12    Q.    That's the policy that existed when Mr. Ayala

13          came in contact with Mattis and Officer Tivnan.

14          And so somebody from -- if a person gets brought

15          to the hospital, somebody from crime scene

16          services goes and takes a picture of them either

17          at the police station or at the hospital?

18                    MS. QUINN:  Objection.

19    A.    Yes.

20    Q.    What happens with those photographs?  Do you

21          ever get to see them?

22    A.    If they're in investigation and they're brought

23          to my attention and there's a reason I would

24          need to see them, yes.
```

```
 1    Q.    What if there isn't an investigation?  In other
 2          words, there's dog bites, dog hurts a person, a
 3          citizen, do you automatically get to see those
 4          photographs?
 5    A.    Automatically?
 6    Q.    Yes.
 7    A.    If somebody told me about it, I would ask for
 8          them.  If that was brought in, if there was
 9          going to be some kind of conflict that needed to
10          be addressed, yes.
11    Q.    What if nobody brought it to your attention,
12          would you get to see this photograph as a matter
13          of course?
14    A.    If it wasn't brought to my attention, then I
15          wouldn't know there was an issue.
16    Q.    What if the person had very bad injuries and
17          requires surgery?
18                    MS. QUINN:  Objection.
19    A.    These are all hypothetical, but yes.  They would
20          bring it to my attention, yes.
21    Q.    Are you familiar with an injured person statute
22          of Massachusetts?
23    A.    The statute itself?
24    Q.    Yes.
```

```
1    A.    That all -- yes.

2    Q.    And can you tell me about the injured person

3          legal statute?

4    A.    They would be asked at booking if they need

5          assistance, then we would bring them to the

6          hospital, bring them to whatever assistance they

7          need.

8    Q.    If a prisoner gets injured, let's say, police

9          are justified in defending themselves from

10         somebody who is violently struggling and the

11         person has a cut on their back, are those

12         photographs taken by the booking room as part of

13         documentation of the injuries the prisoner

14         suffers?

15                    MS. QUINN:  Objection.

16   A.    No.

17   Q.    Why is that?

18   A.    If it's brought to our attention at the booking?

19   Q.    Yes.

20   A.    There's -- unless it's for investigatory

21         reasons, there would be no need.

22   Q.    Do you have a policy to document, to photograph

23         any injuries that prisoners have when they get

24         booked in the police department?
```

1            MS. QUINN:  Objection.

2    A.    Not that I'm aware of.

3    Q.    Are you familiar with a Police Executive

4          Research Form, Guidance on Policies and

5          Practices for Patrol Canines?

6    A.    I'm not aware of their recommendations, no.

7    Q.    The Ayala-Melendez event occurred in October of

8          2019?

9    A.    Yes.

10   Q.    When is it that your department began working on

11         policies to update the existing policies?

12   A.    After reviewing the tape.

13   Q.    And when was it that you reviewed the tape?  Was

14         it shortly after October of 2019?

15   A.    When we received it and did all the professional

16         standards.  I don't recall the time.

17   Q.    Got you.  What is it that needs to be worked as

18         far as the policy?

19   A.    Well, the major thing for me after observing it

20         was the crowd control, more specific on crowd

21         control.

22   Q.    What do you think the policy will say insofar as

23         control is concerned?

24            MR. VIGLIOTTI:  Objection.

```
 1                    MS. QUINN:  Objection.

 2      A.   Say it again?

 3      Q.   What do you think the policy is going to say

 4           insofar as crowd control is concerned?

 5                    MR. VIGLIOTTI:  Objection.

 6                    MS. QUINN:  Objection.

 7      A.   Certainly in the crowd control, that they not be

 8           -- that they'll be perimeter only.

 9      Q.   How do you go about doing that, creating

10           perimeter?

11      A.   Through training.

12      Q.   Will your policies comply with the Executive

13           Research Form Policies for patrolling K-9s?

14      A.   I would have to review the present policies and

15           recommendations.

16      Q.   Those policies state unequivocally that handlers

17           are always responsible for the K-9s at all times

18           and accountable for any force that results from

19           their use.

20                    Do you agree with that general

21           principle?

22                    MS. QUINN:  Objection.

23      A.   Read that again?

24      Q.   Yeah.  The forum states unequivocally that the
```

```
1          handlers, K-9 handlers, are always responsible
2          for the K-9s at all times and are accountable
3          for any force that results from their use?
4                    MS. QUINN:  Objection.
5     Q.   Do you agree with that general principle?
6     A.   Well --
7                    MS. QUINN:  Objection.
8     A.   Well, if the K-9 is outside the vehicle with the
9          officer, yes.
10    Q.   So the handler is responsible for the K-9 at all
11         times?
12    A.   Yes.
13    Q.   And the handler is responsible and accountable
14         for any force that results from the deployment
15         of that dog?
16    A.   Yes.
17    Q.   Have you -- besides the Tivnan incident, have
18         you, since you became chief, is there a policy
19         that requires that every time a K-9 is deployed
20         that it be documented?
21    A.   I would have to read it more specifically, but
22         if they're deployed, then certainly
23         documentation would be required.
24    Q.   How often since you became chief do Worcester
```

1        Police Department dogs bite?

2                MS. QUINN:  Objection.

3    A.   I don't have those numbers.

4    Q.   This is the only case that you are aware of

5         where a civilian has been bitten by a police K-9

6         that your department owns?

7    A.   No.  That's not true.

8    Q.   How many times do you believe that that

9         happened?

10   A.   I don't have those numbers available.

11   Q.   Did you review any numbers in preparation for

12        today to figure out how many times -- how often

13        your dogs bite?

14   A.   Did I review the numbers of bites, I have not,

15        no.

16   Q.   Who is responsible for reviewing the number of

17        bites and alerting you when that happens?

18   A.   That would be who is in charge would be Sergeant

19        Watts.

20   Q.   And anybody else besides Sergeant Watts?

21   A.   You would bring it through his chain.

22   Q.   So that would be Matt D'Andrea?

23   A.   And I believe Lieutenant Doherty is in his chain

24        also.

```
 1    Q.   What is Lieutenant Doherty's first name?

 2    A.   What's that?

 3    Q.   What is his first name?

 4    A.   Dave.

 5    Q.   Dave Doherty.  Do you know if he has any

 6         experience?

 7    A.   He's never been a K-9 in our department.

 8    Q.   Why if a videotape became -- do you know if you

 9         saw that videotape in 2019?

10    A.   I would assume, yes.

11    Q.   Do you know why it's taken, you know, I

12         understand COVID and everything, why it's taken

13         so long?  We're in 2022.

14              MS. QUINN:  Objection.

15    Q.   For that policy to be instituted?

16              MS. QUINN:  Objection.

17    A.   Well, there's still some questions on statute as

18         far as part of the criminal justice reform bill.

19         There's still work in progress when it comes to

20         K-9s and other issues that were in the

21         government's criminal justice reform bill and

22         K-9 was one of them, so we're looking for

23         guidance, but there had been some, you know,

24         commands.
```

```
 1    Q.    What guidance are you looking for?

 2    A.    What is going to be -- what is going to be

 3          authorized through statute and what's not going

 4          to go authorized through statute.  You put

 5          something in the policy that will be obsolete

 6          and these things are completed.

 7    Q.    Between 2016 and today, do you know if Worcester

 8          Police K-9s have bitten more than 30 or 40

 9          people?

10                    MS. QUINN:  Objection.

11    A.    No.

12    Q.    Do you know if any --

13    A.    Do I know?

14    Q.    Yes.

15    A.    No.  We're not in that range, no.

16    Q.    Do you publish when officers use batons, do they

17          have to report their use of force?

18    A.    Yes.

19    Q.    When their officers use their hands or palm

20          heels or punches, do they have to report that?

21    A.    Yes.

22    Q.    If they have to use -- if they have to do a

23          takedown maneuver, do they have to notify about

24          that use of force?
```

1   A.   Depends on -- if it's an arrest, it should be

2        incorporated in the report but depends on the

3        level.

4   Q.   Where do you see dogs in the use of force

5        continuum?  What level do you see them?

6   A.   Once again, I will defer to the situation

7        really.  It depends on the situation.  I mean,

8        dogs can be on scene and not be used as for use

9        of force.

10  Q.   But when they are used, where do you see them in

11       the use of force continuum?

12                 MS. QUINN:  Objection.

13  A.   We will -- we've been discussing that, three,

14       four.

15  Q.   Are they -- do you consider them to be similar

16       or different from the use of batons?

17                 MS. QUINN:  Objection.

18  A.   I would -- each situation is different when it

19       comes to K-9s, but as far as use of force, could

20       you be more specific?

21  Q.   Do you think that K-9s are involved -- when a

22       K-9 bites, they cause more serious injuries than

23       what police officers do with batons?

24                 MS. QUINN:  Objection.

```
1    A.    Once again, depends on the situation.

2    Q.    On what situation?

3    A.    I mean, is a bite worse than getting hit by a

4          stick or a baton, it's -- they both can do

5          damage.

6    Q.    Have you ever seen how much damage police dogs

7          are capable of doing?

8                      MS. QUINN:  Objection.

9    Q.    Here in Worcester, have you ever seen pictures

10         of police officers --

11   A.    Of bites?

12   Q.    Yes.  Of police dogs biting and ripping human

13         tissue?

14   A.    I've seen pictures, yes.

15   Q.    What pictures have you seen in preparation for

16         today?

17   A.    For preparation for today?

18   Q.    Yes.

19   A.    Just the pictures -- the only pictures I've seen

20         in preparation for today is of your client.

21   Q.    Which other pictures have you seen of dog bites?

22   A.    I've seen takedowns from, you know, officers

23         making arrests, so that would be Danny

24         Pennellatore and his dog who I've seen pictures
```

1           of some of the bites.

2    Q.    Have they been bad bites or good bites?

3    A.    Say that again?

4    Q.    Have they been bad bites that caused serious

5           injuries?

6                    MS. QUINN:  Objection.

7    A.    I haven't seen serious injuries.  Once again, it

8           depends on what you're calling a serious injury.

9                    MR. PINEIRO:  That can be marked.

10                   MS. QUINN:  Can we have a color copy

11          of that?  We only have a black and white.

12                   MR. PINEIRO:  I only have one color

13          copy of it.

14                   MS. QUINN:  You don't have an ability

15          of making anymore?

16                   MR. PINEIRO:  Sure.  I'll make it.

17                   (Short recess.)

18                   MR. PINEIRO:  Let's mark these.

19                   (Photographs marked

20                    Exhibit No. 5.)

21                   (Incident Report marked

22                    Exhibit No. 6.)

23   Q.    Do you recognize Exhibit 6, Chief?

24   A.    Which one is that?

1    Q.   Exhibit 6 is the report.

2    A.   The report?

3    Q.   Yes.

4    A.   I would have to read it.

5    Q.   Sure.

6    A.   Do I recognize it?

7    Q.   Yes.

8    A.   It's one of our reports for an arrest.

9    Q.   Do you see there is -- one of the pages, do you

10        see 9 out of 17?

11   A.   I see the report, yes.

12   Q.   And do you see there is a report by Daniel

13        Pennellatore?

14   A.   Yes.

15   Q.   And do you see that there's a K-9 deployment

16        narrative description at the very top?

17   A.   Yes, sir.

18   Q.   And if you look at the Paragraph 2, there seems

19        to have been a large crowd that formed on Water

20        Street involving 15 people that were actively

21        fighting?

22   A.   Yes.

23   Q.   Do you see here -- let me see.  Do you see right

24        around here he says, I retrieved K-9 Beebs from

1       the rear of my cruiser and began running towards

2       Officer McCarthy.  Beebs was on a short leash

3       and collar and I maintained complete control of

4       him during the entire situation.

5               Do you see that there?

6  A.   Yes.

7  Q.   While running towards him I repeatedly began

8       yelling for the crowds to disperse, while giving

9       these commands K-9 Beebs was actively barking.

10      This caused several individuals involved to

11      begin backing away and leaving the area.  I then

12      saw Officer Alward attempt to take Eric into

13      custody.  Eric broke free from his hold and

14      began running towards me.  At this time I

15      ordered Eric to stop running and he fled across

16      the street.

17              Do you see that?

18  A.   Yes.

19  Q.   Officer Alward was able to catch up to Eric and

20      with the assistance of Officer Thomas Bishop, he

21      was able to take Eric to the ground.  As I made

22      my way to their location, I could see Eric

23      physically and actively resisting by throwing

24      punches and kicking at Officer Alward and

1          Officer Thomas Bishop.

2                    Do you see that?

3     A.   I do.

4     Q.   I repeatedly yelled for Eric to stop resisting

5          and informed him he would be bit if he did not

6          stop.  Eric continued to actively resist Officer

7          Alward and Officer Thomas Bishop --

8                    MS. QUINN:  Objection.  Eric

9          continued to actively assault.

10                    MR. PINEIRO:  You're right.

11    Q.   Continued to actively assault Officer Alward and

12         Officer Thomas Bishop.  At this time I applied

13         K-9 Beebs on a direct bite to Eric's left calf.

14         Eric continued to fight Officer Alward and

15         Officer Thomas Bishop even after being

16         apprehended by K-9 Beebs.  Eric then began

17         thrashing his own leg in an attempt to pull it

18         away and break free from K-9 bite.  After

19         approximately 30 seconds of continued

20         struggling, we were able to take Eric into

21         custody.  Once Eric was handcuffed, I

22         immediately took control of Beebs' collar.  I

23         asked officers to clear a path for me to remove

24         Beebs.  I then gave Beebs his out command and he

```
 1              was immediately tactically removed from the

 2              apprehension.  I immediately requested WEMS to

 3              respond to the scene to provide medical care for

 4              the dog bite.

 5                       MS. QUINN:  Objection to the extent

 6              that you misread some of the words.

 7         Q.   Did I read any of it incorrectly?

 8         A.   You did leave a couple of important parts out,

 9              but I think --

10         Q.   But they were corrected; right?

11                       MS. QUINN:  Objection.

12         Q.   Had you ever seen these pictures of Eric Rojas

13              before today?

14         A.   No.

15         Q.   You never seen them?

16         A.   No.

17         Q.   Would you agree with me that these were pictures

18              that appear to have been taken in a hospital?

19                       MS. QUINN:  Objection.

20         Q.   Page 2, do you see medical equipment?

21         A.   I see medical equipment.  It appears to be a

22              hospital, yes.

23         Q.   And can you take a look at Picture No. 5?

24         A.   Yes.
```

```
 1    Q.   Does that appear to you to look like a

 2         relatively serious injury?

 3                    MR. VIGLIOTTI:  Objection.

 4                    MS. QUINN:  Objection.

 5    A.   I'm not a dog person.

 6    Q.   But you're a police officer and the K-9 policy,

 7         is that a policy that has your name on it that

 8         you enacted?

 9    A.   Yes.

10    Q.   Officers are allowed to use reasonable force;

11         yes?

12    A.   Yes.

13    Q.   But not unreasonable force?

14    A.   Correct.

15    Q.   Take a look at Page No. 6.  Can you describe

16         what you see in Page No. 6?

17                    MS. QUINN:  Objection.

18    Q.   How would you characterize that injury?

19                    MS. QUINN:  Objection.

20    A.   Bloody.

21    Q.   Would you consider that to be a serious injury?

22                    MS. QUINN:  Objection.

23    A.   Once again, I'm -- it's not relevant.  I don't

24         know what would be considered serious unless I
```

```
 1            got the medical report and I could read it.  I

 2            may still not understand it.

 3     Q.     So who makes a determination as to whether a dog

 4            bite is a serious injury or not?

 5                    MS. QUINN:  Objection.

 6     A.     I would say medical.

 7     Q.     Medical?

 8     A.     Yes.

 9     Q.     Take a look at No. 7.  Does that look to be a

10            serious injury?

11     A.     It looks bloody.

12     Q.     Does it look to you like the K-9 tore through

13            flesh?

14                    MS. QUINN:  Objection.

15     A.     It's bloody.

16     Q.     Page 8, 9 and take a look at 10.  Any thoughts

17            on 10 as far as the seriousness of Photograph

18            No. 10?

19                    MS. QUINN:  Objection.

20                    MR. VIGLIOTTI:  Objection.

21     A.     It's bloody.

22     Q.     Are your K-9s -- does your policy allow police

23            K-9s to bite when people have been handcuffed

24            already?
```

1    A.   It doesn't specify.

2    Q.   Can K-9s bite after people have been handcuffed?

3                  MR. VIGLIOTTI:  Objection.

4                  MS. QUINN:  Objection.

5    A.   It would be a case by case, I would assume.

6    Q.   Why would you assume that?

7    A.   Because --

8    Q.   If a person has been restrained, why would there

9         be --

10   A.   Restrained, they break free.  There's other

11        things.  There's other things that can happen

12        even after a cuffing that could lead to

13        officers, citizens and the individual himself

14        could be in jeopardy.

15   Q.   So if a person has been handcuffed and placed on

16        the ground, can a police K-9 be allowed to

17        continue biting that person for a period of

18        time?

19                  MR. VIGLIOTTI:  Objection.

20                  MS. QUINN:  Objection.

21   A.   I would say case by case on the ground,

22        restrained.

23   Q.   And whoever determines the case by case, that

24        would be Sergeant Watts, Matt D'Andrea and the

1         deputy; right?

2                   MS. QUINN:  Objection.

3    A.   That?

4    Q.   Who determines that?

5    A.   Who determines that?

6    Q.   Yes.

7    A.   For -- to control the person would be the

8         officers on the scene would determine.

9    Q.   So supervisors have no oversight of those

10        events; right?

11                  MR. VIGLIOTTI:  Objection.

12                  MS. QUINN:  Objection.

13   A.   If they're on the scene and they're, you know,

14        their information was needed or required, then

15        yes.  But if they're not on the scene, the

16        officer would be -- the officers would be the

17        one that would determine what would need to be

18        done to restrain the person.

19   Q.   When you read this report that was prepared by

20        Mr. Pennellatore, does this report suggest that

21        once Mr. Rojas was handcuffed, then the dog was

22        removed from him?  Page 9 out of 17.

23   A.   I'm reading.  I just -- I think you're -- could

24        you be more specific on that question?

```
 1   Q.   Yeah.  From reading this report, did you have a
 2        sense that the dog was released from biting once
 3        the handcuffs were placed on Mr. Rojas?
 4   A.   Yes.  Once Eric was handcuffed, I immediately
 5        took control of Beebs' collar.  Yes.
 6   Q.   The sense that you get here is once the
 7        handcuffs were on, the dog came out?
 8   A.   That's -- yes.
 9   Q.   And you don't get the sense from looking at this
10        report that the dog continued biting after the
11        handcuffs were placed?
12                  MS. QUINN:  Objection.
13   A.   This report indicates that he was -- the bite
14        independent -- after he pulled in front of him,
15        the individual -- after Eric was handcuffed.
16   Q.   If a video exists that showed that the dog was
17        biting after the person was handcuffed, would
18        that raise any concerns in your mind?
19                  MR. VIGLIOTTI:  Objection.
20                  MS. QUINN:  Objection.
21   A.   I'd have to see the video.
22   Q.   Fair.
23                  MR. PINEIRO:  This can be marked.
24                  (Criminal Docket marked
```

```
 1                        Exhibit No. 7.)

 2    Q.   Do you see that document?

 3    A.   I do.

 4    Q.   From the report that Pennellatore prepared,

 5         could you glean that he charged him with

 6         resisting arrest and other charges?

 7    A.   From here?

 8    Q.   From Pennellatore's report?  Second page of the

 9         report.

10              MS. QUINN:  Objection to the extent

11         that Exhibit 6, the report is missing.

12              MR. PINEIRO:  I understand that.

13    Q.   Take a look at Page 2.  Do you see the charges

14         against Eric Rojas right here?

15    A.   Uh-huh.

16    Q.   A&B on police officer, resisting, disorderly,

17         disturbing?

18    A.   Yes.

19    Q.   And did you know that the District Attorney

20         threw the charges out after they reviewed the

21         videotape of this arrest?

22              MS. QUINN:  Objection.

23    A.   On this case?

24    Q.   Yes.
```

1    A.    I was not aware of that.

2    Q.    And if we go back to the police report at the

3          bottom of Page 9 out of 17, do you see that,

4          Once I cleared the scene, I notified Sergeant

5          Maher of the use of force and I called and

6          notified Sergeant Watts as well.  Sergeant Maher

7          notified CSU to respond to take pictures and CSU

8          Fanion responded and took pictures; yes?

9    A.    Yes.

10   Q.    Now, when Eric Rojas must have been booked at

11         some point in time at the Worcester Police

12         Department; right?

13   A.    Yes.  Correct.

14   Q.    And so the police department would have known

15         that he went to the hospital?

16   A.    Unless they took him straight to the hospital.

17         They called an ambulance.  He could have gone

18         straight to the hospital.

19   Q.    And then after he was released from the

20         hospital, he would have gone back to the

21         station?

22   A.    Not necessarily.  Depends on -- I don't see any

23         -- they can be arraigned at the hospital if

24         they're going to stay at times.  I don't know if

| | | |
|---|---|---|
| 1 | | that happened or not.  I would need to -- |
| 2 | Q. | Does the Worcester Police Department have a |
| 3 | | policy today to looking at every dog bite as a |
| 4 | | critical incident? |
| 5 | A. | As a critical incident? |
| 6 | Q. | Yes. |
| 7 | A. | I don't know if that's the language, but if it's |
| 8 | | a bite, there will be reports made to their |
| 9 | | supervisor, yes. |
| 10 | Q. | But they would not even -- but there would not |
| 11 | | be -- in the booking room there would not be |
| 12 | | additional photos taken of the dog bite? |
| 13 | A. | That's what the BCI did.  They send somebody. |
| 14 | | It looks like that's what they did. |
| 15 | Q. | Crime scene took pictures but the booking room |
| 16 | | will not take separate pictures? |
| 17 | | MS. QUINN:  Objection. |
| 18 | A. | No. |
| 19 | Q. | Pictures to send to your office? |
| 20 | A. | No. |
| 21 | Q. | Do you have a policy that whenever a K-9 gets |
| 22 | | deployed for whatever reason, that it has to be |
| 23 | | notified of the chain of command? |
| 24 | A. | Deployed? |

1    Q.    Deployed, meaning get out of the car?

2    A.    Gets out of the car depends on if -- they get

3          out of the car quite frequently.  Deployed in an

4          incident, that would be documented.

5    Q.    Let's say they do a search on a particular

6          location, does that have to be documented up the

7          chain of command?

8    A.    Up the chain of command, they would have to

9          notify -- they would notify their supervisor.

10   Q.    What about if a person -- if a dog is deployed,

11         searches a person and the person surrenders, is

12         there a report that has to go up the chain of

13         command?

14   A.    It would be an arrest report and that would be

15         part of the arrest report.

16   Q.    Do you have a sense from tracking your -- the

17         department tracks K-9 bites; right?

18   A.    The sergeant would track K-9 bites, yes.

19   Q.    Does your department track when your K-9 bites

20         when the individuals are armed or unarmed?  Does

21         your department, when they track use of force

22         reports involving K-9s, does your department

23         track whether the person was armed or unarmed?

24   A.    That would be documented.  It would certainly be

1          documented.

2     Q.   And does that information go to your office?

3     A.   Not specifically.

4     Q.   Does your department document whom gets bit more

5          often, men or women?

6     A.   With the low number that we have, I'm sure it

7          would be easy to determine.

8     Q.   What is the low number that you have?

9     A.   I said I don't know what the exact number is.

10    Q.   Less than 10 since 2016?

11    A.   I would have to check.

12    Q.   Do you know that when a police dog bites,

13         sometimes they have to be physically removed by

14         the handler and when that happens, that worsens

15         the injuries that people have?

16               MS. QUINN:  Objection.

17    A.   I'm not aware of that.

18    Q.   Do you break down in your stats who are the

19         people that get bitten more often, is it white

20         people, minorities or what?

21               MS. QUINN:  Objection.

22    A.   I don't have that information.

23    Q.   When -- do you have any information of when dogs

24         are deployed and used properly to bite in whole,

```
 1           whether these are the types of injuries that the

 2           department sees like the one that the

 3           photographs that I've given you of Rojas?

 4                    MS. QUINN:  Objection.

 5      A.   I don't know the extent of each individual bite.

 6      Q.   Are any of the Worcester dogs taught to grip and

 7           tear flesh?

 8                    MS. QUINN:  Tear?

 9                    MR. PINEIRO:  Yes.

10                    MS. QUINN:  Objection.

11      A.   I don't know what the language is that would be

12           used.

13      Q.   Do you know whether the Worcester K-9s know a

14           good guy from a bad guy?

15                    MS. QUINN:  Objection.

16      A.   Do they know?

17      Q.   Yes.

18      A.   They do what their handlers told.  They do what

19           is told by the handler.

20      Q.   Can dogs think independently?

21                    MS. QUINN:  Objection.

22      A.   I don't know.

23      Q.   Would you consider a dog bite episode to be a

24           violent encounter?
```

```
 1                      MS. QUINN:  Objection.
 2    A.   It would have to be an individual case.  I mean,
 3         it's certainly -- yeah.
 4    Q.   Would you consider a dog bite case such as the
 5         one we've seen here to be a high end level of
 6         force --
 7                      MS. QUINN:  Objection.
 8    Q.   -- above and beyond the use of a baton or OC
 9         sprays?
10                      MS. QUINN:  Objection.
11    A.   Not necessarily.
12    Q.   Why is that?
13    A.   Because it depends on each individual incident,
14         how each, you know, each tool is used.
15    Q.   Do you think that a police dog -- the police
16         dogs bite in the same way that regular pets
17         bite?
18                      MS. QUINN:  Objection.
19    A.   I do not know.  There's a dog that runs on the
20         side -- I would assume.
21    Q.   Do you realize that most police dogs like the
22         ones who have Malinois or Shepherds are working
23         breeds, they're bred for protection and for the
24         attack among other types of things?
```

```
 1                    MS. QUINN:  Objection.
 2    A.   I do not know the DNA or the history behind it.
 3    Q.   But do you understand that they are obtained by
 4         police departments for their innate tendencies
 5         of aggression and protection?
 6                    MS. QUINN:  Objection.
 7    A.   I don't know about aggression, but I do know
 8         that there are dogs that are partial to.
 9    Q.   Do you have an understanding that when police
10         dogs -- can police -- do your police dogs, do
11         they know, first of all, where to bite, what
12         areas to bite and what areas not to bite?
13    A.   I don't know what their training is when it
14         comes to biting.
15    Q.   Has anyone, to your knowledge, ever been bit by
16         a police officer -- by a police dog in the face
17         or neck?
18    A.   I'm not aware of any Worcester Police dog, K-9,
19         has done it.
20    Q.   Can police dogs kill people and have they killed
21         people?
22                    MS. QUINN:  Objection.
23    A.   I would say they could kill, but we haven't in
24         the City of Worcester.
```

1    Q.   But are you aware of other instances where K-9s

2         have attacked and killed people in the U.S.?

3    A.   I'm not aware of that.

4    Q.   Are you aware of any medical literature that

5         says how dog bite cases from K-9s are different

6         in quality from regular pets?

7                   MS. QUINN:   Objection.

8    A.   I'm not up to speed on that question, that

9         information.

10   Q.   Have any of your dogs bitten the wrong people?

11        In other words, people that were not the

12        intended target of the bite or the seizure?

13                  MS. QUINN:   Objection.

14   A.   I don't know the circumstances behind every

15        bite.

16   Q.   Do you have any knowledge about cops, other cops

17        having been bitten by their K-9s?

18   A.   Yes.

19   Q.   And what knowledge do you have of that?

20   A.   There was an officer who came up on another

21        officer and that dog -- the K-9 officer's dog

22        snapped and bit.

23   Q.   And was that officer disciplined for not having

24        his K-9 under control over the circumstances?

```
 1                    MS. QUINN:  Objection.

 2     A.    No.

 3     Q.    And why not?

 4     A.    It was determined that the other individual, the

 5           officer who was bit, that he came up on the dog

 6           and startled the dog.

 7     Q.    So the dog didn't know that the other person was

 8           a police officer?

 9                    MS. QUINN:  Objection.

10     A.    Correct.  I mean, --

11     Q.    Do you know of any -- so that was an unintended

12           bite?

13     A.    Yes.

14     Q.    When you say unintended, do you mean an

15           accidental bite?

16                    MS. QUINN:  Objection.

17     A.    Depends on what language you want to use or how

18           you want to -- it was unintended.  It's not --

19           it wasn't an authorized biting by the handler.

20     Q.    So the handler didn't say, Bite this person?

21     A.    Correct.

22     Q.    Do you know that K-9s don't need to get an order

23           to bite someone if anyone presents a threat to

24           their owner?
```

```
 1                  MS. QUINN:  Objection.

 2   A.    Yes.

 3   Q.    Can any of your Worcester K-9 -- are they

 4         allowed to attack without an order?

 5                  MS. QUINN:  Objection.

 6   A.    No.

 7   Q.    How does that work?

 8   A.    Be more specific.

 9   Q.    In other words, if they're not allowed to bite

10         unless they're given an order, let's talk

11         briefly about the case of Tivnan, his dog and

12         Christopher Ayala-Melendez.  You've agreed with

13         the analysis that the city manager made in the

14         report for discipline?

15   A.    Yes.

16                  MS. QUINN:  Objection.

17   A.    Yes.

18   Q.    Yes?

19   A.    Yes.

20   Q.    Mr. Tivnan grabbed and forcefully threw Mr.

21         Ayala-Melendez in front of the dog.

22                  MS. QUINN:  Objection.

23   Q.    Did you see that in the video?

24                  MS. QUINN:  Objection.
```

1    A.    No.

2    Q.    What did you see him do to Ayala-Melendez?

3    A.    He put his hands on him and was guiding him and

4          the dog, I'm assuming, because, like I said, I

5          don't know dogs.

6    Q.    The city manager didn't say he was guiding him.

7          Did you see any language by the city manager

8          where he states he was guiding him?

9                    MS. QUINN:  Objection.

10   A.    I'd have to read it again.

11   Q.    Take a look at it and see if you see the

12         language that he was guiding him?

13                   MS. QUINN:  For the record, you're

14         referring to Exhibit 4?

15                   MR. PINEIRO:  Yes.

16   Q.    Did you read through it?

17   A.    Yes.

18   Q.    Did he use the word guiding?

19   A.    He did not.

20   Q.    What is the word that he used?

21   A.    Pushing.

22   Q.    Do you agree that's what you saw in the video?

23   A.    Yeah.  I guess he was moving him, pushing him,

24         moving him, guiding him away from the scene and

```
 1          that's when I seen the dog who did not appear to

 2          be --

 3    Q.    Is there a difference between guiding and

 4          pushing?

 5                    MS. QUINN:  Objection.

 6    Q.    Do you see any difference?

 7    A.    Do I see -- there can be.

 8    Q.    Did you see any in the video?

 9                    MS. QUINN:  Objection.

10    A.    I seen him moving him along.

11    Q.    Not pushing him along?

12    A.    Well, moving, pushing, guiding, I guess.

13    Q.    Did you -- isn't it fair to say that the pushing

14          action by Officer Tivnan in front of his dog

15          would very likely result in a dog bite and it

16          did result in a dog bite that day?

17                    MS. QUINN:  Objection.

18    A.    Like I said, I don't know the temperament of any

19          dog, but --

20    Q.    Well, these are attack dogs.

21                    MS. QUINN:  Objection.

22    Q.    The dogs at the Worcester Police Department

23          have --

24                    MS. QUINN:  I think you interrupted
```

```
1              his answer.
2    Q.   I'm sorry.  Go ahead.
3    A.   Well, you said attack dogs.  They're not attack
4         dogs.
5    Q.   What are they?
6    A.   They're K-9s.  They're tools for the Worcester
7         Police Department for many different situations.
8    Q.   One of the situations that they're used for is
9         to find, bite and hold people; yes?
10   A.   Yes.  Yes.
11   Q.   So --
12   A.   They're also used for tracking lost people.  It
13        could be a lost kid.  It could be a lost -- it
14        could be somebody with Alzheimer's or dementia,
15        so they're used for many different things.
16   Q.   But that's not what they were using that dog for
17        that evening?
18                  MS. QUINN:  Objection.
19   A.   That is correct.
20   Q.   He was using it for crowd control?
21   A.   Correct.
22   Q.   Why was he using the dog for crowd control?
23   A.   There was many, many, many, many people there,
24        so it was determined that they needed numerous
```

```
 1            officers to assist.
 2    Q.   Well, why not -- do you think that -- why not
 3            bring the dog with a muzzle because there were
 4            plenty of civilians.  You've seen the videotape;
 5            yes?
 6    A.   Yes.
 7    Q.   The perimeter was broken; yes?
 8    A.   It appears to be, yes.  I can't really see that
 9            from that particular video.
10    Q.   But there were civilians walking in relatively
11            close proximity to the dog; yes?
12    A.   Excuse me?
13    Q.   There were a number of civilians walking in
14            relative close proximity to a trained dog?
15    A.   Yes.
16    Q.   To a working dog?
17    A.   Yes.
18    Q.   A working dog that was in high alert because of
19            the number of people that were there?
20                    MS. QUINN:  Objection.
21    A.   I do not know their temperament.
22    Q.   You don't need to know the temperament.  You saw
23            in the video how the dog would continuously
24            bark --
```

```
 1                    MS. QUINN:  Objection.
 2   Q.   -- as people got close to him.  Did you see that
 3        on the video?
 4   A.   I could not hear any barking.  There was no
 5        sound.
 6   Q.   There's no audio, but you can see the mouth of
 7        the dog moving.  Were you able to see that?
 8                    MS. QUINN:  Objection.
 9   A.   I wasn't focusing on that.
10   Q.   You said that the department will keep the crowd
11        control provision but will limit -- I don't want
12        to put words in your mouth.  Tell us exactly how
13        the new policy is going to work?
14   A.   Well, this particular part of it will be that
15        dogs will be used for perimeter only.
16   Q.   For perimeter only?
17   A.   Perimeter only and crowd control.
18   Q.   There were other officers there who belonged to
19        the Rapid Response Team.  Do you know what that
20        is?
21   A.   NRT maybe?
22   Q.   Is it Rapid Response Team?
23                    MS. QUINN:  Objection.
24   Q.   What is it called?
```

```
 1    A.    I don't know what division you're talking about.

 2    Q.    On how many occasions have dogs been used for

 3          crowd control?

 4    A.    I don't have any number.

 5    Q.    The Beer Garden is one of them; right?

 6    A.    Yes.

 7    Q.    The George Floyd protest was another instance

 8          where they were used?

 9    A.    Yes.

10    Q.    How many dogs were used during the George Floyd

11          protest?

12    A.    I don't know how many officers, K-9 officers

13          were at the scene.

14    Q.    During that evening, that's when Tivnan's dog,

15          Mattis, bit another police officer; yes?

16    A.    Correct.

17    Q.    That happened during crowd control?

18    A.    That's what the officer was there for, yes.  I'm

19          not sure of the function at that time.

20    Q.    And then we've gone through the report of

21          Officer Pennellatore with Beebs and I think it

22          was on March 29th of 2019 and Beebs bit Rojas

23          during crowd control as well; right?

24                    MS. QUINN:  Objection.
```

```
 1    A.   He was there originally for crowd control, yes.

 2    Q.   And he bit somebody.  He bit a person, a citizen

 3         of the City during a crowd control situation?

 4                   MR. VIGLIOTTI:  Objection.

 5                   MS. QUINN:  Objection.

 6    Q.   Yes?

 7    A.   The crowd control, he was there for crowd

 8         control, yes.

 9    Q.   And so my question is, how often are these dogs

10         that have been used for crowd control?  Has your

11         department done an audit to figure out what

12         necessitated the dog, whether the dogs bit and

13         what, you know, what could be learned from those

14         instances?

15    A.   They discuss on a regular basis best practices

16         within our department and other departments

17         also.

18    Q.   Let me show you what was marked as Exhibit

19         No. 5.  This is the Beer Garden Bureau of

20         Professional Standards report.  Did you bring

21         yours or I have a copy if you need it?

22                   MR. VIGLIOTTI:  When you say it's

23         been marked as Exhibit 5, is this from a prior

24         deposition?
```

```
 1                    MR. PINEIRO:  Yes.

 2                    MS. QUINN:  This is from Officer

 3          Tivnan's deposition?

 4                    MR. PINEIRO:  Yes.

 5     Q.   Are you familiar with this report, Chief?

 6     A.   Yes.

 7     Q.   Is this something that you reviewed in

 8          preparation for today?

 9     A.   Yes.

10     Q.   Getting back to K-9s, is there a particular area

11          of the body where Worcester dogs are not allowed

12          to bite, they're specifically trained not to

13          bite in certain areas?

14     A.   I'm not familiar with the exact locations.

15     Q.   And do dogs know where they bite and where they

16          should not bite?

17                    MR. VIGLIOTTI:  Objection.

18                    MS. QUINN:  Objection.

19     A.   Their training would dictate that.

20     Q.   And do you know what that training is like?

21     A.   I do not know their full training.

22     Q.   And who is the person under your chain of

23          command who would know that information?

24     A.   It would be Sergeant Watts.
```

```
1    Q.   Would it be Paul Saucier?

2    A.   He wouldn't go to the training.

3    Q.   And would Matt D'Andrea know where they can and

4         cannot bite?

5              MS. QUINN:  Objection.

6    A.   I'm sure he would.  I'm sure he's had that

7         discussion with Sergeant Watts.

8    Q.   If you look at Page 17 there is an area that

9         talks about video evidence.  Have you seen that

10        portion of the report?

11   A.   This is the documented minutes.

12   Q.   It's a summary that your investigators did at,

13        like, a second by second of what is shown in

14        that video; yes?

15   A.   Yes.

16   Q.   And the investigator who wrote the initial

17        report --

18              MR. PINEIRO:  Someone is at your

19        door.

20              (Short recess.)

21   Q.   I know if I got to figure out who the

22        investigator was, I guess it was Mr. Davenport;

23        right?

24   A.   They all had -- I think there was a couple of
```

```
 1           sergeants who also assisted, but it was Kenny

 2           who did the -- Kenny did the investigation.

 3      Q.   And he's a good investigator; yes?

 4      A.   Yes.

 5      Q.   If we go through the video evidence.  Obviously,

 6           before you put your signature, you felt

 7           comfortable with the video evidence, the way

 8           that your subordinate analyzed the video

 9           evidence and even the body worn camera?

10      A.   What is the question?

11      Q.   Did you feel comfortable at the way that they

12           summarized the video evidence in the case?

13      A.   The play by play here?

14      Q.   Yes.  Beginning on Page 17.

15      A.   Yes.

16      Q.   Did you have anything to add to it or did you

17           feel comfortable that they captured the spirit

18           of what appears in those videos?

19                     MS. QUINN:  Objection.

20      A.   As best as could be described, yes.

21      Q.   And you carefully reviewed the entire report

22           before you put your signatures to it?

23      A.   Yes.  And then we added, I think we did a --

24      Q.   Like a supplement?
```

```
 1    A.    A follow-up.

 2    Q.    A follow-up.  Okay.  But if we go through the

 3          video evidence.  If you look at -- I think it's

 4          Page 18.  Let's see if I can find it here.  You

 5          see at 39:58, PO Tivnan arrives on scene with

 6          K-9 Mattis?

 7    A.    Yes.

 8    Q.    He places himself 1 to 1.5 yards away from the

 9          wall of the building facing toward Franklin

10          Street; yes?

11    A.    Is that a question?

12    Q.    Yes.

13    A.    Yes.

14    Q.    And then if you read a few sentences down, still

15          at 39:58, PO Tivnan holds K-9 Mattis' leash

16          close to collar; yes?

17    A.    Yes.

18    Q.    40:19, Mr. Ayala-Melendez is seen approaching

19          from the west around the corner of Portland

20          Street with a female (hereafter referred to as

21          un-sub 3).  Mr. Ayala-Melendez is wearing a pink

22          hooded sweatshirt.  Un-sub 3 is wearing a

23          multi-colored grey hooded sweatshirt and jeans.

24                     Did I read that right?
```

```
 1    A.    Yes.

 2    Q.    40:27, second sentence, Mr. Ayala-Melendez stops

 3          in front of PO Edwin Guzman and raises his right

 4          arm pointing in an easterly direction; yes?

 5    A.    Yes.

 6    Q.    PO Tivnan then turns and observes Mr.

 7          Ayala-Melendez who has his left hand in his

 8          sweatshirt pocket.  PO Tivnan then grabs Mr.

 9          Ayala-Melendez' left arm with his right hand and

10          then pulls him forcefully across the front of

11          his body.  In turn, placing Mr. Ayala-Melendez

12          directly in front of K-9 Mattis; yes?

13    A.    Yes.

14    Q.    And you agree that that's what you saw in the

15          tape, not guiding, but pulling him forcefully

16          across the front of his body?

17    A.    And I still can use the term guiding if he

18          believes he was guiding him in a direction.

19    Q.    But you couldn't take -- you wouldn't quarrel

20          with the characterization of Captain Davenport

21          and his investigators that he forcefully pulled

22          him across in front of his body placing him in

23          front of K-9 Mattis.  That's what happened?

24                MS. QUINN:  Objection.
```

```
1    A.   I would use both languages.  I would use both
2         adjectives, if you will.
3    Q.   But the language you want to use is -- the
4         guidance is not here.
5    A.   The guidance, it's not in this report.
6    Q.   Is it in any other report?
7    A.   No.
8    Q.   No?
9    A.   No.
10   Q.   So this seems to suggest that by doing what he
11        did, it was predictable that the dog would bite?
12                  MR. VIGLIOTTI:  Objection.
13                  MS. QUINN:  Objection.
14   Q.   No?
15   A.   I would say no.
16   Q.   Because we don't know what the dog is thinking?
17   A.   Exactly.
18   Q.   Do we need to know what the dog is thinking to
19        predict that the dog is going to bite?
20                  MR. VIGLIOTTI:  Objection.
21                  MS. QUINN:  Objection.
22   A.   I guess we would have to know what the dog was
23        thinking.
24   Q.   We'll take him out for a beer one of these days
```

```
 1           and we'll have a beer.
 2      A.   I don't think that's going to happen any time
 3           soon.
 4      Q.   Yeah.
 5      A.   I don't think Beebs --
 6      Q.   Was the dog retired?
 7      A.   Yes.
 8      Q.   So what prompted this investigation?  Does the
 9           Bureau of Professional Standards state how this
10           investigation was going?
11      A.   What's the first sentence?
12      Q.   The investigation was initiated by you?
13      A.   Yes.
14      Q.   As a matter of fact, it was initiated by you.
15           Was that as a result of what some of the people
16           that were arrested that evening told the booking
17           officer they had been subjected to?
18      A.   It did come from the service division, yes.
19      Q.   Did you look at every booking video of the
20           different individuals that were arrested that
21           evening?
22      A.   I did not.
23      Q.   Did you look at the one for Natali Price or
24           Octavia Miller?
```

1    A.    I did not.

2    Q.    Monique Agbanyo or Robert Gould?

3    A.    No.  I did not.

4    Q.    I understand that your Internal Affairs policy

5          has changed in the department, that you now

6          interview every officer that's being

7          investigated?

8                     MS. QUINN:  Objection.

9    A.    Interviews.

10   Q.    Interviews, face-to-face interviews?

11   A.    As opposed to asking for reports.

12   Q.    Right.  As opposed to --

13   A.    We have made a practice to interviewing.

14   Q.    But now you've changed the practice?

15   A.    Now we interview.

16   Q.    Now you interview?

17   A.    Yes.

18   Q.    That's not in your most recent policies.  Is

19         there any reason why it's not listed there?

20                    MS. QUINN:  Objection.

21   A.    I would have to review it.

22   Q.    Why did you decide that from now -- when did you

23         decide that you were going to interview

24         everybody that was accused of any police

```
1              misconduct or conduct unbecoming?
2      A.     That would be a recommendation from Captain
3              Davenport.
4      Q.     And when did he recommend that to you?
5      A.     I don't recall.
6      Q.     Why did he recommend that to you?
7      A.     Best practice.
8      Q.     And when was that instituted?
9      A.     I don't recall.
10     Q.     Does it mean that before that time the police
11             department did not adhere to best practice?
12                    MR. VIGLIOTTI:  Objection.
13                    MS. QUINN:  Objection.
14     A.     I would say no.
15     Q.     The idea of asking --
16     A.     I was always trying to do better.
17     Q.     Fair.  What advantage do you see in interviewing
18             police officers during investigations?
19                    MS. QUINN:  Objection.
20     A.     It's a good investigatory practice.
21     Q.     Do they have them face to face and see how they
22             react to questions?
23     A.     Yes.
24     Q.     Yes?
```

1    A.    Yes.

2    Q.    I mean, you have -- how many detectives do you

3          have working for you in the department?

4    A.    I don't know the number.

5    Q.    When they investigate crimes, they don't send

6          criminals questionnaires to see what they think

7          about what happened?

8                    MR. VIGLIOTTI:  Objection.

9                    MS. QUINN:  Objection.

10   Q.    Did you ever see detectives sending IDCs to

11         people to see what happens in a crime?

12                   MS. QUINN:  Objection.

13   A.    No.

14   Q.    Not a good practice; right?

15                   MS. QUINN:  Objection.

16                   MR. VIGLIOTTI:  Objection.

17   A.    Depends.  I guess it depends on the

18         investigator.

19   Q.    Can we go to Page 40, please, of Captain

20         Davenport's report.  And talking about

21         interviews, was Tivnan interviewed for this

22         investigation or was he sent an IDC?

23   A.    I did not do the investigation.  I just read the

24         investigation.

```
 1    Q.    No.  A different question.  Was he interviewed

 2          face to face as part of this investigation?

 3    A.    I believe so.

 4    Q.    And where does it show that he participated in a

 5          face-to-face interview?

 6    A.    I don't know.

 7    Q.    Can you find it?

 8    A.    I don't see the report.

 9                MS. QUINN:  You got somebody in your

10          lobby.

11                (Discussion off the record.)

12    Q.    Page 32.

13    A.    It was an IDC response.  It was done in a

14          report.

15    Q.    So he was sent a number of questions to answer?

16    A.    Yes.

17    Q.    So he's never been interviewed by the Bureau of

18          Professional Standards?

19    A.    Not face to face.  It was done --

20    Q.    He was asked six questions to answer; right?

21    A.    Yes.

22    Q.    And you determined that he was not truthful when

23          he gave those answers?

24                MS. QUINN:  Objection.
```

1    A.    What I determined was that his -- his report did

2          not match the video.

3    Q.    That he lied?

4    A.    That it was inaccurate, yes.  That the report --

5          his report was inaccurate.

6    Q.    And it resulted in a person that never been

7          charged with a crime having to go to court?

8                    MR. VIGLIOTTI:  Objection.

9                    MS. QUINN:  Objection.

10   A.    He was -- his charges were dismissed.

11   Q.    But not at your request.  It was dismissed by

12         the District Attorney's office?

13   A.    Yes.

14   Q.    Did you ever suggest as part of the

15         investigation that the -- as you investigated

16         the case, that the charges should be dismissed,

17         that your department would withdraw the charges?

18   A.    Myself?

19   Q.    Yes.

20   A.    I did not, no.

21   Q.    Any reason why that did not happen?

22   A.    It had already gone through the clerk.  It had

23         already been determined that there was probable

24         cause, so --

```
 1    Q.    Who cares about what the clerk says.  There was

 2          a video that, you know, in reality, it was a

 3          video.  Once you saw that video, you realized

 4          this kid did not belong in court?

 5                    MR. VIGLIOTTI:  Objection.

 6                    MS. QUINN:  Objection.

 7    Q.    Did you say that to yourself?

 8                    MR. VIGLIOTTI:  Objection.

 9                    MS. QUINN:  Objection.

10    A.    No.

11    Q.    Did you say, My God.  These charges have to be

12          dropped immediately?

13                    MS. QUINN:  Objection.

14    A.    No.

15    Q.    Did that cross your mind?

16    A.    To call the District Attorney's office?

17    Q.    Yes.

18    A.    No.

19    Q.    To say, Drop the charges?

20    A.    No.

21    Q.    Why not?

22    A.    Because I was letting the court system do what

23          the court system does.

24    Q.    Look what Gemme said.  Gemme said, Drop the
```

```
 1            charges for Oliveira?
 2    A.     He wasn't the chief when it happened.
 3    Q.     You felt that there was a basis to -- once you
 4            saw the video, to continue pushing the case?
 5    A.     Well, I'm not proficient in videos, so I wanted
 6            to make sure that --
 7    Q.     But you're proficient in the policies and
 8            procedures and being chief then and calling
 9            strikes when you need to call a strike and
10            calling a ball when you need to call a ball?
11                    MS. QUINN:  Objection.
12    Q.     Yes?
13    A.     I'm not responding to your metaphors for balls
14            and strikes.
15    Q.     Well, I mean, at the end of the day, you're the
16            guy that decides whether somebody complied with
17            the rules or not?
18    A.     Well, there was still investigations to be done
19            and the District Attorney did his investigation
20            and his synopsis and he dropped the charges and
21            we did not argue that.  I did not argue it.
22    Q.     Did you agree with the District Attorney?
23    A.     Did I agree with him?
24    Q.     Yes.
```

```
 1    A.    Yes.  When we sat down and discussed it.

 2    Q.    Did he call you to discuss it in advance?

 3    A.    Not in advance, no.

 4    Q.    You just learned that it had been dismissed?

 5    A.    Yes.  He notified us that they were dismissing

 6          the charges.

 7    Q.    Somebody --

 8    A.    Well, his office notified my office or the -- I

 9          believe it was BOPS said they notified.

10    Q.    Bob?

11    A.    BOPS, Bureau of Professional Standards.

12    Q.    I want to go to Page 40, An unintended bite did

13          result as a byproduct of using the K-9 team at a

14          crowd scene described on unruly, riotous,

15          violent and assaultive; right?

16    A.    Yes.

17    Q.    And at any point in time did you make a

18          determination that Ayala-Melendez was unruly,

19          riotous, violent and assaultive?

20    A.    Did I?

21    Q.    Yes.

22    A.    I never made -- no.

23    Q.    Did anybody make that determination?

24                  MS. QUINN:  Objection.
```

```
1    A.   I don't know if others made that determination.

2    Q.   Did you see anything in the video that suggested

3         that he was unruly, riotous, violent or

4         assaultive?

5                   MS. QUINN:  Objection.

6    A.   No.

7    Q.   Whose choice of words was that, an unintended

8         bite?

9    A.   I think that's what they call it.  That's the

10        terminology they use when it's unintended.  It

11        wasn't -- it was not intended.  There was no

12        order from the officer.

13   Q.   So if there's no order and the dog bites, then

14        it's unintended?

15   A.   That's the language they use.

16   Q.   But the language they used was that the dog

17        would be protective of his owner regardless of

18        an order?

19                  MS. QUINN:  Objection.

20   A.   Yes.

21   Q.   And do you feel that the pushing, as your

22        investigators concluded and you concluded, that

23        that was a foreseeable consequence of pushing

24        and pulling Ayala-Melendez in front of the dog?
```

```
 1                    MS. QUINN:  Objection.
 2   A.   I don't know if foreseeable, but certainly poor
 3        judgment.
 4   Q.   No doubt Ayala-Melendez got bit by a police K-9?
 5   A.   Yes.
 6   Q.   No doubt in your mind that he shouldn't have
 7        been bitten by a K-9?
 8                    MS. QUINN:  Objection.
 9   Q.   But for the actions of Tivnan?
10                    MS. QUINN:  Objection.
11   A.   Once again, the dog, he was -- it was poor
12        judgment having the dog.
13   Q.   You don't think that he intended the dog to do
14        what he did?
15   A.   No.  I do not believe it was intentional.
16   Q.   But you've never interviewed him.  None of you
17        people interviewed him exactly to see what he --
18        what was in his mind?
19   A.   Right.  They did the -- at that time what the
20        process was with his -- I think with his union
21        representation.
22   Q.   The process was under Policy 500.  You had the
23        power to order anyone to submit to a statement;
24        yes?
```

```
 1   A.   Yes.

 2   Q.   But that's not something that you chose in this

 3        case?

 4   A.   He did cooperate with his IDC.

 5   Q.   I know he was in the IDC, but you had the choice

 6        to say, Let's find out what's in his mind.  Did

 7        he intend it or did he not intend it?

 8             MS. QUINN:  Objection.

 9   Q.   That's the only way that you can find out.  Not

10        by sending him a question, Did you intend for

11        this to happen?

12             MS. QUINN:  Objection.

13   Q.   Yes?

14   A.   I could have ordered it, sure.

15   Q.   So there are advantages of interviewing people?

16   A.   Yes.

17   Q.   You can get to what were they thinking of at the

18        time?

19             MR. VIGLIOTTI:  Objection.

20   Q.   Page 42.  On Page 41, Ed McGinn, your deputy,

21        agreed with the sufficiency and logic of the

22        investigation; yes?

23             MS. QUINN:  Objection.

24   Q.   Page 41?
```

```
 1                  MS. QUINN:  Objection.
 2   A.   He's signed, yes, agreed.
 3   Q.   And the chief section begins on Page 42?
 4   A.   Yes.
 5   Q.   Different officers, Kenneth Carville, exonerated
 6        of the alleged excessive force of Monique
 7        Agbanyo; yes?
 8   A.   Yes.
 9   Q.   She says, She was thrown to the ground while
10        being placed under arrest; yes?
11                  Did you look at the videotape of
12        Monique Agbanyo's arrest?
13   A.   I did not investigate that.  I did not.
14   Q.   What about Natali Price, She received a bruise
15        and abrasion of her right elbow.  She claimed
16        this was the result of excessive force?
17   A.   Officer Prizio was exonerated.  Yes.
18   Q.   Did you ever look at the videotape of her actual
19        arrest?
20   A.   No.  I did not.
21   Q.   Or what she said during the booking?
22   A.   I did not.
23   Q.   That she had been knocked out unconscious?
24   A.   I did not.
```

1               MS. QUINN:  Objection.

2    Q.   And Brett Kubiak was also exonerated regarding

3         an allegation of Octavia Miller, that she was

4         thrown to the ground while being placed under

5         handcuffs?

6               MS. QUINN:  Under arrest.

7               MR. PINEIRO:  Under arrest, yes.

8    A.   Yes.

9    Q.   Did you view the videotape of her arrest?

10   A.   I did not.

11   Q.   Do you think that that would have been helpful

12        one way or the other?

13              MS. QUINN:  Objection.

14   A.   For me to do it, I left the professional -- our

15        Bureau of Professional Standards did an

16        outstanding job.

17   Q.   You feel they're better than you in terms of

18        analyzing videos?

19              MS. QUINN:  Objection.

20   A.   I just trust that they're in the best interest

21        of the City and of the citizen.

22   Q.   It's not because you're too busy to watch these

23        videos; right?

24              MS. QUINN:  Objection.

```
1    A.   That's not why I didn't.  I didn't get involved

2         in that portion of the investigation.

3    Q.   And then Page 44 on the unnecessary use of

4         force, Ayala-Melendez, He was bit by a police

5         dog, a police K-9 during arrest.  He claimed

6         this was a result of excessive force, and he was

7         exonerated even though he was bit?

8    A.   He was not exonerated.  Oh, the unnecessary

9         force.

10   Q.   Of the unnecessary force.

11   A.   Yes.

12   Q.   What does it mean to be exonerated?

13   A.   That means that something that occurred but it

14        was -- paraphrasing -- it was done within the

15        law or the policies.

16   Q.   What do you need to sustain a complaint?  How

17        much proof do you need?

18   A.   It depends on the case.

19   Q.   So different cases have different standards or

20        how does it work?

21                  MS. QUINN:  Objection.

22   A.   Well, it depends on the investigation and what

23        we can determine from the investigation.

24   Q.   What do you need to sustain a complaint?
```

```
 1                    MS. QUINN:  Objection.
 2   Q.   Does it need to be on video or no?
 3   A.   No.
 4   Q.   Do you need to have neutral witnesses?  No?
 5   A.   Depends on the case by case.
 6   Q.   So what's the standard?  How much proof does a
 7        person that complains that their rights were
 8        violated need to offer your department for that
 9        complaint to be sustained?
10   A.   It's case by case.
11                    MS. QUINN:  Objection.
12   Q.   Is there a standard, something with which you
13        measure?  How much proof?  Does it have to be
14        clear and convincing evidence?
15                    MS. QUINN:  Objection.
16   Q.   What is your thought on that, Chief?
17   A.   What's my thought on that?
18   Q.   Yes.
19   A.   It needs to, you know, be investigated properly
20        and it's case by case.
21   Q.   So does it have to be a lot of proof or does it
22        have to be more likely than not?
23   A.   It just needs to be proved.
24   Q.   What's that?
```

```
1    A.   It just needs to be proved.  That's all.  It's

2         not a court of law.  It's certainly, you know,

3         whatever -- once again, it's case by case.  It's

4         case by case and, you know, looking at each

5         policy during each investigation and piece by

6         piece, go through the policy and see if there's

7         any violations.

8    Q.   So does the complainant clearly need to prove

9         that a violation occurred?

10                  MS. QUINN:  Objection.

11   A.   No.  It's case by case.  It's case by case.

12   Q.   So there are no standards.  Simply the

13        investigator's determine case by case what is

14        the outcome of the investigation?

15                  MS. QUINN:  Objection.

16   A.   Yeah.  Case by case, yes.

17   Q.   Here you felt that the video didn't present

18        enough evidence that Tivnan used unreasonable

19        force.  That he used more physical force than

20        which was reasonably necessary to accomplish

21        proper police objective?

22   A.   Correct.

23   Q.   But differently you felt that what he did was

24        appropriate in terms of the use of force?
```

```
 1   A.   Well, it wasn't appropriate.  It just -- because

 2        it was an accidental, if you will, an unintended

 3        biting, being in that situation, as I've said,

 4        being in there, I thought it was poor judgment,

 5        but the policy was not specific enough.

 6   Q.   So the policy --

 7   A.   As far as --

 8   Q.   And this was the policy that you prepared; yes?

 9   A.   Well, I signed off on it, yes.

10   Q.   On the basis of the information that your

11        subordinates gave you?

12   A.   From their training and their expertise, yes.

13   Q.   But, you know, the policy said that they were

14        not to be used for crowd control unless

15        permission was obtained?

16             MS. QUINN:  Objection.

17   A.   There needs to be a supervisor calling under.

18   Q.   Who was the supervisor here that day?  Was it

19        Justin Bennes?

20   A.   Yes.  He was the operations -- he was the

21        operations sergeant, yes.

22   Q.   He's a sergeant?

23   A.   Yes.

24   Q.   Was he trained on this policy, in the K-9
```

```
 1          policy, or he just didn't know anything about
 2          it?
 3    A.    The -- he's not trained in the policy.  He is
 4          not the K-9, but he has the authority to request
 5          the K-9.
 6    Q.    Can you hear him on the dispatch calling for K-9
 7          officers?
 8    A.    No.  They called for all -- they called for all
 9          available officers.
10    Q.    And Tivnan took it upon himself to get his dog
11          out and inject the case into a volatile
12          situation that existed that night?
13                    MS. QUINN:  Objection.
14                    MR. VIGLIOTTI:  Objection.
15    A.    It was a -- yes, he did.  He did bring the dog
16          into that situation.
17    Q.    And Sergeant Bennes was not interviewed for this
18          process; right?
19    A.    As far as did they interview, they did -- did
20          BOPS interview him?
21    Q.    Yes.
22    A.    No.
23                    MS. QUINN:  I need to take a break.
24                    MR. PINEIRO:  Sure.
```

```
 1                     (Short recess.)

 2                 MS. QUINN:  We need to clarify a

 3        prior answer.  Chief Sargent was confused by a

 4        question regarding the standard of proof needed

 5        for the Bureau for Professional Standards

 6        investigation or a complaint to be sustained.

 7                 MR. PINEIRO:  No problem.  You can

 8        ask him on redirect.

 9                 MS. QUINN:  No.  We would like to

10        clarify an answer.

11   A.   Because of your -- I was being more case by

12        case, we need the information.  You know, it's

13        certainly -- it's sufficient evidence for the

14        finding of sustained.  We need the sufficient

15        evidence.  I was actually being more generic

16        about we need case by case just -- it's so --

17        but to do the -- to sustain, we want the

18        sufficient evidence.

19   Q.   What is sufficient evidence?

20   A.   You see, that's where the case by case.  It

21        depends on the case and how much information we

22        receive and if the complainant -- the

23        complainant -- it's my Lincoln Street

24        vernacular, if they don't speak to us, if
```

1          they're not allowed to speak to us or they don't

2          speak to us or they don't give us enough

3          information, that would be tough.

4                    It's tough to get a sustained because

5          we don't have enough information, but if we have

6          even if -- without the complaint, the person

7          making the complaint, we can still sustain if we

8          have sufficient evidence.

9     Q.   But your rules and regulations say if they don't

10         want to talk to you, they can send an affidavit

11         and you have to consider it?

12    A.   Yes, we do.  Sure.  Any time there's a

13         complaint, even if while we're in here and I

14         seen another complaint, according to our policy,

15         we would -- I would have to bring up another --

16         I would have to start a BOPS investigation.  If

17         it comes in anonymously, we still do a BOPS

18         investigation, so without the information,

19         without the person speaking to us, we could

20         still -- we could still sustain if we have the

21         sufficient evidence.

22    Q.   So you ideally would like to talk to the

23         complainant and figure out exactly what happened

24         and figure out all the different nuances?

1    A.    Yes.

2    Q.    Get as much detail as you can?

3    A.    Interviews if need be.

4    Q.    If there's a video, show them the video?

5    A.    Exactly.

6    Q.    Just like you do now with police officers?

7    A.    Yes.

8    Q.    So sufficient evidence means a lot of evidence

9          or --

10   A.    No.  Sufficient.

11   Q.    Quite a bit of evidence?

12   A.    Sufficient enough to clearly sustain or find a

13         person responsible for what was the accusation,

14         whatever the accusation was.

15   Q.    Does your policy define what the term sufficient

16         evidence means for purposes of BOPS, Rule 500 or

17         Policy 500?

18                   MS. QUINN:  Objection.

19   A.    Does it?

20   Q.    Define sufficient evidence?

21   A.    Sufficient evidence itself?

22   Q.    Yes.

23   A.    I would have to review to see if actually -- to

24         see if it is -- but sufficient evidence would be

```
 1          what we deem enough to find the person

 2          responsible.

 3     Q.   What your department determines to be sufficient

 4          evidence?

 5     A.   Yes.  Sufficient being sufficient enough, being

 6          enough to find a person responsible to sustain,

 7          to use that evidence to find a person

 8          responsible or not enough evidence, we would not

 9          sustain.

10     Q.   Is there a difference in your line between

11          sufficient evidence and preponderance of the

12          evidence?

13     A.   It's a good question.  I think it's --

14     Q.   You think there is?

15     A.   I think it's similar.  I think if you have to

16          find the evidence, but it would be sufficient

17          evidence, I suppose, yeah.

18     Q.   So sufficient evidence is preponderance of the

19          evidence or is it different?

20               MS. QUINN:  Objection.

21     A.   We can --

22     Q.   You've been around the courts a long time?

23               MS. QUINN:  Objection.

24     A.   Sure.  Yes, I have.
```

```
1    Q.    Yeah.  Does that mean more likely than not,

2          preponderance of the evidence?

3    A.    I don't know the exact -- what the exact

4          definition would be, but --

5    Q.    More likely than not?

6                    MS. QUINN:  Objection.

7    A.    I don't know what the exact --

8    Q.    And as you sit here, you can't tell me what

9          sufficient -- sorry.  I cut you off.

10   A.    I'm not defining preponderance of the evidence.

11         I mean, but --

12   Q.    You don't know what it is?

13   A.    I know what it is, but I'm just saying there's

14         sufficient, you know, if the evidence is

15         sufficient to find a sustained, then we would do

16         it.  And once again, it's case by case.  We have

17         to see the information and have the evidence and

18         go from there.

19   Q.    Got it.  So exonerated of the unreasonable force

20         and your position is not that the use of force

21         was reasonable.  It was just that it was

22         unintended?

23   A.    Unintended.

24   Q.    But not -- you don't know think the force --
```

1      having a dog bite to you is not reasonable ever?

2                  MS. QUINN:  Objection.

3   A.   It could be reasonable.

4   Q.   Yes.  But not here?

5                  MS. QUINN:  Objection.

6   A.   Correct.

7   Q.   And then policy failure.

8   A.   Correct.

9   Q.   Why is there so many policy failures in the

10       Worcester Police Department?

11                 MS. QUINN:  Objection.

12  A.   Well, this particular one here was because it

13       was not -- it was vague, I believe, as far as

14       the crowd control portion of it.  That was

15       vague, so we're in the process of tightening up

16       the practices.

17  Q.   But policies are not an independent piece of

18       paper that walks on its own.  These are human

19       polices that --

20  A.   We do risk management on a regular basis.

21  Q.   I can think of another policy failure.  There

22       was some time ago where it was a period of time

23       where under the use of force policy, you could

24       smack people or hit them on the face so they

```
 1           would not swallow drugs; right?
 2                     MS. QUINN:  Objection.
 3      A.   I don't believe it was a policy.  I don't
 4           believe it was in a policy.
 5      Q.   It wasn't in the policy, so officers thought
 6           they were not restraining and hitting or putting
 7           their fingers in people's mouths to prevent them
 8           from ingesting drugs?
 9                     MS. QUINN:  Objection.
10      Q.   Yes?
11      A.   It wasn't in the policy, so that policy has
12           since been changed.
13      Q.   So now if somebody swallows a drug, you cannot
14           hit them?
15      A.   No.  Of course not.
16      Q.   Bring them to the hospital?
17      A.   Yeah.
18      Q.   But Gary Gemme, do you remember Gary Gemme
19           testified in this case?  He said there was no
20           policy failure.  He said the officers knew that
21           they couldn't put their hands on people unless
22           they were resisting?
23                     MR. VIGLIOTTI:  Objection.
24                     MS. QUINN:  Objection.  Objection to
```

1        the characterization of that testimony.

2   A.   I don't know what he testified to.

3   Q.   You never were at his deposition.  He said it

4        was wrong.  He said, They shouldn't have put

5        their hands on this person?

6                  MS. QUINN:  Objection.

7   A.   Again, I was not here for his interview.

8   Q.   Okay.  Got in.  What type of officer was Tivnan

9        before any of this happened?

10  A.   A patrol officer.

11  Q.   A good officer?

12  A.   I don't know of his -- I was not his immediate

13       supervisor.

14  Q.   Well, I seen in BOPS investigations how the

15       criminal record of a complainant appears in the

16       record but not the disciplinary history of the

17       officer.  Why is that?

18  A.   Say that again?

19  Q.   I've seen some BOPS investigations, the criminal

20       record of a person, if they have a criminal

21       record, their Board of Probation, what their

22       charges have been in the past, but I've never

23       seen in any of the BOPS investigations what the

24       record of the officer was for other complaints

```
 1              of excessive force.  Why is that?
 2                   MS. QUINN:  Objection.
 3       A.    I don't know.  I don't know where you're going
 4              with the question.  What is it you're looking
 5              at?
 6       Q.    What I'm trying to figure out is, is there
 7              anything in this BOPS investigation involving
 8              Tivnan that tells us what his prior record was,
 9              like how many complaints he had, did they
10              involve excessive force, did they involve
11              anything that said that he had lied or --
12                   MS. QUINN:  Objection.
13       A.    I don't know why that would be part of this
14              investigation.  A prior investigation must be
15              similar.
16       Q.    Unless it's similar?  If it isn't similar, then
17              there's no need to look at them?
18       A.    Sure.  Well, BOPS does look at their priors.
19       Q.    But BOPS doesn't say anything in the reports
20              about their priors; right?
21       A.    It's usually for sentencing, if you will, for
22              discipline.
23       Q.    Got it.
24                   MR. PINEIRO:  Let me mark this one as
```

1        the next.

2                      (Incident card marked

3                      Exhibit No. 8.)

4    Q.   Have you ever seen that document; Chief?

5    A.   Is this one from BOPS?

6    Q.   Yes.

7    A.   Yes.  I've seen one, sure.

8    Q.   What is an officer incident card?

9    A.   It would be the complaints against the

10       individual officer.

11   Q.   He had an investigation on November 13th of

12       2017.  Do you know what it involved?

13   A.   I did not review that case, so --

14   Q.   And it says, Chief initiated investigation.

15       What does that mean?

16   A.   That I initiated the investigation.

17   Q.   Do you know what it was?

18   A.   I do not right now.

19   Q.   Was that a full blown investigation or was that

20       simply a commander's investigation?

21   A.   I would have to look at it.

22   Q.   And what about the previous one, it doesn't say

23       the name, but Bray, Gregory.  Do you know what

24       that was?

```
 1    A.   I do not.

 2    Q.   On the November 13, 2017, he was exceptionally

 3         cleared of discourtesy and conduct unbecoming?

 4    A.   Yes.

 5    Q.   And on the Gregory Bray, he was exonerated; yes?

 6    A.   Yes.

 7    Q.   And there is another complaint against him on

 8         March 10th, 2013, and it was not sustained?

 9    A.   Yes.

10    Q.   And do you know what that complaint involved?

11    A.   I do not know.

12    Q.   And you weren't chief by that period of time;

13         right?

14    A.   No.

15    Q.   But you would have been chief during the Bray

16         incident and also during the other incident that

17         you initiated?

18    A.   Yes.

19    Q.   Did you review any materials in connection with

20         the Beshai investigation to prepare for today?

21    A.   I reviewed the reports, yes.

22    Q.   What type of officer was Paul McCarthy?

23    A.   He had a career up until a certain point.

24    Q.   What happened to him after a certain point?
```

1   A.   I don't know.  I don't know.  He had some

2        issues.

3   Q.   What were the issues that he had?

4   A.   Well, he had some health issues.

5   Q.   Related to what, mental health?

6              MS. QUINN:  Objection to the extent

7        that you're asking about mental health and

8        health issues.  I'm going to instruct this

9        witness not to answer.

10             MR. PINEIRO:  I'll reserve.  To the

11       extent that mental health may have played a role

12       in an injury to this child is clearly relevant.

13       And to the extent that it had anything to do

14       with discipline is also relevant, so let me ask

15       again.

16  Q.   Can you detail the nature of the difficulties

17       that he had?  What were the health problems and

18       how they may have impacted his ability to

19       police?

20             MS. QUINN:  Objection.  To the extent

21       that you're requesting protective medical

22       information, I instruct the witness not to

23       answer.

24  Q.   Okay.  Did any of this involve not privileged

```
 1        medical information?
 2                    MS. QUINN:  In what?  Objection.
 3   Q.   Did you understand my question?
 4   A.   Yes, I do.
 5                    THE WITNESS:  Can I have one moment?
 6                    (Short recess.)
 7   A.   The question?
 8   Q.   Was he ever the subject of any fitness for duty
 9        exam?
10   A.   He had been involved with the fitness for duty
11        on time, but his domestic -- he had some issues
12        with domestically that led to his medical
13        conditions.
14   Q.   What issues?  He's not a married guy.  What
15        domestic issues did he have?
16   A.   He was divorced.
17   Q.   And were they -- did the police ever have to
18        respond on the domestic charges against him?
19   A.   No.  Not that I'm aware of, no.
20   Q.   And so what were the issues that were the
21        domestic issues that you knew that he had?
22   A.   He had left his wife and he was -- I don't know
23        if they were living together or what the whole
24        situation was, but he had a significant other
```

```
 1            and a child, not his child, but I think he took

 2            the child under his wing.  I'm not 100 percent.

 3   Q.   How did that impact his ability to be a police

 4            officer?

 5   A.   Ended up -- he had some medical conditions as a

 6            result of his domestic.

 7   Q.   And the conditions that he had, were they mental

 8            health conditions that developed?

 9   A.   I'm not a doctor by any means.  He had some

10            medical conditions.

11   Q.   Let me say this.  If this has to do any with any

12            drugs or alcohol, I'll keep it under seal.  I

13            have no problem doing that.

14                    Was there an issue having to do with

15            abuse of drugs or alcohol and I'll absolutely

16            keep it under seal?

17                    MR. PINEIRO:  Do you want to talk

18            about it?  I'll step out.

19                    MS. QUINN:  Okay.  Sure.

20                    (Short recess.)

21                    MS. QUINN:  What was the question?

22                    MR. PINEIRO:  The question was, I

23            mean, whatever led him into a fitness for duty,

24            was it a mental health, you know, if it's a
```

1      mental health, the depression, psychosis, to me,

2      it doesn't matter.  I'll keep that under

3      protective order.  If it's drugs or alcohol, I

4      will keep it under protective order, sealed.  It

5      cannot be disclosed outside of this deposition.

6                MS. QUINN:  And we really -- we take

7      the position that we can't disclose that,

8      violation of HIPAA.  That we can't disclose that

9      of an employee without a court order or some

10     other -- I'm sorry.  But the chief cannot

11     testify about that.

12                MR. PINEIRO:  So I know that Robin

13     circulated something on 7/21.  Can we just add

14     it as something to discuss during that?

15                MS. QUINN:  Sure.

16                MR. PINEIRO:  Sounds good.  I'll

17     reserve on those grounds.

18  Q.  Were there any other problems that developed

19     that were -- that you think were not related to

20     HIPAA issues or medical issues or mental health

21     issues that affected his ability to do his job?

22  A.  No.

23  Q.  Paul had been trained as a negotiator?

24  A.  Uh-huh.

```
1    Q.   Yes?

2    A.   Yes.

3    Q.   I believe at one point some people say he was

4         one the nicest people in the police force?

5    A.   He was a nice kid.

6    Q.   Personable?

7    A.   Yes.

8    Q.   Didn't usually go hard on people?

9    A.   Not that I'm aware of.

10   Q.   What happened at St. Vincent's?  What happened

11        that he would do something like that?  Was that

12        something out of the blue?

13   A.   Yes.

14   Q.   Had he had any problems before where he had been

15        accused of taking money from people or anything

16        like that that you're aware of?

17   A.   Not that I'm aware of, no.

18   Q.   You know, what was his disciplinary history

19        like?

20   A.   I would have to see his card.  I would have to

21        see his card.  If I recall, it's, again,

22        probably -- it wasn't significant.

23   Q.   I saw a complaint that -- and I can find it in a

24        couple of minutes that predated this incident.
```

```
1          It may have been an event in 2013 sometime.  Let
2     me see if this jogs your memory.  It was a
3     commander investigation that involved Matt
4     D'Andrea and a guy gets, a Spanish dude gets
5     arrested.  His girlfriend, a young lady by the
6     name of Michelle McCarthy complains to the
7     police department that her boyfriend was hit
8     after he was handcuffed and she alleged that
9     Paul came over to remove, physically remove the
10    phone that she had with which she had supposedly
11    recorded the encounter.
12              Do you remember anything about that
13    event involving Paul McCarthy?
14              MS. QUINN:  Objection to that
15    characterization.  Go ahead.
16  A.  I do not recall.
17  Q.  How did the police become aware of that incident
18    at St. Vincent's Hospital involving Paul
19    McCarthy?
20  A.  I'm not sure how we were notified, but there was
21    a video of the incident and I'm not sure how --
22    who made the complaint.
23  Q.  He was never arrested for that incident; right?
24  A.  No.
```

```
 1    Q.    Even though the amount that it involved would

 2          have been an arrestable offense if the police

 3          wanted to arrest him?

 4    A.    I don't recall the number.

 5    Q.    In those days, do you know if it was a figure of

 6          about $1,000?

 7    A.    It sounds about right.

 8    Q.    How long had Paul been a police officer?

 9    A.    I don't know.  I don't remember actually when he

10          got on the job.

11    Q.    When -- was it you who investigated it or was it

12          Chief Gemme?

13    A.    I'd have to see the date on it.

14    Q.    I think that happened in 2019.

15    A.    If it was '19, it was me.  If it was '19.

16    Q.    Did you see the videotape of him picking up a

17          wallet or --

18    A.    Yes.

19    Q.    It must have been shocking to see something like

20          that?

21    A.    Yeah.  Yes.

22    Q.    I guess he went in some type of room and came

23          out, turned in the wallet but the wallet didn't

24          have any money?
```

```
1    A.   I would have to review -- I would have to review
2         the reports, but, you know, that sounds about
3         right.
4    Q.   Obviously it was something painful, to see a
5         colleague getting embroiled in something like
6         that?
7              MS. QUINN:  Objection.
8    Q.   Nobody likes to see that.
9              MS. QUINN:  Objection.
10   A.   It was -- it was -- I felt bad for the kid.  I
11        felt bad for the victim also.
12   Q.   He -- who applied for a criminal complaint?  Was
13        it the victim or did the department apply for a
14        criminal complaint?
15   A.   I'd have to -- well, we would do the complaint.
16        I'm not sure who actually filed.
17   Q.   Why wasn't there a direct complaint?  In other
18        words, my understanding is he had a clerk
19        magistrate hearing.  Why did he -- why was he
20        given the option of having a clerk magistrate
21        hearing?
22   A.   Efficiency maybe.  It's the same process as an
23        arrest.
24   Q.   Well, I mean, the process could have been
```

```
 1              different if there was a direct charge against
 2              him.  He just has to be summonsed into court and
 3              respond to the charges.
 4     A.       I would have to read the terminology we used in
 5              the complaint.
 6     Q.       He testified here that he paid restitution so
 7              the criminal complaint did not issue?
 8     A.       I would have to see what the court records show,
 9              but --
10     Q.       Sometimes that happens.  People steal things and
11              there's a clerk magistrate hearing and they
12              don't get charged as long as they pay
13              restitution.
14                      MS. QUINN:  Objection.
15     Q.       You've seen that in your days?
16     A.       I've seen numerous things at the courthouse.
17     Q.       Sure.  So I wanted to talk briefly about the
18              case of Jovone Torres.  Can you summarize what
19              you know about that case?
20     A.       You have specific questions on it?
21     Q.       You know, what is your understanding of the
22              facts and the case of Jovone Torres?
23                      MS. QUINN:  Objection.
24                      MR. VIGLIOTTI:  Objection.
```

1    Q.   What happened to that kid?

2              MR. VIGLIOTTI:  Objection.

3              MS. QUINN:  Objection.

4    A.   His mother called the police.  He was --

5         according to her, I don't remember the language

6         she used.  I'm paraphrasing.  But the kid was

7         out of control and she couldn't handle him.  He

8         had broken off the rearview mirror in the car,

9         so there was -- she put it out of control or

10        however she -- and the police officers came and

11        tried to settle him down and it did not work.

12        He became pretty upset.  He was very upset.

13             And he was running around and, you

14        know, they were in the process of Section 12'ing

15        him and restraining him to Section 12 and he

16        somehow was running towards the street and the

17        officers were worried about him.  It's a major

18        street and they, you know, they made -- they

19        tried to -- they attempted and they actually

20        succeeded to restraining him.

21   Q.   And he ended up with a broken elbow?

22   A.   That is true.

23   Q.   And he had surgery?

24   A.   Yes.

1    Q.    Yes?

2    A.    Yes.

3    Q.    And he was a ten-year-old child?

4    A.    Yes.  A very, very big young man.

5    Q.    Five-eight?

6    A.    Yes.

7    Q.    He was a big kid.  I think the hospital records

8          said 185 pounds?

9                    MS. QUINN:  Objection.

10   A.    He was a good sized kid.

11   Q.    How much do you weigh?

12   A.    What do I weigh?

13   Q.    Yes.  Probably a lot less than I do?

14   A.    It's all muscle, you know.

15   Q.    I'm sure it is.

16   A.    I'm about 160.  155, 160.  Well, 155 is what I

17         want to be.  That's my first average for the

18         year, but now it's the Super Bowl, after the

19         Super Bowl and it's after Christmas.

20   Q.    Promises.  Exactly.

21   A.    About 160 pounds.

22                   MR. PINEIRO:  And let me do this.

23         Does anybody have a copy?  I have two copies of

24         Jovone Torres -- off the record.

```
 1                        (Discussion off the record.)

 2                        MR. PINEIRO:  We can mark that.

 3                        (Investigation marked

 4                        Exhibit No. 9.)

 5   Q.    Earlier on you said that sometimes complainants

 6         cooperate and, you know, they get in the hot

 7         seat and talk to Internal Affairs?

 8                        MR. VIGLIOTTI:  Objection.

 9                        MS. QUINN:  Objection.

10   Q.    You didn't use the word hot seat, but you go

11         talk to cops?

12                        MR. VIGLIOTTI:  Objection.

13                        MS. QUINN:  Objection.

14   Q.    The mother cooperated with the police, Page 3.

15         You can see she was interviewed and the

16         investigators who interviewed her, Sergeant

17         Avedian and Sergeant Pageau, transcribe, you

18         know, professionally what she said; yes?

19   A.    Yes.

20   Q.    One of the documents involved here -- let's see

21         if I can find it.  Can you go to page -- there's

22         a little Bates stamp.  Page 30 -- Page 31 and

23         then you get to Page 31 and then the numbers

24         switch because we have the City Document
```

```
 1          Response 57, and if you go to a document and

 2          that's Document Response 63.  Maybe, like, six

 3          or seven pages ahead of that.

 4                    MS. QUINN:  And you're talking about

 5          Officer Alers?

 6                    MR. PINEIRO:  Yes.

 7     A.   His report?

 8     Q.   Yes.  His report.  Are you able to identify

 9          this?

10     A.   I have it here, yes.

11     Q.   Did you review this report before, you know, the

12          past two weeks in preparation for today?

13     A.   Yes.

14     Q.   This report obviously shows that there was

15          physical contact between Jovone, Officer Alers

16          and Officer McCarthy?

17     A.   Yes.

18                    MS. QUINN:  Objection.

19     Q.   You see where it says, last paragraph, I think

20          in the third sentence, At this time, I grabbed

21          Jovone and brought him to the ground.

22                    Do you see that?

23     A.   Yes.

24     Q.   Once he was on the ground, he continued to
```

1          struggle and try to free himself; yes?

2    A.    Yes.

3    Q.    Officer McCarthy assisted in restraining him and

4          I then placed him in handcuffs for his safety

5          and ours until he calmed down; yes?

6    A.    Yes.

7    Q.    Once he calmed down, the handcuffs were removed;

8          correct?

9    A.    Yes.

10   Q.    WEMS, and WEMS is Worcester Emergency Medical

11         Services?

12   A.    Yes.

13   Q.    WEMS paramedics then arrived on scene and placed

14         him on a stretcher.  I then informed the

15         paramedics that I would be filing Section 12

16         paperwork and would follow them to the hospital.

17         Upon arrival to UMass on Lake Ave., I filled out

18         the Section 12 paperwork and advised the medical

19         staff of the situation.  A copy of the paperwork

20         has been attached to this report; yes?

21   A.    Yes.

22   Q.    And this was signed by Officer Alers, supervisor

23         Sergeant Gerald O'Connor; yes?

24   A.    Yes.

1    Q.   If you knew nothing else about this case, could

2         you tell from this report that they had to use a

3         certain degree of force to place the kid on the

4         ground for his own safety and put handcuffs on

5         him?

6    A.   Yes.

7    Q.   Could you tell from this report that he was sent

8         in an ambulance to check whether he would be

9         admitted -- a Section 12 is a mental health

10        call; right?

11   A.   Correct.

12   Q.   The police officer would fill out a form saying

13        this happened and I'm concerned about the kid's

14        mental well being; yes?

15                  MR. VIGLIOTTI:   Objection.

16   Q.   Yes?

17                  MR. VIGLIOTTI:   Objection.

18   A.   Yes.

19   Q.   Besides the fact that force was used here, you

20        would not be able to see anywhere in this report

21        that the child was injured?

22   A.   It does not indicate that, no.

23   Q.   I mean, in the upper right the child was crying

24        and acting out and so forth, but you can't tell

```
 1              from this that there's an injury to the elbow or

 2              a deformity to the elbow or that he needs

 3              emergency care and hospitalization because of an

 4              injury to his bones or his skeletal or any parts

 5              of his anatomy?

 6                        MR. VIGLIOTTI:  Objection.

 7                        MS. QUINN:  Objection.

 8     Q.   Yes?

 9                        MR. VIGLIOTTI:  Objection.

10                        MS. QUINN:  Objection.

11     A.   Correct.

12     Q.   Are officers -- if officers use force and the

13          person is injured, are they required to document

14          that there's an injury in the report so that

15          good administrators like yourself are able to

16          determine how your people use force in the

17          field?

18                        MR. VIGLIOTTI:  Objection.

19                        MS. QUINN:  Objection.

20     A.   If they're aware of the injury.

21     Q.   If they were, they have an absolute duty to

22          report it?

23                        MS. QUINN:  Objection.

24     A.   They should tell the EMTs at a minimum.
```

```
 1    Q.   And if any of them -- what level of force would

 2         you glean was used by -- what level of

 3         resistance was Jovone putting out that day on

 4         September 25th, 2017, so the day they put him in

 5         handcuffs?

 6                   MR. VIGLIOTTI:  Objection.

 7                   MS. QUINN:  Objection.

 8    A.   They were put on him to protect him against

 9         himself or --

10    Q.   Right.  Did you glean from this report that

11         regardless of whether he was a child, you said

12         he's a big boy.  I had him as 185 pounds at the

13         age of 10, but did you glean from that that he

14         was a Level 3 resistor within the definition of

15         use of force policies?

16                   MR. VIGLIOTTI:  Objection.

17                   MS. QUINN:  Objection.

18    A.   A Level 3?

19    Q.   Yes.

20    A.   From the report?  He was resisting.  He was

21         actively resisting.

22    Q.   And that's a Level 3; right?

23                   MS. QUINN:  Objection.

24    A.   Actively resisting.
```

```
 1   Q.   And this much Paul McCarthy told us, he said he

 2        was a Level 3 person, so if he was a Level 3

 3        person in Paul McCarthy's mind, why wasn't there

 4        a report prepared by Paul McCarthy to document

 5        his use of force?

 6                  MS. QUINN:  Objection.

 7   A.   The officer that did the report did the

 8        Section 12.

 9   Q.   He did, Alers did.  Alers complied, but McCarthy

10        did not prepare a report, so up until this

11        investigation was done, no one, you know, we

12        didn't get McCarthy's side of the story?

13                  MS. QUINN:  Objection.

14   A.   Up until this?

15   Q.   Yes.

16   A.   It's fair to say.  He was part of the officers.

17   Q.   The arrest?

18   A.   He wasn't arrested.  He was Section 12.

19        Section 12 is different than an arrest.

20   Q.   So in Section 12 you don't have to report -- you

21        don't have to report the use of force that he

22        used whether they get brought to the hospital or

23        not?

24   A.   The use of force was reported through the other
```

1          officer.

2    Q.   But McCarthy had a separate duty to prepare --

3          to tell his supervisors exactly what he did to

4          the boy?

5                    MS. QUINN:  Objection.

6    A.   It's incorporated in the report.

7    Q.   So your understanding is he didn't have a duty

8          to prepare a report?

9    A.   In this instance, I would have to, you know, see

10         exactly what he had done.  It says -- the

11         officer said that he assisted him in restraining

12         the young man.

13   Q.   Got it.

14   A.   And then the -- not McCarthy, the other officer

15         was the handcuffing officer.

16   Q.   Right.  Can we take a look at Page 22.  We've

17         agreed that the mother was interviewed; yes?

18   A.   Yes.

19   Q.   And can we agree that McCarthy nor Officer Alers

20         were ever interviewed by Avedian or Pageau?

21   A.   A face-to-face interview?

22   Q.   Yes.

23   A.   To the IDCs.

24   Q.   So let's look at the first IDC, Page 22, for

```
 1            Mr. Alers, December 14, 2017.  Do you see that?
 2    A.   Yes, I do.
 3    Q.   And above that before we get in Alers, there's a
 4         report, the Bureau for Professional Standards
 5         have the clinical notes that Jovone -- quoting,
 6         Jovone is a ten-year old male with autism who
 7         was forcibly removed from a vehicle on 9/25/2017
 8         sustaining a right medial epicondyle avulsion
 9         fracture.  He underwent open reduction internal
10         fixation for this injury on 9/26/2017 with Dr.
11         Mortimer.
12              Do you see that?
13    A.   I did see that.
14    Q.   And the child remained in the hospital for a few
15         days and returned back for follow-up care; yes?
16              MR. VIGLIOTTI:  Objection.  You asked
17         him if that's what you read or --
18              MR. PINEIRO:  Is that what it says
19         here?
20    A.   That's what you're reading, yes.
21    Q.   And that means that the Bureau for Professional
22         Standards had these records, the entire medical
23         report is in the BOPS file?
24              MS. QUINN:  Objection.
```

A.    Yes.

Q.    If we go to Page 23, right around here.  See if
      I read this right.  This is Mr. Alers.

             At this time, I grabbed Jovone and
      brought him to the ground with the forward
      momentum that Jovone had already established in
      trying to get away.  Once he was on the ground,
      he continued to struggle and try to free
      himself.  I told Jovone that he needed to calm
      down and he continued to struggle.  At this
      time, I was kneeling next to him and grabbed his
      left arm and brought it towards his lower back
      and placed it in a handcuff.  I then went to
      grab Jovone's right arm and was unable to bring
      his right arm in towards his body.

             Did I read that so far so good?

A.    Yes.

Q.    Officer McCarthy was standing in front of us and
      I then communicated to Officer McCarthy that I
      could not gain control of his right arm and
      asked for assistance.  Officer McCarthy then
      grabbed Jovone's right arm and brought it
      inwards towards Jovone's lower back so I could
      place the other cuff on his wrist.

```
 1                       So far so good?

 2    A.    Yes.

 3    Q.    While Jovone was in handcuffs, he stated that

 4          his right elbow hurt.  I then advised Jovone

 5          that he needed to calm down and I was going to

 6          remove the handcuffs so that he could straighten

 7          out his arm.  I then removed the handcuffs and

 8          advised Jovone to put his arm in a more

 9          comfortable position until the ambulance

10          arrived.

11                       Am I right?

12    A.    Correct.

13    Q.    And then the next sentence, the paramedics come

14          in and he says, What happened to the paramedics;

15          yes?

16    A.    Correct.

17    Q.    So this part here that he told the Bureau of

18          Professional Standards in an IDC is not included

19          in this police report.  That's a child complaint

20          of a right elbow injury; yes?

21    A.    He told the -- he told the paramedic.

22    Q.    But he didn't tell you, the department, that the

23          child had an injury to his right elbow?

24                       MR. VIGLIOTTI:  Objection.
```

```
1    A.   No.  Not in his report.

2    Q.   And was there any reason?  Should that have been

3         in the report?

4                   MS. QUINN:  Objection.

5    A.   He notified the -- he's not under arrest.  He

6         wasn't under arrest, so...

7    Q.   So if I put the handcuffs on somebody and I

8         break the arm -- strike that.

9                   How typical is it for somebody to be

10        put in handcuffs and walk out with a broken

11        elbow and have surgery?  Does that happen all

12        the time?

13                  MR. VIGLIOTTI:  Objection.

14                  MS. QUINN:  Objection.

15   A.   No.

16   Q.   How many cases like that do you know of where

17        during the process of putting handcuffs,

18        somebody ends up with a fracture or a shoulder

19        or a fractured elbow or fractured wrist?

20                  MR. VIGLIOTTI:  Objection.

21                  MS. QUINN:  Objection.

22   A.   I'd have to look at the records on those that

23        were in, you know, prior and, you know, during.

24   Q.   Page 24, just to some of the questions that
```

```
 1          Alers responded to, Did Jovone have any physical

 2          injuries to his body or did he or his mother,

 3          Lindsey Beshai, complain that he was hurt after

 4          you brought him under control and put handcuffs

 5          on him?

 6                   Yes.  Jovone stated that his right

 7          elbow was in pain.  I then advised Jovone that

 8          needed to calm down and I was going to remove

 9          the handcuffs so he could straighten out his

10          arm; yes?

11   A.     Correct.

12   Q.     Page 25, he says, second sentence, He was

13          complaining of right elbow pain.

14   A.     Correct.

15   Q.     You're saying that because this was not an

16          arrest, that he didn't have to say anything

17          about his physical injuries?

18                   MR. VIGLIOTTI:  Objection.

19   A.     Well, it would have been -- I mean, he could put

20          it in a report, but it was not -- you know, he

21          notified the proper authorities.  He notified

22          the EMTs.  He was not coming to our station.  He

23          was not -- I mean, maybe a better practice,

24          sure.
```

```
1    Q.   So this is a boy that has suffered a pretty

2         significant injury.  Can we agree on that?

3    A.   Yes.

4    Q.   That's surgery.  Had it not been for the mother

5         that put in this complaint, you would have never

6         known, you at the police department, the City,

7         would never have known what level of force was

8         used or what injury occurred?

9                   MR. VIGLIOTTI:  Objection.

10                  MS. QUINN:  Objection.

11   A.   I think the report indicated that they all

12        followed -- that he stopped the individual.

13        They tried to restrain the individual.  They

14        tried to protect the individual and handcuffed

15        to help protect the individual and as soon as he

16        calmed down, they took the handcuffs off and

17        helped him to the -- with the EMTs, notified the

18        EMTs that he was going on a Section 12 but also

19        that he had pain in his elbow.

20   Q.   So the EMTs but not to anyone in the department?

21   A.   It's not in the report.

22   Q.   And if it's not in the report, you know what

23        they say, it didn't happen?

24                  MR. VIGLIOTTI:  Objection.
```

```
 1                    MS. QUINN:  Objection.
 2    Q.   Have you ever heard that expression?
 3    A.   Of course.
 4    Q.   That's what doctors say, If it's not in the
 5         report, it didn't happen.
 6                    Look at Page 26, December 13, 2017.
 7         This is a statement by Officer McCarthy.
 8         Submitted the following:
 9                    MS. QUINN:  What page are you on?
10                    MR. PINEIRO:  Page 26, the bottom.
11         Right here.
12    Q.   Then he tore the rearview mirror off the
13         windshield.
14                    Do you see where this is, Chief?
15    A.   Are you on 26 or 27?
16    Q.   26.  Officer McCarthy, December 13.  Right
17         around here.
18    A.   Yeah.
19    Q.   Then he tore the rearview mirror off the
20         windshield and tore the cloth on the ceiling.
21         Torres then jumped out of the car and Officer
22         Alers took him to the ground and we handcuffed
23         him.  Although Torres was only 10 years old, he
24         weighs 225 pounds and he continued to struggle
```

```
 1        as we restrained him as best as we could.
 2        Torres was complaining about arm pain and we
 3        removed the handcuffs.  EMS arrived and Torres
 4        was transported to UMass on a Section 12; yes?
 5   A.   Correct.
 6   Q.   On Page 27, your investigators, Did Jovone have
 7        any physical injuries to his body or did he or
 8        his mother, Lindsey, Beshai, complain to you
 9        that he was hurt after you brought him under
10        control and put handcuffs on him?
11                   He responded, Beshai said to me that
12        Jovone's arm didn't look right.  Jovone also
13        said his arm hurt.  Before the ambulance
14        arrived, we removed the handcuffs.  I did not
15        see any injuries.
16                   Do you see that?
17   A.   Yes.
18   Q.   And then if you look at the -- after Page 31, if
19        you look at City Document Response 65, there's
20        yet another statement, another IDC prepared by
21        Officer Alers on July 9th of 2018.
22   A.   What page are we on?
23   Q.   It's City Document Response 65 towards the very
24        end.  It looks like this.
```

1    A.    Yes.

2    Q.    Do you see that?

3    A.    Yes.

4    Q.    Do you see this sentence here, the last

5          paragraph, While Jovone was in handcuffs, he

6          stated that his right elbow hurt; yes?

7    A.    Yes.

8    Q.    So now I want to look at the conclusion real

9          quick.  Page 29 if you're kind enough to turn to

10         that page.

11   A.    Yes.

12   Q.    Do you see at the middle of the page, it lists

13         the name of the doctor who did the surgery, an

14         internal fixation for the right medial

15         epicondyle avulsion fracture.

16               Do you see that right around here?

17   A.    Yours is different.

18   Q.    Page 29?

19   A.    You said 28.  Okay.  Say that again.

20   Q.    It says, The ambulance showed up and the

21         officers removed the handcuffs and Jovone was

22         transported to UMass Hospital University campus

23         where he was diagnosed as, quote, sustaining a

24         right medial epicondyle avulsion fraction.  He

```
 1            underwent open reduction internal fixation for

 2            this injury on 9/26/2017 with Dr. Mortimer, end

 3            of quote; yes?

 4    A.      Yes.

 5    Q.      There was a nurse there that, you know, they had

 6            information from a Cheryl Burke, RN?

 7    A.      Yes.

 8    Q.      And then I wanted to focus on this last

 9            paragraph.  This is the analysis by Sergeant

10            Avedian?

11    A.      Yes.

12    Q.      And then next page, Captain Davenport, the

13            Commanding officer of BOPS agreed with the logic

14            and sufficiency, Deputy Chief Saucier and then

15            we'll get to your finding in a section, but you

16            also agreed with the sufficiency and reasoning

17            and logic; yes?

18    A.      Correct.

19    Q.      So what he wrote, he says, If we analyze the

20            statements from each party, we can surmise this:

21            There was an incident that involved officers

22            handcuffing Mr. Torres.  Ms. Beshai states Mr.

23            Torres was pulled from the vehicle.  Officer

24            Alers' recollection has Mr. Torres running from
```

```
1              the vehicle towards the street which is clearly

2              in contention with Ms. Beshai's recollection.

3              There is no video to clearly prove whose memory

4              is more accurate.

5     A.       There's no video.

6     Q.       There's no video.  There's no video to clearly

7              prove whose memory is more accurate.  We can all

8              agree on that.

9                        Your police, they went looking for a

10             video and they couldn't find one; yes?

11    A.       Yes.

12    Q.       And they can all agree that Mr. Torres was

13             brought to the ground and handcuffed.

14                       Did I read that right?

15    A.       Yes.

16    Q.       The question is, was it necessary to restrain

17             Mr. Torres?  If so, how much force was required?

18             Ms. Beshai contends that her son was calm.

19             Officer Alers disagrees.  Again, there is no

20             video to clearly prove or disprove the memories

21             of Ms. Beshai and Officer Alers; right?

22    A.       Correct.

23    Q.       We can agree that the police force used

24             approached to a Level 3 on the force continuum;
```

```
 1            correct?
 2    A.      Yes.
 3    Q.      And a compliance technique, a takedown, was
 4            utilized?
 5    A.      Yes.
 6    Q.      And do you know that the child suffered any
 7            injuries from the takedown procedure?  Anything
 8            in the record that the child suffered any
 9            injuries in the takedown procedure?
10    A.      I don't know where the injury occurred.
11    Q.      And then the last few sentences, Could
12            Mr. Torres have been injured during the takedown
13            or the handcuffing?  Yes.  Was there unnecessary
14            force used?  We can neither prove nor disprove
15            the allegation with conflicting statements, no
16            witness testimony, and no video.
17                        It's like a real who done it; right?
18                        MR. VIGLIOTTI:  Objection.
19                        MS. QUINN:  Objection.
20    A.      That's -- put the question a different way.  Is
21            it a question?
22    Q.      I'll try.  The takeaway from this conclusion is
23            unless you have a video that shows what
24            happened, the complaint is not going to be
```

1        sustained?

2                MS. QUINN:  Objection.

3   A.   That's not true.

4   Q.   So why talk about no video existing?

5   A.   Because that's usually the first thing that

6       people ask for in these.

7   Q.   Did you or your investigators tip in one

8       particular direction simply because the video

9       didn't exist?  We can -- meaning without the

10      video, we can neither prove or disprove the

11      allegation with conflicting statements, no

12      witness testimony and no video.

13   A.   So what's the question?

14   Q.   The question is, you did have witness testimony.

15      You had Ms. Beshai's testimony.

16   A.   So outside -- outside of her, outside of the

17      mother, there was no other witnesses to this

18      incident.

19   Q.   So you need a video or you need an outside

20      witness is what you're telling us?

21             MR. VIGLIOTTI:  Objection.

22             MS. QUINN:  Objection.

23   Q.   To sustain a complaint?

24             MR. VIGLIOTTI:  Objection.

```
 1                    MS. QUINN:  Objection.
 2     A.   No.  That's not true.  It was -- it was
 3          conflicting stories.  We have two sides to this
 4          story.
 5     Q.   So if --
 6     A.   The officers were called to the scene.  There's
 7          evidence to show that the kid was certainly out
 8          of control and he needed help and his mother
 9          attested to that, she's the one who called us,
10          so...
11     Q.   But without the video or without, like, to steal
12          your words, without an outside person, you
13          cannot -- you couldn't prove or disprove the
14          allegations one way or the other?  That's the
15          bottom line.
16     A.   That's correct.
17     Q.   She was an available witness but no one in your
18          department talked to Alers, interviewed Alers
19          and no one interviewed Officer McCarthy?
20     A.   They were given questions.
21     Q.   And nobody -- so here's the other thing.  Could
22          you tell from this investigation one way or the
23          other whether the child was injured during the
24          takedown or during the handcuffing?
```

1    A.   You cannot tell.

2    Q.   If it happened during the handcuffing, would

3         your conclusions be different?

4    A.   No.

5    Q.   So why say that Mr. Torres had been injured

6         during the takedown or handcuffs?  Why make that

7         statement?

8    A.   That was their evaluation.  Was it during

9         cuffing or was it during the takedown?  Both

10        were, I believe, appropriate at the time.

11   Q.   So if it happened during the handcuffing, then

12        it would also have been appropriate use of

13        force; is that your testimony?

14   A.   I believe that -- I believe that they, you know,

15        they did what they had to do to protect this

16        individual and others, so -- it is -- I believe

17        it was appropriate.

18   Q.   So is this also, like, an unintended consequence

19        of use of force, so one of those cases?

20              MS. QUINN:  Objection.

21              MR. VIGLIOTTI:  Objection.

22   Q.   Sometimes there's policy failures and sometimes

23        there's unintended consequences.

24              MS. QUINN:  Objection.

```
 1                    MR. VIGLIOTTI:  Objection.
 2    A.   There was an incident.  The officers were doing
 3         their best to protect this young man, this young
 4         person and, you know, we'll never know what the
 5         outcome could have been if they let him run into
 6         the street.
 7    Q.   That's assuming that he was running into the
 8         street?
 9    A.   He was heading that way from what the officers
10         were saying.
11    Q.   So even though you didn't interview the
12         officers, you took the officers at their word
13         that that's what was happening; yes?
14    A.   I'm thinking they would, yes.
15    Q.   You didn't take the mother's account of what
16         happened, that he was already -- that he had
17         calmed down by the time the officers arrived?
18    A.   We took her word.  They evaluated it and we
19         looked at the situation and it appears that it
20         certainly protected the young man.
21    Q.   Officer Alers testified and I'm sure I'm going
22         to draw an objection from Mr. Vigliotti, but he
23         testified that the child did not complain about
24         pain in the shoulder or the -- I'm sorry -- the
```

1        elbow or his arm during the takedown.  He said

2        that it happened during the handcuffing process.

3                 Does that change -- does that change

4        your view of the case in any way, shape or form?

5    A.   No.

6    Q.   If an expert were to say that it happened during

7        the handcuffing, would that in your mind be an

8        appropriate use of force?

9                 MR. VIGLIOTTI:  Objection.

10   A.   It was a restraint that needed to be done, they

11       felt needed to be done to protect the young man.

12   Q.   It was a complex avulsion fracture.  Something

13       that doesn't happen every day in police work.

14       Does the level of force and the type of complex

15       displaced fracture, does that raise any concerns

16       in your mind as to the appropriateness of the

17       use of force?

18                 MR. VIGLIOTTI:  Objection.

19                 MS. QUINN:  Objection.

20   A.   Restate that?

21   Q.   Does the fact that the child had a displaced

22       avulsion fracture, does that factor in your mind

23       on the appropriateness of the use of force given

24       that, you know, broken elbows is not something

```
1          that happens every day during an arrest?

2                    MS. QUINN:  Objection.

3                    MR. VIGLIOTTI:  Objection.

4     A.   The intent wasn't to hurt the young man.  The

5          intent was to help the young man.

6     Q.   But the intent doesn't matter because they broke

7          his elbow and he had to have surgery?

8                    MS. QUINN:  Objection.

9                    MR. VIGLIOTTI:  Objection.

10    Q.   The question is whether the level that they used

11         at that time was reasonable; isn't that the

12         question?

13                   MR. VIGLIOTTI:  Objection.

14    A.   Yes.

15    Q.   The police department have -- my client gave the

16         police department an authorization to get

17         medical records and to talk to doctors and

18         that's in the City documents.

19    A.   Uh-huh.

20    Q.   Anybody from the department call the doctor to

21         figure out why the child got his arm broken and

22         when it happened?

23                   MS. QUINN:  Objection.

24    A.   I'm not sure if BOPS did notify the doctor or --
```

1        I'm not sure.

2                    MR. PINEIRO:  Let's mark this.

3                    (Medical Records marked

4                    Exhibit No. 10.)

5    Q.   Have you ever seen this document before today?

6    A.   I have not.

7    Q.   When you meet with BOPS to sign out on a report,

8         do you look at the -- do they bring the reports

9         to your office or do you sit down with them as

10        you open the file?

11   A.   It depends.

12   Q.   Do you know what you did here?  Did you go

13        through the file or did you look through the

14        medicals?

15   A.   We sat in her office and then I read the

16        reports.  If they're, you know, going in detail,

17        if there's any, you know, any issues with BOPS

18        themselves.

19   Q.   The narrative, Page 3 of 4.  You're going to

20        need your glasses for this one.  Do you see in

21        the narrative where it says in parenthesis,

22        Capital S?

23   A.   Yes.

24   Q.   Do you see that?

```
 1    A.    Yes.

 2    Q.    Which means subjective, Called to scene for

 3          reported male with hx of autism acting violent

 4          while in car throwing and upsetting family

 5          members.  When WPD arrived, patient again became

 6          violent and acting out.  WPD forced to place

 7          patient on the ground -- on ground.  During

 8          scuffle patient began complaint of pain to right

 9          humeral area.  No other trauma reported.

10          Parenthesis, O, Arrived to find approximately

11          180-pound 10-year old man awake and alert.

12          Patient screaming inconsolable nearing

13          hysterics.  Patient rolled from prone position

14          to seated.  No other injuries found.  Capital R

15          slash arm with slight deformity to proximal

16          humeral area.  EMS made every attempt to calm

17          and reassure patient through assessment.

18                    Did I read that right?

19    A.    Yes.

20    Q.    Yes?

21    A.    Yes.

22    Q.    Were you aware that -- now, when Ms. Beshai gave

23          a statement to investigators, she told them that

24          there was something about the boy's elbow that
```

```
 1              was not right.  It didn't look to be in its
 2              place.  It look deformed.
 3                          Do you remember having read that in
 4              her statement?
 5                          MS. QUINN:  Objection.
 6      A.      Yes.
 7      Q.      And --
 8      A.      I don't know if that's the exact language.  She
 9              did say it didn't look right.
10      Q.      And she's a layperson.  She doesn't have any
11              medical training?
12      A.      Yes.  As am I.
13      Q.      Got it.  But to the paramedics, the paramedics
14              outlined that the elbow, the right elbow didn't
15              look right, right, it looked deformed?
16                          MR. VIGLIOTTI:  Objection.
17      Q.      Are those the words that are used?
18      A.      In this statement that you just read?
19      Q.      Yes.
20      A.      Could you read that again?
21      Q.      Yes.  Sure.  Fourth line.  Capital R slash, arm,
22              with slight deformity to proximal humeral area;
23              yes?
24      A.      Yes.
```

```
 1    Q.   They saw something was wrong with the boy's

 2         right elbow?

 3                   MR. VIGLIOTTI:  Objection.

 4                   MS. QUINN:  Objection.

 5    A.   They said that there was a deformity, yes.

 6    Q.   And none of that injury or the deformity made

 7         its way into the police report?

 8                   MS. QUINN:  Objection.

 9    A.   No.

10    Q.   Even though Alers brought this child to the

11         hospital?

12                   MR. VIGLIOTTI:  Objection.

13                   MS. QUINN:  Objection.

14    A.   Section 12, yes.

15    Q.   So in terms of what you sustained or did not

16         sustain, your signature appears at Page 31.

17         Unnecessary force, you did not sustain it?

18    A.   Correct.

19    Q.   And was that because there was no clear -- tell

20         me why you did not sustain that?

21    A.   Why?

22    Q.   Your own words?

23    A.   I believe the officers acted appropriately.

24    Q.   Because a child was going to run?
```

1   A.   Well, I think he was -- he was Section 12, so he

2        was worried that he was going to hurt himself or

3        hurt others.

4   Q.   So then that means you can use any level of

5        force?

6                 MR. VIGLIOTTI:  Objection.

7   Q.   To stop somebody?

8                 MR. VIGLIOTTI:  Objection.

9                 MS. QUINN:  Objection.

10  A.   You can use force necessary when it happens.

11  Q.   Broken arm with surgery?

12                MS. QUINN:  Objection.

13  Q.   Yes?

14                MR. VIGLIOTTI:  Objection.

15  A.   Is that a question?

16  Q.   Yes, it is.

17  A.   What's the question?

18  Q.   It's okay to break the kid's arm and have

19        surgery?

20  A.   It's not okay.  I said it was -- I believe that

21        the force necessary was appropriate.

22  Q.   And Alers wasn't disciplined for failing to

23        report exactly the level of force that he used?

24                MR. VIGLIOTTI:  Objection.

```
 1                    MS. QUINN:  Objection.
 2    Q.   Or for mentioning that the boy had been hurt?
 3                    MR. VIGLIOTTI:  Objection.
 4                    MS. QUINN:  Objection.
 5    A.   He was not.
 6    Q.   And McCarthy wasn't disciplined for failing to
 7         document his use of force?
 8                    MS. QUINN:  Objection.
 9    A.   That's correct.
10                    MR. PINEIRO:  Can I take a
11         five-minute break?  It's a little warm in here.
12         I'll be right back.
13                    (Short recess.)
14    Q.   Officer William Stout had a Last Chance
15         Agreement, did he not?
16    A.   Correct.
17    Q.   In fairness, that didn't happen during your
18         tenure?
19    A.   Correct.
20    Q.   But you were deputy at the time?
21    A.   I believe so, yes.
22    Q.   And you became aware of the Last Chance
23         Agreement involving Officer Stout?
24    A.   Correct.
```

```
 1    Q.   Why did he have a Last Chance Agreement?

 2    A.   I believe he had a problem -- he had a problem

 3         out in Northborough, I believe.

 4    Q.   And do you know the nature of the problem?

 5    A.   Domestic.

 6    Q.   And do you know what the facts were?

 7    A.   I think I started that case, but...

 8    Q.   Did he break into his house?

 9    A.   He was -- yes.  He went in the house.  I don't

10         know if it was a break or he was grabbing shoes

11         or something.  The kids were outside maybe.  I

12         don't know if the kids were outside.

13    Q.   You mean his children?

14    A.   What's that?

15    Q.   When you say his kids?

16    A.   His children.  He has two children with the

17         woman who lived there and I believe he had an

18         altercation with his -- I don't know the

19         specifics right now, but he had an altercation

20         with the --

21    Q.   The significant other or his ex-wife?

22    A.   They may have been married still.  I'm not sure

23         of that part.

24    Q.   Was there a physical altercation?
```

```
 1   A.   I think it was a threat.  Like I said, I would
 2        have to read it and go through it to make -- I
 3        believe it was a threat.  I believe it was a
 4        verbal threat.
 5   Q.   And can we go through the agreement?
 6                      MR. PINEIRO:  Mark this as the next.
 7                      (Last Chance Agreement marked
 8                       Exhibit No. 11.)
 9                      (Docket marked
10                       Exhibit No. 12.)
11   Q.   The Last Chance Agreement was signed by the city
12        manager in '15?
13   A.   Yes.
14   Q.   Daniel Gilbert who is the president of Local
15        911?
16   A.   Yes.
17   Q.   And by Officer William Stout?
18   A.   Yes.
19   Q.   Who was given 60 days, Paragraph 1?
20   A.   Yes.
21   Q.   And for how long has -- and this is a ten-year
22        Last Chance Agreement, Paragraph 2?
23   A.   Yes.
24   Q.   And if you look at the next exhibit, which is
```

```
 1            the criminal docket from the Westborough

 2            District Court, you can see the nature of the

 3            charges; right?

 4   A.   This one here?

 5   Q.   That one here.  First charge up here.  This is

 6            William Stout?

 7   A.   Yes.

 8   Q.   His attorney, charge of home invasion, felony?

 9   A.   Yes.

10   Q.   So a home invasion, you have to break into a

11            house; right?

12   A.   You would have to be -- you don't have to break

13            in.  You just have to be in the house with the

14            --

15   Q.   And those charges were dismissed at the request

16            of the Commonwealth?

17   A.   Yes.

18   Q.   And then there was a trespass.  There was a

19            trespass charge?  Do you see that?

20   A.   I'm looking for it.

21   Q.   At the bottom right here, 266, 120?

22   A.   Yes.  There was a charge of --

23   Q.   There was a charge of -- a third charge of

24            breaking and entering, a misdemeanor, second
```

```
 1        page top?
 2   A.   Yes.
 3   Q.   Threat to commit a crime?
 4   A.   Yes.
 5   Q.   And A&B?
 6   A.   What's that?
 7   Q.   And the last charge of A&B, 265, Section 13A?
 8   A.   Yes.
 9   Q.   Is that domestic A&B or --
10   A.   A&B.  Where is the A&B?
11   Q.   Right here, 265, Section 13A.  Right around
12        here, Chief.
13   A.   I don't believe so.  It's not --
14   Q.   That's not a domestic charge?
15   A.   That is against not the significant other, I
16        believe.
17   Q.   I got it.  There was an investigation into this
18        charge?
19   A.   Yes.  There was with the BOPS.  On the BOPS.
20   Q.   Yes.  Bureau of Professional Standards?
21   A.   Yes.
22   Q.   So do you know what it was sustained against
23        them?  Was criminal conduct sustained?
24   A.   I don't have that paperwork.
```

```
 1    Q.    Were you a part of that process?  Did you review
 2          it as a deputy chief?
 3    A.    I don't know if I would have to -- I would have
 4          to see the -- where he was stationed at the
 5          time.
 6    Q.    Was he a patrolman when this happened?
 7    A.    Yes.  But that doesn't mean he worked for me.
 8    Q.    Were you in -- right around this time, were you
 9          in charge of operations?
10    A.    Yes.
11    Q.    In 2014?
12    A.    2014, yes.
13    Q.    Let's see when he was arraigned.  Is it --
14    A.    I'm not sure if he was in operations at that
15          time.  He worked in numerous divisions.  I'm
16          aware of the investigation.
17    Q.    Were these types of charges, a home invasion,
18          breaking and entering, were these types of
19          charges sufficient to get an officer fired?
20    A.    Yes.
21    Q.    The type of charges against Officer Tivnan for
22          lying, are those the types of charges that
23          are -- if the police department wanted, they
24          could result in the termination of Officer
```

```
 1          Tivnan?
 2                    MS. QUINN:  Objection.
 3     A.   For the failure to report?
 4     Q.   Yes.  For lying?
 5     A.   For the failure to report, I suppose you could
 6          fire him, sure.
 7     Q.   Did you or the city manager ever consider firing
 8          Mr. Tivnan?
 9     A.   I did not.
10     Q.   Did the city manager consider firing Mr. Tivnan?
11                    MS. QUINN:  Objection.
12     A.   You'll have to ask him on that one.
13     Q.   Well, did you have any conversations with him on
14          whether he thought it was appropriate to fire
15          him?
16     A.   We didn't talk about discipline until we
17          disciplined him.
18     Q.   Did you ever have any disagreements with the
19          city manager that you thought that he wanted
20          more in the way of discipline and you wanted
21          something less?
22     A.   No.  We didn't disagree.  We discussed what we
23          believed was appropriate.
24     Q.   Did you get any pushback from the union or from
```

```
 1          officers when you sustained the complaint
 2          against Officer Tivnan?
 3     A.   Pushback from the union --
 4     Q.   Discontent that you decided to discipline him?
 5          Did you get any pressure from any of the police
 6          officers --
 7     A.   To change my mind?
 8     Q.   Yes.
 9     A.   No.  No.  They wouldn't -- didn't discuss that
10          part with them.  They certainly sat down with --
11          and they grieved it.  There's a grievance.
12     Q.   They have a right to grieve?
13     A.   Sure.
14     Q.   Did you ever have any conversations with Dan
15          Gilbert about what the City was looking for in
16          terms of discipline against Officer Tivnan?
17     A.   I'm sure we did.
18     Q.   What did you discuss?
19     A.   Just suspension, what we thought was
20          appropriate.
21     Q.   Was he looking for less time than what you were
22          looking for?
23     A.   I don't recall him really negotiating any time.
24          We just talked more about, you know, what the --
```

1          what I had planned on sustaining.

2     Q.   Another officer that your department disciplined

3          was -- is it Ryan Joyal, is that his name?

4     A.   Yes.

5     Q.   How was he disciplined?

6     A.   Five days' suspension, I believe.

7                    MR. PINEIRO:  And let me just get

8          this marked.

9                       (Investigations marked

10                      Exhibit No. 13.)

11    Q.   Was Mr. Joyal given a Last Chance Agreement?

12    A.   No.

13    Q.   Why wasn't he given a Last Chance Agreement?

14    A.   No reason other than don't believe it came to

15         that.  I believe the violation warranted.

16    Q.   Who decides whether or not an officer gets a

17         Last Chance Agreement or not, is it you or the

18         administration?

19    A.   It's usually something from the human resources

20         side.

21    Q.   And human resources did not feel that his

22         encounter with a civilian individual rose to the

23         level of Last Chance Agreement?

24                   MS. QUINN:  Objection.

1    A.    You would have to ask them.

2    Q.    After the sanction was issued against Joyal, a

3          bunch of officers called in sick in protest for

4          what happened.  Am I right in saying that?

5    A.    It was never determined that that's why they

6          called in sick.

7    Q.    Did your department conduct an investigation?

8    A.    Yes.

9    Q.    And have you reached any conclusions in that

10         investigation?

11   A.    It's still working with human resources on that.

12   Q.    Which means what, is your department going to

13         issue discipline against the officers in

14         question?

15                    MS. QUINN:  Objection.

16   A.    We're still working with human resources.

17   Q.    Who were the officers that were being

18         investigated?

19   A.    I don't have the list.

20   Q.    Do you know the name of one of them?

21   A.    There's -- I think one was Germane (phonetic).

22         I remember that name and I think Quitadamo.

23         There was 14 of them.  There was 14 of them, so

24         I don't have all their names in front of me.

```
1    Q.    Did those people call in sick on the same day?

2    A.    They did.

3    Q.    And the day that they called in sick, did it

4          have anything to do with when Officer Joyal was

5          scheduled to begin his suspension?

6    A.    It did.

7    Q.    When did these officers call in sick, was it the

8          same day or different dates?

9    A.    Joyal's suspension, it was the first day of his

10         suspension.

11   Q.    And 14 people called in sick?

12   A.    Yes.

13   Q.    Did Joyal call in sick?

14   A.    No.  He was suspended.

15   Q.    And what type of investigation did your office

16         conduct?

17   A.    They interviewed each and every one of them.

18         Human resources has been involved and the

19         officials were interviewed.

20   Q.    And their supervisors were interviewed as well?

21   A.    Yes.

22   Q.    What did those people have to say?  Are these

23         people on the same shift?

24   A.    Yes.
```

```
 1    Q.    Same day shift?

 2    A.    Three-to-eleven, four-to-twelve.

 3    Q.    How many officers work on the three-to-eleven

 4          shift?

 5    A.    Counting officials, it could be 48 to 52, I

 6          believe.

 7    Q.    And that's a third of the force calling in sick?

 8    A.    Oh, a third of the -- there was 14 people who

 9          banged in sick that day, yes.

10    Q.    Based on what you've uncovered, do you think

11          that the 14, 15 people that called in sick, they

12          did that in protest for the sanction against

13          Joyal?

14                    MR. VIGLIOTTI:  Objection.

15    A.    We have not proved that.

16    Q.    But what do you need to prove it?

17    A.    What we need to prove that this was a joint

18          venture, for True Blue flu to be criminal or at

19          least it would be not criminal -- I'm sorry.  We

20          are not allowed to protest police officers,

21          public safety.  Termination would be

22          appropriate.

23    Q.    So if you could prove it, termination would be

24          appropriate?
```

```
1    A.    I believe so.  Not necessarily we would

2          terminate, but it would definitely be considered

3          appropriate.

4    Q.    The sanction was issued around September 16th of

5          2020?

6    A.    Say that again?

7    Q.    The discipline was issued around September of

8          2020, the findings by your department?

9    A.    On Joyal?

10   Q.    Yes.

11   A.    I don't recall the exact time.

12   Q.    This happened in the midst of COVID?

13   A.    It did.

14   Q.    Maybe everyone had COVID that day?

15                  MR. VIGLIOTTI:  Objection.

16                  MS. QUINN:  Objection.

17   A.    I don't know what they -- their excuse is.

18   Q.    What did they say?

19   A.    Funerals, sick family, obligations with

20         children.  There was a few different.

21   Q.    Did you believe them?  Did you or your

22         investigators believe them?

23   A.    It's under perjury, so...

24   Q.    Just because it's under perjury doesn't mean
```

```
 1              it's true?
 2    A.   We have -- I do believe them, yes.  I believe
 3         that we have to -- you know, once again, whether
 4         I believe them or not, I think is irrelevant.
 5    Q.   Well, you can draw your own conclusions.  That's
 6         an abnormally high number of people?
 7    A.   I have to go by business.
 8    Q.   You need to go by what?
 9    A.   It's all business is what I'm saying.  It's not
10         a personal thing.  It can't be personal.
11    Q.   Do you think in your heart of hearts that's what
12         they were doing?
13                   MR. VIGLIOTTI:  Objection.
14                   MS. QUINN:  Objection.
15    Q.   They were protesting to the sanction that you
16         and the City issued; is that --
17                   MS. QUINN:  Objection.
18    A.   It's never proved.
19    Q.   Can we go over briefly some of the aspects of
20         the Joyal report?  Page 2.  There's a report by
21         Joyal; right?
22    A.   Yes.
23    Q.   And it was reviewed by the supervisor the same
24         day, 7/21/20, right around the same time?
```

1   A.   It says that?

2   Q.   It says 7/21/20, date of report, 7/21/20?

3   A.   Use of force was not initially reported on the

4        21st.  It was put in on the 22nd.

5   Q.   Got it.  So tell me what happened in this case

6        and then we'll go briefly over the report?

7   A.   The video went viral and ended up with a video

8        first thing in the morning regarding a police

9        officer being spit at and striking the

10       individual on the gurney.

11  Q.   That person's strapped?

12  A.   Section 12.  He was redirected, but the language

13       is redirect but, you know, that was -- it was,

14       you know, not within, I believe, their training.

15  Q.   Within their what?

16  A.   I don't believe it was in their training on that

17       form of redirect, but his intent was to redirect

18       his head because he was spitting at him and the

19       other police officers.

20  Q.   So this is a case.  It happened at the Albion

21       here on Main Street?

22  A.   It happened down Main Street.  I know that.

23  Q.   Some dude is driving by and records the

24       interactions between Officer Joyal and this

```
 1          person?
 2    A.    Yes.
 3    Q.    And that person is going in for mental health
 4          evaluation, Section 12?
 5    A.    Correct.
 6    Q.    And this person is strapped to a gurney?
 7    A.    Correct.
 8    Q.    And are his hands free to hit the officer or
 9          anything like that?
10    A.    I don't believe so.
11    Q.    Was he handcuffed at the time for his safety?
12    A.    I don't believe so.
13    Q.    But he couldn't use his hands to touch or hit
14          the officer?
15                    MS. QUINN:  Objection.
16    A.    Correct.
17    Q.    But there's testimony that he spat at the
18          officer?
19    A.    Yes.
20    Q.    And he struck him?
21    A.    In an attempt to redirect.
22    Q.    And in the report here, Joyal said absolutely
23          nothing about smacking this guy in the face?
24    A.    No.  He did not put any -- he did not -- it was
```

```
 1           not included in his original report or did he

 2           report it to his supervisor.

 3      Q.   Were you concerned that that's indicative of the

 4           code of silence, not reporting with level of

 5           force when he had a clear responsibility to do

 6           it?

 7      A.   He had a responsibility to report that to his

 8           supervisor.

 9      Q.   What does that show to you about intent, he

10           didn't want people to know what force he used?

11                   MR. VIGLIOTTI:  Objection.

12                   MS. QUINN:  Objection.

13      A.   He should have reported it.

14      Q.   Just like Alers should have reported this kid

15           got hurt?

16                   MR. VIGLIOTTI:  Objection.

17                   MS. QUINN:  Objection.

18      A.   Different situations.

19      Q.   Different.  You see there's a difference?  But

20           here all he says is, Babineau was being placed

21           in the stretcher.  He attempted to spit on

22           officers multiple times.  Babineau was

23           transported to St. Vincent's Hospital; right?

24      A.   Correct.
```

```
 1    Q.   Where was Officer Carlson when he cosigned this
 2         report?  Do you know if he came to the scene?
 3    A.   The report, are you talking about?
 4    Q.   Yeah.  His supervisor was Sergeant Jeffrey
 5         Carlson and he cosigned the report?
 6    A.   Yes.
 7    Q.   Did he ever come to the scene?
 8    A.   No.
 9    Q.   Was he ever questioned about when he found this
10         information?
11    A.   I believe he -- they did the use of force report
12         the next day.
13    Q.   And they did the -- would you agree with me that
14         he did a use of force report because there was
15         an article in the paper that came the next day?
16              MS. QUINN:  Objection.
17    A.   No.  He did a report.  He did a use of force
18         report because I told him.  He was told through
19         the chain to do a use of force report.
20    Q.   But you saw the videotape the next morning after
21         it happened?
22    A.   Correct.
23    Q.   Had it not been for the videotape that existed
24         showing what he did, he probably would have
```

1      never said anything of what he did to this

2      person whom he came in contact with?

3                  MS. QUINN:  Objection.

4                  MR. VIGLIOTTI:  Objection.

5   Q.   Fair to say that?

6                  MS. QUINN:  Objection.

7                  MR. VIGLIOTTI:  Objection.

8   A.   I don't know if it's fair to say.  It's

9      possible.

10  Q.   You think it's more than possible.  Probable?

11                 MS. QUINN:  Objection.

12  A.   I said it's possible.  I said it's possible.

13  Q.   The next day at about 1822 hours he corrected

14     the report.  Babineau was being placed into the

15     stretcher when he spit on me and continued to

16     attempt to spit on me.  Other officers and EMTs

17     multiple -- can't read that -- multiple times.

18     Due to concerns with the transfer of bodily

19     fluids and the multitude of potential sicknesses

20     associated with bodily fluids, my reaction was

21     to deliver an open hand distraction technique to

22     move his face away from me to momentarily

23     redirect his attention from spitting on myself

24     as well as the other officers and paramedics on

```
 1            scene; right?
 2    A.      Right.
 3    Q.      So the next day about an hour or what, more than
 4            24 hours later or less than 24 hours later,
 5            about 24 hours later he came clean and said that
 6            he smacked this guy in the face?
 7                      MR. VIGLIOTTI:  Objection.
 8                      MS. QUINN:  Objection.
 9    A.      I don't believe that's the language he used.
10    Q.      What did he see him do?  Did he slap this guy in
11            the face?
12    A.      He attempted to redirect with an open hand.
13    Q.      And you believe that?
14    A.      But that is not the -- that -- that was more
15            than what they're trained but because of the
16            situation and the stress and the COVID, as he
17            was moving, I believe my feeling is it was -- it
18            needed to be reported as opposed to the
19            direct -- at that time, the redirect would not
20            have been -- should not have been reported.  Did
21            not have to be reported, I should say.
22    Q.      It needed to be reported because what you saw in
23            the video was a use of force?
24    A.      Correct.
```

```
 1    Q.   And unless he tells you what he does in the
 2         field, you have no way of knowing how to train
 3         people in the use of force?
 4    A.   Correct.
 5    Q.   Now, the training division was consulted here?
 6    A.   Correct.
 7    Q.   Did you believe that what he was doing was a
 8         distraction rather than a slap to teach him a
 9         lesson for spitting?
10    A.   I believe he was attempting to do so.
11    Q.   Now, this investigation happened in -- I guess
12         it was started shortly after the event; right?
13         Right after July 22nd?
14    A.   The investigation started the next month.
15    Q.   And did you have the liberty of ordering Joyal
16         to submit to a statement so that you could
17         figure out what his state of mind was of what he
18         was trying to accomplish?
19    A.   He did give a report.  He did a report.
20    Q.   But not interviewed?
21    A.   He was interviewed.
22    Q.   There's no doubt that this guy spat at cops;
23         right?  That he spat at Joyal?
24    A.   Correct.
```

```
 1    Q.   On Page 8 he's asked to say, When did you talk
 2         to your supervisor.
 3                   On July 22, 2020 around 1400 I
 4         received a call from Lieutenant Sean Martha as
 5         well as my union present Dan Gilbert.  In that
 6         phone call I was advised that a use of force was
 7         recorded from a passerby and posted online.
 8         After reviewing the video, I observed my open-
 9         handed distraction technique, which I did not
10         remember from the day before.
11                   When he said that, did any of the
12         investigators believe that statement that he
13         made there?
14                   MR. VIGLIOTTI:  Objection.
15    Q.   That he didn't remember hitting this person in
16         the face?
17                   MR. VIGLIOTTI:  Objection.
18                   MS. QUINN:  Objection.
19    A.   You'd have to ask the investigators.
20    Q.   At that time I immediately called my direct
21         supervisor, Sergeant Carlson, and notified him
22         of the video.  I then immediately went to the
23         station and filed all the appropriate paperwork
24         for that incident.  Policy No. 400 states that
```

```
 1              supervisor notification is only required when

 2              lethal force and/or less-lethal force weapon

 3              techniques are utilized.

 4                        Is that right?  Is that what it says

 5              there?

 6      A.      That's what it says, yes.

 7      Q.      Would you agree with that?

 8                        MS. QUINN:  Objection.

 9      Q.      Was he suggesting that he didn't have any duty

10              to tell his supervisor that he had used force

11              against this person?

12                        MS. QUINN:  Objection.

13      A.      That's what he said.

14      Q.      Then one his partners was questioned, Brian

15              Gerardi, Page 9?

16      A.      Correct.

17      Q.      He was asked -- in the video, is he next to

18              Officer Joyal when this incident happened?

19      A.      He was next to the gurney also.

20      Q.      How far from this person was he?

21      A.      A couple of feet.

22      Q.      Question No. 2 on Page 9, While preparing

23              Mr. Babineau for transport, did you observe any

24              employee use force towards Mr. Babineau?
```

1            No.  I did not observe any use of

2       force.

3            Do you see that?

4  A.  Where is that?

5  Q.  On Page 9, the bottom of Page 9.  They asked,

6       did you see Babineau -- While preparing Mr.

7       Babineau for transport, did you observe any

8       employee use force towards Mr. Babineau?  And he

9       did not observe any use of force.

10  A.  Correct.

11  Q.  Next question, Did you see Officer Joyal use a

12       distraction or redirection technique during his

13       encounter with Mr. Babineau?

14            No.  I did not see Officer Joyal use

15       a distraction or redirection technique during

16       his encounter with Mr. Babineau.

17            Do you see that?

18  A.  I do.

19  Q.  And then, If your response to Question 1 is no,

20       please explain why you did you not observe this

21       event.

22            And he says, I did not observe this

23       event because I was standing off to the side of

24       the gurney with Mr. Babineau and I was not

```
 1              watching the events taking place.  I was

 2              watching motor vehicle and pedestrian traffic in

 3              the area.

 4                      Do you see that?

 5       A.     I do.

 6       Q.     Did you order that Brian Gerardi be questioned?

 7       A.     They did the investigation, BOPS did the

 8              investigation.  They interviewed.

 9       Q.     Did you put any stock, any -- did you think any

10              of this was credible, the responses that Brian

11              Gerardi gave?

12       A.     Yes.

13       Q.     Was his response credible?

14       A.     Yes.

15       Q.     Did you think that he did not want to rat on a

16              fellow officer?

17       A.     I found him -- I found his part to be credible.

18       Q.     Did you speak with him?

19       A.     I did not speak with him.

20       Q.     And didn't ask anybody to speak with him?

21       A.     They did reports.

22       Q.     And then there was an Officer Anderson's

23              response.  Was he also another person who was

24              there?  Page 10, 11.
```

1    A.   Yes.  I got it.

2    Q.   No. 2, While preparing Mr. Babineau for

3         transport, did you observe any employ a use of

4         force towards Mr. Babineau?

5                   Answer, I observed an officer on

6         scene utilize an open hand distraction technique

7         to the facial area of Mr. Babineau in an attempt

8         to redirect his mandible to prevent further

9         assault via spit and bodily fluids.

10                  Do you see that?

11   A.   Yes.

12   Q.   That Officer Anderson, if he observed an

13        unapproved use of force, was he responsible to

14        notify his supervisors that he observed that?

15                  MS. QUINN:  Objection.

16   A.   His -- the officer was -- the Joyal kid was

17        responsible.  He should.  He's the one who

18        needed to notify the sergeant.

19   Q.   So did Anderson notice what Joyal did?  Did he

20        prepare a report to notify people about what

21        happened?

22                  MS. QUINN:  Objection.

23   A.   He did not.

24   Q.   Did he comply with the policies and procedures

```
 1              of the department?
 2    A.   He did.  The officer -- at that time the officer
 3         who made the strike, if you will, the redirect
 4         is responsible for doing the report.
 5    Q.   Now, did Officer Anderson comply by -- did he
 6         report it to anybody within 24 hours of the
 7         happening of this event?
 8    A.   He did not.
 9    Q.   He just kept his mouth shut?
10                   MS. QUINN:  Objection.
11    A.   He did not report it.
12    Q.   Eventually when he was asked what happened, he
13         told the truth?
14    A.   Yes.  As he saw it, yes.
15    Q.   And by not reporting that, do you construe that
16         as being consistent with the code of silence of
17         not ratting or snitching on your fellow
18         officers?
19                   MS. QUINN:  Objection.
20    A.   Could you reuse different words?  I mean,
21         ratting?
22    Q.   Well, not telling on them?
23    A.   I believe that he was --
24    Q.   Trying to protect them?
```

```
 1                    MR. VIGLIOTTI:  Objection.

 2                    MS. QUINN:  Objection.

 3    A.   No.  I don't believe that.

 4    Q.   What was he trying to do?

 5                    MR. VIGLIOTTI:  Objection.

 6    A.   He gave the information that needed to be given

 7         when asked.

 8    Q.   Which he was asked, but he didn't volunteer it?

 9    A.   He did not.

10    Q.   Was he disciplined?

11    A.   No.

12    Q.   And if we go to the conclusions, I think there's

13         a report here on Page 18, Officer Davenport,

14         September 17, 2020.  Insofar as using more force

15         than that which is reasonable and necessary to

16         accomplish a proper police objective, Officer

17         Joyal was exonerated?

18    A.   Yes.

19    Q.   Why was he exonerated?

20    A.   I believe that he was attempting to do a

21         maneuver.  I just don't believe he did the

22         maneuver properly.

23    Q.   Who said that he was trying to do a maneuver if

24         you never interviewed them?
```

```
 1   A.   I had investigators who we sit down and discuss

 2        and we talked about this.  I have 500 police

 3        officers.  I wouldn't be doing every interview.

 4   Q.   Who were the people that you relied on for

 5        disciplining that this was not an excessive use

 6        of force?

 7   A.   Captain Davenport, training division.

 8   Q.   And then insofar as submitting reports, he

 9        didn't submit an initial report to say what

10        happened?

11   A.   Correct.

12   Q.   So why was that failure to submit a use of force

13        report not sustained?  He was exonerated, wasn't

14        he?

15   A.   He was exonerated.  But he was -- he was found

16        responsible for the failure to report to his

17        supervisor.

18   Q.   Submitting reports and failure to report use of

19        force exonerated, Page 19?

20   A.   Yep.

21   Q.   So was that because he came clean 24 hours later

22        and reported it?

23   A.   He eventually reported it, but we -- he did not

24        report to his supervisor.  He had the 24 hours
```

```
 1            to do the report that was -- that he needed to

 2            do for the use of force, so he did that report.

 3            He ended up doing -- he did submit that report,

 4            but what he was found responsible for was he

 5            failed to report it immediately to his

 6            supervisor.

 7      Q.    And do you think if that tape did not exist, had

 8            it not been for the existence of the tape, you

 9            think he would have come clean and reported it

10            within 24 hours later?

11                    MR. VIGLIOTTI:  Objection.

12                    MS. QUINN:  Objection.

13      A.    It's hypothetical.

14      Q.    It's hypothetical?

15      A.    Yes.

16      Q.    Why was he so -- the parts of the complaint that

17            were sustained was the awareness of activities

18            and knowledgeability of laws; yes?

19      A.    Yes.

20      Q.    And then their initial verbal reports to

21            supervisor, that was sustained because he didn't

22            tell the supervisor within 24 hours?

23      A.    I believe it's before the end of the shift.  I

24            don't know what the language is.  He needs to
```

```
 1            notify.  The use of force report can be put in

 2            the, but the notification needs to be made

 3            forthwith.

 4     Q.    He was in charge with filing an untruthful

 5            report?

 6     A.    Correct.

 7     Q.    Even though his report didn't say everything

 8            that happened?

 9     A.    His original report, no.

10     Q.    The form -- one of the forms that we circulated

11            at the beginning where you told the office of

12            the District Attorney that Tivnan lied, had you

13            signed any other letters like that where you

14            disclose information about an officer that had

15            been untruthful?

16     A.    I would -- we had a list that we went over.  I

17            think we're still in the process.  This was

18            asked for because of -- I believe there was a

19            case and it was requested through the District

20            Attorney.  It was the District Attorney who

21            asked for it.

22     Q.    So Tivnan is one of the individuals on this

23            questionnaire that you filled out for the

24            District Attorney?
```

```
1   A.   I signed that, yes.

2   Q.   And did you sign one in connection with Joyal as

3        well?

4   A.   It's very specific and no.  No.  It's very

5        specific on those three incidents.  Those three

6        reasons that you would check the box, very

7        specific.

8   Q.   Got it.  Who else -- which other forms have you

9        signed with regard to other officers?

10  A.   I have to check the records.

11               MR. PINEIRO:  We can mark that.

12               (Incident Narrative Report marked

13               Exhibit No. 14.)

14  Q.   Do you know who Michael Spalatro is?

15  A.   I do.

16  Q.   Has he ever been disciplined?

17  A.   You would have to check the record.

18  Q.   Do you have any idea of whether -- what type of

19       officer Spalatro is?

20  A.   He's a good police officer that I know of.  He's

21       on the SWAT team.  I know him from training and

22       training only.

23  Q.   Michael Spalatro prepared a report on March 6th

24       of 2015.  Have you seen this report before?
```

| 1 | A. | Not that I'm aware of. |
|---|----|-----|
| 2 | Q. | Do you know who Richard Jellyman is? |
| 3 | A. | I do not. |
| 4 | Q. | Do you see his name here? |
| 5 | A. | I do. |
| 6 | Q. | He was charged with leaving the scene of an |
| 7 | | accident and property damage, assault with |
| 8 | | intent to murder, assault and battery with a |
| 9 | | dangerous weapon and failure to stop for a |
| 10 | | police officer; yes? |
| 11 | A. | Is that a question? |
| 12 | Q. | Yes.  These are the charges that appear in -- |
| 13 | A. | Yes. |
| 14 | Q. | -- Spalatro's report and this means this is |
| 15 | | Spalatro's arrest report? |
| 16 | A. | Entered by Michael Spalatro, yes. |
| 17 | Q. | And if you read through this report, this stems |
| 18 | | from an arrest on March 6th of 2015 when he was |
| 19 | | working a uniform paid detail at the Club |
| 20 | | Riviera on 241 Southbridge Street; is that |
| 21 | | right? |
| 22 | A. | (Shakes head.) |
| 23 | Q. | And -- |
| 24 | A. | Correct. |

1    Q.   If you go down the report, Mr. Jellyman gets

2         into his car, looked directly at me as I was

3         standing in front of him in full uniform.  I

4         then yell out and identify myself as a police

5         officer to the operator.  I raised my hands and

6         commanded the operator to stop.  At this time,

7         the operator was stopped.  During the time the

8         motor vehicle was stopped, I was able to see the

9         operator and I recognized from inside the club.

10        I then heard the engine of the motor vehicle rev

11        up.  The operator then put the motor vehicle

12        into gear and began driving straight at me,

13        while accelerating at a high rate of speed.  I

14        then attempted to jump out of the way of the

15        motor vehicle.  I was just able to move enough

16        for the motor vehicle to not strike me straight

17        on.  As the motor vehicle passed, my left hip

18        was struck by the driver's side mirror.  The

19        operator of the vehicle then continued out of

20        the parking lot at a high rate of speed and

21        turned left on Southbridge Street.

22                  Did I read that right?

23   A.   Correct.

24   Q.   Then as you go down further at 0124, I was

```
 1            informed that Officer N. LaFleche had the motor

 2            vehicle stopped on Grafton Street by Water

 3            Street.  Officer J. Watkins then transported me

 4            to Grafton Street and Water Street.  I

 5            positively 100 percent identified the motor

 6            vehicle and operator.  The operator was

 7            identified as Richard Jellyman, 3/26/81.  The

 8            motor vehicle registration number was US86KR.

 9            The vehicle was registered to Richard Jellyman.

10                     Do you see that?

11       A.   Yes.

12       Q.   And then it says what he was subsequently

13            arrested and charged for.  Do you see that?

14       A.   I see that.

15       Q.   And then the next page, R. Jellyman was

16            handcuffed, double locked.  R. Jellyman did

17            state that he was diabetic and that his sugar

18            was low.  EMS responded to the scene and tested

19            his sugar level.

20                     And then it talks about the fact that

21            EMTs were there; yes?

22       A.   EMTs came, yes.

23       Q.   Since this was his arrest, could you glean from

24            this report that Officer Spalatro used any level
```

```
 1          of force at all?
 2                    MS. QUINN:  Objection.
 3     A.   I don't see any here.
 4     Q.   Okay.
 5                    (Complaint marked
 6                    Exhibit No. 15.)
 7     Q.   Have you ever seen this report before, Chief?
 8     A.   Yes.  This report here?
 9     Q.   Yes.  When is the last time that you saw this
10          report?
11     A.   June of '16, give or take.
12     Q.   It's signed by you?
13     A.   It is, yes.
14     Q.   As to Officer LaFleche -- let's see.  Chief's
15          finding Page 000151.  Do you agree with the
16          logic and sufficiency?  Do you see that?
17     A.   I do, yes.
18     Q.   And on the unnecessary use of force, you did not
19          sustain a complaint?
20     A.   That's correct.
21     Q.   The allegation was that, Spalatro used more
22          physical force than that which is reasonably
23          necessary to accomplish a proper police
24          objective?
```

A.   That's correct.

Q.   And then on the issue of submitting reports, the

     allegation was, quote, Mr. Jellyman's assault is

     not described in either of Officer Spalatro's

     report or the report prepared by Officer Nathan

     LaFleche which demonstrates beyond any doubt the

     continued existence of a pervasive code of

     silence within the Worcester Police Department.

               And then as it relates to Worcester

     Police Policy 1403.1, submitting reports,

     Officers and employees must promptly, accurately

     and truthfully complete and submit all reports,

     forms and records as requested.

               You sustained this portion of the

     complaint?

               MR. VIGLIOTTI:  Objection.

A.   No.  I did not.  Not on -- oh, on Nathan

     LaFleche.  I sustained for Spalatro.

Q.   For Spalatro; correct?

A.   Correct.

               MR. VIGLIOTTI:  Want to make sure the

     record is clear on that.

               MR. PINEIRO:  You're right.  Thank

     you.

```
 1                    MR. VIGLIOTTI:  It's my client.

 2                    MR. PINEIRO:  Thank you for being so

 3          helpful.

 4     Q.   And then 1406.11.  On the awareness of

 5          activities, knowledgeability of laws, rules and

 6          regulations, you've also sustained a complaint

 7          against Spalatro; am I right?

 8     A.   Correct.

 9     Q.   And he was retrained on Policy 400?

10     A.   Correct.

11     Q.   And how was he retrained on Policy 400?

12     A.   That's the commander -- I have the commander

13          either send them -- sit down with him and review

14          the policy or go to training for a day or two,

15          whatever they deemed appropriate.

16     Q.   Did the D.A. -- did the Worcester County D.A.

17          get a letter similar to the one on Tivnan for

18          violating the rule on submitting reports because

19          of employees have to promptly, accurately and

20          truthfully complete and submit reports and forms

21          and records as requested?

22     A.   I would have to defer to the BOPS.

23     Q.   I want you to take a quick look at Page -- in

24          this investigation, was Spalatro interviewed by
```

1   any of your investigators?

2   A.   I did not review this complaint prior to us

3        coming today, so I would have to go through it.

4        And also --

5   Q.   No problem.  Page 8, one of the sergeants was

6        questioned, Sergeant Donohue.  Do you know if

7        that was Spalatro's direct supervisor?

8   A.   I do not know who his direct supervisor was at

9        that time.  I was the deputy chief at this time.

10  Q.   Got it.  You were deputy chief at the time?

11  A.   Of the incident and for most of the

12       investigation until I -- the chief had left in

13       May.  I believe this was signed in June.

14  Q.   Did you ever discuss with Gemme what he thought

15       of the investigation before you completed it?

16  A.   I don't recall if we had any.

17  Q.   Do you still talk to Chief Gemme?

18  A.   No.

19  Q.   And then Page 9, your investigators took

20       statements from Officer Adam Bullock.  He was

21       asked to respond to questions; am I right?

22  A.   Yes.

23  Q.   And he was asked -- well, there were five

24       different questions that he was asked to respond

```
 1          that carried from Page 9 to 10?
 2   A.     Correct.
 3   Q.     Bottom of Page 10 --
 4   A.     Excuse me for a second.
 5   Q.     Yes, sir.
 6                    MS. QUINN:  Let's go off.
 7                    (Discussion off the record.)
 8   Q.     So Officer Bullock was asked to respond?
 9   A.     Yes.
10   Q.     Page 10.  Do you see the previous to last, While
11          standing by and seeing, we were advised via
12          radio that Officer Spalatro was being
13          transported to our location to make an
14          identification of Jellyman.
15                    Do you see that?
16   A.     I see that.
17   Q.     And then last sentence, last paragraph, Officer
18          Spalatro was transported to our location by
19          Officer Watkins.  Once on scene, Officer
20          Spalatro exited the vehicle and approached
21          Jellyman.  Officer Spalatro was visibly upset
22          and began speaking with Jellyman in close
23          proximity to Jellyman's face.  Jellyman began to
24          tense up and my attention was now partially
```

```
 1            drawn to continuing my control of Jellyman's

 2            left arm.

 3                      Did I read that correct on Page 10?

 4       A.   Yes.

 5       Q.   At this time, Officer Spalatro extended his

 6            right arm towards the general direction of

 7            Jellyman's head and was continuing to make

 8            statements to Jellyman about the earlier

 9            incident.  From my vantage point, it was unclear

10            whether Officer Spalatro made contact with

11            Jellyman, but Jellyman's head did move

12            backwards.  I then observed Officer Spalatro's

13            hands up against Jellyman's upper chest as he

14            continued to speak with Jellyman.

15                      Do you see that?

16       A.   I see that.

17       Q.   So Page 11 he's asked some more questions, typed

18            questions and you see them; right?

19       A.   Yes.

20       Q.   And then eventually Page 13 there was an

21            interview of him by Sergeant Avedian, Sergeant

22            George and I guess he had -- who is Tom Daly?

23       A.   Tom Daly was a union representative at the time.

24       Q.   And who is Attorney Tom Horgan, do you know who
```

```
 1          he is?

 2    A.    No idea.

 3    Q.    But anyway, did you give an order that he be

 4          interviewed?

 5    A.    I did not.  I was the deputy chief at this time

 6          and not -- I had nothing to do with this

 7          investigation.

 8    Q.    So Chief Gemme, Page 13, ordered an interview be

 9          conducted of Adam Bullock; yes?  On top of

10          Page 13.

11    A.    Yes.

12    Q.    Page 15, Avedian asks him, Tell me what happens.

13          Tell me what he does.

14                     BULLOCK:  He walks up to Jellyman and

15          got right up and INAUDIBLE and started yelling

16          at him.

17                     Do you see that?

18    A.    Where is that?

19    Q.    Right here.

20    A.    15?

21    Q.    15 where it --

22    A.    Yes.

23    Q.    Then Page 16, Avedian, I think it's the fourth

24          line.  Avedian said, Okay.  And you stated you
```

```
 1           saw him extend his arm.

 2                     And Bullock says, Yes.

 3                     AVEDIAN:  Show me.  What did he do?

 4           Was he -- did he have a closed fist?

 5                     BULLOCK:  I don't recall.  It was

 6           quick.  I don't recall if it was a closed fist

 7           or open fit.

 8                     Do you see that?

 9      A.   I do not.

10      Q.   Right here.

11      A.   You're all over the place.

12      Q.   Right up here.  Page 16.

13      A.   Okay.  I'm on 16.  I'm just trying to --

14      Q.   Right where my index finger is.

15      A.   Show me what you did, yes.

16      Q.   Then further down, Avedian said, Did you punch

17           him?

18                     BULLOCK:  It appeared to be -- to me

19           as though he had, yes, but I couldn't be, you

20           know, certain.

21                     Did I read that right?

22      A.   Yes.

23      Q.   Avedian says, Punch him, slap him, question

24           mark.
```

```
 1                   BULLOCK:  I don't know if his hand
 2           was open or closed to be honest with you.
 3    A.    Yes.
 4    Q.    And then Page 17, Avedian at the very bottom,
 5           Did you see him make contact with his face?
 6                   BULLOCK:  It appeared that he did
 7           make contact with him.
 8                   Did I get that right?
 9    A.    Yes.
10    Q.    Page 18.
11    A.    You missed the other part here.  It says, It
12           appeared that he did.  And then Avedian said, I
13           don't want, "It appeared."  Did he make contact
14           with his face?  Did you see him make contact?
15                   And Bullock said, It, it wasn't his
16           face.  It looked like he hit his head.
17    Q.    And then Page 18, Avedian said, Hit his head
18           where?  Where on his head?
19                   BULLOCK:  Somewhere on top.
20                   AVEDIAN:  Top of his head?
21                   Yes.
22                   AVEDIAN:  And, like, punch him in the
23           top of the head?
24                   BULLOCK:  Either a punch or a slap.
```

```
 1          I told you, I don't know if his hand was open or

 2          closed at the time.  Yes?

 3    A.    Correct.

 4    Q.    Page 19, Avedian asking Bullock, How certain

 5          were you that he did make contact with him?  If

 6          you can give me a percentage, 100 percent, 90

 7          percent?

 8                    I'd, I'd say 100 percent.

 9                    Do you see that?

10    A.    Correct.

11    Q.    Page 20, Avedian at the bottom of the page, All

12          right.  Did you report this to any supervisor?

13                    And what did he respond, Page 21?

14    A.    You want me to respond?

15    Q.    Yes.

16    A.    He said no.

17    Q.    AVEDIAN:  Did you feel that you should have?

18                    BULLOCK:  Nope.

19                    AVEDIAN:  Why is that?

20                    BULLOCK:  As I said, I wasn't for

21          certain that he had been struck.  In addition,

22          he made no complaint to me of any injuries or

23          having been struck.  There was, I mean, I

24          couldn't tell if he had been hit or not, to be
```

1          honest with you, because there was no injury.

2                    Do you see that?

3     A.   I do.

4     Q.   AVEDIAN:  But you stated that you saw him extend

5          his arm and strike him in the head?

6                    Bullock responded, Correct.

7                    And you were pretty certain, 100

8          percent, that you saw that?

9                    Correct.

10                   Do you see that?

11    A.   I see it.

12    Q.   And Bullock was questioned about Spalatro.  If

13         you look at Page 30, he only gave an ID?

14    A.   That's correct.

15    Q.   And Spalatro gave an explanation.  Let's see.

16         If you can go to Page 31 at the very bottom, he

17         gives an explanation of what happened.  Last few

18         sentences, I was also upset that the operator

19         had tried to run me down with his motor vehicle

20         after I spent part of my night trying to ensure

21         him a safe ride home.  As I approached the

22         suspect, I positively identified him.  He was

23         identified as Richard Jellyman.  I then

24         attempted to speak with Mr. Jellyman but he

```
 1          seemed disoriented, confused and acting bizarre.

 2          Given Mr. Jellyman's behavior and the fact that

 3          he had just intentionally tried to seriously

 4          injure and/or kill me with his motor vehicle, I

 5          began to develop a sense of fear and nervousness

 6          towards Mr. Jellyman.  Given this, I pushed my

 7          hands forcefully into Mr. Jellyman's chest in

 8          order to get his attention and create a safe

 9          distance between us.  As I did this, I noticed

10          that Mr. Jellyman stepped and moved backwards.

11          Once Mr. Jellyman steadied himself and realized

12          the severity of the situation, I began to

13          question him about the earlier conduct.

14                    Do you see that?

15     A.   Yes, I do.

16     Q.   When you came to your final conclusions, did you

17          find this testimony or this account by Officer

18          Spalatro to be credible?

19     A.   This was right after I became chief.  This

20          investigation was done during a previous

21          administration.  It was complete during the

22          previous administration, so I don't recall the

23          conversation that I had with the BOPS division.

24     Q.   I don't want to put words in your mouth.  Did
```

```
 1          you sign it simply to go along with the previous
 2          administration?
 3    A.    No.  I'm sure we had conversation and I don't
 4          really have the opportunity to discuss this case
 5          with BOPS since '16.
 6    Q.    Now, when this happened, did you have an
 7          understanding of whether Jellyman had already
 8          been handcuffed or no?
 9    A.    I don't recall.
10    Q.    None of the other officers that were present
11          there alleged that they saw any of this conduct;
12          am I right?
13                    MS. QUINN:  Objection.
14    A.    I believe one of the officers said that he saw
15          it, saw Jellyman's head go back but did not
16          know.
17    Q.    That was Bullock who said that?
18    A.    No.  That was -- that was previous and then he
19          went into -- I'm just going off what you just
20          said.  Who was the other officer?  I believe he
21          said that --
22    Q.    Bullock or LaFleche?
23    A.    I believe LaFleche said that he -- I would have
24          to go back and I'm paraphrasing, but he said
```

```
 1              that he didn't see anything, that he believed he

 2              saw his head snap back.  That was LaFleche and

 3              Bullock both times.  Okay.  Then you're accurate

 4              then.  It was LaFleche -- I mean, if it was

 5              Bullock, then it's correctly saying nobody else

 6              seen him.

 7      Q.      Page 48, last paragraph.  Actually, the previous

 8              paragraph says, The report that was submitted by

 9              Officer LaFleche, Paul Cyr, Jarrett Watkins,

10              Victor Martinez-Pietri and Sergeant Brian

11              Donohue provided no significant information as

12              to the interaction between Officers Spalatro and

13              Richard Jellyman due to the vantage point during

14              the interaction.

15                        Do you see that?

16      A.      I do.

17      Q.      And so then it goes at the very bottom of this

18              paragraph, Although Officer LaFleche was on

19              scene and wrote a supplemental report to the

20              arrest of Officer Spalatro, Officer LaFleche at

21              no point during this incident saw any contact

22              made between Officer Spalatro and Richard

23              Jellyman.

24      A.      Correct.
```

```
 1   Q.   But the crux of this investigation is the fact
 2        that no single person on scene including the
 3        paramedics ever saw any contact made between
 4        Officer Spalatro and Richard Jellyman.
 5                  Did I read that right?
 6   A.   Correct.
 7   Q.   Furthermore, at no point in time during the
 8        incident with Jellyman did he ever complain that
 9        he was struck by Officer Spalatro.  To any
10        officers on scene, two paramedics, a transport
11        officer, Victor Martinez-Pietri on his booking
12        video or in his booking questions.
13                  Do you see that?
14   A.   I do.
15   Q.   Along with the complaints filed by Richard
16        Jellyman and Attorney Hector Pineiro, it should
17        be noted that an undated photograph was
18        submitted with the complaint which showed the
19        slight darkening under the left eye as of the
20        date of this report.  Attorney Pineiro and his
21        client, Richard Jellyman, had responded to the
22        Bureau of Professional Standards for an
23        interview; is that right?
24   A.   That's correct.
```

1    Q.   Did you come to the conclusion that there was an

2         unreported use of force by Officer Spalatro that

3         eventually he would have to correct this report?

4    A.   I would have to review this report and I haven't

5         reviewed this report in five years.  Like I

6         said, I didn't.

7    Q.   But the exhibit that we marked clearly didn't

8         say that he -- whether it was punching or

9         slapping.  It doesn't say anything about any

10        physical contact between him and Mr. Jellyman?

11   A.   The original report, this one here?

12   Q.   Right.

13   A.   Correct.

14   Q.   And eventually he must have been required to put

15        in a report saying what he did consistent with

16        his IDC?

17   A.   Say that again?

18   Q.   Eventually was he asked to update, to supplement

19        his report so that it would contain information

20        that he gave to the Bureau of Professional

21        Standards?

22   A.   I'd have to review the reports.

23   Q.   And did you consider at any point in time

24        whether his willingness and his failure to

```
 1              report, can we agree that he used force on

 2              Jellyman?

 3                      MS. QUINN:  Objection.

 4     A.   I'd have to review the reports.

 5     Q.   Well, Mr. Bullock, Officer Bullock, told the

 6          officer that he made contact.  He doesn't know

 7          if it was a slap or a punch; right?

 8     A.   That's what he said.

 9     Q.   And he said he didn't even know if it was on top

10          of the head or some other area, but it was in

11          the upper extremity; yes?

12     A.   That's what he said.

13                      MR. VIGLIOTTI:  Objection.

14                      MS. QUINN:  Objection.

15     Q.   Is that information enough to sustain a

16          complaint of an unreasonable and reasonable use

17          of force and truthfulness in reporting?

18     A.   I would have to review all of these reports.

19                      MR. PINEIRO:  I'm done.

20                      MS. QUINN:  That's it.  No questions.

21                      (Whereupon, the deposition was

22          concluded at 4:05 p.m.)

23

24
```

1      Excerpt from Rule 30 (e):
       Submission to Witness; Changes; Signing.

2

             When the testimony is fully
3      transcribed, the deposition shall be submitted
       to the witness for examination and shall be read
4      to or by him/her, unless such examination and
       reading are waived by the witness and by the
5      parties.  Any changes in form or substance which
       the witness desires to make shall be entered
6      upon the deposition by the officer with a
       statement of the reasons given by the witness
7      for making them.  This procedure must be
       accomplished within 30 days of receipt of the
8      transcript.

9

       *********************************************
10

11

             I have read the foregoing, and it is a
12     true transcript of the testimony given by me at
       the taking of the subject deposition.

13

14

15

16                    _____
                      STEVEN SARGENT

17

18                    _____
                      DATE

19

20

21

22

23     CASE NAME:  Melendez vs. Tivnan
       DATE TAKEN:  January 31, 2022

24

<u>ERRATA SHEET</u>

    In accordance with the rules of procedure governing depositions, you are entitled to read and correct your deposition.
    Accordingly, please carefully read your deposition and, on this errata sheet, make any changes or corrections in form or substance to your deposition that you feel should be made.
    PLEASE DO NOT MARK THE TRANSCRIPT.
    After completing this procedure, sign at the conclusion of such changes/corrections (if any) and return it in accordance with your instructions.

PAGE LINE
____ ____  CHANGE:_____
           REASON:_____
____ ____  CHANGE:_____
           REASON:_____
____ ____  CHANGE:_____
           REASON:_____
____ ____  CHANGE:_____
           REASON:_____
____ ____  CHANGE:_____
           REASON:_____
____ ____  CHANGE:_____
           REASON:_____
____ ____  CHANGE:_____
           REASON:_____
____ ____  CHANGE:_____
           REASON:_____
____ ____  CHANGE:_____
           REASON:_____
____ ____  CHANGE:_____
           REASON:_____
____ ____  CHANGE:_____
           REASON:_____
____ ____  CHANGE:_____
           REASON:_____

I have read the foregoing transcript.


_____  DATE:_____
STEVEN SARGENT

1

2          Commonwealth of Massachusetts
           South Middlesex, ss.

3                     I, Linda Dunlop, Notary Public in and
           for the Commonwealth of Massachusetts, do hereby
4          certify that there came before me on the
           31st day of January, 2022, STEVEN SARGENT, who
5          was satisfactorily identified and duly sworn by
           me; that the ensuing examination upon oath of
6          the said deponent was reported stenographically
           by me and transcribed into typewriting under my
7          direction and control; and that the written
           transcript is a true record of the questions
8          asked and answers given at said deposition.

9                     I FURTHER CERTIFY that I am neither
           attorney nor counsel for, nor related to or
10         employed by any of the parties to the action in
           which this deposition is taken; and, further,
11         that I am not a relative or employee of any
           attorney or financially interested in the
12         outcome of the action.

13

14                    IN WITNESS WHEREOF I have hereunto
           set my hand and affixed my seal of office this
           13th day of February, 2022 at Framingham.

15

16                        _____

17                        Linda Dunlop, CSR
                          Notary Public,
18                        Commonwealth of Massachusetts
                          My Commission
19                        Expires:  12/15/28

20

21

22

23

24

**$**

**$1,000** [1] - 152:6

**'**

**'15** [1] - 190:12
**'16** [3] - 21:3, 223:11, 235:5
**'19** [2] - 152:15
**'86** [1] - 6:1

**0**

**000151** [1] - 223:15
**0124** [1] - 221:24
**01608** [1] - 2:10
**01609** [1] - 2:15
**01610** [1] - 2:4
**01721** [1] - 1:23

**1**

**1** [7] - 4:3, 21:14, 28:1, 47:9, 113:8, 190:19, 211:19
**1.5** [1] - 113:8
**10** [15] - 4:12, 27:4, 33:13, 88:16, 88:17, 88:18, 96:10, 162:13, 171:23, 183:4, 212:24, 227:1, 227:3, 227:10, 228:3
**10-year** [1] - 184:11
**100** [6] - 16:12, 148:2, 222:5, 232:6, 232:8, 233:7
**10:06** [1] - 1:21
**10th** [2] - 27:12, 145:8
**11** [4] - 4:13, 190:8, 212:24, 228:17
**12** [18] - 4:14, 6:13, 20:1, 155:15, 159:15, 159:18, 160:9, 163:8, 163:18, 163:19, 163:20, 170:18, 172:4, 186:14, 187:1, 190:10, 202:12, 203:4
**12'ing** [1] - 155:14
**12/15/28** [1] - 242:19
**120** [1] - 191:21
**12th** [1] - 42:9
**13** [8] - 4:15, 145:2, 171:6, 171:16, 196:10, 228:20, 229:8, 229:10
**134193** [1] - 1:16

**13A** [2] - 192:7, 192:11
**13th** [5] - 27:11, 27:12, 28:8, 144:11, 242:14
**14** [8] - 4:16, 165:1, 197:23, 198:11, 199:8, 199:11, 219:13
**1400** [1] - 209:3
**1403.1** [1] - 224:10
**1406.11** [1] - 225:4
**144** [1] - 4:10
**14th** [1] - 32:5
**15** [8] - 4:17, 20:22, 83:20, 199:11, 223:6, 229:12, 229:20, 229:21
**15-year** [1] - 34:23
**155** [2] - 156:16
**157** [1] - 4:11
**16** [3] - 229:23, 230:12, 230:13
**160** [3] - 156:16, 156:21
**16th** [1] - 200:4
**17** [7] - 83:10, 90:22, 93:3, 111:8, 112:14, 215:14, 231:4
**18** [5] - 35:4, 113:4, 215:13, 231:10, 231:17
**180-pound** [1] - 184:11
**1822** [1] - 206:13
**183** [1] - 4:12
**185** [2] - 156:8, 162:12
**19** [4] - 35:13, 35:16, 216:19, 232:4
**190** [2] - 4:13, 4:14
**196** [1] - 4:15
**1986** [1] - 6:1
**1990s** [1] - 61:10

**2**

**2** [15] - 4:4, 27:15, 31:15, 32:20, 33:11, 47:9, 47:16, 83:18, 86:20, 92:13, 190:22, 201:20, 210:22, 213:2
**20** [4] - 35:13, 35:16, 35:24, 232:11
**20-11453** [1] - 1:2
**2013** [2] - 145:8, 151:1
**2014** [2] - 193:11, 193:12
**2015** [3] - 20:22, 219:24, 220:18
**2016** [6] - 20:24, 27:4, 28:13, 32:6, 79:7,

96:10
**2017** [6] - 62:24, 144:12, 145:2, 162:4, 165:1, 171:6
**2018** [3] - 68:19, 68:23, 172:21
**2019** [6] - 47:18, 74:8, 74:14, 78:9, 108:22, 152:14
**2020** [5] - 46:15, 200:5, 200:8, 209:3, 215:14
**2021** [3] - 12:1, 42:9, 50:21
**2022** [5] - 1:20, 78:13, 240:23, 242:4, 242:14
**21** [3] - 4:3, 31:24, 232:13
**219** [1] - 4:16
**21st** [1] - 202:4
**22** [5] - 37:13, 38:9, 164:16, 164:24, 209:3
**223** [1] - 4:17
**225** [1] - 171:24
**22nd** [2] - 202:4, 208:13
**23** [3] - 38:10, 38:14, 166:2
**23rd** [1] - 28:13
**24** [9] - 168:24, 207:4, 207:5, 214:6, 216:21, 216:24, 217:10, 217:22
**241** [1] - 220:20
**242** [1] - 4:23
**25** [1] - 169:12
**25th** [1] - 162:4
**26** [5] - 50:20, 171:6, 171:10, 171:15, 171:16
**265** [2] - 192:7, 192:11
**266** [1] - 191:21
**26th** [2] - 47:3, 47:18
**27** [2] - 171:15, 172:6
**28** [1] - 173:19
**29** [2] - 173:9, 173:18
**29th** [2] - 36:17, 108:22

**3**

**3** [14] - 4:5, 27:24, 28:1, 41:22, 42:4, 113:22, 157:14, 162:14, 162:18, 162:22, 163:2, 175:24, 183:19
**3)** [1] - 113:21

**3/26/81** [1] - 222:7
**30** [7] - 5:5, 79:8, 85:19, 157:22, 233:13, 240:1, 240:7
**301** [1] - 2:9
**31** [8] - 1:20, 4:4, 157:22, 157:23, 172:18, 186:16, 233:16, 240:23
**31st** [1] - 242:4
**32** [1] - 120:12
**39:58** [2] - 113:5, 113:15

**4**

**4** [7] - 2:15, 4:6, 38:20, 44:7, 44:8, 103:14, 183:19
**40** [7] - 27:15, 45:15, 45:24, 46:8, 79:8, 119:19, 124:12
**40-day** [2] - 40:12, 50:5
**400** [3] - 209:24, 225:9, 225:11
**40:19** [1] - 113:18
**40:27** [1] - 114:2
**41** [3] - 4:5, 127:20, 127:24
**42** [3] - 68:14, 127:20, 128:3
**44** [2] - 4:6, 130:3
**455** [1] - 2:9
**48** [2] - 199:5, 236:7
**4:05** [1] - 239:22
**4:20-CV-40115TSH** [1] - 1:3

**5**

**5** [6] - 3:4, 4:7, 82:20, 86:23, 109:19, 109:23
**500** [4] - 126:22, 137:16, 137:17, 216:2
**508** [4] - 1:23, 2:4, 2:10, 2:16
**52** [1] - 199:5
**57** [1] - 158:1

**6**

**6** [8] - 4:8, 28:19, 82:22, 82:23, 83:1, 87:15, 87:16, 92:11
**60** [1] - 190:19
**63** [1] - 158:2
**65** [2] - 172:19, 172:23

**69** [1] - 1:22
**6th** [2] - 219:23, 220:18

**7**

**7** [4] - 4:9, 29:11, 88:9, 92:1
**7/21** [1] - 149:13
**7/21/20** [3] - 201:24, 202:2
**753-4121** [1] - 1:23
**754-7285** [1] - 2:16
**770-0600** [1] - 2:4
**799-1161** [1] - 2:10

**8**

**8** [5] - 4:10, 88:16, 144:3, 209:1, 226:5
**807** [2] - 1:19, 2:3
**82** [2] - 4:7, 4:8

**9**

**9** [14] - 4:11, 32:20, 33:11, 83:10, 88:16, 90:22, 93:3, 157:4, 210:15, 210:22, 211:5, 226:19, 227:1
**9/25/2017** [1] - 165:7
**9/26/2017** [2] - 165:10, 174:2
**90** [1] - 232:6
**91** [1] - 4:9
**911** [1] - 190:15
**9th** [1] - 172:21

**A**

**A&B** [6] - 92:16, 192:5, 192:7, 192:9, 192:10
**a.m** [1] - 1:21
**ability** [4] - 82:14, 146:18, 148:3, 149:21
**able** [11] - 48:17, 70:17, 84:19, 84:21, 85:20, 107:7, 158:8, 160:20, 161:15, 221:8, 221:15
**abnormally** [1] - 201:6
**abrasion** [1] - 128:15
**absolute** [1] - 161:21
**absolutely** [2] - 148:15, 203:22
**abuse** [1] - 148:15
**accelerating** [1] - 221:13

**acceptable** [1] - 56:16
**accepted** [1] - 27:15
**accident** [1] - 220:7
**accidental** [2] - 101:15, 133:2
**accomplish** [4] - 132:20, 208:18, 215:16, 223:23
**accomplished** [1] - 240:7
**accordance** [2] - 241:2, 241:7
**according** [5] - 27:5, 28:9, 36:11, 136:14, 155:5
**According** [1] - 45:11
**Accordingly** [1] - 241:4
**account** [4] - 33:24, 50:3, 180:15, 234:17
**accountable** [4] - 22:12, 75:18, 76:2, 76:13
**accurate** [8] - 43:21, 49:20, 53:11, 56:19, 175:4, 175:7, 236:3
**accurately** [2] - 224:11, 225:19
**accusation** [2] - 137:13, 137:14
**accused** [2] - 117:24, 150:15
**acted** [1] - 186:23
**acting** [4] - 160:24, 184:3, 184:6, 234:1
**action** [5] - 30:10, 30:13, 104:14, 242:10, 242:12
**actions** [2] - 56:15, 126:9
**actively** [8] - 83:20, 84:9, 84:23, 85:6, 85:9, 85:11, 162:21, 162:24
**activities** [3] - 19:1, 217:17, 225:5
**actual** [1] - 128:18
**Adam** [2] - 226:20, 229:9
**adamantly** [1] - 36:2
**add** [2] - 112:16, 149:13
**added** [1] - 112:23
**addition** [1] - 232:21
**additional** [1] - 94:12
**addressed** [1] - 72:10
**adhere** [1] - 118:11
**adjectives** [1] - 115:2
**administration** [7] - 21:17, 25:21, 56:4,

196:18, 234:21, 234:22, 235:2
**administrative** [5] - 16:8, 16:9, 16:15, 55:10, 59:10
**administratively** [3] - 25:24, 26:1, 26:9
**administrators** [1] - 161:15
**admits** [1] - 36:2
**admitted** [2] - 34:22, 160:9
**advance** [2] - 124:2, 124:3
**advantage** [1] - 118:17
**advantages** [3] - 22:2, 22:6, 127:15
**advised** [7] - 33:18, 159:18, 167:4, 167:8, 169:7, 209:6, 227:11
**Affairs** [3] - 24:2, 117:4, 157:7
**affected** [1] - 149:21
**affidavit** [1] - 136:10
**affixed** [1] - 242:14
**affray** [1] - 48:21
**Agbanyo** [2] - 117:2, 128:7
**Agbanyo's** [1] - 128:12
**age** [1] - 162:13
**AGENCY** [1] - 1:22
**aggression** [2] - 99:5, 99:7
**aggressive** [1] - 68:7
**aggressively** [1] - 48:23
**ago** [5] - 16:19, 61:13, 61:24, 66:16, 140:22
**agree** [21] - 6:18, 6:22, 50:12, 50:18, 51:10, 75:20, 76:5, 86:17, 103:22, 114:14, 123:22, 123:23, 164:19, 170:2, 175:8, 175:12, 175:23, 205:13, 210:7, 223:15, 239:1
**agreed** [12] - 5:2, 5:9, 21:16, 21:24, 37:9, 37:12, 102:12, 127:21, 128:2, 164:17, 174:13, 174:16
**agreeing** [1] - 14:8
**agreement** [5] - 21:20, 26:22, 29:13, 190:5
**Agreement** [25] - 4:3,

4:13, 19:15, 19:16, 20:11, 21:13, 21:15, 21:19, 22:7, 25:3, 26:18, 28:4, 28:6, 28:11, 28:20, 188:15, 188:23, 189:1, 190:7, 190:11, 190:22, 196:11, 196:13, 196:17, 196:23
**agreement/last** [1] - 27:19
**Agreement/Last** [1] - 28:11
**Agreements** [4] - 22:3, 22:13, 25:5, 39:24
**ahead** [3] - 105:2, 151:15, 158:3
**AKERSON** [1] - 2:14
**Alaya** [1] - 49:3
**Alaya-Melendez** [1] - 49:3
**Albion** [1] - 202:20
**alcohol** [3] - 148:12, 148:15, 149:3
**ALERS** [2] - 1:10, 2:14
**Alers** [20] - 158:5, 158:15, 159:22, 163:9, 164:19, 165:1, 165:3, 166:3, 169:1, 171:22, 172:21, 175:19, 175:21, 178:18, 180:21, 186:10, 187:22, 204:14
**Alers'** [1] - 174:24
**alert** [2] - 106:18, 184:11
**alerting** [1] - 77:17
**allegation** [5] - 129:3, 176:15, 177:11, 223:21, 224:3
**allegations** [3] - 45:16, 50:4, 178:14
**alleged** [4] - 37:18, 128:6, 151:8, 235:11
**allow** [1] - 88:22
**allowed** [10] - 14:11, 43:9, 51:23, 87:10, 89:16, 102:4, 102:9, 110:11, 136:1, 199:20
**altercation** [3] - 189:18, 189:19, 189:24
**Alward** [6] - 84:12, 84:19, 84:24, 85:7, 85:11, 85:14
**Alzheimer's** [1] -

105:14
**ambulance** [5] - 93:17, 160:8, 167:9, 172:13, 173:20
**amend** [1] - 50:2
**amended** [1] - 46:19
**Amendment/Change** [1] - 28:6
**amount** [1] - 152:1
**analysis** [4] - 50:18, 51:1, 102:13, 174:9
**analyze** [1] - 174:19
**analyzed** [1] - 112:8
**analyzing** [1] - 129:18
**anatomy** [1] - 161:5
**Anderson** [3] - 213:12, 213:19, 214:5
**Anderson's** [1] - 212:22
**announced** [3] - 14:20, 15:1, 15:2
**anonymously** [1] - 136:17
**answer** [19] - 7:10, 16:1, 17:16, 41:4, 41:15, 57:11, 57:12, 58:9, 58:11, 58:12, 58:18, 105:1, 120:15, 120:20, 135:3, 135:10, 146:9, 146:23, 213:5
**answers** [2] - 120:23, 242:8
**anticipate** [1] - 41:8
**anyway** [1] - 229:3
**appear** [5] - 32:4, 86:18, 87:1, 104:1, 220:12
**APPEARANCES** [1] - 2:1
**appeared** [5] - 24:4, 230:18, 231:6, 231:12, 231:13
**applicable** [1] - 1:14
**applied** [2] - 85:12, 153:12
**apply** [1] - 153:13
**appointing** [3] - 16:24, 26:23, 26:24
**apprehended** [1] - 85:16
**apprehension** [1] - 86:2
**approached** [3] - 175:24, 227:20, 233:21
**approaching** [3] - 47:22, 47:24, 113:18
**appropriate** [19] -

30:11, 40:17, 46:3, 57:19, 132:24, 133:1, 179:10, 179:12, 179:17, 181:8, 187:21, 194:14, 194:23, 195:20, 199:22, 199:24, 200:3, 209:23, 225:15
**appropriately** [3] - 70:21, 70:22, 186:23
**appropriateness** [2] - 181:16, 181:23
**April** [1] - 6:1
**area** [11] - 48:4, 48:17, 84:11, 110:10, 111:8, 184:9, 184:16, 185:22, 212:3, 213:7, 239:10
**areas** [3] - 99:12, 110:13
**argue** [2] - 123:21
**arm** [26] - 48:12, 48:18, 114:4, 114:9, 166:12, 166:14, 166:15, 166:20, 166:22, 167:7, 167:8, 168:8, 169:10, 172:2, 172:12, 172:13, 181:1, 182:21, 184:15, 185:21, 187:11, 187:18, 228:2, 228:6, 230:1, 233:5
**armed** [2] - 95:20, 95:23
**Army** [1] - 6:5
**arraigned** [2] - 93:23, 193:13
**arrest** [25] - 80:1, 83:8, 92:6, 92:21, 95:14, 95:15, 128:10, 128:12, 128:19, 129:6, 129:7, 129:9, 130:5, 152:3, 153:23, 163:17, 163:19, 168:5, 168:6, 169:16, 182:1, 220:15, 220:18, 222:23, 236:20
**arrestable** [1] - 152:2
**arrested** [11] - 22:21, 22:22, 23:14, 23:15, 23:17, 116:16, 116:20, 151:5, 151:23, 163:18, 222:13
**arrests** [1] - 81:23

**arrival** [1] - 159:17
**Arrived** [1] - 184:10
**arrived** [6] - 159:13,
167:10, 172:3,
172:14, 180:17,
184:5
**arrives** [1] - 113:5
**article** [1] - 205:15
**ASHLAND** [1] - 1:23
**aside** [2] - 56:11, 57:3
**aspects** [1] - 201:19
**assault** [9] - 34:2,
36:6, 36:13, 85:9,
85:11, 213:9, 220:7,
220:8, 224:3
**assaulted** [1] - 48:24
**assaulting** [1] - 39:4
**assaultive** [4] - 49:16,
124:15, 124:19,
125:4
**assert** [2] - 47:17,
49:24
**asserted** [1] - 47:17
**assessment** [2] -
50:12, 184:17
**assist** [1] - 106:1
**assistance** [5] - 62:13,
73:5, 73:6, 84:20,
166:21
**assisted** [3] - 112:1,
159:3, 164:11
**associated** [1] -
206:20
**assume** [5] - 69:12,
78:10, 89:5, 89:6,
98:20
**assuming** [2] - 103:4,
180:7
**attached** [1] - 159:20
**attack** [5] - 98:24,
102:4, 104:20, 105:3
**attacked** [1] - 100:2
**attempt** [6] - 84:12,
85:17, 184:16,
203:21, 206:16,
213:7
**attempted** [6] - 48:20,
155:19, 204:21,
207:12, 221:14,
233:24
**attempting** [3] - 48:20,
208:10, 215:20
**attention** [9] - 55:1,
71:23, 72:11, 72:14,
72:20, 73:18,
206:23, 227:24,
234:8
**attested** [1] - 178:9
**Attorney** [13] - 36:18,
41:23, 56:19, 92:19,

123:19, 123:22,
218:12, 218:20,
218:24, 228:24,
237:16, 237:20
**attorney** [4] - 11:4,
191:8, 242:9, 242:11
**ATTORNEY** [1] - 4:18
**Attorney's** [5] - 42:9,
42:15, 51:12,
121:12, 122:16
**attorney/client** [4] -
56:7, 56:12, 57:10,
57:13
**attorneys** [1] - 57:4
**Auburn** [1] - 62:19
**audio** [1] - 107:6
**audit** [1] - 109:11
**August** [1] - 46:15
**AUGUSTUS** [2] - 1:6,
2:8
**authorities** [1] -
169:21
**authority** [4] - 16:24,
26:23, 26:24, 134:4
**authorization** [1] -
182:16
**authorized** [3] - 79:3,
79:4, 101:19
**autism** [2] - 165:6,
184:3
**automatically** [2] -
72:3, 72:5
**available** [3] - 77:10,
134:9, 178:17
**Ave** [1] - 159:17
**aVEDIAN** [1] - 230:3
**Avedian** [14] - 157:17,
164:20, 174:10,
228:21, 229:12,
229:23, 229:24,
230:16, 230:23,
231:4, 231:12,
231:17, 232:4,
232:11
**AVEDIAN** [5] - 231:20,
231:22, 232:17,
232:19, 233:4
**average** [1] - 156:17
**avulsion** [5] - 165:8,
173:15, 173:24,
181:12, 181:22
**awake** [1] - 184:11
**aware** [24] - 33:21,
55:16, 55:18, 67:7,
67:10, 74:2, 74:6,
77:4, 93:1, 96:17,
99:18, 100:1, 100:3,
100:4, 147:19,
150:9, 150:16,
150:17, 151:17,

161:20, 184:22,
188:22, 193:16,
220:1
**awareness** [2] -
217:17, 225:4
**AYALA** [1] - 1:4
**Ayala** [30] - 47:19,
47:21, 47:22, 48:6,
48:9, 48:12, 48:21,
48:22, 49:10, 49:13,
49:14, 49:20, 49:21,
49:22, 49:23, 71:12,
74:7, 102:12,
102:21, 103:2,
113:18, 113:21,
114:2, 114:7, 114:9,
114:11, 124:18,
125:24, 126:4, 130:4
**AYALA-MELENDEZ**
[1] - 1:4
**Ayala-Melendez** [26] -
47:19, 47:21, 47:22,
48:6, 48:9, 48:21,
48:22, 49:13, 49:14,
49:20, 49:21, 49:22,
49:23, 74:7, 102:12,
102:21, 103:2,
113:18, 113:21,
114:2, 114:7,
114:11, 124:18,
125:24, 126:4, 130:4
**Ayala-Melendez'** [1] -
114:9
**Ayala-Melendez's** [1]
- 48:12

**B**

**Babineau** [14] -
204:20, 204:22,
206:14, 210:23,
210:24, 211:6,
211:7, 211:8,
211:13, 211:16,
211:24, 213:2,
213:4, 213:7
**backing** [1] - 84:11
**backwards** [1] -
228:12, 234:10
**bad** [6] - 72:16, 82:2,
82:4, 97:14, 153:10,
153:11
**Bagley** [3] - 10:23,
11:1, 11:2
**ball** [2] - 123:10
**balls** [1] - 123:13
**banged** [1] - 199:9
**bark** [1] - 106:24
**barking** [2] - 84:9,
107:4

**based** [4] - 33:23,
45:16, 52:4, 199:10
**basis** [4] - 109:15,
123:3, 133:10,
140:20
**Bates** [1] - 157:22
**baton** [2] - 81:4, 98:8
**batons** [3] - 79:16,
80:16, 80:23
**battery** [3] - 34:2,
36:14, 220:8
**BAY** [1] - 1:22
**BCI** [1] - 94:13
**bears** [2] - 43:11, 45:4
**became** [10] - 32:8,
53:18, 62:1, 76:18,
76:24, 78:8, 155:12,
184:5, 188:22,
234:19
**become** [2] - 21:2,
151:17
**Beebs** [10] - 83:24,
84:2, 84:9, 85:13,
85:16, 85:24,
108:21, 108:22,
116:5
**Beebs'** [2] - 85:22,
91:5
**beer** [2] - 115:24,
116:1
**Beer** [2] - 69:15,
108:5, 109:19
**began** [2] - 74:10,
84:1, 84:7, 84:14,
85:16, 184:8,
221:12, 227:22,
227:23, 234:5,
234:12
**begin** [2] - 84:11,
198:5
**beginning** [2] -
112:14, 218:11
**begins** [1] - 128:3
**behalf** [7] - 1:13,
55:17, 56:1, 57:7,
57:17, 57:20, 58:7
**behavior** [1] - 234:2
**behest** [1] - 36:17
**behind** [4] - 48:2,
48:7, 99:2, 100:14
**believes** [1] - 114:18
**belong** [1] - 122:4
**belonged** [1] - 199:9
**below** [1] - 45:16
**Bennes** [2] - 133:19,
134:17
**Beshai** [8] - 145:20,
169:3, 172:8,
172:11, 174:22,
175:18, 175:21,

184:22
**BESHAI** [1] - 1:8
**Beshai's** [2] - 175:2,
177:15
**best** [7] - 109:15,
112:20, 118:7,
118:11, 129:20,
172:1, 180:3
**Beth** [1] - 11:1
**better** [3] - 118:16,
129:17, 169:23
**between** [14] - 5:2,
21:16, 35:15, 70:11,
79:7, 104:3, 138:10,
158:15, 202:24,
234:9, 236:12,
236:22, 237:3,
238:10
**beyond** [2] - 98:8,
224:6
**BFC** [1] - 37:23
**big** [3] - 156:4, 156:7,
162:12
**Bill** [1] - 10:23
**bill** [3] - 11:2, 78:18,
78:21
**Bishop** [7] - 64:12,
64:13, 84:20, 85:1,
85:7, 85:12, 85:15
**bit** [17] - 41:17, 49:4,
66:13, 85:5, 96:4,
99:15, 100:22,
101:5, 108:15,
108:22, 109:2,
109:12, 126:4,
130:4, 130:7, 137:11
**bite** [46] - 65:19,
65:22, 68:11, 68:14,
77:1, 77:13, 81:3,
85:13, 85:18, 86:4,
88:4, 88:23, 89:2,
91:13, 94:3, 94:8,
94:12, 96:24, 97:5,
97:23, 98:4, 98:16,
98:17, 99:11, 99:12,
100:5, 100:12,
100:15, 101:12,
101:15, 101:23,
102:9, 104:15,
104:16, 105:9,
110:12, 110:13,
110:15, 110:16,
111:4, 115:11,
115:19, 124:12,
125:8, 140:1
**Bite** [1] - 101:20
**bites** [18] - 69:8,
69:10, 69:11, 72:2,
77:14, 77:17, 80:22,
81:11, 81:21, 82:1,

82:2, 82:4, 95:17, 95:18, 95:19, 96:12, 125:13

**biting** [10] - 49:23, 68:13, 81:12, 89:17, 91:2, 91:10, 91:17, 99:14, 101:19, 133:3

**bitten** [7] - 71:7, 77:5, 79:8, 96:19, 100:10, 100:17, 126:7

**bizarre** [1] - 234:1

**black** [1] - 82:11

**blank** [12] - 35:5, 35:8, 36:2, 37:23, 37:24, 38:1, 38:3, 38:4, 38:15, 38:16, 39:1

**Blank** [1] - 35:6

**blank's** [2] - 36:3, 36:4

**bless** [1] - 6:14

**bloody** [4] - 87:20, 88:11, 88:15, 88:21

**blown** [1] - 144:19

**Blue** [1] - 199:18

**blue** [1] - 150:12

**Board** [1] - 142:21

**bob** [1] - 124:10

**bodily** [3] - 206:18, 206:20, 213:9

**body** [10] - 48:14, 49:6, 110:11, 112:9, 114:11, 114:16, 114:22, 166:15, 169:2, 172:7

**bones** [1] - 161:4

**booked** [2] - 73:24, 93:10

**booking** [12] - 23:24, 24:3, 73:4, 73:12, 73:18, 94:11, 94:15, 116:16, 116:19, 128:21, 237:11, 237:12

**BOPS** [28] - 4:15, 9:21, 32:21, 42:23, 124:9, 124:11, 134:20, 136:16, 136:17, 137:16, 142:14, 142:19, 142:23, 143:7, 143:18, 143:19, 144:5, 165:23, 174:13, 182:24, 183:7, 183:17, 192:19, 212:7, 225:22, 234:23, 235:5

**Boston** [1] - 65:14

**bottom** [12] - 35:6, 47:2, 93:3, 171:10, 178:15, 191:21,

---

211:5, 227:3, 231:4, 232:11, 233:16, 236:17

**Bowl** [2] - 156:18, 156:19

**box** [5] - 43:5, 43:14, 51:19, 51:21, 219:6

**boy** [9] - 29:19, 34:22, 34:23, 35:1, 35:22, 162:12, 164:4, 170:1, 188:2

**boy's** [2] - 184:24, 186:1

**boyfriend** [1] - 151:7

**BRAEBURN** [1] - 1:22

**Bray** [3] - 144:23, 145:5, 145:15

**break** [11] - 85:18, 89:10, 96:18, 134:23, 168:8, 187:18, 188:11, 189:8, 189:10, 191:10, 191:12

**breaking** [2] - 191:24, 193:18

**Breathalyzer** [2] - 26:11, 26:13

**bred** [1] - 98:23

**breeds** [1] - 98:23

**BRETT** [1] - 1:5

**Brett** [1] - 129:2

**Brian** [4] - 210:14, 212:6, 212:10, 236:10

**briefly** [4] - 102:11, 154:17, 201:19, 202:6

**bring** [11] - 72:20, 73:5, 73:6, 77:21, 106:3, 109:20, 134:15, 136:15, 141:16, 166:14, 183:8

**broke** [5] - 48:22, 49:3, 49:11, 84:13, 182:6

**broken** [7] - 106:7, 155:8, 155:21, 168:10, 181:24, 182:21, 187:11

**brought** [19] - 24:18, 42:23, 43:1, 55:1, 71:14, 71:22, 72:8, 72:11, 72:14, 73:18, 158:21, 163:22, 166:5, 166:12, 166:22, 169:4, 172:9, 175:13, 186:10

**bruise** [1] - 128:14

---

building [2] - 48:6, 113:9

**Bullock** [14] - 226:20, 227:8, 229:9, 230:2, 231:15, 232:4, 233:6, 233:12, 235:17, 235:22, 236:3, 236:5, 239:5

**BULLOCK** [9] - 229:14, 230:5, 230:18, 231:1, 231:6, 231:19, 231:24, 232:18, 232:20

**bunch** [1] - 197:3

**Bureau** [3] - 8:12, 8:16, 8:20, 9:5, 9:8, 9:19, 10:2, 11:5, 11:19, 11:24, 12:14, 13:1, 13:19, 13:23, 15:7, 18:2, 20:20, 33:5, 37:8, 46:21, 50:16, 109:19, 116:9, 120:17, 124:11, 129:15, 135:5, 165:4, 165:21, 167:17, 192:20, 237:22, 238:20

**bureau** [1] - 13:15

**Burke** [1] - 174:6

**business** [2] - 201:7, 201:9

**busy** [1] - 129:22

**but..** [1] - 189:7

**buy** [1] - 65:7

**buying** [1] - 64:19

**BY** [6] - 2:5, 2:11, 2:17, 3:4, 4:18, 5:16

**byproduct** [1] - 124:13

---

**C**

**CA** [1] - 1:2

**cage** [1] - 65:2

**calf** [1] - 85:13

**calm** [5] - 166:9, 167:5, 169:8, 175:18, 184:16

**calmed** [4] - 159:5, 159:7, 170:16, 180:17

**camera** [1] - 112:9

**campus** [1] - 173:22

**Canines** [1] - 74:5

**cannot** [8] - 49:2, 70:16, 111:4, 141:13, 149:5, 149:10, 178:13, 179:1

---

**capable** [1] - 81:7

**Capital** [3] - 183:22, 184:14, 185:21

**Captain** [7] - 10:3, 14:4, 43:1, 114:20, 118:2, 119:19, 174:12

**captain** [6] - 55:2, 55:3, 67:3, 67:17, 67:19, 216:7

**captured** [1] - 112:17

**car** [8] - 64:22, 95:1, 95:2, 95:3, 155:8, 171:21, 184:4, 221:2

**card** [4] - 144:2, 144:8, 150:20, 150:21

**Card** [1] - 4:10

**care** [3] - 86:3, 161:3, 165:15

**career** [1] - 145:23

**carefully** [2] - 112:21, 241:4

**cares** [1] - 122:1

**Carl** [1] - 54:17

**Carlson** [3] - 205:1, 205:5, 209:21

**carried** [1] - 227:1

**carry** [1] - 64:23

**Carville** [1] - 128:5

**CASE** [1] - 240:23

**Case** [1] - 41:18

**case** [86] - 15:4, 15:5, 15:11, 15:14, 15:17, 19:22, 19:24, 22:17, 22:19, 22:20, 31:4, 33:21, 34:14, 37:6, 39:23, 41:24, 42:1, 44:21, 46:12, 53:18, 54:3, 54:4, 54:18, 55:21, 56:2, 58:19, 58:20, 58:21, 58:24, 59:1, 77:4, 89:5, 89:21, 89:23, 92:23, 98:2, 98:4, 102:11, 112:12, 121:16, 123:4, 127:3, 130:18, 131:5, 131:10, 131:20, 132:3, 132:4, 132:11, 132:13, 132:16, 134:11, 135:11, 135:12, 135:16, 135:20, 135:21, 139:16, 141:19, 144:13, 154:18, 154:19, 154:22, 160:1, 181:4, 189:7, 202:5, 202:20, 218:19,

---

235:4

**cases** [8] - 14:24, 15:11, 40:11, 46:10, 100:5, 130:19, 168:16, 179:19

**catch** [1] - 84:19

**category** [1] - 43:19

**caused** [2] - 82:4, 84:10

**ceiling** [1] - 171:20

**certain** [9] - 14:14, 110:13, 145:23, 145:24, 160:3, 230:20, 232:4, 232:21, 233:7

**certainly** [13] - 8:21, 14:11, 75:7, 76:22, 95:24, 98:3, 126:2, 132:2, 135:13, 178:7, 180:20, 195:10

**Certificate** [1] - 4:23

**certifications** [1] - 13:9

**Certified** [1] - 1:16

**certify** [1] - 242:4

**CERTIFY** [1] - 242:9

**chain** [10] - 55:8, 66:24, 77:21, 77:23, 94:23, 95:7, 95:8, 95:12, 110:22, 205:19

**challenges** [1] - 6:20

**chance** [2] - 27:19, 28:2

**Chance** [26] - 4:13, 19:15, 19:16, 20:11, 21:15, 21:19, 22:3, 22:7, 22:13, 25:3, 25:5, 26:18, 28:3, 28:11, 28:19, 39:24, 188:14, 188:22, 189:1, 190:7, 190:11, 190:22, 196:11, 196:13, 196:17, 196:23

**change** [3] - 181:3, 195:7

**CHANGE** [12] - 241:9, 241:10, 241:11, 241:12, 241:13, 241:14, 241:15, 241:16, 241:17, 241:18, 241:19, 241:20

**changed** [5] - 62:23, 63:1, 117:5, 117:14, 141:12

**Changes** [1] - 240:1

**changes** [11] - 6:23,

7:2, 7:5, 9:11, 10:6, 14:21, 15:1, 15:2, 15:5, 240:5, 241:5
**changes/corrections** [1] - 241:7
**characterization** [3] - 114:20, 142:1, 151:15
**characterize** [1] - 87:18
**charge** [20] - 26:8, 26:10, 38:9, 43:9, 51:23, 63:8, 67:19, 77:18, 154:1, 191:5, 191:8, 191:19, 191:22, 191:23, 192:7, 192:14, 192:18, 193:9, 218:4
**charged** [18] - 17:20, 17:23, 25:20, 26:3, 27:20, 28:22, 37:14, 39:3, 52:5, 52:7, 52:8, 52:24, 92:5, 121:7, 154:12, 220:6, 222:13
**charges** [28] - 36:18, 36:19, 37:2, 37:5, 38:3, 38:4, 52:22, 92:6, 92:13, 92:20, 121:10, 121:16, 121:17, 122:11, 122:19, 123:1, 123:20, 124:6, 142:22, 147:18, 154:3, 191:3, 191:15, 193:17, 193:19, 193:21, 193:22, 220:12
**check** [9] - 40:3, 43:5, 43:6, 51:19, 96:11, 160:8, 219:6, 219:10, 219:17
**checked** [1] - 43:13
**checking** [1] - 28:14
**Cheryl** [1] - 174:6
**chest** [2] - 228:13, 234:7
**Chief** [24] - 5:17, 5:21, 6:10, 20:9, 20:16, 31:5, 31:8, 36:17, 39:21, 44:8, 67:3, 82:23, 110:5, 131:16, 135:3, 144:4, 144:14, 152:12, 171:14, 174:14, 192:12, 223:7, 226:17, 229:8
**chief** [35] - 6:7, 6:16, 20:6, 20:17, 21:2, 22:17, 27:8, 30:22,

31:22, 32:9, 37:1, 37:14, 37:18, 39:12, 39:13, 40:5, 40:7, 60:13, 60:14, 62:1, 67:4, 76:18, 76:24, 123:2, 123:8, 128:3, 145:12, 145:15, 149:10, 193:2, 226:9, 226:10, 226:12, 229:5, 234:19
**chief's** [1] - 223:14
**chiefs** [1] - 26:17
**child** [19] - 146:12, 148:1, 148:2, 156:3, 160:21, 160:23, 162:11, 165:14, 167:19, 167:23, 176:6, 176:8, 178:23, 180:23, 181:21, 182:21, 186:10, 186:24
**children** [4] - 189:13, 189:16, 200:20
**chipped** [2] - 35:7, 35:9
**choice** [3] - 58:11, 125:7, 127:5
**chose** [1] - 127:2
**Christmas** [1] - 156:19
**CHRISTOPHER** [1] - 1:4
**Christopher** [4] - 49:10, 49:12, 49:14, 102:12
**circulate** [1] - 21:8
**circulated** [2] - 149:13, 218:10
**circumstances** [3] - 9:18, 100:14, 100:24
**citizen** [3] - 72:3, 109:2, 129:21
**citizens** [1] - 89:13
**city** [41] - 10:5, 10:10, 12:9, 12:10, 14:7, 14:9, 14:19, 14:24, 15:9, 15:12, 16:20, 26:19, 26:24, 27:12, 28:7, 28:13, 40:8, 40:13, 40:18, 42:20, 44:2, 44:3, 44:4, 44:23, 45:5, 45:10, 45:22, 47:12, 49:17, 50:12, 50:19, 51:2, 51:6, 51:10, 102:13, 103:6, 103:7, 190:11, 194:7, 194:10, 194:19
**CITY** [4] - 1:6, 1:10, 2:7, 2:8

**City** [19] - 1:6, 2:9, 5:22, 55:17, 55:19, 55:20, 55:23, 59:11, 99:24, 109:3, 129:21, 157:24, 170:6, 172:19, 172:23, 182:18, 195:15, 201:16
**City's** [1] - 10:13
**civil** [4] - 55:21, 56:1, 72:21, 58:24
**Civil** [1] - 1:15
**civilian** [4] - 30:16, 30:17, 77:5, 196:22
**civilians** [3] - 106:4, 106:10, 106:13
**claimed** [2] - 128:15, 130:5
**claims** [1] - 35:6
**clarify** [2] - 135:2, 135:10
**clean** [3] - 207:5, 216:21, 217:9
**clear** [6] - 49:18, 85:23, 131:14, 186:19, 204:5, 224:22
**cleared** [2] - 93:4, 145:3
**clearly** [8] - 132:8, 137:12, 146:12, 175:1, 175:3, 175:6, 175:20, 238:7
**clerk** [5] - 121:22, 122:1, 153:18, 153:20, 154:11
**client** [5] - 55:14, 81:20, 182:15, 225:1, 237:21
**clinical** [1] - 165:5
**close** [6] - 36:6, 106:11, 106:14, 107:2, 113:16, 227:22
**closed** [4] - 230:4, 230:6, 231:2, 232:2
**cloth** [1] - 171:20
**Club** [1] - 220:19
**club** [1] - 221:9
**code** [3] - 204:4, 214:16, 224:7
**collar** [4] - 84:3, 85:22, 91:5, 113:16
**colleague** [2] - 60:3, 153:5
**Collies** [1] - 66:2
**color** [2] - 82:10, 82:12
**colored** [1] - 113:23
**comfortable** [7] -

43:13, 43:20, 52:12, 112:7, 112:11, 112:17, 167:9
**coming** [3] - 49:15, 169:22, 226:3
**command** [12] - 9:2, 9:23, 9:24, 10:4, 55:8, 66:24, 85:24, 94:23, 95:7, 95:8, 95:13, 110:23
**commanded** [1] - 221:6
**commander** [3] - 151:3, 225:12
**commander's** [1] - 144:20
**Commanding** [1] - 174:13
**commanding** [1] - 37:8
**commands** [2] - 78:24, 84:9
**commencing** [1] - 1:21
**Commission** [6] - 7:18, 7:21, 7:22, 8:13, 9:14, 242:18
**commit** [1] - 192:3
**committed** [1] - 34:2
**common** [2] - 70:23, 70:24
**Commonwealth** [6] - 1:17, 42:1, 191:16, 242:1, 242:3, 242:18
**communicated** [1] - 166:19
**communications** [4] - 56:8, 56:12, 57:3, 57:11
**community** [1] - 9:1
**Community** [1] - 19:19
**complain** [4] - 169:3, 172:8, 180:23, 237:8
**complainant** [7] - 53:14, 53:16, 132:8, 135:22, 135:23, 136:23, 142:15
**complainants** [1] - 157:5
**complained** [1] - 30:17
**complaining** [2] - 169:13, 172:2
**complains** [2] - 131:7, 151:6
**Complaint** [2] - 4:4, 4:17
**complaint** [45] - 9:13, 11:8, 11:12, 11:13,

11:15, 17:12, 30:17, 30:20, 31:14, 33:22, 36:12, 38:21, 130:16, 130:24, 131:9, 135:6, 136:6, 136:7, 136:13, 136:14, 145:7, 145:10, 150:23, 151:22, 153:12, 153:14, 153:15, 153:17, 154:5, 154:7, 167:19, 170:5, 176:24, 177:23, 184:8, 195:1, 217:16, 223:5, 223:19, 224:15, 225:6, 226:2, 232:22, 237:18, 239:16
**complaints** [11] - 8:2, 8:7, 8:11, 9:11, 18:23, 142:24, 143:9, 144:9, 237:15
**complete** [6] - 16:17, 16:18, 84:3, 224:12, 225:20, 234:21
**completed** [3] - 63:20, 79:6, 226:15
**completely** [1] - 56:24
**completing** [1] - 241:6
**complex** [2] - 181:12, 181:14
**compliance** [1] - 176:3
**complied** [3] - 56:15, 123:16, 163:9
**comply** [3] - 75:12, 213:24, 214:5
**concerned** [6] - 33:16, 71:5, 74:23, 75:4, 160:13, 204:3
**concerns** [3] - 91:18, 181:15, 206:18
**concluded** [5] - 20:23, 46:14, 125:22, 239:22
**conclusion** [5] - 50:4, 173:8, 176:22, 238:1, 241:7
**conclusions** [7] - 46:21, 54:23, 179:3, 197:9, 201:5, 215:12, 234:16
**conditions** [6] - 24:16, 147:13, 148:5, 148:7, 148:8, 148:10
**conduct** [23] - 17:13, 17:14, 17:19, 17:21, 17:23, 19:13, 25:20, 25:22, 26:4, 26:9,

27:20, 29:12, 30:18, 37:15, 43:8, 51:22, 118:1, 145:3, 192:23, 197:7, 198:16, 234:13, 235:11
**Conduct** [3] - 42:6, 42:12, 43:7
**conducted** [4] - 10:7, 18:2, 55:12, 229:9
**confer** [1] - 9:19
**conflict** [2] - 60:4, 72:9
**conflicting** [3] - 176:15, 177:11, 178:3
**confronted** [1] - 37:24
**confused** [2] - 135:3, 234:1
**connection** [3] - 43:6, 145:19, 219:2
**consequence** [2] - 125:23, 179:18
**consequences** [1] - 179:23
**consider** [12] - 30:10, 30:13, 55:4, 60:4, 80:15, 87:21, 97:23, 98:4, 136:11, 194:7, 194:10, 238:23
**considered** [4] - 17:24, 55:6, 87:24, 200:2
**consistent** [4] - 40:11, 46:9, 214:16, 238:15
**constituted** [2] - 8:8, 8:10
**construe** [1] - 214:15
**consult** [1] - 44:3
**consulted** [1] - 208:5
**contact** [16] - 29:19, 36:3, 38:1, 71:13, 158:15, 206:2, 228:10, 231:5, 231:7, 231:13, 231:14, 232:5, 236:21, 237:3, 238:10, 239:6
**contain** [1] - 238:19
**contained** [1] - 50:5
**contends** [1] - 175:18
**contention** [1] - 175:2
**continue** [2] - 89:17, 123:4
**continued** [14] - 48:6, 85:6, 85:9, 85:14, 85:19, 91:10, 158:24, 166:8, 166:10, 171:24, 206:15, 221:19,

224:7, 228:14
**Continued** [1] - 85:11
**continuing** [2] - 228:1, 228:7
**continuously** [1] - 106:23
**continuum** [3] - 80:5, 80:11, 175:24
**contract** [1] - 21:20
**control** [37] - 48:18, 49:12, 70:18, 71:1, 71:5, 74:20, 74:21, 74:23, 75:4, 75:7, 84:3, 85:22, 90:7, 91:5, 100:24, 105:20, 105:22, 107:11, 107:17, 108:3, 108:17, 108:23, 109:1, 109:3, 109:7, 109:8, 109:10, 133:14, 140:14, 155:7, 155:9, 166:20, 169:4, 172:10, 178:8, 228:1, 242:7
**conversation** [4] - 33:7, 40:9, 234:23, 235:3
**conversations** [4] - 39:22, 46:2, 194:13, 195:14
**convicted** [1] - 25:17
**convincing** [1] - 131:14
**cooperate** [2] - 127:4, 157:6
**cooperated** [1] - 157:14
**copies** [2] - 21:8, 156:23
**cops** [4] - 100:16, 157:11, 208:22
**copy** [7] - 21:9, 21:11, 82:10, 82:13, 109:21, 156:23, 159:19
**corner** [1] - 113:19
**Correct** [1] - 233:6
**correct** [65] - 13:22, 26:15, 33:9, 62:10, 69:18, 87:14, 93:13, 101:10, 101:21, 105:19, 105:21, 108:16, 132:22, 140:6, 140:8, 159:8, 160:11, 161:11, 167:12, 167:16, 169:11, 169:14, 172:5, 174:18, 175:22, 176:1,

178:16, 186:18, 188:9, 188:16, 188:19, 188:24, 203:5, 203:7, 203:16, 204:24, 205:22, 207:24, 208:4, 208:6, 208:24, 210:16, 211:10, 216:11, 218:6, 220:24, 221:23, 223:20, 224:1, 224:19, 224:20, 225:8, 225:10, 227:2, 228:3, 232:3, 232:10, 233:9, 233:14, 236:24, 237:6, 237:24, 238:3, 238:13, 241:3
**corrected** [2] - 86:10, 206:13
**corrections** [1] - 241:5
**correctly** [4] - 33:14, 36:1, 47:16, 236:5
**correspondence** [1] - 49:9
**Cortis** [2] - 61:17, 66:13
**Cortis's** [1] - 61:17
**cosigned** [2] - 205:1, 205:5
**counsel** [2] - 5:2, 242:9
**counseling** [1] - 40:24
**counter** [1] - 49:14
**countering** [1] - 49:11
**counting** [1] - 199:5
**County** [1] - 225:16
**couple** [6] - 48:7, 66:17, 86:8, 111:24, 150:24, 210:21
**course** [2] - 48:7, 54:9, 72:13, 141:15, 171:3
**court** [11] - 7:12, 56:14, 58:6, 121:7, 122:4, 122:22, 122:23, 132:2, 149:9, 154:2, 154:8
**COURT** [1] - 1:1
**Court** [2] - 36:19, 191:2
**courthouse** [1] - 154:16
**courts** [1] - 138:22
**cover** [1] - 60:22
**COVID** [4] - 78:12, 200:12, 200:14, 207:16
**Craved** [2] - 13:3,

13:5
**create** [1] - 234:8
**created** [1] - 48:5
**creating** [2] - 48:2, 75:9
**credible** [4] - 212:10, 212:13, 212:17, 234:18
**crime** [10] - 13:16, 17:24, 26:10, 52:9, 71:8, 71:15, 94:15, 119:11, 121:7, 192:3
**crimes** [1] - 119:5
**criminal** [26] - 17:20, 17:23, 25:19, 25:20, 25:22, 26:3, 26:8, 36:12, 37:5, 38:4, 42:2, 43:9, 51:23, 78:18, 78:21, 142:15, 142:19, 142:20, 153:12, 153:14, 154:7, 191:1, 192:23, 199:18, 199:19
**Criminal** [2] - 4:9, 91:24
**criminally** [3] - 39:4, 52:7, 52:8
**criminals** [1] - 119:6
**critical** [2] - 94:4, 94:5
**cross** [2] - 52:1, 122:15
**crowd** [24] - 70:17, 71:1, 71:2, 71:5, 74:20, 75:4, 75:7, 83:19, 105:20, 105:22, 107:10, 107:17, 108:3, 108:17, 108:23, 109:1, 109:3, 109:7, 109:10, 124:14, 133:14, 140:14
**crowds** [1] - 84:8
**cruiser** [1] - 84:1
**crux** [1] - 237:1
**crying** [1] - 160:23
**CSR** [1] - 242:17
**CSU** [2] - 93:7
**cuff** [1] - 166:24
**cuffing** [2] - 89:12, 179:9
**custody** [2] - 84:13, 85:21
**cut** [2] - 73:11, 139:9
**Cyr** [1] - 236:9

**D**

**D'Andrea** [6] - 67:2, 67:5, 77:22, 89:24,

111:3, 151:4
**D'Aquila** [9] - 15:21, 15:22, 17:8, 17:10, 18:12, 40:4, 40:23, 41:9, 41:12
**D.A** [2] - 225:16
**Daly** [2] - 228:22, 228:23
**damage** [3] - 81:5, 81:6, 220:7
**Dan** [3] - 61:13, 195:14, 209:5
**dangerous** [2] - 36:14, 220:9
**Daniel** [3] - 55:23, 83:12, 190:14
**Danny** [1] - 81:23
**darkening** [1] - 237:19
**DATE** [3] - 240:18, 240:23, 241:23
**date** [7] - 8:6, 16:12, 32:3, 46:16, 152:13, 202:2, 237:20
**dated** [3] - 28:16, 42:8, 50:20
**dates** [2] - 11:24, 198:8
**dating** [1] - 61:10
**Dave** [2] - 78:4, 78:5
**Davenport** [9] - 10:3, 14:4, 43:1, 111:22, 114:20, 118:3, 174:12, 215:13, 216:7
**Davenport's** [1] - 119:20
**David** [2] - 32:16, 32:22
**days** [11] - 5:5, 14:19, 45:15, 45:24, 46:8, 115:24, 152:5, 154:15, 165:15, 190:19, 240:7
**days'** [1] - 196:6
**deals** [1] - 11:4
**December** [3] - 165:1, 171:6, 171:16
**decide** [2] - 117:22, 117:23
**decided** [2] - 37:1, 195:4
**decides** [2] - 123:16, 196:16
**decision** [3] - 17:3, 63:16, 63:18
**decisions** [1] - 17:1
**deem** [1] - 138:1
**deemed** [3] - 5:6, 7:17, 225:15
**defend** [1] - 38:2

**DEFENDANT** [1] -
2:14
**defendant's** [2] - 43:8,
51:22
**Defendants** [2] - 1:7,
1:11
**DEFENDANTS** [1] -
2:7
**defended** [1] - 38:1
**defending** [1] - 73:9
**defer** [2] - 80:6,
225:22
**define** [2] - 137:15,
137:20
**defined** [1] - 69:15
**defining** [1] - 139:10
**definitely** [2] - 30:5,
200:2
**definition** [2] - 139:4,
162:14
**deformed** [2] - 185:2,
185:15
**deformity** [5] - 161:2,
184:15, 185:22,
186:5, 186:6
**degree** [1] - 160:3
**Delasantos** [3] -
15:14, 15:17, 15:20
**deliver** [1] - 206:21
**dementia** [1] - 105:14
**demonstrates** [1] -
224:6
**demonstrations** [2] -
65:18, 65:22
**denies** [1] - 36:2
**dentist** [1] - 35:9
**denying** [1] - 39:1
**department** [71] -
5:20, 10:14, 11:9,
11:21, 12:3, 14:13,
16:16, 18:24, 21:22,
29:2, 30:10, 30:13,
30:19, 34:10, 37:16,
38:12, 39:3, 40:22,
52:5, 53:20, 54:12,
56:13, 56:17, 57:5,
57:15, 59:8, 60:1,
60:10, 61:11, 63:4,
64:18, 65:4, 65:7,
66:1, 69:1, 69:2,
73:24, 74:10, 77:6,
78:7, 93:14, 95:17,
95:19, 95:21, 95:22,
96:4, 97:2, 107:10,
109:11, 109:16,
117:5, 118:11,
119:3, 121:17,
131:8, 138:3, 151:7,
153:13, 167:22,
170:6, 170:20,

178:18, 182:15,
182:16, 182:20,
193:23, 196:2,
197:7, 197:12,
200:8, 214:1
**Department** [8] -
32:19, 77:1, 93:12,
94:2, 104:22, 105:7,
140:10, 224:8
**DEPARTMENT** [1] -
2:8
**departments** [5] -
62:12, 62:18, 68:6,
99:4, 109:16
**depict** [1] - 47:20
**deployed** [8] - 76:19,
76:22, 94:22, 94:24,
95:1, 95:3, 95:10,
96:24
**deployment** [2] -
76:14, 83:15
**DEPONENT** [1] - 3:3
**deponent** [2] - 5:3,
242:6
**deposed** [2] - 68:19,
68:23
**deposition** [15] - 5:4,
5:6, 109:24, 110:3,
142:3, 149:5,
239:21, 240:3,
240:6, 240:12,
241:3, 241:4, 241:5,
242:8, 242:10
**DEPOSITION** [1] -
1:12
**depositions** [1] -
241:3
**depression** [1] - 149:1
**deputy** [12] - 30:22,
39:12, 39:13, 60:14,
67:4, 90:1, 127:20,
188:20, 193:2,
226:9, 226:10, 229:5
**Deputy** [2] - 67:3,
174:14
**describe** [3] - 7:21,
33:7, 87:15
**described** [3] -
112:20, 124:14,
224:4
**DESCRIPTION** [1] -
4:2
**description** [1] - 83:16
**designating** [2] -
55:20, 55:23
**desires** [1] - 240:5
**detail** [5] - 33:7, 137:2,
146:16, 183:16,
220:19
**details** [1] - 60:24

**detection** [1] - 61:18
**detective** [1] - 13:15
**detectives** [2] - 119:2,
119:10
**determination** [4] -
88:3, 124:18,
124:23, 125:1
**determine** [7] - 45:13,
90:8, 90:17, 96:7,
130:23, 132:13,
161:16
**determined** [6] -
101:4, 105:24,
120:22, 121:1,
121:23, 197:5
**determines** [4] -
89:23, 90:4, 90:5,
138:3
**determining** [1] -
16:24
**develop** [1] - 234:5
**developed** [2] - 148:8,
149:18
**diabetic** [1] - 222:17
**diagnosed** [1] -
173:23
**dictate** [1] - 110:19
**difference** [4] - 104:3,
104:6, 138:10,
204:19
**different** [27] - 52:15,
52:22, 52:24, 70:6,
80:16, 80:18, 100:5,
105:7, 105:15,
116:20, 120:1,
128:5, 130:19,
136:24, 138:19,
154:1, 163:19,
173:17, 176:20,
179:3, 198:8,
200:20, 204:18,
204:19, 214:20,
226:24
**differently** [1] - 132:23
**difficulties** [1] -
146:16
**direct** [10] - 5:15, 58:5,
58:19, 85:13,
153:17, 154:1,
207:19, 209:20,
226:7, 226:8
**direction** [6] - 48:10,
114:4, 114:18,
177:8, 228:6, 242:7
**directly** [3] - 48:8,
114:12, 221:2
**Director** [1] - 37:23
**director** [1] - 55:7
**disadvantages** [1] -
22:3

**disagree** [1] - 194:22
**disagreed** [1] - 53:5
**disagreements** [1] -
194:18
**disagrees** [1] - 175:19
**disciplinary** [3] -
50:20, 142:16,
150:18
**discipline** [16] - 17:1,
17:4, 17:7, 19:14,
21:4, 55:11, 59:11,
102:14, 143:22,
146:14, 194:16,
194:20, 195:4,
195:16, 197:13,
200:7
**disciplined** [10] -
54:13, 54:17,
100:23, 187:22,
188:6, 194:17,
196:2, 196:5,
215:10, 219:16
**disciplining** [1] -
216:5
**disclose** [3] - 149:7,
149:8, 218:14
**disclosed** [1] - 149:5
**Disclosure** [5] - 4:5,
41:21, 42:7, 42:13,
43:7
**disclosure** [1] - 57:1
**discontent** [1] - 195:4
**discourtesy** [4] - 11:9,
27:20, 29:12, 145:3
**discuss** [11] - 14:23,
43:3, 56:8, 109:15,
124:2, 149:14,
195:9, 195:18,
216:1, 226:14, 235:4
**discussed** [7] - 14:24,
39:19, 40:10, 44:1,
46:5, 124:1, 194:22
**discussing** [2] - 31:4,
80:13
**Discussion** [1] - 227:7
**discussion** [5] - 37:7,
40:21, 111:7,
120:11, 157:1
**discussions** [2] -
31:7, 45:22
**dismiss** [2] - 36:19,
37:2
**dismissed** [6] - 36:20,
121:10, 121:11,
121:16, 124:4,
191:15
**dismissing** [1] - 124:5
**disorderly** [1] - 92:16
**disoriented** [1] - 234:1
**dispatch** [1] - 134:6

**disperse** [1] - 84:8
**displaced** [2] -
181:15, 181:21
**disprove** [4] - 175:20,
176:14, 177:10,
178:13
**distance** [1] - 234:9
**distraction** [6] -
206:21, 208:8,
209:9, 211:12,
211:15, 213:6
**DISTRICT** [2] - 1:1, 1:2
**district** [1] - 56:14
**District** [14] - 36:18,
42:8, 42:15, 51:11,
92:19, 121:12,
122:16, 123:19,
123:22, 191:2,
218:12, 218:19,
218:20, 218:24
**disturbing** [1] - 92:17
**diversion** [1] - 30:8
**Division** [1] - 42:16
**division** [6] - 42:17,
108:1, 116:18,
208:5, 216:7, 234:23
**divisions** [3] - 67:20,
193:15
**divorced** [1] - 147:16
**DNA** [1] - 99:2
**DO** [1] - 241:6
**Docket** [4] - 4:9, 4:14,
91:24, 190:9
**docket** [1] - 191:1
**doctor** [4] - 148:9,
173:13, 182:20,
182:24
**doctors** [2] - 171:4,
182:17
**document** [19] -
21:16, 26:16, 28:7,
28:10, 28:18, 41:23,
44:19, 44:22, 45:2,
50:10, 73:22, 92:2,
96:4, 144:4, 158:1,
161:13, 163:4,
183:5, 188:7
**Document** [4] -
157:24, 158:2,
172:19, 172:23
**documentation** [2] -
73:13, 76:23
**documented** [6] -
76:20, 95:4, 95:6,
95:24, 96:1, 111:11
**documents** [5] - 28:5,
44:18, 44:20,
157:20, 182:18
**dog** [73] - 61:17,
61:18, 61:20, 61:22,

64:20, 66:9, 67:8, 71:1, 71:8, 72:2, 76:15, 81:21, 81:24, 86:4, 87:5, 88:3, 90:21, 91:2, 91:7, 91:10, 91:16, 94:3, 94:12, 95:10, 96:12, 97:23, 98:4, 98:15, 98:19, 99:16, 99:18, 100:5, 100:21, 101:5, 101:6, 101:7, 102:11, 102:21, 103:4, 104:1, 104:14, 104:15, 104:16, 104:19, 105:16, 105:22, 106:3, 106:11, 106:14, 106:16, 106:18, 106:23, 107:7, 108:14, 109:12, 115:11, 115:16, 115:18, 115:19, 115:22, 116:6, 125:13, 125:16, 125:24, 126:11, 126:12, 126:13, 130:5, 134:10, 134:15, 140:1
**dogs** [45] - 64:18, 64:19, 64:23, 65:5, 65:7, 65:8, 65:9, 66:1, 66:6, 66:8, 66:18, 66:20, 67:17, 68:1, 68:7, 68:14, 70:17, 77:1, 77:13, 80:4, 80:8, 81:6, 81:12, 96:23, 97:6, 97:20, 98:16, 98:21, 99:8, 99:10, 99:20, 100:10, 103:5, 104:20, 104:22, 105:3, 105:4, 107:15, 108:2, 108:10, 109:9, 109:12, 110:11, 110:15
**Doherty** [4] - 32:17, 32:22, 77:23, 78:5
**Doherty's** [1] - 78:1
**domestic** [8] - 147:11, 147:15, 147:18, 147:21, 148:6, 189:5, 192:9, 192:14
**domestically** [1] - 147:12
**done** [18] - 24:8, 24:12, 60:12, 70:21, 90:18, 99:19, 109:11, 120:13,

120:19, 123:18, 130:14, 163:11, 164:10, 176:17, 181:10, 181:11, 234:20, 239:19
**Donohue** [2] - 226:6, 236:11
**door** [1] - 111:19
**double** [1] - 222:16
**doubt** [4] - 126:4, 126:6, 208:22, 224:6
**down** [21] - 22:23, 96:18, 113:14, 124:1, 155:11, 159:5, 159:7, 166:10, 167:5, 169:8, 170:16, 180:17, 183:9, 195:10, 202:22, 216:1, 221:1, 221:24, 225:13, 230:16, 233:19
**Dr** [4] - 37:22, 37:23, 165:10, 174:2
**drafts** [1] - 70:3
**draw** [2] - 180:22, 201:5
**drawn** [1] - 228:1
**driver's** [1] - 221:18
**driving** [2] - 202:23, 221:12
**Drop** [2] - 122:19, 122:24
**dropped** [2] - 122:12, 123:20
**drove** [3] - 22:24, 23:9, 25:15
**drug** [2] - 61:17, 141:13
**drugs** [5] - 141:1, 141:8, 148:12, 148:15, 149:3
**drunk** [2] - 23:13, 25:15
**dude** [2] - 151:4, 202:23
**due** [2] - 206:18, 236:13
**duly** [2] - 5:13, 242:5
**Dunlop** [3] - 1:16, 242:3, 242:17
**during** [39] - 40:24, 47:18, 84:4, 108:10, 108:14, 108:17, 108:23, 109:3, 118:18, 128:21, 130:5, 132:5, 145:15, 145:16, 149:14, 168:17, 168:23, 176:12,

178:23, 178:24, 179:2, 179:6, 179:8, 179:9, 179:11, 181:1, 181:2, 181:6, 182:1, 184:7, 188:17, 211:12, 211:15, 221:7, 234:20, 234:21, 236:13, 236:21, 237:7
**duties** [1] - 71:4
**duty** [10] - 41:6, 41:9, 41:11, 147:8, 147:10, 148:23, 161:21, 164:2, 164:7, 210:9

# E

**E'Aquila** [1] - 16:3
**Early** [4] - 23:18, 23:19, 23:21, 24:9
**Early's** [1] - 42:14
**easiest** [1] - 21:10
**easterly** [1] - 114:4
**easy** [2] - 6:16, 96:7
**Ed** [1] - 127:20
**EDWARD** [1] - 1:6
**Edwin** [2] - 48:8, 114:3
**efficiency** [1] - 153:22
**efforts** [1] - 49:10
**eight** [1] - 156:5
**either** [4] - 71:16, 224:4, 225:13, 231:24
**elbow** [19] - 128:15, 155:21, 161:1, 161:2, 161:4, 167:20, 167:23, 168:11, 168:19, 169:7, 169:13, 170:19, 173:6, 181:1, 182:7, 184:24, 185:14, 186:2
**elbows** [1] - 181:24
**eleven** [2] - 199:2, 199:3
**Elise** [4] - 13:4, 13:5, 13:10, 13:12
**embroiled** [1] - 153:5
**Emergency** [1] - 159:10
**emergency** [5] - 15:18, 15:19, 15:23, 16:13, 161:3
**employ** [1] - 213:3
**employed** [1] - 242:10
**employee** [6] - 27:21,

37:15, 149:9, 210:24, 211:8, 242:11
**employees** [3] - 55:20, 224:11, 225:19
**EMS** [3] - 172:3, 184:16, 222:18
**EMTs** [8] - 161:24, 169:22, 170:17, 170:18, 170:20, 206:16, 222:21, 222:22
**enacted** [1] - 87:8
**encounter** [5] - 97:24, 151:11, 196:22, 211:13, 211:16
**end** [5] - 98:5, 123:15, 172:24, 174:2, 217:23
**ended** [4] - 148:5, 155:21, 202:7, 217:3
**ending** [1] - 21:24
**ends** [1] - 168:18
**engaged** [2] - 29:11, 49:22
**engine** [1] - 221:10
**ensuing** [1] - 242:5
**ensure** [1] - 233:20
**entered** [2] - 220:16, 240:5
**entering** [2] - 191:24, 193:18
**entire** [3] - 84:4, 112:21, 165:22
**entitled** [1] - 241:3
**epicondyle** [3] - 165:8, 173:15, 173:24
**episode** [1] - 97:23
**equipment** [2] - 86:20, 86:21
**Eric** [17] - 84:12, 84:13, 84:15, 84:19, 84:21, 84:22, 85:4, 85:6, 85:8, 85:14, 85:20, 85:21, 86:12, 91:4, 91:15, 92:14, 93:10
**eric** [1] - 85:16
**Eric's** [1] - 85:13
**ERRATA** [1] - 241:1
**errata** [1] - 241:4
**Escobar** [7] - 22:17, 22:19, 22:20, 23:21, 23:23, 25:2, 25:11
**escort** [1] - 48:21
**especially** [2] - 6:19, 6:21
**ESQ** [4] - 2:5, 2:11, 2:12, 2:17

37:15, 149:9,

**established** [1] - 166:6
**evaluated** [1] - 180:18
**evaluation** [2] - 179:8, 203:4
**evening** [4] - 105:17, 108:14, 116:16, 116:21
**event** [7] - 74:7, 151:1, 151:13, 208:12, 211:21, 211:23, 214:7
**events** [2] - 90:10, 212:1
**eventually** [6] - 214:12, 216:23, 228:20, 238:3, 238:14, 238:18
**evidence** [35] - 111:9, 112:5, 112:7, 112:9, 112:12, 113:3, 131:14, 132:18, 135:13, 135:15, 135:18, 135:19, 136:8, 136:21, 137:8, 137:11, 137:16, 137:20, 137:21, 137:24, 138:4, 138:7, 138:8, 138:11, 138:12, 138:16, 138:17, 138:18, 138:19, 139:2, 139:10, 139:14, 139:17, 178:7
**ex** [1] - 189:21
**ex-wife** [1] - 189:21
**exact** [9] - 17:11, 46:16, 96:9, 110:14, 139:3, 139:7, 185:8, 200:11
**exactly** [9] - 107:12, 115:17, 126:17, 136:23, 137:5, 156:20, 164:3, 164:10, 187:23
**exam** [2] - 41:11, 147:9
**examination** [3] - 240:3, 240:4, 242:5
**EXAMINATION** [1] - 3:4
**examined** [1] - 5:14
**example** [1] - 26:6
**except** [1] - 5:10
**exceptionally** [1] - 145:2
**Excerpt** [1] - 240:1
**excessive** [8] - 34:11, 38:15, 128:6,

128:16, 130:6,
143:1, 143:10, 216:5
**excited** [1] - 62:7
**excuse** [3] - 106:12,
200:17, 227:4
**executed** [1] - 27:3
**Executive** [2] - 74:3,
75:12
**exhibit** [4] - 41:20,
44:4, 190:24, 238:7
**Exhibit** [24] - 21:14,
28:1, 31:15, 41:22,
42:3, 44:7, 44:8,
82:20, 82:22, 82:23,
83:1, 92:1, 92:11,
103:14, 109:18,
109:23, 144:3,
157:4, 183:4, 190:8,
190:10, 196:10,
219:13, 223:6
**EXHIBITS** [2] - 4:2,
4:18
**exist** [2] - 177:9, 217:7
**existed** [3] - 71:12,
134:12, 205:23
**existence** [2] - 217:8,
224:7
**existing** [2] - 74:11,
177:4
**exists** [1] - 91:16
**exited** [1] - 227:20
**exonerated** [13] -
128:5, 128:17,
129:2, 130:7, 130:8,
130:12, 139:19,
145:5, 215:17,
215:19, 216:13,
216:15, 216:19
**experience** [5] - 13:5,
61:4, 67:5, 67:16,
78:6
**expert** [4] - 55:24,
57:23, 59:16, 181:6
**expertise** [1] - 133:12
**experts** [3] - 55:20,
59:2, 68:5
**Expires** [1] - 242:19
**explain** [2] - 10:15,
211:20
**explained** [1] - 33:23
**explanation** [2] -
233:15, 233:17
**express** [1] - 54:21
**expression** [1] - 171:2
**extend** [2] - 230:1,
233:4
**extended** [1] - 228:5
**extent** [13] - 17:16,
41:2, 41:13, 50:8,
56:6, 57:8, 86:5,

92:10, 97:5, 146:6,
146:11, 146:13,
146:20
**extremity** [1] - 239:11
**eye** [1] - 237:19

**F**

**face** [29] - 11:16,
35:22, 36:3, 36:4,
38:16, 99:16,
117:10, 118:21,
120:2, 120:5,
120:19, 140:24,
164:21, 203:23,
206:22, 207:6,
207:11, 209:16,
227:23, 231:5,
231:14, 231:16
**face-to-face** [3] -
117:10, 120:5,
164:21
**facial** [1] - 213:7
**facing** [1] - 113:9
**fact** [7] - 67:17,
116:14, 160:19,
181:21, 222:20,
234:2, 237:1
**factor** [1] - 181:22
**facts** [2] - 154:22,
189:6
**failed** [1] - 217:5
**failing** [3] - 37:20,
187:22, 188:6
**failure** [10] - 140:7,
140:21, 141:20,
194:3, 194:5,
216:12, 216:16,
216:18, 220:9,
238:24
**failures** [1] - 140:9,
179:22
**fair** [6] - 91:22,
104:13, 118:17,
163:16, 206:5, 206:8
**fairness** [1] - 188:17
**falls** [1] - 67:2
**false** [8] - 43:9, 51:23,
52:6, 52:9, 52:13,
53:1, 53:10
**familiar** [6] - 44:10,
68:12, 72:21, 74:3,
110:5, 110:14
**family** [2] - 184:4,
200:19
**Fanion** [1] - 93:8
**far** [17] - 13:7, 15:8,
22:17, 65:9, 66:24,
69:3, 71:4, 74:18,
78:18, 80:19, 88:17,

133:7, 134:19,
140:13, 166:16,
167:1, 210:20
**fear** [1] - 234:5
**February** [2] - 12:1,
242:14
**Federal** [1] - 1:15
**federal** [2] - 56:14,
58:6
**feet** [3] - 24:17, 48:7,
210:21
**fell** [1] - 39:15
**fellow** [2] - 212:16,
214:17
**felony** [1] - 191:8
**felt** [9] - 33:24, 63:23,
112:6, 123:3,
132:17, 132:23,
153:10, 153:11,
181:11
**female** [2] - 47:23,
113:20
**few** [5] - 113:14,
165:14, 176:11,
200:20, 233:17
**field** [6] - 24:8, 24:11,
24:19, 24:21,
161:17, 208:2
**fight** [1] - 85:14
**fighting** [1] - 83:21
**figure** [9] - 77:12,
109:11, 111:21,
136:23, 136:24,
143:6, 152:5,
182:21, 208:17
**file** [7] - 33:22, 35:9,
37:14, 40:3, 165:23,
183:10, 183:13
**filed** [7] - 30:20, 38:4,
52:13, 59:12,
153:16, 209:23,
237:15
**filing** [4] - 52:6, 52:9,
159:15, 218:4
**fill** [2] - 43:3, 160:12
**filled** [2] - 159:17,
218:23
**final** [1] - 234:16
**financially** [1] - 242:11
**findings** [5] - 17:8,
17:9, 46:18, 52:4,
200:8
**finger** [1] - 230:14
**fingers** [1] - 141:7
**fire** [2] - 194:6, 194:14
**fired** [1] - 193:19
**firing** [2] - 194:7,
194:10
**first** [12] - 42:19,
45:10, 78:1, 78:3,

99:11, 116:11,
156:17, 164:24,
177:5, 191:5, 198:9,
202:8
**fist** [3] - 36:7, 230:4,
230:6
**fit** [1] - 230:7
**fitness** [6] - 41:6,
41:9, 41:11, 147:8,
147:10, 148:23
**five** [14] - 14:2, 14:19,
32:8, 61:7, 61:8,
61:23, 64:16, 66:17,
156:5, 188:11,
196:6, 226:23, 238:5
**five-eight** [1] - 156:5
**five-minute** [1] -
188:11
**fixation** [3] - 165:10,
173:14, 174:1
**fled** [1] - 84:15
**flesh** [2] - 88:13, 97:7
**Floyd** [2] - 108:7,
108:10
**flu** [1] - 199:18
**fluids** [3] - 206:19,
206:20, 213:9
**focus** [1] - 174:8
**focusing** [1] - 107:9
**follow** [4] - 113:1,
113:2, 159:16,
165:15
**follow-up** [3] - 113:1,
113:2, 165:15
**followed** [1] - 170:12
**following** [4] - 29:2,
32:21, 48:15, 171:8
**follows** [2] - 5:15, 47:4
**FOR** [3] - 2:2, 2:7,
2:14
**force** [106] - 11:10,
26:2, 29:7, 30:14,
33:19, 33:24, 34:8,
34:11, 35:7, 36:5,
38:11, 38:12, 38:15,
68:20, 69:3, 69:13,
69:14, 69:17, 75:18,
76:3, 76:14, 79:17,
79:24, 80:4, 80:9,
80:11, 80:19, 87:10,
87:13, 93:5, 95:21,
98:6, 128:6, 128:16,
130:4, 130:6, 130:9,
130:10, 132:19,
132:24, 139:19,
139:20, 139:24,
140:23, 143:1,
143:10, 150:4,
160:3, 160:19,
161:12, 161:16,

162:1, 162:15,
163:5, 163:21,
163:24, 170:7,
175:17, 175:23,
175:24, 176:14,
179:13, 179:19,
181:8, 181:14,
181:17, 181:23,
186:17, 187:5,
187:10, 187:21,
187:23, 188:7,
199:7, 202:3, 204:5,
204:10, 205:11,
205:14, 205:17,
205:19, 207:23,
208:3, 209:6, 210:2,
210:10, 210:24,
211:2, 211:8, 211:9,
213:4, 213:13,
215:14, 216:6,
216:12, 216:19,
217:2, 218:1, 223:1,
223:18, 223:22,
238:2, 239:1, 239:17
**Force** [1] - 29:8
**forced** [1] - 184:6
**forcefully** [5] - 102:20,
114:10, 114:15,
114:21, 234:7
**forcibly** [1] - 165:7
**foregoing** [2] -
240:11, 241:22
**foreseeable** [2] -
125:23, 126:2
**forgive** [1] - 7:13
**Form** [7] - 4:5, 41:21,
42:7, 42:13, 43:7,
74:4, 75:13
**form** [12] - 5:10, 14:20,
43:4, 43:17, 56:22,
58:15, 160:12,
181:4, 202:17,
218:10, 240:5, 241:5
**formed** [2] - 61:23,
83:19
**former** [1] - 37:8
**FORMER** [1] - 1:10
**forms** [4] - 218:10,
219:8, 224:13,
225:20
**forth** [2] - 45:16,
160:24
**forthwith** [1] - 218:3
**forty** [1] - 6:4
**forum** [1] - 75:24
**forward** [2] - 48:1,
166:5
**four** [8] - 9:3, 13:22,
14:3, 28:12, 32:8,
64:17, 80:14, 199:2

**four-to-twelve** [1] - 199:2
**fourth** [3] - 28:10, 185:21, 229:23
**fraction** [1] - 173:24
**fracture** [6] - 165:9, 168:18, 173:15, 181:12, 181:15, 181:22
**fractured** [2] - 168:19
**Framingham** [1] - 242:14
**Francese** [3] - 64:13, 64:14, 64:15
**Frankfurt** [1] - 6:6
**Franklin** [4] - 48:1, 49:6, 49:21, 113:9
**free** [9] - 48:22, 49:3, 49:11, 84:13, 85:18, 89:10, 159:1, 166:8, 203:8
**frequency** [1] - 9:4
**frequently** [1] - 95:3
**front** [18] - 17:11, 31:21, 35:9, 48:8, 48:14, 91:14, 102:21, 104:14, 114:3, 114:10, 114:12, 114:16, 114:22, 114:23, 125:24, 166:18, 197:24, 221:3
**full** [7] - 5:19, 6:9, 68:11, 68:13, 110:21, 144:19, 221:3
**fully** [3] - 65:7, 65:9, 240:2
**function** [1] - 108:19
**funding** [3] - 62:22, 62:23, 63:3
**funerals** [1] - 200:19
**FURTHER** [1] - 242:9
**furthermore** [1] - 237:7

## G

**gain** [2] - 48:17, 166:20
**Garden** [3] - 69:15, 108:5, 109:19
**Gary** [2] - 141:18
**gear** [1] - 221:12
**gears** [1] - 41:17
**Gemme** [15] - 6:10, 20:9, 20:16, 31:5, 31:8, 36:17, 39:21, 122:24, 141:18, 152:12, 226:14,

226:17, 229:8
**general** [5] - 45:12, 70:13, 75:20, 76:5, 228:6
**General** [2] - 7:2, 7:6
**generic** [1] - 135:15
**George** [4] - 14:1, 108:7, 108:10, 228:22
**Gerald** [1] - 159:23
**Gerardi** [3] - 210:15, 212:6, 212:11
**German** [1] - 6:6
**Germane** [1] - 197:21
**Germany** [1] - 6:6
**Gilbert** [3] - 190:14, 195:15, 209:5
**girlfriend** [1] - 151:5
**given** [19] - 14:6, 20:11, 24:18, 25:2, 25:5, 97:3, 102:10, 153:20, 178:20, 181:23, 190:19, 196:11, 196:13, 215:6, 234:2, 234:6, 240:6, 240:12, 242:8
**glasses** [1] - 183:20
**glean** [5] - 92:5, 162:2, 162:10, 162:13, 222:23
**God** [1] - 122:11
**Gould** [1] - 117:2
**governing** [1] - 241:3
**government** [1] - 7:16
**government's** [1] - 78:21
**grab** [1] - 166:14
**grabbed** [5] - 102:20, 158:20, 166:4, 166:11, 166:22
**grabbing** [1] - 189:10
**grabs** [1] - 114:8
**Grafton** [2] - 222:2, 222:4
**grant** [1] - 64:21
**grasp** [3] - 48:22, 49:3, 49:12
**grasping** [1] - 48:11
**green** [1] - 65:7
**Gregory** [2] - 144:23, 145:5
**grey** [1] - 113:23
**grievance** [2] - 19:10, 195:11
**grieve** [2] - 19:8, 195:12
**grieved** [2] - 19:8, 195:11
**grip** [1] - 97:6
**ground** [14] - 84:21,

89:16, 89:21, 128:9, 129:4, 158:21, 158:24, 160:4, 166:5, 166:7, 171:22, 175:13, 184:7
**grounds** [4] - 19:11, 38:22, 41:11, 149:17
**group** [2] - 9:14, 61:8
**guess** [9] - 11:6, 103:23, 104:12, 111:22, 115:22, 119:17, 152:22, 208:11, 228:22
**guidance** [5] - 70:2, 78:23, 79:1, 115:4, 115:5
**Guidance** [1] - 74:4
**guiding** [11] - 103:3, 103:6, 103:8, 103:12, 103:18, 103:24, 104:3, 104:12, 114:15, 114:17, 114:18
**gurney** [5] - 30:4, 202:10, 203:6, 210:19, 211:24
**guy** [9] - 97:14, 123:16, 147:14, 151:4, 203:23, 207:6, 207:10, 208:22
**Guzman** [2] - 48:8, 114:3

## H

**half** [1] - 29:14
**Hall** [1] - 2:9
**hand** [16] - 12:11, 30:9, 36:5, 47:23, 48:10, 48:13, 48:19, 114:7, 114:9, 206:21, 207:12, 213:6, 231:1, 232:1, 242:14
**handcuff** [1] - 166:13
**handcuffed** [20] - 26:7, 30:2, 30:5, 34:7, 39:5, 85:21, 88:23, 89:2, 89:15, 90:21, 91:4, 91:15, 91:17, 151:8, 170:14, 171:22, 175:13, 203:11, 222:16, 235:8
**handcuffing** [8] - 164:15, 174:22, 176:13, 178:24, 179:2, 179:11,

181:2, 181:7
**handcuffs** [24] - 33:17, 91:3, 91:7, 91:11, 129:5, 159:4, 159:7, 160:4, 162:5, 167:3, 167:6, 167:7, 168:7, 168:10, 168:17, 169:4, 169:9, 170:16, 172:3, 172:10, 172:14, 173:5, 173:21, 179:6
**handed** [1] - 209:20
**handle** [1] - 155:7
**handler** [7] - 67:6, 76:10, 76:13, 96:14, 97:19, 101:19, 101:20
**handlers** [4] - 75:16, 76:1, 97:18
**handling** [1] - 11:12
**hands** [10] - 48:24, 79:19, 103:3, 141:21, 142:5, 203:8, 203:13, 221:5, 228:13, 234:7
**hard** [1] - 150:8
**hats** [1] - 60:10
**head** [10] - 10:23, 11:2, 20:7, 30:23, 52:20, 53:9, 63:6, 202:18, 220:22, 228:7, 228:11, 231:16, 231:17, 231:18, 231:20, 231:23, 235:5, 235:15, 236:2, 239:10
**heading** [1] - 180:9
**Health** [1] - 19:20
**health** [13] - 20:4, 146:4, 146:5, 146:7, 146:8, 146:11, 146:17, 148:8, 148:24, 149:1, 149:20, 160:9, 203:3
**hear** [3] - 56:4, 107:4, 134:6
**heard** [9] - 19:10, 54:5, 56:2, 57:4, 57:12, 57:14, 68:10, 171:2, 221:10
**hearing** [10] - 45:13, 50:20, 55:10, 55:15, 59:10, 59:11, 59:15, 153:19, 153:21, 154:11
**Hearing** [2] - 4:6, 44:6
**heart** [3] - 52:21, 53:9, 201:11

**hearts** [1] - 201:11
**HECTOR** [2] - 2:3, 2:5
**Hector** [2] - 1:18, 237:16
**hector@pineirolegal .com** [1] - 2:5
**heels** [1] - 79:20
**help** [5] - 24:14, 66:13, 170:15, 178:8, 182:5
**helped** [1] - 170:17
**helpful** [2] - 129:11, 225:3
**Hennessy** [1] - 41:24
**hereafter** [1] - 113:20
**hereby** [1] - 242:3
**herein** [1] - 50:5
**hereunto** [1] - 242:13
**hes** [1] - 67:23
**high** [5] - 98:5, 106:18, 201:6, 221:13, 221:20
**him/her** [1] - 240:4
**himself** [10] - 23:1, 38:2, 89:13, 113:8, 134:10, 159:1, 162:9, 166:9, 187:2, 234:11
**hip** [1] - 221:17
**HIPAA** [2] - 149:8, 149:20
**hire** [1] - 68:6
**hiring** [1] - 55:19
**history** [3] - 99:2, 142:16, 150:18
**hit** [10] - 30:1, 30:3, 81:3, 140:24, 141:14, 151:7, 203:8, 203:13, 231:16, 232:24
**Hit** [1] - 231:17
**hits** [1] - 34:6
**hitting** [3] - 26:7, 141:6, 209:15
**hold** [4] - 44:16, 65:23, 84:13, 105:9
**holds** [2] - 22:12, 113:15
**home** [4] - 191:8, 191:10, 193:17, 233:21
**honest** [2] - 231:2, 233:1
**hooded** [2] - 113:22, 113:23
**Horgan** [1] - 228:24
**Hospital** [3] - 151:18, 173:22, 204:23
**hospital** [16] - 71:15, 71:17, 73:6, 86:18, 86:22, 93:15, 93:16,

93:18, 93:20, 93:23, 141:16, 156:7, 159:16, 163:22, 165:14, 186:11
**hospitalization** [1] - 161:3
**hot** [2] - 157:6, 157:10
**hour** [1] - 207:3
**hours** [9] - 206:13, 207:4, 207:5, 214:6, 216:21, 216:24, 217:10, 217:22
**house** [7] - 18:19, 19:1, 19:4, 189:8, 189:9, 191:11, 191:13
**human** [22] - 10:13, 10:18, 10:21, 11:2, 11:7, 11:10, 11:21, 12:3, 14:13, 14:23, 15:10, 15:12, 18:6, 40:21, 42:21, 55:12, 81:12, 140:18, 196:19, 196:21, 197:11, 197:16
**Human** [1] - 198:18
**humeral** [3] - 184:9, 184:16, 185:22
**hurt** [10] - 167:4, 169:3, 172:9, 172:13, 173:6, 182:4, 187:2, 187:3, 188:2, 204:15
**hurts** [1] - 72:2
**hx** [1] - 184:3
**hypothetical** [3] - 72:19, 217:13, 217:14
**hysterics** [1] - 184:13

## I

**ID** [1] - 233:13
**IDC** [9] - 50:15, 119:22, 120:13, 127:4, 127:5, 164:24, 167:18, 172:20, 238:16
**IDCs** [2] - 119:10, 164:23
**idea** [5] - 23:12, 70:20, 118:15, 219:18, 229:2
**ideally** [1] - 136:22
**identification** [1] - 227:14
**identified** [6] - 5:13, 222:5, 222:7, 233:22, 233:23, 242:5

**identify** [2] - 158:8, 221:4
**immediate** [1] - 142:12
**immediately** [8] - 85:22, 86:1, 86:2, 91:4, 122:12, 209:20, 209:22, 217:5
**impact** [1] - 148:3
**impacted** [2] - 7:6, 146:18
**impaired** [1] - 24:4
**implemented** [1] - 10:11
**important** [1] - 86:8
**IN** [1] - 242:13
**inaccurate** [10] - 50:9, 51:1, 51:15, 51:16, 51:20, 52:2, 52:14, 58:14, 121:4, 121:5
**inappropriate** [5] - 56:24, 58:14, 59:4, 59:7, 59:14
**INAUDIBLE** [1] - 229:15
**incapable** [1] - 24:23
**incident** [36] - 16:12, 19:18, 20:17, 20:22, 32:23, 33:9, 33:24, 34:15, 36:10, 37:21, 38:24, 47:18, 50:14, 63:19, 76:17, 94:4, 94:5, 95:4, 98:13, 144:8, 145:16, 150:24, 151:17, 151:21, 151:23, 174:21, 177:18, 180:2, 209:24, 210:18, 219:12, 226:11, 228:9, 236:21, 237:8
**Incident** [5] - 4:8, 4:10, 4:16, 82:21, 144:2
**incidents** [1] - 219:5
**included** [2] - 167:18, 204:1
**including** [3] - 39:1, 45:15, 237:2
**inconsolable** [1] - 184:12
**incorporated** [2] - 80:2, 164:6
**incorporating** [1] - 69:21
**incorrectly** [1] - 86:7
**independent** [2] - 91:14, 140:17
**independently** [1] -

97:20
**index** [1] - 230:14
**indicate** [1] - 160:22
**indicated** [2] - 20:16, 170:11
**indicates** [1] - 91:13
**indicative** [1] - 204:3
**individual** [18] - 30:1, 30:2, 34:6, 66:10, 89:13, 91:15, 97:5, 98:2, 98:13, 101:4, 144:10, 170:12, 170:13, 170:14, 170:15, 179:16, 196:22, 202:10
**individuals** [4] - 84:10, 95:20, 116:20, 218:22
**inflated** [2] - 43:9, 51:23
**information** [29] - 8:18, 16:2, 17:17, 19:5, 41:3, 41:15, 57:9, 90:14, 96:2, 96:22, 96:23, 100:9, 110:23, 133:10, 135:12, 135:21, 136:3, 136:5, 136:18, 139:17, 146:22, 147:1, 174:6, 205:10, 215:6, 218:14, 236:11, 238:19, 239:15
**informed** [6] - 11:13, 11:14, 14:12, 85:5, 159:14, 222:1
**ingesting** [1] - 141:8
**initial** [4] - 50:13, 111:16, 216:9, 217:20
**initiate** [1] - 40:18
**initiated** [5] - 116:12, 116:14, 144:14, 144:16, 145:17
**inject** [1] - 134:11
**injure** [1] - 234:4
**injured** [8] - 72:21, 73:2, 73:8, 160:21, 161:13, 176:12, 178:23, 179:5
**injuries** [17] - 35:2, 72:16, 73:13, 73:23, 80:22, 82:5, 82:7, 96:15, 97:1, 169:2, 169:17, 172:7, 172:15, 176:7, 176:9, 184:14, 232:22
**injury** [20] - 82:8, 87:2,

87:18, 87:21, 88:4, 88:10, 146:12, 161:1, 161:4, 161:14, 161:20, 165:10, 167:20, 167:23, 170:2, 170:8, 174:2, 176:10, 186:6, 233:1
**innate** [1] - 99:4
**inside** [1] - 221:9
**insofar** [4] - 74:22, 75:4, 215:14, 216:8
**instance** [3] - 34:21, 108:7, 164:9
**instances** [2] - 100:1, 109:14
**instituted** [2] - 78:15, 118:8
**instruct** [6] - 16:1, 17:15, 41:4, 41:15, 146:8, 146:22
**instructions** [1] - 241:8
**intake** [1] - 14:16
**Integrity** [1] - 42:16
**intend** [2] - 127:7, 127:10
**intended** [3] - 100:12, 125:11, 126:13
**intent** [9] - 52:21, 52:24, 54:7, 182:4, 182:5, 182:6, 202:17, 204:9, 220:8
**intentional** [1] - 126:15
**intentionally** [2] - 53:10, 234:3
**interaction** [4] - 48:15, 49:19, 236:12, 236:14
**interactions** [1] - 202:24
**interest** [2] - 60:5, 129:20
**interested** [2] - 56:11, 242:11
**interfering** [1] - 48:19
**Internal** [3] - 24:2, 117:4, 157:7
**internal** [4] - 13:6, 165:9, 173:14, 174:1
**interrogatories** [1] - 5:15
**interrupted** [1] - 104:24
**interview** [18] - 18:9, 53:13, 55:18, 62:2, 117:6, 117:15, 117:16, 117:23, 120:5, 134:19,

134:20, 142:7, 164:21, 180:11, 216:3, 228:21, 229:8, 237:23
**interviewed** [24] - 18:5, 18:7, 62:3, 119:21, 120:1, 120:17, 126:16, 126:17, 134:17, 157:15, 157:16, 164:17, 164:20, 178:18, 178:19, 198:17, 198:19, 198:20, 208:20, 208:21, 212:8, 215:24, 225:24, 229:4
**interviewing** [3] - 117:13, 118:17, 127:15
**interviews** [6] - 11:17, 117:9, 117:10, 119:21, 137:3
**intradepartmental** [1] - 49:9
**invasion** [3] - 191:8, 191:10, 193:17
**invest** [1] - 63:4
**investigate** [3] - 8:2, 119:5, 128:13
**investigated** [9] - 15:9, 30:19, 30:21, 31:10, 117:7, 121:15, 131:19, 152:11, 197:18
**Investigation** [3] - 4:11, 4:15, 157:3
**investigation** [74] - 10:20, 14:8, 14:9, 14:10, 16:15, 16:18, 16:21, 18:1, 18:2, 18:22, 20:23, 25:19, 31:1, 35:12, 35:15, 37:10, 39:9, 39:11, 46:11, 46:14, 46:18, 54:9, 54:10, 54:21, 55:5, 63:20, 71:22, 72:1, 112:2, 116:8, 116:10, 116:12, 119:22, 119:23, 119:24, 120:2, 121:15, 123:19, 127:22, 130:2, 130:22, 130:23, 132:5, 132:14, 135:6, 136:16, 136:18, 143:7, 143:14, 144:11, 144:14, 144:16, 144:19, 144:20,

145:20, 151:3,
163:11, 178:22,
192:17, 193:16,
197:7, 197:10,
198:15, 208:11,
208:14, 212:7,
212:8, 225:24,
226:12, 226:15,
229:7, 234:20, 237:1
**investigations** [13] -
8:1, 10:6, 10:12,
10:14, 10:22, 13:6,
14:14, 14:15,
118:18, 123:18,
142:14, 142:19,
142:23
**Investigations** [1] -
196:9
**investigative** [1] -
12:22
**investigator** [7] -
13:12, 36:11, 60:23,
111:16, 111:22,
112:3, 119:18
**investigator's** [1] -
132:13
**investigators** [13] -
111:12, 114:21,
125:22, 157:16,
172:6, 177:7,
184:23, 200:22,
209:12, 209:19,
216:1, 226:1, 226:19
**investigatory** [3] -
13:13, 73:20, 118:20
**involve** [7] - 19:22,
19:24, 20:3, 28:23,
143:10, 146:24
**involved** [27] - 10:19,
10:22, 11:11, 11:16,
12:13, 14:12, 14:19,
15:13, 16:20, 16:22,
16:23, 22:14, 31:1,
32:12, 47:4, 68:21,
80:21, 84:10, 130:1,
144:12, 145:10,
147:10, 151:3,
152:1, 157:20,
174:21, 198:18
**involvement** [2] -
11:21, 14:6
**involving** [7] - 10:12,
83:20, 95:22, 143:7,
151:13, 151:18,
188:23
**inwards** [1] - 166:23
**irrelevant** [1] - 201:4
**issue** [7] - 19:8, 19:9,
72:15, 148:14,
154:7, 197:13, 224:2

**issued** [6] - 21:5,
36:13, 197:2, 200:4,
200:7, 201:16
**issues** [14] - 78:20,
146:2, 146:3, 146:4,
146:8, 147:11,
147:14, 147:15,
147:20, 147:21,
149:20, 149:21,
183:17
**item** [1] - 63:5
**iteration** [1] - 69:14
**itself** [2] - 72:23,
137:21

## J

**January** [6] - 1:20,
20:24, 32:5, 50:20,
240:23, 242:4
**JARED** [1] - 2:12
**Jarrett** [1] - 236:9
**jeans** [1] - 113:23
**Jeffrey** [1] - 205:4
**Jellyman** [28] - 220:2,
221:1, 222:7, 222:9,
222:15, 222:16,
227:14, 227:21,
227:22, 227:23,
228:8, 228:11,
228:14, 229:14,
233:23, 233:24,
234:6, 234:10,
234:11, 235:7,
236:13, 236:23,
237:4, 237:8,
237:16, 237:21,
238:10, 239:2
**Jellyman's** [9] - 224:3,
227:23, 228:1,
228:7, 228:11,
228:13, 234:2,
234:7, 235:15
**jeopardy** [1] - 89:14
**job** [6] - 21:18, 22:11,
25:13, 129:16,
149:21, 152:10
**Joe** [1] - 42:14
**jogs** [1] - 151:2
**JOHN** [2] - 1:10, 2:17
**joint** [1] - 199:17
**Joseph** [2] - 64:14,
64:15
**Jovone** [21] - 154:18,
154:22, 156:24,
158:15, 158:21,
162:3, 165:5, 165:6,
166:4, 166:6, 166:9,
167:3, 167:4, 167:8,
169:1, 169:6, 169:7,

172:6, 172:12,
173:5, 173:21
**Jovone's** [4] - 166:14,
166:22, 166:23,
172:12
**Joyal** [20] - 196:3,
196:11, 197:2,
198:4, 198:13,
199:13, 200:9,
201:20, 201:21,
202:24, 203:22,
208:15, 208:23,
210:18, 211:11,
211:14, 213:16,
213:19, 215:17,
219:2
**Joyal's** [1] - 198:9
**JOYCE** [1] - 2:14
**JT** [1] - 1:8
**judgment** [5] - 63:23,
63:24, 126:3,
126:12, 133:4
**July** [5] - 20:22, 36:17,
172:21, 208:13,
209:3
**jump** [1] - 221:14
**jumped** [1] - 171:21
**June** [8] - 27:4, 27:10,
27:11, 27:12, 28:8,
223:11, 226:13
**justice** [2] - 78:18,
78:21
**justified** [2] - 34:1,
73:9
**Justin** [1] - 133:19
**juvenile** [5] - 19:22,
19:24, 20:3, 29:21,
36:13
**jvigliotti@rja** [1] -
2:16
**jvigliotti@rja-law.
com** [1] - 2:16

## K

**K-9** [61] - 48:23, 49:4,
49:22, 61:2, 61:6,
61:8, 61:13, 62:8,
62:12, 62:22, 62:23,
63:4, 63:10, 63:14,
64:1, 64:3, 65:1,
66:24, 67:6, 67:23,
68:11, 69:12, 71:6,
76:1, 76:8, 76:10,
76:19, 77:5, 78:7,
78:22, 80:22, 83:15,
83:24, 84:9, 85:13,
85:16, 85:18, 87:6,
88:12, 89:16, 94:21,
95:17, 95:18, 95:19,

99:18, 100:21,
100:24, 102:3,
108:12, 113:6,
113:15, 114:12,
114:23, 124:13,
126:4, 126:7, 130:5,
133:24, 134:4,
134:5, 134:6
**K-9s** [24] - 61:4, 61:11,
67:6, 68:21, 69:1,
69:16, 75:13, 75:17,
76:2, 78:20, 79:8,
80:19, 80:21, 88:22,
88:23, 89:2, 95:22,
97:13, 100:1, 100:5,
100:17, 101:22,
105:6, 110:10
**keep** [7] - 11:14, 58:3,
107:10, 148:12,
148:16, 149:2, 149:4
**keeps** [2] - 22:10,
22:11
**Kenneth** [1] - 128:5
**Kenny** [2] - 112:1,
112:2
**kept** [1] - 214:9
**Kevin** [1] - 13:3
**kicking** [1] - 84:24
**kid** [12] - 105:13,
122:4, 150:5,
153:10, 155:1,
155:6, 156:7,
156:10, 160:3,
178:7, 204:14,
213:16
**kid's** [2] - 160:13,
187:18
**kidding** [1] - 60:23
**kids** [3] - 189:11,
189:12, 189:15
**kill** [3] - 99:20, 99:23,
234:4
**killed** [2] - 99:20,
100:2
**kind** [3] - 40:24, 72:9,
173:9
**kneeling** [1] - 166:11
**knocked** [1] - 128:23
**knowing** [1] - 208:2
**knowledge** [5] -
12:13, 52:10, 99:15,
100:16, 100:19
**knowledgeability** [2] -
217:18, 225:5
**known** [4] - 53:18,
93:14, 170:6, 170:7
**KUBIAK** [2] - 1:5, 2:7
**Kubiak** [1] - 129:2

## L

**lady** [1] - 151:5
**LaFleche** [11] - 222:1,
223:14, 224:6,
224:18, 235:22,
235:23, 236:2,
236:4, 236:9,
236:18, 236:20
**Lake** [1] - 159:17
**Lancaster** [1] - 2:15
**lane** [1] - 48:2
**LANE** [1] - 1:22
**language** [16] - 17:11,
68:12, 68:15, 94:7,
97:11, 101:17,
103:7, 103:12,
115:3, 125:15,
125:16, 155:5,
185:8, 202:12,
207:9, 217:24
**languages** [1] - 115:1
**large** [1] - 83:19
**last** [20] - 10:5, 11:3,
11:23, 28:2, 29:13,
36:10, 44:24, 45:4,
47:16, 158:19,
173:4, 174:8,
176:11, 192:7,
223:9, 227:10,
227:17, 233:17,
236:7
**Last** [25] - 4:13, 19:15,
19:16, 20:11, 21:15,
21:19, 22:2, 22:6,
22:13, 25:2, 25:5,
26:17, 28:3, 28:19,
39:24, 188:14,
188:22, 189:1,
190:7, 190:11,
190:22, 196:11,
196:13, 196:17,
196:23
**latest** [1] - 69:14
**LAW** [2] - 2:3, 2:8
**law** [4] - 7:16, 7:17,
130:15, 132:2
**law.com** [1] - 2:16
**lawful** [1] - 48:16
**laws** [2] - 45:12,
217:18, 225:5
**Laws** [2] - 7:2, 7:6
**lawsuit** [1] - 57:21
**layperson** [1] - 185:10
**lead** [1] - 89:12
**learn** [1] - 23:11
**learned** [3] - 57:9,
109:13, 124:4
**leash** [2] - 84:2,
113:15

**least** [1] - 199:19
**leave** [5] - 16:8, 16:10,
48:16, 68:5, 86:8
**leaving** [2] - 84:11,
220:6
**led** [2] - 147:12,
148:23
**left** [15] - 35:9, 36:5,
47:23, 48:12, 85:13,
114:7, 114:9,
129:14, 147:22,
166:12, 221:17,
221:21, 226:12,
228:2, 237:19
**leg** [1] - 85:17
**legal** [1] - 73:3
**less** [8] - 14:18, 45:24,
96:10, 156:13,
194:21, 195:21,
207:4, 210:2
**less-lethal** [1] - 210:2
**lesson** [1] - 208:9
**lethal** [2] - 210:2
**letter** [4] - 45:4, 47:1,
50:19, 225:17
**letters** [1] - 218:13
**letting** [1] - 122:22
**Level** [6] - 162:14,
162:18, 162:22,
163:2, 175:24
**level** [15] - 26:2, 80:3,
80:5, 98:5, 162:1,
162:2, 170:7,
181:14, 182:10,
187:4, 187:23,
196:23, 204:4,
222:19, 222:24
**liberty** [1] - 208:13
**licensing** [1] - 13:17
**lie** [1] - 52:1
**lied** [7] - 43:8, 51:12,
51:17, 51:22, 121:3,
143:11, 218:12
**Lieutenant** [5] - 23:18,
24:9, 77:23, 78:1,
209:4
**lieutenant** [1] - 55:2
**lieutenants** [1] - 13:19
**light** [1] - 50:2
**likely** [4] - 104:15,
131:22, 139:1, 139:5
**limit** [1] - 107:11
**Lincoln** [3] - 19:18,
19:19, 135:23
**Linda** [3] - 1:15,
242:3, 242:17
**Lindsey** [2] - 169:3,
172:8
**LINDSEY** [1] - 1:8
**line** [5] - 63:5, 138:10,

178:15, 185:21,
229:24
**LINE** [1] - 241:9
**Link** [1] - 19:20
**list** [3] - 15:6, 197:19,
218:16
**listed** [1] - 117:19
**lists** [1] - 173:12
**literature** [1] - 100:4
**Litigation** [1] - 42:16
**lived** [1] - 189:17
**living** [1] - 147:23
**lobby** [1] - 120:10
**Local** [1] - 190:14
**local** [1] - 62:2
**location** [5] - 48:7,
84:22, 95:6, 227:13,
227:18
**locations** [1] - 110:14
**locked** [1] - 222:16
**logic** [6] - 14:9, 37:10,
127:21, 174:13,
174:17, 223:16
**look** [49] - 13:8, 23:24,
26:16, 31:21, 32:14,
33:17, 44:9, 47:5,
66:6, 68:4, 70:4,
70:6, 83:18, 86:23,
87:1, 87:15, 88:9,
88:12, 88:16, 92:13,
103:11, 111:8,
113:3, 116:19,
116:23, 122:24,
128:11, 128:18,
143:17, 143:18,
144:21, 164:16,
164:24, 168:22,
171:6, 172:12,
172:18, 172:19,
173:8, 183:8,
183:13, 185:1,
185:2, 185:9,
185:15, 190:24,
225:23, 233:13
**looked** [8] - 11:23,
24:3, 69:13, 71:6,
180:19, 185:15,
221:2, 231:16
**looking** [12] - 20:20,
78:22, 79:1, 91:9,
94:3, 132:4, 143:4,
175:9, 191:20,
195:15, 195:21,
195:22
**looks** [3] - 88:11,
94:14, 172:24
**lost** [3] - 105:12,
105:13
**low** [3] - 96:6, 96:8,
222:18

**lower** [3] - 49:23,
166:12, 166:23
**lying** [3] - 28:23,
193:22, 194:4

**M**

**MA** [2] - 1:23, 2:15
**MADISON** [1] - 2:12
**magistrate** [3] -
153:19, 153:20,
154:11
**Maher** [2] - 93:5, 93:6
**Main** [5] - 1:19, 2:3,
2:9, 202:21, 202:22
**maintained** [1] - 84:3
**major** [2] - 74:19,
155:17
**male** [3] - 33:16,
165:6, 184:3
**Malinois** [5] - 66:3,
67:9, 67:11, 68:3,
98:22
**man** [8] - 156:4,
164:12, 180:3,
180:20, 181:11,
182:4, 182:5, 184:11
**management** [1] -
140:20
**Manager** [1] - 1:6
**manager** [40] - 10:5,
10:10, 12:9, 14:7,
14:10, 14:19, 15:1,
15:10, 15:12, 16:20,
26:19, 27:1, 27:12,
28:7, 28:13, 40:8,
40:13, 40:19, 42:20,
44:2, 44:3, 44:4,
44:23, 45:5, 45:10,
45:22, 47:12, 49:18,
50:13, 50:19, 51:2,
51:6, 51:10, 102:13,
103:6, 103:7,
190:12, 194:7,
194:10, 194:19
**manager's** [1] - 12:10
**mandate** [1] - 12:9
**mandible** [1] - 213:8
**maneuver** [5] - 36:7,
79:23, 215:21,
215:22, 215:23
**March** [4] - 108:22,
145:8, 219:23,
220:18
**Marcotte** [6] - 32:11,
33:8, 33:15, 33:18,
33:23, 34:14
**mark** [11] - 21:12,
31:13, 41:19, 44:5,
82:18, 143:24,

157:2, 183:2, 190:6,
219:11, 230:24
**MARK** [1] - 241:6
**marked** [21] - 21:13,
31:14, 41:21, 44:6,
82:9, 82:19, 82:21,
91:23, 91:24,
109:18, 109:23,
144:2, 157:3, 183:3,
190:7, 190:9, 196:8,
196:9, 219:12,
223:5, 238:7
**marking** [1] - 42:3
**married** [2] - 147:14,
189:22
**Martha** [1] - 209:4
**Martinez** [2] - 236:10,
237:11
**Martinez-Pietri** [2] -
236:10, 237:11
**MASSACHUSETTS**
[1] - 1:2
**Massachusetts** [11] -
1:18, 1:20, 2:4, 2:10,
7:2, 7:5, 52:10,
72:22, 242:1, 242:3,
242:18
**match** [1] - 121:2
**material** [1] - 15:5
**materials** [1] - 145:19
**Matt** [8] - 23:19, 23:21,
67:2, 67:5, 77:22,
89:24, 111:3, 151:3
**matter** [7] - 20:7,
30:23, 42:2, 72:12,
116:14, 149:2, 182:6
**matters** [3] - 18:11,
53:4
**Mattis** [8] - 48:23,
49:4, 49:22, 71:13,
108:15, 113:6,
114:12, 114:23
**Mattis'** [1] - 113:15
**MCCARTHY** [2] - 1:10,
2:8
**McCarthy** [20] - 84:2,
145:22, 151:6,
151:13, 151:19,
158:16, 159:3,
163:1, 163:4, 163:9,
164:2, 164:14,
164:19, 166:18,
166:19, 166:21,
171:7, 171:16,
178:19, 188:6
**McCarthy's** [2] -
163:3, 163:12
**McGinn** [1] - 127:20
**mean** [33] - 8:6, 8:7,
8:24, 46:11, 51:5,

52:18, 58:1, 59:21,
63:3, 65:21, 80:7,
81:3, 98:2, 101:10,
101:14, 118:10,
119:2, 123:15,
130:12, 139:1,
139:11, 144:15,
148:23, 153:24,
160:23, 169:19,
169:23, 189:13,
193:7, 200:24,
214:20, 232:23,
236:4
**meaning** [3] - 43:16,
95:1, 177:9
**means** [10] - 68:13,
130:13, 137:8,
137:16, 148:9,
165:21, 184:2,
187:4, 197:12,
220:14
**measure** [1] - 131:13
**mechanisms** [1] -
10:16
**medial** [3] - 165:8,
173:14, 173:24
**medical** [19] - 16:2,
41:14, 86:3, 86:20,
86:21, 88:1, 88:6,
88:7, 100:4, 146:21,
147:1, 147:12,
148:5, 148:10,
149:20, 159:18,
165:22, 182:17,
185:11
**Medical** [3] - 4:12,
159:10, 183:3
**Medical/Dental** [1] -
35:4
**medicals** [1] - 183:14
**meet** [5] - 9:3, 9:4, 9:7,
9:21, 183:7
**meeting** [1] - 11:17
**meetings** [1] - 9:12
**meets** [1] - 9:21
**melee** [2] - 64:2, 64:4
**Melendez** [29] - 47:19,
47:21, 47:22, 48:6,
48:9, 48:12, 48:21,
48:22, 49:3, 49:13,
49:14, 49:20, 49:21,
49:22, 49:23, 74:7,
102:12, 102:21,
103:2, 113:18,
113:21, 114:2,
114:7, 114:11,
124:18, 125:24,
126:4, 130:4, 240:23
**MELENDEZ** [1] - 1:4
**Melendez'** [1] - 114:9

**Melendez's** [1] - 48:12
**member** [3] - 32:18, 60:18, 64:5
**members** [2] - 10:2, 184:5
**memories** [1] - 175:20
**memory** [5] - 39:20, 62:10, 151:2, 175:3, 175:7
**men** [1] - 96:5
**mental** [11] - 20:3, 146:5, 146:7, 146:11, 148:7, 148:24, 149:1, 149:20, 160:9, 160:14, 203:3
**mention** [1] - 9:13
**mentioning** [1] - 188:2
**metaphors** [1] - 123:13
**Michael** [5] - 5:21, 47:24, 219:14, 219:23, 220:16
**Michelle** [1] - 151:6
**middle** [4] - 64:2, 64:4, 71:2, 173:12
**Middlesex** [1] - 242:2
**midst** [1] - 200:12
**might** [1] - 55:2
**Miller** [2] - 116:24, 129:3
**mind** [11] - 91:18, 122:15, 126:6, 126:18, 127:6, 163:3, 181:7, 181:16, 181:22, 195:7, 208:17
**mine** [1] - 31:19
**minimum** [2] - 36:5, 161:24
**minor** [1] - 1:8
**minorities** [1] - 96:20
**minute** [2] - 46:17, 188:11
**minutes** [2] - 111:11, 150:24
**Miranda** [2] - 13:4, 13:6
**mirror** [6] - 7:15, 7:16, 155:8, 171:12, 171:19, 221:18
**misconduct** [1] - 118:1
**misdemeanor** [1] - 191:24
**misread** [1] - 86:6
**missed** [1] - 231:11
**missing** [1] - 92:11
**mistake** [5] - 25:14, 25:15, 52:20, 52:21,

53:8
**mistaken** [1] - 54:6
**moment** [2] - 48:11, 147:5
**momentarily** [1] - 206:22
**momentum** [1] - 166:6
**Monday** [1] - 1:20
**money** [2] - 150:15, 152:24
**Monique** [3] - 117:2, 128:6, 128:12
**month** [3] - 16:19, 32:8, 208:14
**months** [2] - 8:22, 16:11
**Moore's** [1] - 64:21
**morning** [4] - 5:17, 5:18, 202:8, 205:20
**Mortimer** [2] - 165:11, 174:2
**most** [5] - 14:14, 68:6, 98:21, 117:18, 226:11
**mother** [8] - 155:4, 157:14, 164:17, 169:2, 170:4, 172:8, 177:17, 178:8
**mother's** [1] - 180:15
**motions** [1] - 5:10
**motor** [12] - 212:2, 221:8, 221:10, 221:11, 221:15, 221:16, 221:17, 222:1, 222:5, 222:8, 233:19, 234:4
**mouth** [6] - 68:11, 68:13, 107:6, 107:12, 214:9, 234:24
**mouths** [1] - 141:7
**move** [3] - 206:22, 221:15, 228:11
**moved** [2] - 13:10, 234:10
**moving** [6] - 103:23, 103:24, 104:10, 104:12, 107:7, 207:17
**MP** [1] - 6:3
**MR** [133] - 3:4, 5:16, 12:7, 17:18, 20:14, 21:7, 22:4, 22:8, 24:5, 27:24, 29:24, 31:13, 31:17, 31:20, 41:5, 41:16, 41:19, 42:5, 44:5, 56:9, 56:21, 57:2, 58:15, 60:6, 74:24, 75:5, 82:9, 82:12, 82:16,

82:18, 85:10, 87:3, 88:20, 89:3, 89:19, 90:11, 91:19, 91:23, 92:12, 97:9, 103:15, 109:4, 109:22, 110:1, 110:4, 110:17, 111:18, 115:12, 115:20, 118:12, 119:8, 119:16, 121:8, 122:5, 122:8, 127:19, 129:7, 134:14, 134:24, 135:7, 141:23, 143:24, 146:10, 148:17, 148:22, 149:12, 149:16, 154:24, 155:2, 156:22, 157:2, 157:8, 157:12, 158:6, 160:15, 160:17, 161:6, 161:9, 161:18, 162:6, 162:16, 165:16, 165:18, 167:24, 168:13, 168:20, 169:18, 170:9, 170:24, 171:10, 176:18, 177:21, 177:24, 179:21, 180:1, 181:9, 181:18, 182:3, 182:9, 182:13, 183:2, 185:16, 186:3, 186:12, 187:6, 187:8, 187:14, 187:24, 188:3, 188:10, 190:6, 196:7, 199:14, 200:15, 201:13, 204:11, 204:16, 206:4, 206:7, 207:7, 209:14, 209:17, 215:1, 215:5, 217:11, 219:11, 224:16, 224:21, 224:23, 225:1, 225:2, 239:13, 239:19
**MS** [290] - 7:8, 7:11, 7:23, 9:10, 9:16, 12:4, 15:24, 17:15, 21:23, 22:5, 22:9, 24:6, 24:13, 24:15, 24:24, 25:16, 27:22, 28:1, 28:24, 29:10, 29:15, 29:20, 29:23, 31:16, 33:1, 34:12, 39:8, 40:2, 40:15, 41:2, 41:13, 42:3,

43:15, 46:23, 50:8, 50:17, 50:22, 51:3, 51:9, 51:14, 51:18, 53:7, 53:21, 54:8, 54:14, 54:19, 55:22, 56:3, 56:6, 56:18, 56:23, 57:8, 57:22, 57:24, 58:8, 58:13, 59:3, 59:13, 59:17, 60:7, 62:21, 66:7, 66:21, 67:18, 68:8, 69:5, 70:8, 70:14, 71:18, 72:18, 73:15, 74:1, 75:1, 75:6, 75:22, 76:4, 76:7, 77:2, 78:14, 78:16, 79:10, 80:12, 80:17, 80:24, 81:8, 82:6, 82:10, 82:14, 85:8, 86:5, 86:11, 86:19, 87:4, 87:17, 87:19, 87:22, 88:5, 88:14, 88:19, 89:4, 89:20, 90:2, 90:12, 91:12, 91:20, 92:10, 92:22, 94:17, 96:16, 96:21, 97:4, 97:8, 97:10, 97:15, 97:21, 98:1, 98:7, 98:10, 98:18, 99:1, 99:6, 99:22, 100:7, 100:13, 101:1, 101:9, 101:16, 102:1, 102:5, 102:16, 102:22, 102:24, 103:9, 103:13, 104:5, 104:9, 104:17, 104:21, 104:24, 105:18, 106:20, 107:1, 107:8, 107:23, 108:24, 109:5, 110:2, 110:18, 111:5, 112:19, 114:24, 115:13, 115:21, 117:8, 117:20, 118:13, 118:19, 119:9, 119:12, 119:15, 120:9, 120:24, 121:9, 122:6, 122:9, 122:13, 123:11, 124:24, 125:5, 125:19, 126:1, 126:8, 126:10, 127:8, 127:12, 127:23, 128:1, 129:1, 129:6, 129:13, 129:19, 129:24, 130:21, 131:1, 131:11,

131:15, 132:10, 132:15, 133:16, 134:13, 134:23, 135:2, 135:9, 137:18, 138:20, 138:23, 139:6, 140:2, 140:5, 140:11, 141:2, 141:9, 141:24, 142:6, 143:2, 143:12, 146:6, 146:20, 147:2, 148:19, 148:21, 149:6, 149:15, 151:14, 153:7, 153:9, 154:14, 154:23, 155:3, 156:9, 157:9, 157:13, 158:4, 158:18, 161:7, 161:10, 161:19, 161:23, 162:7, 162:17, 162:23, 163:6, 163:13, 164:5, 165:24, 168:4, 168:14, 168:21, 170:10, 171:1, 171:9, 176:19, 177:2, 177:22, 178:1, 179:20, 179:24, 181:19, 182:2, 182:8, 182:23, 185:5, 186:4, 186:8, 186:13, 187:9, 187:12, 188:1, 188:4, 188:8, 194:2, 194:11, 196:24, 197:15, 200:16, 201:14, 201:17, 203:15, 204:12, 204:17, 205:16, 206:3, 206:6, 206:11, 207:8, 209:18, 210:8, 210:12, 213:15, 213:22, 214:10, 214:19, 215:2, 217:12, 223:2, 227:6, 235:13, 239:3, 239:14, 239:20
**multi** [1] - 113:23
**multi-colored** [1] - 113:23
**multiple** [4] - 18:23, 204:22, 206:17
**multitude** [1] - 206:19
**murder** [1] - 220:8
**muscle** [1] - 156:14

**must** [6] - 93:10, 143:14, 152:19, 224:11, 238:14, 240:7
**muzzle** [1] - 106:3

## N

**NAME** [1] - 240:23
**name** [11] - 5:19, 78:1, 78:3, 87:7, 144:23, 151:6, 173:13, 196:3, 197:20, 197:22, 220:4
**names** [4] - 9:17, 11:3, 13:8, 197:24
**narrative** [3] - 83:16, 183:19, 183:21
**Narrative** [2] - 4:16, 219:12
**Natali** [2] - 116:23, 128:14
**Nathan** [2] - 224:5, 224:17
**nature** [5] - 16:7, 17:12, 146:16, 189:4, 191:2
**nearing** [1] - 184:12
**necessarily** [4] - 29:3, 93:22, 98:11, 200:1
**necessary** [7] - 36:5, 132:20, 175:16, 187:10, 187:21, 215:15, 223:23
**necessitated** [1] - 109:12
**neck** [1] - 99:17
**need** [38] - 8:3, 11:18, 14:12, 52:23, 53:1, 71:24, 73:4, 73:7, 73:21, 90:17, 94:1, 101:22, 106:22, 109:21, 115:18, 123:9, 123:10, 130:16, 130:17, 130:24, 131:2, 131:4, 131:8, 132:8, 134:23, 135:2, 135:12, 135:14, 135:16, 137:3, 143:17, 177:19, 183:20, 199:16, 199:17, 201:8
**needed** [16] - 62:11, 72:9, 90:14, 105:24, 135:4, 166:9, 167:5, 169:8, 178:8, 181:10, 181:11, 207:18, 207:22, 213:18, 215:6, 217:1

**needs** [8] - 74:17, 131:19, 131:23, 132:1, 133:17, 161:2, 217:24, 218:2
**negative** [1] - 54:23
**negotiating** [1] - 195:23
**negotiator** [1] - 149:23
**neighbors** [1] - 18:23
**nervousness** [1] - 234:5
**neutral** [1] - 131:4
**never** [21] - 53:23, 53:24, 54:1, 54:5, 65:15, 78:7, 86:15, 120:17, 121:6, 124:22, 126:16, 142:3, 142:22, 151:23, 170:5, 170:7, 180:4, 197:5, 201:18, 206:1, 215:24
**new** [4] - 61:23, 62:8, 69:22, 107:13
**news** [1] - 62:2
**next** [19] - 38:3, 41:19, 44:4, 144:1, 166:11, 167:13, 174:12, 190:6, 190:24, 205:12, 205:15, 205:20, 206:13, 207:3, 208:14, 210:17, 210:19, 211:11, 222:15
**nice** [1] - 150:5
**nicest** [1] - 150:4
**night** [2] - 134:12, 233:20
**NO** [1] - 1:2
**nobody** [4] - 72:11, 153:8, 178:21, 236:5
**none** [4] - 8:15, 126:16, 186:6, 235:10
**normally** [1] - 26:17
**Northborough** [1] - 189:3
**NOT** [1] - 241:6
**notary** [1] - 5:7
**Notary** [4] - 1:17, 5:14, 242:3, 242:17
**noted** [1] - 237:17
**notes** [1] - 165:5
**nothing** [3] - 160:1, 203:23, 229:6
**notice** [2] - 45:13, 213:19
**Notice** [2] - 4:6, 44:6
**noticed** [1] - 234:9

**notification** [2] - 210:1, 218:2
**notified** [13] - 93:4, 93:6, 93:7, 94:23, 124:5, 124:8, 124:9, 151:20, 168:5, 169:21, 170:17, 209:21
**notify** [8] - 79:23, 95:9, 182:24, 213:14, 213:18, 213:20, 218:1
**November** [2] - 144:11, 145:2
**NRT** [1] - 107:21
**nuances** [1] - 136:24
**number** [17] - 8:16, 8:17, 10:18, 46:7, 54:10, 77:16, 96:6, 96:8, 96:9, 106:13, 106:19, 108:4, 119:4, 120:15, 152:4, 201:6, 222:8
**numbers** [5] - 77:3, 77:10, 77:11, 77:14, 157:23
**numerous** [9] - 9:11, 44:18, 44:20, 46:1, 67:19, 67:20, 105:24, 154:16, 193:15
**nurse** [1] - 174:5

## O

**O'Connor** [1] - 159:23
**oath** [1] - 242:5
**object** [1] - 58:16
**objection** [339] - 7:8, 7:23, 9:10, 9:16, 12:4, 15:24, 21:23, 22:4, 22:5, 22:8, 22:9, 24:5, 24:6, 24:13, 24:15, 24:24, 25:16, 28:24, 29:10, 29:15, 29:20, 29:23, 34:12, 39:8, 40:2, 40:15, 41:2, 41:13, 43:15, 46:23, 50:8, 50:17, 50:22, 51:3, 51:9, 51:14, 51:18, 53:7, 53:21, 54:8, 54:14, 54:19, 55:22, 56:3, 56:18, 56:21, 57:8, 57:22, 57:24, 58:8, 59:3, 59:13, 59:17, 60:6, 60:7, 62:21, 66:7, 66:21, 67:18, 68:8, 69:5, 70:8, 70:14, 71:18,

72:18, 73:15, 74:1, 74:24, 75:1, 75:5, 75:6, 75:22, 76:4, 76:7, 77:2, 78:14, 78:16, 79:10, 80:12, 80:17, 80:24, 81:8, 82:6, 85:8, 86:5, 86:11, 86:19, 87:3, 87:4, 87:17, 87:19, 87:22, 88:5, 88:14, 88:19, 88:20, 89:3, 89:4, 89:19, 89:20, 90:2, 90:11, 90:12, 91:12, 91:19, 91:20, 92:10, 92:22, 94:17, 96:16, 96:21, 97:4, 97:10, 97:15, 97:21, 98:1, 98:7, 98:10, 98:18, 99:1, 99:6, 99:22, 100:7, 100:13, 101:1, 101:9, 101:16, 102:1, 102:5, 102:16, 102:22, 102:24, 103:9, 104:5, 104:9, 104:17, 104:21, 105:18, 106:20, 107:1, 107:8, 107:23, 108:24, 109:4, 109:5, 110:17, 110:18, 111:5, 112:19, 114:24, 115:12, 115:13, 115:20, 115:21, 117:8, 117:20, 118:12, 118:13, 118:19, 119:8, 119:9, 119:12, 119:15, 119:16, 120:24, 121:8, 121:9, 122:6, 122:8, 122:9, 122:13, 123:11, 124:24, 125:5, 125:19, 126:1, 126:8, 126:10, 127:8, 127:12, 127:19, 127:23, 128:1, 129:1, 129:13, 129:19, 129:24, 130:21, 131:1, 131:11, 131:15, 132:10, 132:15, 133:16, 134:13, 134:14, 137:18, 138:20, 138:23, 139:6, 140:2, 140:5, 140:11, 141:2, 141:9, 141:23,

141:24, 142:6, 143:2, 143:12, 146:6, 146:20, 147:2, 151:14, 153:7, 153:9, 154:14, 154:23, 154:24, 155:2, 155:3, 156:9, 157:8, 157:9, 157:12, 157:13, 158:18, 160:15, 160:17, 161:6, 161:7, 161:9, 161:10, 161:18, 161:19, 161:23, 162:6, 162:7, 162:16, 162:17, 162:23, 163:6, 163:13, 164:5, 165:16, 165:24, 167:24, 168:4, 168:13, 168:14, 168:20, 168:21, 169:18, 170:9, 170:10, 170:24, 171:1, 176:18, 176:19, 177:2, 177:21, 177:22, 177:24, 178:1, 179:20, 179:21, 179:24, 180:1, 180:22, 181:9, 181:18, 181:19, 182:2, 182:3, 182:8, 182:9, 182:13, 182:23, 185:5, 185:16, 186:3, 186:4, 186:8, 186:12, 186:13, 187:6, 187:8, 187:9, 187:12, 187:14, 187:24, 188:1, 188:3, 188:4, 188:8, 194:2, 194:11, 196:24, 197:15, 199:14, 200:15, 200:16, 201:13, 201:14, 201:17, 203:15, 204:11, 204:12, 204:16, 204:17, 205:16, 206:3, 206:4, 206:6, 206:7, 206:11, 207:7, 207:8, 209:14, 209:17, 209:18, 210:8, 210:12, 213:15, 213:22, 214:10, 214:19, 215:1, 215:2, 215:5, 217:11, 217:12, 223:2, 224:16,

235:13, 239:3,
239:13, 239:14
**Objection** [2] - 58:13,
122:5
**objections** [1] - 5:10
**objective** [2] - 132:21,
215:16, 223:24
**obligation** [2] - 34:9,
34:13
**obligations** [1] -
200:19
**observe** [7] - 210:23,
211:1, 211:7, 211:9,
211:20, 211:22,
213:3
**observed** [5] - 209:8,
213:5, 213:12,
213:14, 228:12
**observes** [1] - 114:6
**observing** [1] - 74:19
**obsolete** [1] - 79:5
**obtained** [2] - 99:3,
133:15
**obviously** [3] - 112:5,
153:4, 158:14
**OC** [1] - 98:8
**occasions** [1] - 108:2
**occur** [1] - 11:17
**occurred** [9] - 18:17,
18:20, 20:22, 53:3,
74:7, 130:13, 132:9,
170:8, 176:10
**Octavia** [2] - 116:24,
129:3
**October** [5] - 42:9,
47:3, 47:18, 74:7,
74:14
**OF** [7] - 1:2, 1:6, 1:8,
1:10, 2:3, 2:7, 2:8
**offense** [1] - 152:2
**offer** [1] - 131:8
**OFFICE** [1] - 2:3
**office** [27] - 10:11,
12:11, 14:14, 15:12,
16:22, 16:23, 17:9,
18:22, 40:22, 42:9,
42:14, 42:15, 42:18,
51:12, 64:22, 70:2,
94:19, 96:2, 121:12,
122:16, 124:8,
183:9, 183:15,
198:15, 218:11,
242:14
**officer** [82] - 5:23,
14:17, 14:18, 16:3,
21:17, 21:20, 23:17,
25:12, 26:1, 26:7,
31:11, 32:12, 34:6,
34:7, 34:8, 36:14,
37:8, 37:15, 65:10,

66:12, 67:23, 76:9,
87:6, 90:16, 92:16,
99:16, 100:20,
100:21, 100:23,
101:5, 101:8,
108:15, 108:18,
116:17, 117:6,
125:12, 142:8,
142:10, 142:11,
142:17, 142:24,
144:8, 144:10,
145:22, 148:4,
152:8, 159:3,
160:12, 163:7,
164:1, 164:11,
164:14, 164:15,
166:18, 166:21,
171:16, 174:13,
174:23, 180:21,
193:19, 196:2,
196:16, 202:9,
203:8, 203:14,
203:18, 212:16,
213:5, 213:16,
214:2, 218:14,
219:19, 219:20,
220:10, 221:5,
222:3, 227:21,
235:20, 237:11,
239:6, 240:6
**OFFICER** [4] - 1:5,
1:10
**Officer** [95] - 18:12,
32:11, 33:8, 33:15,
33:18, 33:20, 33:23,
34:1, 34:14, 36:1,
37:19, 37:21, 38:14,
40:23, 50:14, 51:12,
55:11, 56:1, 56:15,
57:20, 57:21, 59:12,
64:13, 66:11, 71:13,
84:2, 84:12, 84:19,
84:20, 84:24, 85:1,
85:6, 85:7, 85:11,
85:12, 85:14, 85:15,
104:14, 108:21,
110:2, 128:17,
158:5, 158:15,
158:16, 159:22,
164:19, 166:19,
171:7, 171:21,
172:21, 175:19,
175:21, 178:19,
188:14, 188:23,
190:17, 193:21,
193:24, 195:2,
195:16, 198:4,
202:24, 205:1,
210:18, 211:11,
211:14, 212:22,
213:12, 214:5,

215:13, 215:16,
222:1, 222:24,
223:14, 224:4,
224:5, 226:20,
227:8, 227:12,
227:17, 227:19,
228:5, 228:10,
228:12, 234:17,
236:9, 236:18,
236:20, 236:22,
237:4, 237:9, 238:2,
239:5
**officer's** [1] - 100:21
**officers** [72] - 8:2,
15:8, 17:5, 23:15,
25:6, 47:19, 47:21,
48:3, 48:5, 48:19,
57:16, 62:15, 63:2,
63:12, 64:17, 65:12,
66:5, 66:10, 68:4,
79:16, 79:19, 80:23,
81:10, 81:22, 85:23,
87:10, 89:13, 90:8,
90:16, 106:1,
107:18, 108:12,
118:18, 128:5,
134:7, 134:9, 137:6,
141:5, 141:20,
155:10, 155:17,
161:12, 163:16,
173:21, 174:21,
178:6, 180:2, 180:9,
180:12, 180:17,
186:23, 195:1,
195:6, 197:3,
197:13, 197:17,
198:7, 199:3,
199:20, 202:19,
204:22, 206:16,
206:24, 214:18,
216:3, 219:9,
235:10, 235:14,
237:10
**Officers** [2] - 224:11,
236:12
**offices** [1] - 1:18
**officials** [2] - 198:19,
199:5
**often** [6] - 9:7, 76:24,
77:12, 96:5, 96:19,
109:9
**old** [6] - 29:18, 34:23,
156:3, 165:6,
171:23, 184:11
**Oliveira** [29] - 18:13,
18:14, 18:15, 19:4,
19:6, 19:16, 20:17,
21:5, 27:6, 27:13,
29:24, 30:2, 30:16,
30:22, 31:2, 31:4,

31:10, 33:20, 34:1,
34:21, 35:21, 36:1,
36:12, 37:19, 37:21,
38:14, 39:3, 123:1
**Oliveira's** [3] - 18:19,
19:1, 30:18
**Oliver** [1] - 38:24
**once** [21] - 49:20,
80:6, 81:1, 82:7,
85:21, 87:23, 90:21,
91:2, 91:4, 91:6,
122:3, 123:3,
126:11, 132:3,
139:16, 158:24,
159:7, 166:7, 201:3,
227:19, 234:11
**Once** [1] - 93:4
**one** [62] - 9:13, 10:21,
17:5, 20:20, 22:15,
26:1, 27:3, 28:5,
54:16, 60:2, 61:7,
62:2, 62:10, 63:12,
67:15, 78:22, 82:12,
82:24, 83:8, 83:9,
90:17, 97:2, 98:5,
105:8, 108:5,
115:24, 116:23,
129:12, 140:12,
143:24, 144:5,
144:7, 144:22,
147:5, 150:3, 150:4,
157:20, 163:11,
175:10, 177:7,
178:9, 178:14,
178:17, 178:19,
178:22, 179:19,
183:20, 191:4,
191:5, 194:12,
197:20, 197:21,
198:17, 210:14,
213:17, 218:10,
218:22, 219:2,
225:17, 226:5,
235:14, 238:11
**ones** [1] - 98:22
**online** [1] - 209:7
**open** [13] - 8:7, 30:9,
36:7, 165:9, 174:1,
183:10, 206:21,
207:12, 209:8,
213:6, 230:7, 231:2,
232:1
**operations** [6] - 39:14,
39:15, 133:20,
133:21, 193:9,
193:14
**operator** [9] - 221:5,
221:6, 221:7, 221:9,
221:11, 221:19,
222:6, 233:18

**opportunity** [4] -
24:19, 50:1, 53:13,
235:4
**opposed** [4] - 60:11,
117:11, 117:12,
207:18
**option** [1] - 153:20
**order** [16] - 48:16,
48:20, 52:24,
101:22, 102:4,
102:10, 125:12,
125:13, 125:18,
126:23, 149:3,
149:4, 149:9, 212:6,
229:3, 234:8
**ordered** [5] - 41:9,
41:12, 84:15,
127:14, 229:8
**ordering** [1] - 208:15
**original** [4] - 50:3,
204:1, 218:9, 238:11
**originally** [1] - 109:1
**OUI** [4] - 22:21, 22:22,
23:14, 23:15
**outcome** [4] - 25:18,
132:14, 180:5,
242:12
**outlets** [1] - 62:3
**outlined** [1] - 185:14
**outside** [9] - 76:8,
149:5, 177:16,
177:19, 178:12,
189:11, 189:12
**outstanding** [1] -
129:16
**oversight** [1] - 90:9
**own** [5] - 85:17,
140:18, 160:4,
186:22, 201:5
**owned** [1] - 68:1
**owner** [2] - 101:24,
125:17
**owns** [1] - 77:6

## P

**P.C** [2] - 2:3, 2:14
**p.m** [1] - 239:22
**Page** [66] - 31:24,
32:20, 33:13, 35:13,
35:24, 37:13, 38:9,
38:14, 47:9, 47:16,
86:20, 87:15, 87:16,
90:22, 92:13, 93:3,
111:8, 112:14,
113:4, 119:19,
120:12, 124:12,
127:20, 128:3,
130:3, 157:14,
157:22, 157:23,

164:16, 164:24, 166:2, 171:6, 171:10, 172:6, 172:18, 183:19, 186:16, 201:20, 209:1, 210:15, 210:22, 211:5, 215:13, 216:19, 223:15, 225:23, 226:5, 226:19, 227:1, 227:3, 228:3, 228:17, 228:20, 229:8, 229:10, 229:23, 231:4, 231:17, 232:4, 232:13, 233:13, 233:16

**PAGE** [4] - 3:3, 4:2, 4:22, 241:9

**page** [38] - 27:10, 27:18, 27:22, 27:24, 28:1, 28:7, 28:10, 28:17, 31:21, 31:22, 33:3, 33:11, 35:4, 44:24, 47:7, 88:16, 92:8, 127:24, 157:21, 168:24, 169:12, 171:9, 172:22, 173:9, 173:10, 173:12, 173:18, 174:12, 192:1, 212:24, 222:15, 227:10, 229:12, 230:12, 231:10, 232:11, 236:7

**Pageau** [5] - 13:3, 36:11, 36:12, 157:17, 164:20

**Pages** [1] - 35:16

**pages** [3] - 28:12, 83:9, 158:3

**paid** [2] - 154:6, 220:19

**pain** [6] - 169:7, 169:13, 170:19, 172:2, 180:24, 184:8

**painful** [1] - 153:4

**palm** [2] - 36:7, 79:19

**paper** [4] - 42:19, 42:20, 140:18, 205:15

**paperwork** [5] - 159:16, 159:18, 159:19, 192:24, 209:23

**paragraph** [12] - 33:13, 36:10, 37:18, 45:10, 47:16, 158:19, 173:5,

174:9, 227:17, 236:7, 236:8, 236:18

**Paragraph** [7] - 27:15, 28:19, 29:11, 32:20, 83:18, 190:19, 190:22

**paramedic** [1] - 167:21

**paramedics** [9] - 159:13, 159:15, 167:13, 167:14, 185:13, 206:24, 237:3, 237:10

**paraphrasing** [3] - 130:14, 155:6, 235:24

**parenthesis** [2] - 183:21, 184:10

**parking** [1] - 221:20

**part** [26] - 17:2, 18:22, 25:20, 26:9, 29:13, 35:24, 39:9, 39:10, 41:24, 50:14, 55:4, 73:12, 78:18, 95:15, 107:14, 120:2, 121:14, 143:13, 163:16, 167:17, 189:23, 193:1, 195:10, 212:17, 231:11, 233:20

**partial** [1] - 99:8

**partially** [1] - 227:24

**participate** [1] - 18:1

**participated** [1] - 120:4

**particular** [10] - 44:9, 44:22, 65:14, 95:5, 106:9, 107:14, 110:10, 140:12, 177:8

**parties** [3] - 5:3, 240:5, 242:10

**partner** [1] - 34:10

**partners** [1] - 210:14

**parts** [3] - 86:8, 161:4, 217:16

**party** [1] - 174:20

**passed** [1] - 221:17

**passerby** [1] - 209:7

**past** [4] - 47:19, 47:21, 142:22, 158:12

**path** [1] - 85:23

**patient** [6] - 184:5, 184:7, 184:8, 184:12, 184:13, 184:17

**patrol** [2] - 39:14, 142:10

**Patrol** [1] - 74:5

**patrolling** [1] - 75:13

**patrolman** [2] - 60:20, 193:6

**patrons** [1] - 48:3

**PAUL** [1] - 1:10

**Paul** [12] - 67:21, 111:1, 145:22, 149:23, 151:9, 151:13, 151:18, 152:8, 163:1, 163:3, 163:4, 236:9

**pay** [2] - 27:16, 154:12

**pedestrian** [1] - 212:2

**penalty** [1] - 45:23

**pending** [1] - 42:2

**Pennellatore** [14] - 55:23, 57:6, 57:20, 58:4, 58:24, 64:6, 64:11, 66:12, 66:19, 81:24, 83:13, 90:20, 92:4, 108:21

**Pennellatore's** [1] - 92:8

**people** [45] - 12:22, 26:13, 54:12, 68:10, 79:9, 83:20, 88:23, 89:2, 96:15, 96:19, 96:20, 99:20, 99:21, 100:2, 100:10, 100:11, 105:9, 105:12, 105:23, 106:19, 107:2, 116:15, 119:11, 126:17, 127:15, 140:24, 141:21, 150:3, 150:4, 150:8, 150:15, 154:10, 161:16, 177:6, 198:1, 198:11, 198:22, 198:23, 199:8, 199:11, 201:6, 204:10, 208:3, 213:20, 216:4

**people's** [1] - 141:7

**perceived** [1] - 49:16

**percent** [7] - 16:12, 148:2, 222:5, 232:6, 232:7, 232:8, 233:8

**percentage** [1] - 232:6

**perfectly** [1] - 56:9

**perimeter** [8] - 48:4, 71:3, 75:8, 75:10, 106:7, 107:15, 107:16, 107:17

**period** [6] - 13:17, 40:24, 45:15, 89:17, 140:22, 145:12

**perjury** [2] - 200:23, 200:24

**permission** [1] - 133:15

**person** [51] - 10:21, 22:10, 22:16, 25:2, 39:5, 71:7, 71:14, 72:2, 72:16, 72:21, 73:2, 73:11, 87:5, 89:8, 89:15, 89:17, 90:7, 90:18, 91:17, 95:10, 95:11, 95:23, 101:7, 101:20, 109:2, 110:22, 121:6, 131:7, 136:6, 136:19, 137:13, 138:1, 138:6, 138:7, 142:5, 142:20, 161:13, 163:2, 163:3, 178:12, 180:4, 203:1, 203:3, 203:6, 206:2, 209:15, 210:11, 210:20, 212:23, 237:2

**person's** [1] - 202:11

**personable** [1] - 150:6

**personal** [2] - 201:10

**personally** [1] - 54:20

**personnel** [1] - 11:7

**pervasive** [1] - 224:7

**pet** [1] - 67:14

**pets** [2] - 98:16, 100:6

**phone** [2] - 151:10, 209:6

**phonetic** [1] - 197:21

**Photograph** [1] - 88:17

**photograph** [3] - 72:12, 73:22, 237:17

**photographs** [4] - 71:20, 72:4, 73:12, 97:3

**Photographs** [2] - 4:7, 82:19

**photos** [1] - 94:12

**physical** [9] - 35:1, 132:19, 158:15, 169:1, 169:17, 172:7, 189:24, 223:22, 238:10

**physically** [3] - 84:23, 96:13, 151:9

**pick** [1] - 66:8

**picking** [1] - 152:16

**picks** [1] - 66:9

**Picture** [1] - 86:23

**picture** [1] - 71:16

**pictures** [15] - 71:9, 81:9, 81:14, 81:15, 81:19, 81:21, 81:24, 86:12, 86:17, 93:7, 93:8, 94:15, 94:16, 94:19

**piece** [3] - 132:5, 132:6, 140:17

**Pietri** [2] - 236:10, 237:11

**Pineiro** [4] - 1:19, 56:20, 237:16, 237:20

**PINEIRO** [57] - 2:3, 2:5, 3:4, 4:18, 5:16, 12:7, 17:18, 20:14, 21:7, 27:24, 29:24, 31:13, 31:17, 31:20, 41:5, 41:16, 41:19, 42:5, 44:5, 56:9, 56:21, 57:2, 58:15, 82:9, 82:12, 82:16, 82:18, 85:10, 91:23, 92:12, 97:9, 103:15, 110:1, 110:4, 111:18, 129:7, 134:24, 135:7, 143:24, 146:10, 148:17, 148:22, 149:12, 149:16, 156:22, 157:2, 158:6, 165:18, 171:10, 183:2, 188:10, 190:6, 196:7, 219:11, 224:23, 225:2, 239:19

**pink** [1] - 113:21

**place** [7] - 20:18, 160:3, 166:24, 184:6, 185:2, 212:1, 230:11

**placed** [10] - 89:15, 91:3, 91:11, 128:10, 129:4, 159:4, 159:13, 166:13, 204:20, 206:14

**places** [1] - 113:8

**placing** [2] - 114:11, 114:22

**PLAINTIFF** [1] - 2:2

**Plaintiff** [3] - 1:4, 1:9, 1:13

**planned** [1] - 196:1

**play** [2] - 112:13

**played** [1] - 146:11

**PLEASE** [1] - 241:6

**plenty** [1] - 106:4

**PO** [7] - 47:24, 48:8, 113:5, 113:15, 114:3, 114:6, 114:8

**pocket** [3] - 47:24, 48:13, 114:8

**point** [13] - 10:21, 39:12, 64:8, 93:11, 124:17, 145:23,

145:24, 150:3,
228:9, 236:13,
236:21, 237:7,
238:23
**pointing** [2] - 48:9,
114:4
**police** [93] - 5:20,
5:23, 6:7, 6:16, 11:8,
14:13, 16:3, 16:15,
18:24, 20:6, 20:17,
25:12, 26:17, 27:8,
30:10, 30:19, 31:11,
34:10, 36:14, 53:1,
53:19, 60:10, 61:10,
62:16, 66:5, 68:4,
68:11, 71:17, 73:8,
73:24, 77:5, 80:23,
81:6, 81:10, 81:12,
87:6, 88:22, 89:16,
92:16, 93:2, 93:14,
96:12, 98:15, 98:21,
99:4, 99:9, 99:10,
99:16, 99:20, 101:8,
108:15, 117:24,
118:10, 118:18,
126:4, 130:4, 130:5,
132:21, 137:6,
146:19, 147:17,
148:3, 150:4, 151:7,
151:17, 152:2,
152:8, 155:4,
155:10, 157:14,
160:12, 167:19,
170:6, 175:9,
175:23, 181:13,
182:15, 182:16,
186:7, 193:23,
195:5, 199:20,
202:8, 202:19,
215:16, 216:2,
219:20, 220:10,
221:4, 223:23
**POLICE** [1] - 1:10
**Police** [14] - 5:22,
29:7, 32:18, 74:3,
77:1, 79:8, 93:11,
94:2, 99:18, 104:22,
105:7, 140:10,
224:8, 224:10
**polices** [1] - 140:19
**Policies** [2] - 74:4,
75:13
**policies** [17] - 7:6,
7:15, 11:19, 12:6,
56:16, 69:22, 74:11,
75:12, 75:14, 75:16,
117:18, 123:7,
130:15, 140:17,
162:15, 213:24
**policing** [1] - 6:24

**Policy** [6] - 29:7,
126:22, 137:17,
224:10, 225:9,
225:11
**policy** [48] - 9:11,
11:23, 38:12, 69:13,
69:15, 69:17, 70:4,
71:6, 71:12, 73:22,
74:18, 74:22, 75:3,
76:18, 78:15, 79:5,
87:6, 87:7, 88:22,
94:3, 94:21, 107:13,
117:4, 132:5, 132:6,
133:5, 133:6, 133:8,
133:13, 133:24,
134:1, 134:3,
136:14, 137:15,
140:7, 140:9,
140:21, 140:23,
141:3, 141:4, 141:5,
141:11, 141:20,
179:22, 209:24,
225:14
**poor** [4] - 54:22,
126:2, 126:11, 133:4
**portion** [1] - 111:10,
130:2, 140:14,
224:14
**Portland** [2] - 47:23,
113:19
**position** [7] - 5:20,
6:17, 45:14, 139:20,
149:7, 167:9, 184:13
**positive** [1] - 49:12
**positively** [2] - 222:5,
233:22
**possibility** [1] - 26:21
**possible** [6] - 21:1,
55:24, 206:9,
206:10, 206:12
**POST** [9] - 7:18, 7:21,
7:22, 8:3, 8:4, 8:5,
8:8, 8:13, 9:14
**posted** [1] - 209:7
**potential** [1] - 206:19
**potentially** [1] - 56:14
**pounds** [4] - 156:8,
156:21, 162:12,
171:24
**power** [1] - 126:23
**PPA** [1] - 1:8
**practice** [7] - 117:13,
117:14, 118:7,
118:11, 118:20,
119:14, 169:23
**Practices** [1] - 74:5
**practices** [2] - 109:15,
140:16
**predated** [1] - 150:24
**predecessor** [1] - 6:10

**predict** [1] - 115:19
**predictable** [1] -
115:11
**preparation** [6] -
77:11, 81:15, 81:17,
81:20, 110:8, 158:12
**prepare** [5] - 145:20,
163:10, 164:2,
164:8, 213:20
**prepared** [7] - 90:19,
92:4, 133:8, 163:4,
172:20, 219:23,
224:5
**preparing** [3] -
210:22, 211:6, 213:2
**preponderance** [4] -
138:11, 138:18,
139:2, 139:10
**present** [7] - 9:1, 9:2,
33:18, 75:14,
132:17, 209:5,
235:10
**presentation** [2] -
8:21, 8:23
**presents** [1] - 101:23
**president** [1] - 190:14
**pressing** [1] - 38:3
**pressure** [1] - 195:5
**presumably** [1] - 24:2
**pretty** [4] - 62:6,
155:12, 170:1, 233:7
**prevent** [3] - 36:6,
141:7, 213:8
**previous** [8] - 45:4,
144:22, 227:10,
234:20, 234:22,
235:1, 235:18, 236:7
**Price** [2] - 116:23,
128:14
**primarily** [1] - 12:19
**principle** [2] - 75:21,
76:5
**priors** [2] - 143:18,
143:20
**prisoner** [3] - 26:8,
73:8, 73:13
**prisoners** [1] - 73:23
**private** [2] - 22:23,
60:23
**privilege** [1] - 57:10
**privileged** [2] - 17:17,
146:24
**Prizio** [1] - 128:17
**probable** [2] - 121:23,
206:10
**Probation** [1] - 142:21
**problem** [6] - 135:7,
148:13, 189:2,
189:4, 226:5
**problems** [5] - 20:4,

29:6, 146:17,
149:18, 150:14
**Procedure** [2] - 1:15,
29:7
**procedure** [5] - 176:7,
176:9, 240:7, 241:3,
241:6
**procedures** [5] - 7:7,
12:6, 56:16, 123:8,
213:24
**process** [14] - 10:17,
69:20, 69:21,
126:20, 126:22,
134:18, 140:15,
153:22, 153:24,
155:14, 168:17,
181:2, 193:1, 218:17
**processing** [1] - 11:11
**professional** [2] -
74:15, 129:14
**Professional** [33] -
8:12, 8:17, 8:20, 9:5,
9:9, 9:20, 10:2, 11:5,
11:19, 11:24, 12:15,
13:2, 13:19, 13:23,
15:7, 18:3, 20:21,
33:5, 37:9, 46:22,
50:16, 109:20,
116:9, 120:18,
124:11, 129:15,
135:5, 165:4,
165:21, 167:18,
192:20, 237:22,
238:20
**professionally** [1] -
157:18
**proficient** [1] - 123:5,
123:7
**progress** [2] - 55:11,
78:19
**progressive** [1] -
19:13
**promises** [1] - 156:20
**prompted** [1] - 116:8
**promptly** [2] - 224:11,
225:19
**prone** [1] - 184:13
**proof** [5] - 130:17,
131:6, 131:13,
131:21, 135:4
**proper** [5] - 37:5,
132:21, 169:21,
215:16, 223:23
**properly** [3] - 96:24,
131:19, 215:22
**property** [4] - 22:23,
23:6, 23:9, 220:7
**prosecuted** [1] - 43:10
**prosecuting** [1] -
36:18

**prosecutor** [1] - 37:1
**protect** [7] - 162:8,
170:14, 170:15,
179:15, 180:3,
181:11, 214:24
**protected** [3] - 17:17,
41:14, 180:20
**protection** [2] - 98:23,
99:5
**protective** [4] -
125:17, 146:21,
149:3, 149:4
**protest** [5] - 108:7,
108:11, 197:3,
199:12, 199:20
**protesting** [1] -
201:15
**prove** [10] - 132:8,
175:3, 175:7,
175:20, 176:14,
177:10, 178:13,
199:16, 199:17,
199:23
**proved** [4] - 131:23,
132:1, 199:15,
201:18
**provide** [1] - 86:3
**provided** [2] - 50:1,
236:11
**provision** [1] - 107:11
**provisions** [2] - 1:14,
45:12
**proximal** [2] - 184:15,
185:22
**proximity** [3] - 106:11,
106:14, 227:23
**psychologist** [1] -
52:19
**psychosis** [1] - 149:1
**Public** [4] - 1:17, 5:14,
242:3, 242:17
**public** [2] - 5:8,
199:21
**publish** [1] - 79:16
**pull** [1] - 85:17
**pulled** [3] - 91:14,
114:21, 174:23
**pulling** [4] - 48:13,
49:5, 114:15, 125:24
**pulls** [1] - 114:10
**Punch** [1] - 230:23
**punch** [6] - 30:7, 35:8,
230:16, 231:22,
231:24, 239:7
**punched** [2] - 38:15,
39:1
**punches** [2] - 79:20,
84:24
**punching** [4] - 34:22,
36:2, 37:24, 238:8

**purchase** [1] - 64:18
**purchased** [1] - 66:19
**purchasing** [1] - 65:5
**purposes** [1] - 137:16
**pursuant** [1] - 1:14
**purview** [1] - 39:15
**push** [2] - 49:11,
  49:14
**pushback** [2] -
  194:24, 195:3
**pushed** [4] - 36:4,
  47:19, 49:21, 234:6
**pushing** [12] - 47:21,
  48:24, 49:6, 103:21,
  103:23, 104:4,
  104:11, 104:12,
  104:13, 123:4,
  125:21, 125:23
**put** [28] - 9:15, 34:19,
  79:4, 103:3, 107:12,
  112:6, 112:22,
  141:21, 142:4,
  155:9, 160:4, 162:4,
  162:8, 167:8, 168:7,
  168:10, 169:4,
  169:19, 170:5,
  172:10, 176:20,
  202:4, 203:24,
  212:9, 218:1,
  221:11, 234:24,
  238:14
**putting** [3] - 141:6,
  162:3, 168:17

## Q

**qualities** [5] - 22:11,
  25:7, 66:19, 68:4,
  68:7
**quality** [3] - 25:11,
  54:22, 100:6
**quarrel** [1] - 114:19
**quarter** [2] - 8:21, 8:24
**questionable** [2] -
  63:23, 63:24
**questioned** [5] -
  205:9, 210:14,
  212:6, 226:6, 233:12
**questionnaire** [1] -
  218:23
**questionnaires** [1] -
  119:6
**questions** [17] - 33:4,
  58:12, 60:11, 78:17,
  118:22, 120:15,
  120:20, 154:20,
  168:24, 178:20,
  226:21, 226:24,
  228:17, 228:18,
  237:12, 239:20,

242:7
**quick** [4] - 21:9, 173:9,
  225:23, 230:6
**QUINN** [291] - 2:11,
  7:8, 7:11, 7:23, 9:10,
  9:16, 12:4, 15:24,
  17:15, 21:23, 22:5,
  22:9, 24:6, 24:13,
  24:15, 24:24, 25:16,
  27:22, 28:1, 28:24,
  29:10, 29:15, 29:20,
  29:23, 31:16, 33:1,
  34:12, 39:8, 40:2,
  40:15, 41:2, 41:13,
  42:3, 43:15, 46:23,
  50:8, 50:17, 50:22,
  51:3, 51:9, 51:14,
  51:18, 53:7, 53:21,
  54:8, 54:14, 54:19,
  55:22, 56:3, 56:6,
  56:18, 56:23, 57:8,
  57:22, 57:24, 58:8,
  58:13, 59:3, 59:13,
  59:17, 60:7, 62:21,
  66:7, 66:21, 67:18,
  68:8, 69:5, 70:8,
  70:14, 71:18, 72:18,
  73:15, 74:1, 75:1,
  75:6, 75:22, 76:4,
  76:7, 77:2, 78:14,
  78:16, 79:10, 80:12,
  80:17, 80:24, 81:8,
  82:6, 82:10, 82:14,
  85:8, 86:5, 86:11,
  86:19, 87:4, 87:17,
  87:19, 87:22, 88:5,
  88:14, 88:19, 89:4,
  89:20, 90:2, 90:12,
  91:12, 91:20, 92:10,
  92:22, 94:17, 96:16,
  96:21, 97:4, 97:8,
  97:10, 97:15, 97:21,
  98:1, 98:7, 98:10,
  98:18, 99:1, 99:6,
  99:22, 100:7,
  100:13, 101:1,
  101:9, 101:16,
  102:1, 102:5,
  102:16, 102:22,
  102:24, 103:9,
  103:13, 104:5,
  104:9, 104:17,
  104:21, 104:24,
  105:18, 106:20,
  107:1, 107:8,
  107:23, 108:24,
  109:5, 110:2,
  110:18, 111:5,
  112:19, 114:24,
  115:13, 115:21,
  117:8, 117:20,

118:13, 118:19,
  119:9, 119:12,
  119:15, 120:9,
  120:24, 121:9,
  122:6, 122:9,
  122:13, 123:11,
  124:24, 125:5,
  125:19, 126:1,
  126:8, 126:10,
  127:8, 127:12,
  127:23, 128:1,
  129:1, 129:6,
  129:13, 129:19,
  129:24, 130:21,
  131:1, 131:11,
  131:15, 132:10,
  132:15, 133:16,
  134:13, 134:23,
  135:2, 135:9,
  137:18, 138:20,
  138:23, 139:6,
  140:2, 140:5,
  140:11, 141:2,
  141:9, 141:24,
  142:6, 143:2,
  143:12, 146:6,
  146:20, 147:2,
  148:19, 148:21,
  149:6, 149:15,
  151:14, 153:7,
  153:9, 154:14,
  154:23, 155:3,
  156:9, 157:9,
  157:13, 158:4,
  158:18, 161:7,
  161:10, 161:19,
  161:23, 162:7,
  162:17, 162:23,
  163:6, 163:13,
  164:5, 165:24,
  168:4, 168:14,
  168:21, 170:10,
  171:1, 171:9,
  176:19, 177:2,
  177:22, 178:1,
  179:20, 179:24,
  181:19, 182:2,
  182:8, 182:23,
  185:5, 186:4, 186:8,
  186:13, 187:9,
  187:12, 188:1,
  188:4, 188:8, 194:2,
  194:11, 196:24,
  197:15, 200:16,
  201:14, 201:17,
  203:15, 204:12,
  204:17, 205:16,
  206:3, 206:6,
  206:11, 207:8,
  209:18, 210:8,
  210:12, 213:15,

213:22, 214:10,
  214:19, 215:2,
  217:12, 223:2,
  227:6, 235:13,
  239:3, 239:14,
  239:20
**quinnwl@**
  **worcesterma.gov**
  [1] - 2:11
**Quitadamo** [1] -
  197:22
**quite** [4] - 9:7, 66:13,
  95:3, 137:11
**quote** [4] - 36:4,
  173:23, 174:3, 224:3
**quoting** [1] - 165:5

## R

**radio** [1] - 227:12
**railroad** [2] - 22:23,
  23:7
**raise** [2] - 91:18,
  181:15
**raised** [1] - 221:5
**raises** [1] - 114:3
**range** [1] - 79:15
**Rapid** [2] - 107:19,
  107:22
**rat** [1] - 212:15
**rate** [2] - 221:13,
  221:20
**rather** [1] - 208:8
**ratting** [2] - 214:17,
  214:21
**reached** [1] - 197:9
**react** [1] - 118:22
**reaction** [2] - 38:16,
  53:17, 206:20
**reactively** [1] - 36:4
**read** [48] - 5:4, 26:21,
  33:14, 36:1, 36:8,
  36:22, 38:5, 44:14,
  44:18, 44:20, 47:12,
  47:13, 47:15, 75:23,
  76:21, 83:4, 86:7,
  88:1, 90:19, 103:10,
  103:16, 113:14,
  113:24, 119:23,
  154:4, 165:17,
  166:3, 166:16,
  175:14, 183:15,
  184:18, 185:3,
  185:18, 185:20,
  190:2, 206:17,
  220:17, 221:22,
  228:3, 230:21,
  237:5, 240:3,
  240:11, 241:3,
  241:4, 241:22

**reading** [5] - 37:17,
  90:23, 91:1, 165:20,
  240:4
**real** [3] - 21:8, 173:8,
  176:17
**reality** [1] - 122:2
**realize** [1] - 98:21
**realized** [2] - 122:3,
  234:11
**really** [7] - 54:6, 54:23,
  80:7, 106:8, 149:6,
  195:23, 235:4
**rear** [1] - 84:1
**REARDON** [1] - 2:14
**rearview** [3] - 155:8,
  171:12, 171:19
**REASON** [12] -
  241:10, 241:11,
  241:12, 241:13,
  241:14, 241:15,
  241:16, 241:17,
  241:18, 241:19,
  241:20, 241:21
**reason** [7] - 24:11,
  71:23, 94:22,
  117:19, 121:21,
  168:2, 196:14
**reasonable** [7] -
  87:10, 139:21,
  140:1, 140:3,
  182:11, 215:15,
  239:16
**reasonably** [2] -
  132:20, 223:22
**reasoning** [2] - 14:8,
  174:16
**reasons** [4] - 62:11,
  73:21, 219:6, 240:6
**reassure** [1] - 184:17
**receipt** [2] - 5:5, 240:7
**receive** [2] - 8:3,
  135:22
**received** [5] - 13:11,
  42:8, 74:15, 128:14,
  209:4
**receiving** [1] - 44:21
**recent** [1] - 117:18
**recess** [7] - 20:15,
  82:17, 111:20,
  135:1, 147:6,
  148:20, 188:13
**recognize** [2] - 82:23,
  83:6
**recognized** [1] - 221:9
**recollection** [2] -
  174:24, 175:2
**recommend** [4] -
  14:18, 45:21, 118:4,
  118:6
**recommendation** [3] -

40:18, 46:4, 118:2
**recommendations** [4]
- 10:9, 40:5, 74:6,
75:15
**record** [15] - 103:13,
120:11, 142:15,
142:16, 142:20,
142:21, 142:24,
143:8, 156:24,
157:1, 176:8,
219:17, 224:22,
227:7, 242:7
**recorded** [2] - 151:11,
209:7
**Records** [3] - 4:12,
35:5, 183:3
**records** [9] - 154:8,
156:7, 165:22,
168:22, 182:17,
202:23, 219:10,
224:13, 225:21
**redeeming** [3] - 22:11,
25:6, 25:11
**redirect** [10] - 135:8,
202:13, 202:17,
203:21, 206:23,
207:12, 207:19,
213:8, 214:3
**redirected** [1] - 202:12
**redirection** [2] -
211:12, 211:15
**reduction** [2] - 165:9,
174:1
**refer** [1] - 68:10
**referred** [2] - 9:14,
113:20
**referring** [2] - 27:23,
103:14
**reflect** [1] - 11:20
**reform** [2] - 78:18,
78:21
**refuse** [1] - 24:23
**refused** [1] - 48:17
**regard** [3] - 47:3,
48:14, 219:9
**regarding** [5] - 18:24,
63:19, 129:2, 135:4,
202:8
**regardless** [2] -
125:17, 162:11
**registered** [1] - 222:9
**registration** [1] -
222:8
**regular** [5] - 13:13,
98:16, 100:6,
109:15, 140:20
**regulation** [2] - 37:20,
37:22
**regulations** [7] - 12:2,
12:5, 21:21, 28:23,

29:3, 136:9, 225:6
**related** [3] - 146:5,
149:19, 242:9
**relates** [4] - 10:11,
17:9, 18:12, 224:9
**relative** [3] - 32:22,
106:14, 242:11
**relatively** [2] - 87:2,
106:10
**Release** [1] - 28:12
**released** [2] - 91:2,
93:19
**relevant** [3] - 87:23,
146:12, 146:14
**relied** [1] - 216:4
**rely** [1] - 62:12
**remained** [1] - 165:14
**remember** [17] - 21:4,
32:11, 36:24, 37:7,
44:21, 46:4, 62:7,
69:4, 69:6, 141:18,
151:12, 152:9,
155:5, 185:3,
197:22, 209:10,
209:15
**remove** [5] - 85:23,
151:9, 167:6, 169:8
**removed** [9] - 86:1,
90:22, 96:13, 159:7,
165:7, 167:7, 172:3,
172:14, 173:21
**repeatedly** [2] - 84:7,
85:4
**rephrase** [2] - 26:5,
58:1
**Report** [4] - 4:8, 4:16,
82:21, 219:12
**report** [146] - 32:16,
32:21, 34:9, 34:13,
47:17, 50:2, 50:13,
50:15, 51:13, 52:7,
52:9, 52:13, 52:14,
53:1, 53:10, 53:11,
79:17, 79:20, 80:2,
83:1, 83:2, 83:11,
83:12, 88:1, 90:19,
90:20, 91:1, 91:10,
91:13, 92:4, 92:8,
92:9, 92:11, 93:2,
95:12, 95:14, 95:15,
102:14, 108:20,
109:20, 110:5,
111:10, 111:17,
112:21, 115:5,
115:6, 119:20,
120:8, 120:14,
121:1, 121:4, 121:5,
158:7, 158:8,
158:11, 158:14,
159:20, 160:2,

160:7, 160:20,
161:14, 161:22,
162:10, 162:20,
163:4, 163:7,
163:10, 163:20,
163:21, 164:6,
164:8, 165:4,
165:23, 167:19,
168:1, 168:3,
169:20, 170:11,
170:21, 170:22,
171:5, 183:7, 186:7,
187:23, 194:3,
194:5, 201:20,
202:2, 202:6,
203:22, 204:1,
204:2, 204:7, 205:2,
205:3, 205:5,
205:11, 205:14,
205:17, 205:18,
205:19, 206:14,
208:19, 213:20,
214:4, 214:6,
214:11, 215:13,
216:9, 216:13,
216:16, 216:18,
216:24, 217:1,
217:2, 217:3, 217:5,
218:1, 218:5, 218:7,
218:9, 219:23,
219:24, 220:14,
220:15, 220:17,
221:1, 222:24,
223:7, 223:8,
223:10, 224:5,
232:12, 236:8,
236:19, 237:20,
238:3, 238:4, 238:5,
238:11, 238:15,
238:19, 239:1
**reported** [20] - 34:15,
34:17, 35:21, 47:4,
48:15, 49:8, 163:24,
184:3, 184:9, 202:3,
204:13, 204:14,
207:18, 207:20,
207:21, 207:22,
216:22, 216:23,
217:9, 242:6
**Reporter** [2] - 1:16,
4:23
**REPORTING** [1] - 1:22
**reporting** [4] - 49:19,
204:4, 214:15,
239:17
**reports** [23] - 31:2,
35:8, 83:8, 94:8,
95:22, 117:11,
143:19, 145:21,
153:2, 183:8,

183:16, 212:21,
216:8, 216:18,
217:20, 224:2,
224:10, 224:12,
225:18, 225:20,
238:22, 239:4,
239:18
**representation** [2] -
56:19, 126:21
**representative** [1] -
228:23
**request** [3] - 121:11,
134:4, 191:15
**requested** [5] - 36:12,
86:2, 218:19,
224:13, 225:21
**requesting** [2] - 16:2,
146:21
**required** [8] - 26:13,
35:8, 76:23, 90:14,
161:13, 175:17,
210:1, 238:14
**requires** [3] - 71:7,
72:17, 76:19
**Research** [2] - 74:4,
75:13
**reservation** [1] - 43:19
**reservations** [2] -
43:23, 43:24
**reserve** [5] - 17:18,
41:5, 41:16, 146:10,
149:17
**reserved** [1] - 5:11
**resist** [1] - 85:6
**resistance** [1] - 162:3
**resisted** [1] - 49:10
**resisting** [8] - 84:23,
85:4, 92:6, 92:16,
141:22, 162:20,
162:21, 162:24
**resistor** [1] - 162:14
**resource** [2] - 10:13,
11:7
**resources** [20] -
10:18, 10:21, 10:24,
11:2, 11:11, 11:21,
12:3, 14:13, 14:23,
15:10, 15:13, 18:6,
40:22, 42:21, 55:12,
196:19, 196:21,
197:11, 197:16,
198:18
**respective** [1] - 5:3
**respond** [10] - 33:4,
86:3, 93:7, 147:18,
154:3, 226:21,
226:24, 227:8,
232:13, 232:14
**responded** [6] - 93:8,
169:1, 172:11,

222:18, 233:6,
237:21
**responding** [1] -
123:13
**Response** [6] -
107:19, 107:22,
158:1, 158:2,
172:19, 172:23
**response** [8] - 33:3,
34:2, 49:17, 50:15,
120:13, 211:19,
212:13, 212:23
**responses** [1] -
212:10
**responsibility** [2] -
204:5, 204:7
**responsible** [16] -
29:4, 66:23, 75:17,
76:1, 76:10, 76:13,
77:16, 137:13,
138:2, 138:6, 138:8,
213:13, 213:17,
214:4, 216:16, 217:4
**restate** [1] - 181:20
**restitution** [2] - 154:6,
154:13
**restore** [1] - 48:20
**restrain** [3] - 90:18,
170:13, 175:16
**restrained** [5] - 30:6,
89:8, 89:10, 89:22,
172:1
**restraining** [5] -
141:6, 155:15,
155:20, 159:3,
164:11
**restraint** [1] - 181:10
**restricted** [2] - 16:5,
16:7
**result** [8] - 104:15,
104:16, 116:15,
124:13, 128:16,
130:6, 148:6, 193:24
**resulted** [2] - 39:24,
121:6
**results** [3] - 75:18,
76:3, 76:14
**resume** [1] - 60:21
**RETAINED** [1] - 4:18
**retire** [1] - 66:16
**retired** [2] - 66:14,
116:6
**retrained** [2] - 225:9,
225:11
**retrieved** [1] - 83:24
**return** [1] - 241:7
**returned** [1] - 165:15
**reuse** [1] - 214:20
**rev** [1] - 221:10
**reveal** [2] - 41:3, 41:14

**reveals** [1] - 17:16
**review** [19] - 18:9,
18:23, 75:14, 77:11,
77:14, 117:21,
137:23, 144:13,
145:19, 153:1,
158:11, 193:1,
225:13, 226:2,
238:4, 238:22,
239:4, 239:18
**reviewed** [12] - 37:12,
37:14, 39:10, 54:9,
54:10, 74:13, 92:20,
110:7, 112:21,
145:21, 201:23,
238:5
**reviewing** [5] - 31:2,
49:18, 74:12, 77:16,
209:8
**Richard** [9] - 220:2,
222:7, 222:9,
233:23, 236:13,
236:22, 237:4,
237:15, 237:21
**ride** [1] - 233:21
**rights** [2] - 56:1, 131:7
**riotous** [3] - 124:14,
124:19, 125:3
**ripping** [1] - 81:12
**rises** [1] - 26:2
**risk** [1] - 140:20
**Riviera** [1] - 220:20
**RN** [1] - 174:6
**Robert** [1] - 117:2
**Roberto** [1] - 42:1
**Robin** [1] - 149:12
**Rodrigo** [2] - 18:14,
18:15
**Rodriguez** [1] - 15:16
**Rojas** [7] - 86:12,
90:21, 91:3, 92:14,
93:10, 97:3, 108:22
**role** [2] - 12:2, 146:11
**rolled** [1] - 184:13
**Room** [1] - 2:9
**room** [8] - 15:18,
15:19, 15:23, 16:13,
73:12, 94:11, 94:15,
152:22
**rose** [1] - 196:22
**Rule** [2] - 137:16,
240:1
**rule** [2] - 12:1, 225:18
**Rules** [1] - 1:15
**rules** [9] - 12:5, 21:21,
28:23, 29:2, 69:22,
123:17, 136:9,
225:5, 241:2
**run** [6] - 14:22, 21:9,
21:10, 180:5,

186:24, 233:19
**running** [8] - 84:1,
84:7, 84:14, 84:15,
155:13, 155:16,
174:24, 180:7
**runs** [1] - 98:19
**Ryan** [1] - 196:3

# S

**safe** [2] - 233:21,
234:8
**safety** [5] - 64:24,
159:4, 160:4,
199:21, 203:11
**sanction** [4] - 197:2,
199:12, 200:4,
201:15
**Sargent** [2] - 5:21,
135:3
**SARGENT** [6] - 1:12,
3:3, 5:12, 240:16,
241:24, 242:4
**sat** [3] - 124:1, 183:15,
195:10
**satisfactorily** [2] -
5:13, 242:5
**Saucier** [4] - 67:3,
67:21, 111:1, 174:14
**save** [1] - 21:17
**saw** [24] - 53:6, 65:18,
78:9, 84:12, 103:22,
106:22, 114:14,
122:3, 123:4,
150:23, 186:1,
205:20, 207:22,
214:14, 223:9,
230:1, 233:4, 233:8,
235:11, 235:14,
235:15, 236:2,
236:21, 237:3
**scene** [27] - 13:16,
71:8, 71:15, 80:8,
86:3, 90:8, 90:13,
90:15, 93:4, 94:15,
103:24, 108:13,
113:5, 124:14,
159:13, 178:6,
184:2, 205:2, 205:7,
207:1, 213:6, 220:6,
222:18, 227:19,
236:19, 237:2,
237:10
**scheduled** [1] - 198:5
**scratched** [1] - 71:8
**screaming** [1] -
184:12
**scuffle** [1] - 184:8
**seal** [3] - 148:12,
148:16, 242:14

**sealed** [1] - 149:4
**Sean** [1] - 209:4
**search** [1] - 95:5
**searches** [1] - 95:11
**seat** [2] - 157:7,
157:10
**seated** [1] - 184:14
**second** [13] - 27:10,
27:18, 28:17, 33:13,
37:18, 44:16, 92:8,
111:13, 114:2,
169:12, 191:24,
227:4
**seconds** [1] - 85:19
**Section** [18] - 20:1,
155:14, 155:15,
159:15, 159:18,
160:9, 163:8,
163:18, 163:19,
163:20, 170:18,
172:4, 186:14,
187:1, 192:7,
192:11, 202:12,
203:4
**section** [3] - 37:13,
128:3, 174:15
**see** [148] - 14:10, 24:3,
26:7, 28:9, 31:24,
32:14, 32:20, 33:14,
34:4, 35:5, 35:6,
35:10, 35:11, 35:24,
42:10, 44:11, 44:12,
45:17, 47:1, 47:2,
47:10, 50:7, 53:12,
65:15, 65:21, 70:11,
71:21, 71:24, 72:3,
72:12, 80:4, 80:5,
80:10, 83:9, 83:10,
83:11, 83:12, 83:15,
83:23, 84:5, 84:17,
84:22, 85:2, 86:20,
86:21, 87:16, 91:21,
92:2, 92:13, 93:3,
93:22, 102:23,
103:2, 103:7,
103:11, 104:6,
104:7, 104:8, 106:8,
107:2, 107:6, 107:7,
113:4, 113:5,
118:17, 118:21,
119:6, 119:10,
119:11, 120:8,
125:2, 126:17,
132:6, 135:20,
137:23, 137:24,
139:17, 150:20,
150:21, 151:2,
152:13, 152:16,
152:19, 153:4,
153:8, 154:8,

157:15, 157:20,
158:19, 158:22,
160:20, 164:9,
165:1, 165:12,
165:13, 166:2,
171:14, 172:15,
172:16, 173:2,
173:4, 173:12,
173:16, 183:20,
183:24, 191:2,
191:19, 193:4,
193:13, 204:19,
207:10, 211:3,
211:6, 211:11,
211:14, 211:17,
212:4, 213:10,
220:4, 221:8,
222:10, 222:13,
222:14, 223:3,
223:14, 223:16,
227:10, 227:15,
227:16, 228:15,
228:16, 228:18,
229:17, 230:8,
231:5, 231:14,
232:9, 233:2,
233:10, 233:11,
233:15, 234:14,
236:1, 236:15,
237:13
**seeing** [1] - 227:11
**sees** [1] - 97:2
**seizure** [1] - 100:12
**seminars** [1] - 13:9
**Senator** [1] - 64:21
**send** [5] - 94:13,
94:19, 119:5,
136:10, 225:13
**sending** [2] - 119:10,
127:10
**sense** [8] - 70:13,
70:23, 70:24, 91:2,
91:6, 91:9, 95:16,
234:5
**sent** [9] - 8:3, 8:4, 8:5,
8:12, 41:6, 42:14,
119:22, 120:15,
160:7
**sentence** [7] - 114:2,
116:11, 158:20,
167:13, 169:12,
173:4, 227:17
**sentences** [3] -
113:14, 176:11,
233:18
**sentencing** [1] -
143:21
**separate** [2] - 94:16,
164:2
**September** [4] - 162:4,

200:4, 200:7, 215:14
**sergeant** [10] - 13:3,
14:1, 63:8, 64:17,
66:11, 95:18,
133:21, 133:22,
213:18
**Sergeant** [33] - 13:3,
13:4, 32:16, 32:22,
36:11, 55:24, 57:5,
57:19, 58:4, 58:23,
64:5, 66:20, 66:23,
70:1, 77:18, 77:20,
89:24, 93:4, 93:6,
110:24, 111:7,
134:17, 157:16,
157:17, 159:23,
174:9, 205:4,
209:21, 226:6,
228:21, 236:10
**sergeants** [8] - 12:19,
12:20, 13:1, 13:22,
14:2, 14:3, 112:1,
226:5
**series** [1] - 33:4
**serious** [9] - 80:22,
82:4, 82:7, 82:8,
87:2, 87:21, 87:24,
88:4, 88:10
**seriously** [1] - 234:3
**seriousness** [1] -
88:17
**served** [1] - 6:12
**serves** [1] - 62:10
**service** [1] - 116:18
**services** [2] - 71:9,
71:16
**Services** [1] - 159:11
**set** [2] - 45:16, 242:14
**settle** [1] - 155:11
**Settlement** [4] - 4:3,
21:13, 28:6, 28:11
**settlement** [1] - 27:18
**seven** [1] - 158:3
**several** [1] - 84:10
**severity** [1] - 234:12
**shakes** [1] - 220:22
**shall** [4] - 5:4, 240:3,
240:3, 240:5
**shape** [2] - 14:20,
181:4
**share** [2] - 8:18, 42:19
**SHAWN** [1] - 1:5
**Shawn** [2] - 43:6,
53:18
**SHEET** [1] - 241:1
**sheet** [1] - 241:4
**Shepherd** [1] - 66:4
**Shepherds** [2] - 67:9,
98:22
**shift** [6] - 23:22,

41:17, 198:23,
199:1, 199:4, 217:23
**shocking** [1] - 152:19
**shoes** [1] - 189:10
**short** [9] - 13:17,
20:15, 82:17, 84:2,
111:20, 135:1,
147:6, 148:20,
188:13
**Shorthand** [1] - 1:16
**shortly** [4] - 36:10,
63:19, 74:14, 208:12
**shoulder** [3] - 49:1,
168:18, 180:24
**show** [12] - 41:23,
42:6, 44:4, 46:17,
109:18, 120:4,
137:4, 154:8, 178:7,
204:9, 230:3, 230:15
**showed** [3] - 91:16,
173:20, 237:18
**showing** [1] - 205:24
**shown** [2] - 48:11,
111:13
**shows** [2] - 158:14,
176:23
**Shrewsbury** [1] -
62:19
**shut** [1] - 214:9
**sick** [11] - 197:3,
197:6, 198:1, 198:3,
198:7, 198:11,
198:13, 199:7,
199:9, 199:11,
200:19
**sicknesses** [1] -
206:19
**side** [10] - 38:16,
58:22, 70:12, 98:20,
163:12, 196:20,
211:23, 221:18
**sides** [1] - 178:3
**sign** [11] - 5:4, 14:6,
14:7, 26:17, 26:20,
26:21, 43:17, 183:7,
219:2, 235:1, 241:6
**signature** [10] - 31:22,
31:24, 32:3, 32:4,
42:8, 43:11, 45:5,
45:8, 112:6, 186:16
**Signature** [1] - 5:7
**signatures** [1] -
112:22
**signed** [16] - 5:7, 27:9,
28:7, 28:12, 43:22,
44:2, 45:2, 128:2,
133:9, 159:22,
190:11, 218:13,
219:1, 219:9,
223:12, 226:13

**significant** [6] -
147:24, 150:22,
170:2, 189:21,
192:15, 236:11
**Signing** [1] - 240:1
**signs** [1] - 26:19
**silence** [3] - 204:4,
214:16, 224:8
**similar** [10] - 40:11,
44:18, 46:10, 80:15,
138:15, 143:15,
143:16, 225:17
**simple** [1] - 58:3
**simply** [5] - 54:6,
132:12, 144:20,
177:8, 235:1
**single** [1] - 237:2
**sit** [6] - 43:3, 52:12,
139:8, 183:9, 216:1,
225:13
**sits** [1] - 10:18
**situation** [16] - 22:1,
80:6, 80:7, 80:18,
81:1, 81:2, 84:4,
109:3, 133:3,
134:12, 134:16,
147:24, 159:19,
180:19, 207:16,
234:12
**situations** [3] - 105:7,
105:8, 204:18
**six** [6] - 6:8, 6:9, 8:22,
16:11, 120:20, 158:2
**sixth** [1] - 6:8
**sized** [1] - 156:10
**skeletal** [1] - 161:4
**skills** [1] - 12:23
**slap** [6] - 30:7, 207:10,
208:8, 230:23,
231:24, 239:7
**slapping** [2] - 34:22,
238:9
**slash** [2] - 184:15,
185:21
**slight** [3] - 184:15,
185:21
**smack** [1] - 140:24
**smacked** [1] - 207:6
**smacking** [1] - 203:23
**smaller** [1] - 67:20
**snap** [1] - 236:2
**snapped** [1] - 100:22
**snitching** [1] - 214:17
**so..** [3] - 168:6,
178:10, 200:23
**sober** [1] - 24:4
**sobriety** [4] - 24:8,
24:11, 24:19, 24:21
**someone** [2] - 33:21,
101:23

**Someone** [1] - 111:18
**sometime** [1] - 151:1
**sometimes** [8] - 25:6,
62:15, 62:18, 96:13,
154:10, 157:5,
179:22
**somewhere** [1] -
231:19
**son** [1] - 175:18
**soon** [2] - 116:3,
170:15
**sorry** [10] - 8:15, 14:1,
15:17, 15:22, 40:8,
105:2, 139:9,
149:10, 180:24,
199:19
**sort** [1] - 57:9
**sorts** [1] - 6:23
**sound** [2] - 20:24,
107:5
**sounds** [3] - 149:16,
152:7, 153:2
**South** [1] - 242:2
**Southbridge** [2] -
220:20, 221:21
**Spalatro** [25] - 219:14,
219:19, 219:23,
220:16, 222:24,
223:21, 224:18,
224:19, 225:7,
225:24, 227:12,
227:18, 227:20,
227:21, 228:5,
228:10, 233:12,
233:15, 234:18,
236:12, 236:20,
236:22, 237:4,
237:9, 238:2
**Spalatro's** [5] -
220:14, 220:15,
224:4, 226:7, 228:12
**Spanish** [1] - 151:4
**spat** [3] - 203:17,
208:22, 208:23
**speaking** [2] - 136:19,
227:22
**special** [1] - 65:2
**specialized** [1] - 64:24
**specific** [15] - 11:22,
33:7, 51:4, 70:9,
70:15, 71:4, 74:20,
80:20, 90:24, 102:8,
133:5, 154:20,
219:4, 219:5, 219:7
**specifically** [4] - 69:6,
76:21, 96:3, 110:12
**specifics** [1] - 189:19
**specify** [1] - 89:1
**speculation** [1] -
59:18

**speed** [3] - 100:8,
221:13, 221:20
**spend** [1] - 64:19
**spent** [4] - 53:23,
64:20, 65:4, 233:20
**spirit** [1] - 112:17
**spit** [5] - 202:9,
204:21, 206:15,
206:16, 213:9
**spitting** [4] - 38:16,
202:18, 206:23,
208:9
**spoken** [4] - 54:1,
54:3, 54:4, 54:18
**sporting** [3] - 67:8,
67:11
**sprays** [1] - 98:9
**squad** [1] - 60:16
**ss** [1] - 242:2
**St** [3] - 150:10,
151:18, 204:23
**staff** [10] - 9:2, 9:24,
10:4, 12:14, 12:19,
33:18, 33:19, 33:21,
159:19
**stamp** [1] - 157:22
**standard** [3] - 131:6,
131:12, 135:4
**Standards** [33] - 8:12,
8:17, 8:20, 9:5, 9:9,
9:20, 10:2, 11:6,
11:20, 11:24, 12:15,
13:2, 13:20, 13:23,
15:8, 18:3, 20:21,
33:5, 37:9, 46:22,
50:16, 109:20,
116:9, 120:18,
124:11, 129:15,
135:5, 165:4,
165:22, 167:18,
192:20, 237:22,
238:21
**standards** [3] - 74:16,
130:19, 132:12
**standing** [4] - 166:18,
211:23, 221:3,
227:11
**start** [2] - 17:8, 136:16
**started** [4] - 189:7,
208:12, 208:14,
229:15
**startled** [1] - 101:6
**state** [7] - 7:16, 62:16,
64:22, 75:16, 116:9,
208:17, 222:17
**STATE** [1] - 1:22
**statement** [12] - 35:17,
52:6, 126:23, 171:7,
172:20, 179:7,
184:23, 185:4,

**185**:18, 208:16,
209:12, 240:6
**statements** [6] -
58:14, 174:20,
176:15, 177:11,
226:20, 228:8
**states** [5] - 28:18,
75:24, 103:8,
174:22, 209:24
**STATES** [1] - 1:1
**station** [6] - 24:18,
33:22, 71:17, 93:21,
169:22, 209:23
**stationed** [1] - 193:4
**stats** [1] - 96:18
**status** [3] - 11:14,
16:5, 16:7
**statute** [6] - 72:21,
72:23, 73:3, 78:17,
79:3, 79:4
**stay** [1] - 93:24
**steadied** [1] - 234:11
**steal** [2] - 154:10,
178:11
**stems** [1] - 220:17
**stenographically** [1] -
242:6
**step** [1] - 148:18
**stepped** [1] - 234:10
**steps** [1] - 48:1
**Steve** [1] - 61:17
**Steven** [2] - 5:21
**STEVEN** [6] - 1:12,
3:3, 5:12, 240:16,
241:24, 242:4
**stick** [1] - 81:4
**still** [24] - 7:10, 14:22,
14:23, 17:6, 40:21,
48:13, 66:3, 78:17,
78:19, 88:2, 113:14,
114:17, 123:18,
136:7, 136:17,
136:20, 189:22,
197:11, 197:16,
218:17, 226:17
**stock** [1] - 212:9
**stood** [1] - 50:3
**stop** [7] - 48:19,
84:15, 85:4, 85:6,
187:7, 220:9, 221:6
**stopped** [4] - 170:12,
221:7, 221:8, 222:2
**stops** [1] - 114:2
**stories** [1] - 178:3
**story** [2] - 163:12,
178:4
**Stout** [4] - 188:14,
188:23, 190:17,
191:6
**straight** [4] - 93:16,

93:18, 221:12, 221:16
**straighten** [2] - 167:6, 169:9
**strapped** [2] - 202:11, 203:6
**street** [7] - 25:13, 84:16, 155:16, 155:18, 175:1, 180:6, 180:8
**Street** [21] - 1:19, 2:3, 2:9, 19:18, 19:19, 47:23, 48:1, 49:7, 49:22, 83:20, 113:10, 113:20, 135:23, 202:21, 202:22, 220:20, 221:21, 222:2, 222:3, 222:4
**stress** [1] - 207:16
**stretcher** [3] - 159:14, 204:21, 206:15
**strike** [5] - 5:11, 123:9, 168:8, 214:3, 221:16, 233:5
**strikes** [2] - 123:9, 123:14
**striking** [2] - 35:22, 202:9
**struck** [5] - 203:20, 221:18, 232:21, 232:23, 237:9
**struggle** [4] - 159:1, 166:8, 166:10, 171:24
**struggling** [2] - 73:10, 85:20
**sub** [2] - 113:21, 113:22
**subject** [2] - 147:8, 240:12
**subjected** [1] - 116:17
**subjective** [1] - 184:2
**Submission** [1] - 240:1
**submit** [7] - 126:23, 208:16, 216:9, 216:12, 217:3, 224:12, 225:20
**submitted** [5] - 32:21, 171:8, 236:8, 237:18, 240:3
**submitting** [5] - 216:8, 216:18, 224:2, 224:10, 225:18
**subordinate** [2] - 39:17, 112:8
**subordinates** [1] - 133:11
**subsequently** [1] -

222:12
**substance** [2] - 240:5, 241:5
**succeeded** [1] - 155:20
**suffered** [3] - 170:1, 176:6, 176:8
**suffers** [1] - 73:14
**sufficiency** [5] - 37:10, 127:21, 174:14, 174:16, 223:16
**sufficient** [23] - 135:13, 135:14, 135:18, 135:19, 136:8, 136:21, 137:8, 137:10, 137:12, 137:15, 137:20, 137:21, 137:24, 138:3, 138:5, 138:11, 138:16, 138:18, 139:9, 139:14, 139:15, 193:19
**sugar** [2] - 222:17, 222:19
**suggest** [3] - 90:20, 115:10, 121:14
**suggested** [2] - 40:19, 125:2
**suggesting** [1] - 210:9
**Sullivan** [2] - 48:1, 61:13
**summarize** [1] - 154:18
**summarized** [1] - 112:12
**summary** [3] - 35:12, 35:15, 111:12
**summonsed** [1] - 154:2
**Super** [2] - 156:18, 156:19
**Supernor** [2] - 54:17, 55:7
**supervisor** [31] - 23:21, 24:12, 34:17, 55:7, 58:5, 60:1, 60:2, 63:6, 63:8, 94:9, 95:9, 133:17, 133:18, 142:13, 159:22, 201:23, 204:2, 204:8, 205:4, 209:2, 209:21, 210:1, 210:10, 216:17, 216:24, 217:6, 217:21, 217:22, 226:7, 226:8, 232:12
**supervisors** [5] -

54:16, 90:9, 164:3, 198:20, 213:14
**supplement** [2] - 112:24, 238:18
**supplemental** [1] - 236:19
**suppose** [2] - 138:17, 194:5
**supposedly** [1] - 151:10
**surgery** [8] - 72:17, 155:23, 168:11, 170:4, 173:13, 182:7, 187:11, 187:19
**surmise** [1] - 174:20
**surrenders** [1] - 95:11
**suspect** [2] - 14:17, 233:22
**suspend** [1] - 45:14
**suspended** [1] - 198:14
**suspension** [12] - 14:18, 21:6, 27:16, 40:6, 40:12, 45:23, 50:6, 195:19, 196:6, 198:5, 198:9, 198:10
**sustain** [15] - 18:11, 130:16, 130:24, 135:17, 136:7, 136:20, 137:12, 138:6, 138:9, 177:23, 186:16, 186:17, 186:20, 223:19, 239:15
**sustained** [22] - 38:7, 38:10, 38:18, 38:21, 39:2, 131:9, 135:6, 135:14, 136:4, 139:15, 145:8, 177:1, 186:15, 192:22, 192:23, 195:1, 216:13, 217:17, 217:21, 224:14, 224:18, 225:6
**sustaining** [3] - 165:8, 173:23, 196:1
**SUV** [1] - 64:23
**swallow** [1] - 141:1
**swallows** [1] - 141:13
**SWAT** [2] - 60:18, 219:21
**sweatshirt** [3] - 113:22, 113:23, 114:8
**switch** [1] - 157:24
**sworn** [2] - 5:13, 242:5
**synopsis** [1] - 123:20

**system** [2] - 122:22, 122:23

**T**

**tactically** [1] - 86:1
**takeaway** [1] - 176:22
**takedown** [9] - 79:23, 176:3, 176:7, 176:9, 176:12, 178:24, 179:6, 179:9, 181:1
**takedowns** [1] - 81:22
**TAKEN** [1] - 240:23
**talks** [3] - 12:2, 111:9, 222:20
**tape** [10] - 23:24, 24:3, 53:5, 54:10, 54:22, 74:12, 74:13, 114:15, 217:7, 217:8
**target** [1] - 100:12
**taught** [1] - 97:6
**teach** [1] - 208:8
**team** [5] - 60:18, 61:23, 62:8, 124:13, 219:21
**Team** [2] - 107:19, 107:22
**tear** [2] - 97:7, 97:8
**technique** [6] - 176:3, 206:21, 209:9, 211:12, 211:15, 213:6
**techniques** [1] - 210:3
**teeth** [1] - 68:14
**temperament** [3] - 104:18, 106:21, 106:22
**ten** [5] - 28:18, 28:19, 156:3, 165:6, 190:21
**ten-year** [4] - 28:18, 28:19, 165:6, 190:21
**ten-year-old** [1] - 156:3
**tendencies** [1] - 99:4
**tense** [1] - 227:24
**tenure** [1] - 188:18
**term** [2] - 114:17, 137:15
**terminate** [1] - 200:2
**terminated** [3] - 17:5, 19:6, 19:11
**termination** [5] - 19:12, 40:1, 193:24, 199:21, 199:23
**terminology** [2] - 125:10, 154:4
**terms** [5] - 70:3, 129:17, 132:24, 186:15, 195:16
**Terrace** [1] - 2:15

**test** [5] - 24:8, 24:11, 24:19, 24:21, 41:6
**tested** [1] - 222:18
**testified** [7] - 5:14, 55:14, 141:19, 142:2, 154:6, 180:21, 180:23
**testify** [7] - 57:6, 57:20, 58:6, 59:1, 59:10, 59:15, 149:11
**testifying** [1] - 57:16
**testimony** [10] - 142:1, 176:16, 177:12, 177:14, 177:15, 179:13, 203:17, 234:17, 240:2, 240:12
**THE** [8] - 2:2, 2:7, 2:14, 7:10, 20:13, 31:18, 147:5, 241:6
**themselves** [2] - 73:9, 183:18
**thereby** [2] - 43:8, 51:22
**they've** [1] - 13:9
**thinking** [6] - 25:18, 115:16, 115:18, 115:23, 127:17, 180:14
**third** [4] - 158:20, 191:23, 199:7, 199:8
**thirty** [1] - 5:5
**Thomas** [5] - 84:20, 85:1, 85:7, 85:12, 85:15
**thoughts** [1] - 88:16
**thrashing** [1] - 85:17
**threat** [5] - 101:23, 190:1, 190:3, 190:4, 192:3
**three** [6] - 21:8, 80:13, 199:2, 199:3, 219:5
**three-to-eleven** [2] - 199:2, 199:3
**threw** [2] - 92:20, 102:20
**throwing** [2] - 84:23, 184:4
**thrown** [2] - 128:9, 129:4
**tightening** [1] - 140:15
**Tim** [2] - 63:7, 63:8
**tip** [1] - 177:7
**tissue** [1] - 81:13
**TIVNAN** [1] - 1:5, 2:7
**Tivnan** [47] - 15:4, 15:11, 41:18, 45:11, 45:23, 50:14, 51:12, 52:5, 52:13, 53:18, 54:13, 54:24, 55:12,

56:1, 57:7, 57:17, 57:21, 58:5, 59:12, 59:21, 63:12, 64:8, 71:13, 76:17, 102:11, 102:20, 104:14, 113:5, 113:15, 114:6, 114:8, 119:21, 126:9, 132:18, 134:10, 142:8, 143:8, 193:21, 194:1, 194:8, 194:10, 195:2, 195:16, 218:12, 218:22, 225:17, 240:23

**Tivnan's** [5] - 43:7, 45:7, 56:15, 108:14, 110:3

**today** [18] - 11:9, 14:6, 16:3, 44:15, 52:12, 69:16, 77:12, 79:7, 81:16, 81:17, 81:20, 86:13, 94:3, 110:8, 145:20, 158:12, 183:5, 226:3

**together** [4] - 9:9, 9:15, 18:17, 147:23

**Tom** [4] - 64:13, 228:22, 228:23, 228:24

**Tommy** [1] - 64:12

**took** [14] - 20:18, 26:11, 85:22, 91:5, 93:8, 93:16, 94:15, 134:10, 148:1, 170:16, 171:22, 180:12, 180:18, 226:19

**tool** [1] - 98:14

**tools** [1] - 105:6

**tooth** [2] - 35:7, 35:9

**top** [8] - 38:14, 83:16, 192:1, 229:9, 231:19, 231:20, 231:23, 239:9

**tore** [4] - 88:12, 171:12, 171:19, 171:20

**torres** [1] - 172:2

**TORRES** [1] - 1:8

**Torres** [13] - 154:18, 154:22, 156:24, 171:21, 171:23, 172:3, 174:22, 174:23, 174:24, 175:12, 175:17, 176:12, 179:5

**touch** [2] - 31:18, 203:13

**tough** [2] - 136:3, 136:4

**tour** [1] - 50:5

**toward** [3] - 49:21, 49:24, 113:9

**towards** [19] - 48:1, 48:23, 49:6, 49:13, 49:15, 84:1, 84:7, 84:14, 155:16, 166:12, 166:15, 166:23, 172:23, 175:1, 210:24, 211:8, 213:4, 228:6, 234:6

**track** [7] - 65:21, 69:7, 69:10, 95:18, 95:19, 95:21, 95:23

**tracked** [2] - 68:20, 69:2

**tracking** [4] - 61:20, 61:22, 95:16, 105:12

**tracks** [6] - 22:24, 23:10, 69:1, 69:11, 95:17

**traffic** [1] - 212:2

**train** [3] - 23:5, 23:10, 208:2

**trained** [9] - 65:8, 65:9, 65:10, 106:14, 110:12, 133:24, 134:3, 149:23, 207:15

**training** [23] - 9:11, 13:7, 13:11, 65:11, 65:13, 65:14, 65:15, 68:18, 75:11, 99:13, 110:19, 110:20, 110:21, 111:2, 133:12, 185:11, 202:14, 202:16, 208:5, 216:7, 219:21, 219:22, 225:14

**traits** [1] - 66:5

**transcribe** [1] - 157:17

**transcribed** [2] - 240:3, 242:6

**transcript** [6] - 5:4, 5:6, 240:8, 240:12, 241:22, 242:7

**TRANSCRIPT** [1] - 241:6

**transfer** [3] - 63:18, 63:22, 206:18

**transferred** [1] - 63:15

**transport** [4] - 210:23, 211:7, 213:3, 237:10

**transported** [6] - 172:4, 173:22, 204:23, 222:3,

227:13, 227:18

**trauma** [1] - 184:9

**travel** [1] - 48:2

**Treatment** [1] - 35:4

**treatments** [1] - 41:3

**trespass** [3] - 23:12, 191:18, 191:19

**trial** [1] - 5:11

**tried** [6] - 155:11, 155:19, 170:13, 170:14, 233:19, 234:3

**truck** [1] - 23:9

**true** [8] - 50:5, 77:7, 155:22, 177:3, 178:2, 201:1, 240:12, 242:7

**True** [1] - 199:18

**trust** [1] - 129:20

**truth** [3] - 37:20, 38:24, 214:13

**truthful** [1] - 120:22

**truthfully** [2] - 224:12, 225:20

**truthfulness** [3] - 29:6, 38:21, 239:17

**try** [4] - 7:15, 159:1, 166:8, 176:22

**trying** [13] - 24:14, 46:9, 60:13, 60:22, 118:16, 143:6, 166:7, 208:18, 214:24, 215:4, 215:23, 230:13, 233:20

**turn** [3] - 48:2, 114:11, 173:9

**turned** [2] - 152:23, 221:21

**turns** [1] - 114:6

**twelve** [1] - 199:2

**two** [13] - 15:20, 28:5, 28:7, 29:13, 55:20, 57:16, 70:11, 156:23, 158:12, 178:3, 189:16, 225:14, 237:10

**two-page** [1] - 28:7

**type** [21] - 9:8, 16:5, 21:19, 29:12, 64:18, 66:1, 66:5, 66:18, 66:19, 67:5, 67:9, 67:16, 68:3, 68:24, 142:8, 145:22, 152:22, 181:14, 193:21, 198:15, 219:18

**typed** [1] - 228:17

**types** [6] - 66:6, 97:1, 98:24, 193:17,

193:18, 193:22

**typewriting** [1] - 242:6

**typical** [1] - 168:9

## U

**U.S** [1] - 100:2

**UMass** [3] - 159:17, 172:4, 173:22

**un-sub** [1] - 113:21

**Un-sub** [1] - 113:22

**unable** [1] - 166:14

**unapproved** [1] - 213:13

**unarmed** [2] - 95:20, 95:23

**unbecoming** [9] - 17:13, 17:14, 17:19, 19:13, 27:21, 29:12, 37:15, 118:1, 145:3

**unclear** [2] - 228:9

**unconscious** [1] - 128:23

**uncovered** [1] - 199:10

**undated** [1] - 237:17

**under** [26] - 20:9, 39:15, 41:12, 67:2, 100:24, 110:22, 126:22, 128:10, 129:4, 129:6, 129:7, 133:17, 140:23, 148:2, 148:12, 148:16, 149:2, 149:4, 168:5, 168:6, 169:4, 172:9, 200:23, 200:24, 237:19, 242:6

**understood** [1] - 56:10

**underwent** [2] - 165:9, 174:1

**unequivocally** [2] - 75:16, 75:24

**uniform** [2] - 220:19, 221:3

**unintended** [12] - 101:11, 101:14, 101:18, 124:12, 125:7, 125:10, 125:14, 133:2, 139:22, 139:23, 179:18, 179:23

**union** [6] - 26:23, 126:20, 194:24, 195:3, 209:5, 228:23

**unit** [12] - 13:13, 13:14, 61:2, 61:6, 62:23, 63:4, 63:6, 63:14, 64:10, 67:1,

69:12, 70:2

**UNITED** [1] - 1:1

**units** [1] - 39:13

**University** [1] - 173:22

**unless** [11] - 14:15, 73:20, 87:24, 93:16, 102:10, 133:14, 141:21, 143:16, 176:23, 208:1, 240:4

**unnecessary** [8] - 29:6, 38:11, 130:3, 130:8, 130:10, 176:13, 186:17, 223:18

**unreasonable** [7] - 11:10, 26:2, 30:14, 87:13, 132:18, 139:19, 239:16

**unreported** [1] - 238:2

**unruly** [3] - 124:14, 124:18, 125:3

**unstable** [1] - 24:16

**untruthful** [3] - 37:22, 218:4, 218:15

**up** [33] - 20:7, 45:15, 46:5, 46:7, 84:19, 95:6, 95:8, 95:12, 100:8, 100:20, 101:5, 113:1, 113:2, 136:15, 140:15, 145:23, 148:5, 152:16, 155:21, 163:10, 163:14, 165:15, 168:18, 173:20, 191:5, 202:7, 217:3, 221:11, 227:24, 228:13, 229:14, 229:15, 230:12

**update** [2] - 74:11, 238:18

**updated** [1] - 11:20

**upgrading** [1] - 69:20

**upper** [5] - 35:24, 48:18, 160:23, 228:13, 239:11

**upset** [5] - 33:19, 155:12, 227:21, 233:18

**upsetting** [1] - 184:4

**US86KR** [1] - 222:8

**uses** [1] - 26:2

**utilize** [1] - 213:6

**utilized** [2] - 176:4, 210:3

## V

**vague** [2] - 140:13, 140:15

**vantage** [2] - 228:9, 236:13
**vehicle** [21] - 22:24, 64:24, 76:8, 165:7, 174:23, 175:1, 212:2, 221:8, 221:10, 221:11, 221:15, 221:16, 221:17, 221:19, 222:2, 222:6, 222:8, 222:9, 227:20, 233:19, 234:4
**venture** [1] - 199:18
**verbal** [3] - 40:4, 190:4, 217:20
**vernacular** [1] - 135:24
**versus** [1] - 42:1
**via** [2] - 213:9, 227:11
**vice** [1] - 60:16
**victim** [2] - 153:11, 153:13
**Victor** [2] - 236:10, 237:11
**video** [52] - 47:20, 49:2, 49:18, 50:2, 91:16, 91:21, 102:23, 103:22, 104:8, 106:9, 106:23, 107:3, 111:9, 111:14, 112:5, 112:7, 112:8, 112:12, 113:3, 116:19, 121:2, 122:2, 122:3, 123:4, 125:2, 131:2, 132:17, 137:4, 151:21, 175:3, 175:5, 175:6, 175:10, 175:20, 176:16, 176:23, 177:4, 177:8, 177:10, 177:12, 177:19, 178:11, 202:7, 207:23, 209:8, 209:22, 210:17, 237:12
**videos** [4] - 112:18, 123:5, 129:18, 129:23
**videotape** [10] - 78:8, 78:9, 92:21, 106:4, 128:11, 128:18, 129:9, 152:16, 205:20, 205:23
**view** [2] - 129:9, 181:4
**VIGLIOTTI** [80] - 2:17, 22:4, 22:8, 24:5, 60:6, 74:24, 75:5, 87:3, 88:20, 89:3,

89:19, 90:11, 91:19, 109:4, 109:22, 110:17, 115:12, 115:20, 118:12, 119:8, 119:16, 121:8, 122:5, 122:8, 127:19, 134:14, 141:23, 154:24, 155:2, 157:8, 157:12, 160:15, 160:17, 161:6, 161:9, 161:18, 162:6, 162:16, 165:16, 167:24, 168:13, 168:20, 169:18, 170:9, 170:24, 176:18, 177:21, 177:24, 179:21, 180:1, 181:9, 181:18, 182:3, 182:9, 182:13, 185:16, 186:3, 186:12, 187:6, 187:8, 187:14, 187:24, 188:3, 199:14, 200:15, 201:13, 204:11, 204:16, 206:4, 206:7, 207:7, 209:14, 209:17, 215:1, 215:5, 217:11, 224:16, 224:21, 225:1, 239:13
**Vigliotti** [1] - 180:22
**Vincent's** [3] - 150:10, 151:18, 204:23
**violated** [4] - 21:21, 37:19, 37:21, 131:8
**violating** [1] - 225:18
**violation** [7] - 18:17, 18:20, 29:2, 38:11, 132:9, 149:8, 196:15
**violations** [2] - 28:22, 132:7
**violent** [6] - 97:24, 124:15, 124:19, 125:3, 184:3, 184:6
**violently** [1] - 73:10
**viral** [1] - 202:7
**visibly** [1] - 227:21
**volatile** [1] - 134:11
**volunteer** [1] - 215:8
**vs** [3] - 1:5, 1:9, 240:23

## W

**wait** [1] - 7:12
**waived** [2] - 5:8, 240:4

**walk** [1] - 168:10
**walking** [4] - 48:3, 48:10, 106:10, 106:13
**walks** [2] - 140:18, 229:14
**wall** [2] - 48:5, 113:9
**wallet** [3] - 152:17, 152:23
**warm** [1] - 188:11
**warned** [1] - 29:5
**warranted** [2] - 50:6, 196:15
**watch** [1] - 129:22
**watching** [2] - 212:1, 212:2
**Water** [3] - 83:19, 222:2, 222:4
**water** [1] - 20:13
**Watkins** [3] - 222:3, 227:19, 236:9
**Watts** [17] - 55:24, 57:5, 57:19, 58:5, 58:23, 63:7, 63:8, 64:5, 66:20, 66:23, 70:2, 77:19, 77:20, 89:24, 93:6, 110:24, 111:7
**weapon** [3] - 36:15, 210:2, 220:9
**wearing** [2] - 113:21, 113:22
**weather** [1] - 24:16
**weeks** [1] - 158:12
**weigh** [2] - 156:11, 156:12
**weighs** [1] - 171:24
**WEMS** [4] - 86:2, 159:10, 159:13
**WENDY** [1] - 2:11
**west** [1] - 113:19
**Westborough** [1] - 191:1
**WHEREOF** [1] - 242:13
**white** [2] - 82:11, 96:19
**whole** [2] - 96:24, 147:23
**wife** [2] - 147:22, 189:21
**William** [3] - 188:14, 190:17, 191:6
**willingness** [1] - 238:24
**windshield** [2] - 171:13, 171:20
**wing** [1] - 148:2
**withdraw** [1] - 121:17
**witness** [13] - 1:13,

55:24, 146:9, 146:22, 176:16, 177:12, 177:14, 177:20, 178:17, 240:3, 240:4, 240:5, 240:6
**Witness** [4] - 42:6, 42:12, 43:7, 240:1
**WITNESS** [5] - 7:10, 20:13, 31:18, 147:5, 242:13
**witnesses** [3] - 57:23, 131:4, 177:17
**woman** [1] - 189:17
**women** [1] - 96:5
**Worcester** [29] - 1:19, 2:4, 2:10, 2:15, 5:22, 5:24, 6:3, 23:15, 29:7, 32:18, 61:6, 76:24, 79:7, 81:9, 93:11, 94:2, 97:6, 97:13, 99:18, 99:24, 102:3, 104:22, 105:6, 110:11, 140:10, 159:10, 224:8, 224:9, 225:16
**WORCESTER** [4] - 1:6, 1:10, 2:8, 2:8
**word** [6] - 52:1, 103:18, 103:20, 157:10, 180:12, 180:18
**words** [14] - 26:6, 50:9, 72:2, 86:6, 100:11, 102:9, 107:12, 125:7, 153:18, 178:12, 185:17, 186:22, 214:20, 234:24
**works** [3] - 11:4, 11:5, 61:21
**world** [1] - 68:11
**worn** [2] - 60:9, 112:9
**worried** [2] - 155:17, 187:2
**worse** [1] - 81:3
**worsens** [1] - 96:14
**WPD** [2] - 184:5, 184:6
**wrist** [2] - 166:24, 168:19
**writes** [1] - 45:11
**writing** [2] - 34:9, 34:19
**written** [1] - 242:7
**wrote** [5] - 52:16, 53:10, 111:16, 174:19, 236:19

## Y

**yards** [1] - 113:8
**year** [9] - 6:8, 9:3, 10:5, 28:18, 28:19, 156:3, 156:18, 165:6, 190:21
**years** [12] - 6:4, 6:13, 13:13, 29:14, 61:7, 61:8, 61:13, 61:24, 66:17, 171:23, 238:5
**yell** [1] - 221:4
**yelled** [1] - 85:4
**yelling** [2] - 84:8, 229:15
**young** [12] - 22:10, 25:12, 30:1, 151:5, 156:4, 164:12, 180:3, 180:20, 181:11, 182:4, 182:5
**younger** [1] - 61:15
**yourself** [2] - 122:7, 161:15

## Z

**Zayas** [1] - 42:2