1

```
 1            COMMONWEALTH OF MASSACHUSETTS
   WORCESTER, SS. DISTRICT COURT DEPARTMENT
 2            CIVIL ACTION NO. 420-CV-401157SH
 3   _____
 4   LINDSEY M. BESHAI TORRES,     )
     PPA of JT, a minor,           )
 5                 Plaintiff,      )
                                   )
 6         vs.                     )
                                   )
 7   OFFICER JOHN R. ALERS, FORMER )
     POLICE OFFICER PAUL P. MCCARTHY )
 8   AND THE CITY OF WORCESTER,    )
                 Defendants.       )
 9   _____
10        DEPOSITION OF JOHN ALERS, called as a
11   witness by and on behalf of the Plaintiff,
12   pursuant to the applicable provisions of the
13   Massachusetts Rules of Civil Procedure, before
14   Melissa R. McKenzie, Certified Shorthand
15   Reporter, No. 1445F97, and Notary Public within
16   and for the Commonwealth of Massachusetts, at the
17   offices of Hector E. Pineiro, P.C., 807 Main
18   Street, Worcester, Massachusetts, on Wednesday,
19   January 19, 2022.
20
21
22        BAY STATE REPORTING AGENCY
              69 BRAEBURN LANE
23            ASHLAND, MA 01721
               (508) 753-4131
24
```

2

**APPEARANCES:**

HECTOR E. PINEIRO, ESQUIRE
LAW OFFICE OF HECTOR E. PINEIRO, P.C.
807 Main Street
Worcester, MA 01610
(508) 770-0600
hector@pineirolegal.com
For the Plaintiff

WENDY L. QUINN, ASSISTANT CITY SOLICITOR
CITY OF WORCESTER
LAW DEPARTMENT
Room 301 - City Hall
Worcester, MA 01608
(508) 799-1161
quinnwl@ci.worcester.ma.us
For the Defendants

JARED J. MADISON, ASSISTANT CITY SOLICITOR
CITY OF WORCESTER
LAW DEPARTMENT
Room 301 - City Hall
Worcester, MA 01608
(508) 799-1161
madisonj@worcesterma.gov
For the Defendants

JOHN K. VIGLIOTTI, ESQUIRE
REARDON, JOYCE & AKERSON, P.C.
4 Lancaster Terrace
Worcester, MA 01609
(508) 754-7285
jvigliotti@rja-law.com
For Officer John Alers

3

## I N D E X

TESTIMONY OF:    DIRECT CROSS REDIRECT RECROSS

John Alers    4

## E X H I B I T S

EXHIBITS       DESCRIPTION         PAGE

1          Interrogatories      57


EXHIBITS RETAINED BY ATTORNEY PINEIRO

CERTIFICATION OF REPORTER           68

4

S T I P U L A T I O N S

It is agreed by and between counsel for the respective parties that the deponent shall read and sign the deposition transcript within thirty (30) days from receipt of transcript or the deposition will be deemed to have been signed. Signature before a notary public is waived.

It is further agreed that all objections, except as to form, and motions to strike are reserved for the time of trial.

JOHN ALERS, having been satisfactorily identified and duly sworn by the Notary Public, was examined and testified as follows to direct interrogatories:

BY MR. PINEIRO:

Q.   Good afternoon. Can you tell us your name and your place of employment?

A.   **My name is John Alers. I'm employed by the City of Worcester as a Worcester police officer.**

Q.   Have you ever worked for any other police department before Worcester?

A.   **No, I have not.**

Q.   Where did you go to high school, sir?

5

1  A.  **Burncoat Senior High School is where I graduated**
2      **from.**
3  Q.  What year did you graduate?
4  A.  **2007.**
5  Q.  So you're 34, 35 years old?
6  A.  **32, sir.**
7           MR. VIGLIOTTI:  A little jacked up.
8           MR. PINEIRO:  I know.  COVID has
9  affected my math skills.
10  Q.  When did you attend the academy?
11  A.  **In 2013.**
12  Q.  What did you do after finishing Burncoat and
13      joining the police force, what type of employment
14      did you have?
15  A.  **Can I clarify that? So you want me to state**
16      **where I worked after high school in lieu of prior**
17      **to being hired by the police department?**
18  Q.  Yes.
19  A.  **So out of high school, I was employed at Home**
20      **Depot for a short period of time, and then**
21      **afterwards, I was employed by the City as a**
22      **dispatcher. And then I also did a short period**
23      **of time there prior to coming on in the police**
24      **academy of 2013.**

6

1  Q.  How long did you work as a dispatcher?
2  A.  **I do not recall an exact time frame, but I would**
3      **say less than a year, if I were to approximate.**
4  Q.  The academy that you participated was it a
5      six-month academy?
6  A.  **The academy was, yes, the time full-time academy**
7      **through Worcester Police Department.**
8  Q.  And did you have any training to deal with people
9      that have mental health disorders?
10  A.  **Yes.**
11  Q.  Did you have any training to deal with people
12      that have autism or that fell within the range of
13      the autism spectrum disorder?
14  A.  **Yes.**
15  Q.  Who trained you on autism spectrum disorder?
16           MR. VIGLIOTTI: During the academy?
17           MR. PINEIRO: During the academy.
18  A.  **I do not recall the name exactly, but it should**
19      **be listed on the power point presentation for**
20      **that course given during the academy. I do not**
21      **recall his name exactly.**
22  Q.  Okay. Once you joined the police force in '07,
23      did you have any in-service training dealing with
24      people with disability and in particular

7

1      individuals that suffered from autistic spectrum
2      disorder?
3           MR. VIGLIOTTI: Objection. Just for
4  clarification, not '07. I think '13 is when he
5  graduated.
6  Q.  I'm sorry, '13, yes?
7  A.  **Due to that little piece, could you repeat that**
8      **for me.**
9  Q.  Once you joined the police force, did you have
10      any type of in-service training on autism
11      spectrum disorder or people that were affected
12      with autism?
13  A.  **Yes.**
14  Q.  What type of training did you have?
15  A.  **Power point presentation format within in-service**
16      **training.**
17  Q.  Who did those power point presentations?
18  A.  **Members of the training staff, part of our**
19      **training division.**
20  Q.  Who do you remember in particular talking about
21      the subject matter of autism?
22  A.  **I do not recall because we have several**
23      **instructors who instruct several different parts**
24      **of our power point presentations and trainings in**

8

1      **our in-service. So I couldn't definitively tell**
2      **you who was the instructor at the time.**
3  Q.  Bearing in mind that the incident that brings us
4      here today occurred on September 25th of '17,
5      when was the last time before that date that you
6      had any in-service training on people with the --
7      suffering with autism or autism spectrum
8      disorder?
9  A.  **I do not recall directly as to an exact time**
10      **frame as to when I would have received training**
11      **prior to that, but I believe it's provided in**
12      **documentation as far as actual dates.**
13  Q.  Did you have to take -- those power point
14      presentations, would you have to sign off that
15      you participated in that training program having
16      to do with autism?
17  A.  **So it would be encompassed in our day of**
18      **training, signing that we were present for**
19      **whatever the day held for training as far as our**
20      **in-service practices.**
21  Q.  Got it. When was the last time that you would
22      have participated in a training like that before
23      September 25th of '17?
24  A.  **Typically we have in-service twice a year, I**

9

1  believe. So it really depends on where the
2  incident fell in accordance to where we had the
3  -- the time frame of the training, which I cannot
4  speak to directly.   I don't recall the exact date
5  or month for that matter.
6  Q.  How long would you say that training program
7      lasted?
8  A.  Could  you clarify.
9  Q.  The one on autism?
10 A.  I do not recall an exact time frame.
11 Q.  Was it more than an hour or less than an hour?
12 A.  If I were -- I can't give you a definitive answer
13     on that.
14 Q.  You've been in the force already about nine
15     years?
16 A.  Yes, sir.
17 Q.  And would you agree that autism is a disability?
18            MR. VIGLIOTTI:  Objection.
19 A.  I believe that autism is a form of mental
20     illness.
21 Q.  But in your view it's not a disability?
22            MR. VIGLIOTTI: Objection.
23 A.  I'm unable to answer that question.
24 Q.  Is mental illness a disability? Do you

10

1      understand whether mental illness is a disability
2      or not?
3  A.  I understand that mental illness is its own --
4      if I could just have a moment to collect myself
5      here.
6  Q.  Sure.
7  A.  I believe that there's a variety of issues within
8      mental illness. I  can't  definitively  tell  you
9      that it's directly correlated to  disability.
10 Q.  And can you tell me whether autism is a mental
11     illness or not?
12            MR. VIGLIOTTI:  Objection.
13 A.  I would need to refer to my materials to give you
14     a better accurate answer on  that.
15 Q.  Tell me everything that you were trained on
16     before regarding autism and how to deal with
17     people that -- at the police department, that
18     fell within the autism spectrum disorder?
19            MR. VIGLIOTTI: Objection.
20 A.  Could I have more clarification on that because
21     that's a large portion of material.
22 Q.  I just want to know what you were trained how to
23     deal with people that have autism, how to handle
24     them, how to approach them, how to talk to them,

11

1      how to interact with them, that sort of thing?
2            MR. VIGLIOTTI:  Objection.
3  A.  Okay. So when speaking with individuals with
4      autism, it's really case-by-case basis. Because
5      each individual has their own situation, and the
6      manner of approach is really dependent on the
7      individual.
8  Q.  So what did you learn about how to approach
9      individuals that have autism?
10 A.  To have a calm demeanor and speak to them.
11 Q.  Why did you learn that was important or why did
12     they emphasize that to you?
13            MS. QUINN:  Objection.
14 Q.  Was that something that was impressed upon you
15     during the training session?
16            MR. VIGLIOTTI:  Objection.
17 A.  Each individual needs -- every interaction is
18     different and I can't give you a definitive
19     answer to as to what you're trying to ask me.
20 Q.  Why was it important to talk to people who suffer
21     from autism in a calm manner?
22 A.  It's to try to have the individual be receptive
23     to whatever you're trying to speak to them about
24     or deal with.

12

1  Q.  Anything else that you were taught about the way
2      that you approach or talk to people that have
3      autism?
4  A.  Can you ask me that again, please.
5  Q.  Any other things that you were taught during your
6      training session on how to approach people with
7      the autism spectrum disorder?
8  A.  Again, it depends on the person, and depending on
9      what their actions are.
10 Q.  What type of illness do you understand autism to
11     be?
12            MR. VIGLIOTTI:  Objection.
13 A.  To my understanding, it's a form of mental
14     illness.
15 Q.  Okay. Do you understand it to be a neurological
16     condition as well?
17 A.  I'm unsure.
18 Q.  Besides JT, have you ever interacted with any
19     other autistic children?
20            MR. VIGLIOTTI:  Objection.
21 A.  I have dealt with thousands upon thousands of
22     individuals, and it is a probability. I can't
23     speak to it definitely given the volume of people
24     that I've spoken and interacted with.

13

1   Q.   I'm trying to be -- I appreciate your answer.
2        I'm trying to be more specific. Have you gone to
3        a home where you go to a house or a school or any
4        other setting where there are issues, somebody
5        calls the police or EMTs because an autistic
6        child is acting out?
7            MR. VIGLIOTTI: Objection.
8   A.   **Again, I can't definitively give you an exact**
9        **incident or a day or time because of the shear**
10       **volume of calls that I've been on.**
11  Q.   You don't have any specific memory of having
12       interacted -- let me finish. I know you're
13       nodding. With any other autistic children during
14       the course of your career with the Worcester
15       police?
16  A.   **And I'll say again, that it is a probability, but**
17       **I don't recall definitively.**
18  Q.   Have you ever interacted with any adult that you
19       learned was an autistic person? You came in
20       contact with them because of a service call?
21           MR. VIGLIOTTI: Objection.
22  A.   **I have dealt with adults who suffer from mental**
23       **illness. I cannot speak directly to autism.**
24  Q.   Okay. Have you ever heard the term during your

14

1        training of meltdown that people with autistic
2        spectrum disorder experience sometimes?
3   A.   **Yes.**
4   Q.   Tell me everything you learned about the
5        training, what did you learn about that concept?
6   A.   **Individuals that are having meltdowns will**
7        **exhibit behaviors, whether it be vocalization or**
8        **motions physically, that are indicating that**
9        **they're in some type of crisis.**
10  Q.   Or distress?
11  A.   **Correct.**
12  Q.   And based on your training, what did you learn on
13       how to deal with people that were experiencing
14       that?
15           MR. VIGLIOTTI: What was the last
16       word?
17           MR. PINEIRO: People that were
18       experiencing a meltdown.
19  A.   **In dealing with people that are a point of**
20       **meltdown, it would be in the best interest of the**
21       **individual to try and give them an opportunity**
22       **and space to see if they can calm down.**
23  Q.   Okay. How would you go about doing that?
24  A.   **Trying to speak to them in a calm manner and**

15

1        seeing if they're able to calm down.
2   Q.   Okay. Did you learn anything about physical
3        contact as a law enforcement officer with adults
4        or children that have -- that fell within the
5        spectrum -- autism spectrum disorder?
6   A.   **I think in this question there's two concepts**
7        **kind of being merged together in the question**
8        **that you're presenting. Would you clarify that**
9        **for me?**
10  Q.   Tell me what is it that you need clarification,
11       and what are the two questions that you're
12       concerned with?
13  A.   **So when in regards to police involvement with --**
14       **please repeat the question.**
15  Q.   I'm not trying to trick you or anything.
16  A.   **I understand. I just want to give you the best**
17       **answer I can.**
18  Q.   I appreciate that. I'm trying to find out if you
19       were trained in any particular way on, you know,
20       when you were a police officer, when you're
21       responding to a person that has autism spectrum
22       disorder in terms of whether to touch or not
23       touch the person under certain circumstances?
24  A.   **So again, this is every individual is different,**

16

1        **and circumstances can be different from**
2        **individual to individual. And it's really**
3        **dependent on what the circumstances that are**
4        **presented.**
5   Q.   Did any of the training suggest to you to try not
6        -- not trying to make physical contact if you
7        could not have to have physical contact with
8        them?
9            MR. VIGLIOTTI: Objection.
10           MS. QUINN: Objection.
11  A.   **I would need to refer to my materials to give you**
12       **a better answer on that matter.**
13  Q.   Okay. This matter was investigated after
14       Ms. Beshai filed a claim with the police
15       department.
16  A.   **Yes.**
17  Q.   Is that fair to say?
18  A.   **I'm sorry.**
19  Q.   Is that fair to say?
20  A.   **Yes.**
21  Q.   And you were notified about the complaint and
22       what she claimed by internal affairs or the
23       Bureau of Professional Standards?
24  A.   **Yes.**

17

1   Q.   And they gave you a summary of what she or her
2        attorney at the time claimed so that -- and you
3        were asked a series of written questions that you
4        had to respond to?
5   A.   **I was provided a series of questions by internal**
6        **affairs in regards to the incident.**
7   Q.   And the format in which you responded to internal
8        affairs what do you call the document in which
9        you responded?
10  A.   **It's called an IDC or intradepartmental**
11       **correspondence.**
12  Q.   When you got your IDC, did you talk to your
13       immediate supervisor at the time? How did you
14       get notified about this complaint, was it through
15       your supervisor?
16  A.   **To the best of my memory, I was provided the**
17       **paperwork from a supervisor.**
18  Q.   Do you remember who your supervisor was at the
19       time?
20  A.   **I do not recall exactly who gave me the**
21       **questions.**
22  Q.   What did you do when you got the paperwork?
23  A.   **I reviewed the questions provided and answered**
24       **them to the best of my ability.**

18

1   Q.   Did you get a chance to talk to Paul McCarthy to
2        see what he remembered about the incident?
3   A.   **I don't recall having a conversation.**
4   Q.   Have you ever spoken to, you know, besides
5        September 25, 2017, have you ever spoken to Paul
6        McCarthy about what happened and about the
7        injuries that this child sustained?
8   A.   **I did speak to Paul, but I do not recall the**
9        **contents of our conversation.**
10  Q.   Do you remember where it happened?
11  A.   **Where?**
12  Q.   The conversation happened?
13  A.   **No, I don't recall.**
14  Q.   Were you in uniform?
15  A.   **I don't recall.**
16  Q.   Do you remember who brought the conversation, was
17       it you, was it him?
18  A.   **I do not recall.**
19  Q.   Do you remember what you said to him?
20  A.   **No, I do not recall.**
21  Q.   Do you remember what he said to you?
22  A.   **No.**
23  Q.   Is that the only time that you spoken to Paul
24       about this incident?

19

1        MR. VIGLIOTTI:  Objection.
2   Q.   Or have you spoken to him more than once?
3   A.   **I do not recall how many times, if there were**
4        **more than one occasion, that I would have spoken**
5        **to him. I do not recall.**
6   Q.   Okay. Got it. Once you got the paperwork, did
7        you have a union rep when you got a copy of the
8        complaint?
9   A.   **No.**
10  Q.   As a police officer, you have a union rep, don't
11       you?
12  A.   **Yes.**
13  Q.   Did you call your union rep to talk to him about
14       the complaint that you had received?
15  A.   **No.**
16  Q.   So you did not consult your union rep?
17  A.   **No.**
18  Q.   Okay. And did you seek any other opinions, any
19       other advice from any of your superiors, about
20       how to fill out the report?
21  A.   **To the best of my knowledge, I just inquired**
22       **about the format of how I'm supposed to submit**
23       **the questions.**
24  Q.   Okay,

20

1   A.   **To the best of my knowledge that's the only**
2        **inquiry I made into how to hand in my responses.**
3   Q.   Thanks. And who did you speak to about how to go
4        about answering?
5        MR. VIGLIOTTI:  Objection.
6   Q.   Meaning to respond to the format?
7   A.   **I'm sorry. Can you --**
8   Q.   Do you remember who did you speak to in terms of
9        how would you go about responding to the format
10       of the questions?
11  A.   **To the best of my knowledge it was my lieutenant.**
12  Q.   And who was your lieutenant at the time?
13  A.   **Lieutenant Paul Gafney.**
14  Q.   Okay. And do you recall speaking to Mr. Gafney
15       about this event?
16  A.   **I don't recall the content of our conversation.**
17  Q.   Okay. Let me go back. What different positions
18       have you held in the police department since you
19       joined in 2013?
20  A.   **When I initially came onto the police department,**
21       **I was assigned to the Service Division, and then**
22       **from Service Division, I went to Last Half**
23       **Operations, which is patrol, and then from Last**
24       **Half Operations patrol, I went to Days Operation**

21

1  Patrol.
2  Q.  What years did you do Days Operation Patrol?
3  A.  To the best of my knowledge at some point in
4      2017.
5  Q.  And this is right around the same time that this
6      happened?
7  A.  I am unsure of the definitive time frame as to
8      when that corresponds with the incident.
9  Q.  What other positions have you held in the
10     department since 2017?
11 A.  I am currently a school resource officer.
12 Q.  What are your responsibilities as a school
13     resource officer?
14 A.  For clarification, the title has been changed to
15     school liaison officer. It was recently changed
16     at the beginning of January.
17 Q.  For how long have you held this position?
18 A.  For a couple months. I was an intermediate
19     school officer filling in for officers who are in
20     that position, but if they were unavailable or
21     not at work, I would fill in. And then within
22     the last couple of months approximately, I've
23     been taking that on as a full-time role.
24 Q.  And what are your responsibilities in that role?

22

1  A.  Checking in with the schools in my designated
2      area.
3  Q.  And what schools are you assigned to?
4  A.  So there's numerous schools. I think a better
5      way to explain that to you is the northeast
6      portion of the City, which with the Worcester
7      Public Schools, they refer to it as the Burncoat
8      quadrant. So any schools within the Worcester
9      Public Schools that correlate with that quadrant,
10     in addition to any other schools that aren't part
11     of the Worcester Public School system that fall
12     into that region.
13 Q.  Do you travel from school to school and make
14     contact with school officials?
15 A.  Correct. And respond to any issues pertaining to
16     students that need officer assistance.
17 Q.  And in that capacity, have you interacted with
18     any autistic or disabled children?
19 A.  To my recollection, no, not directly.
20 Q.  On September 25th, you responded to a police
21     dispatch, yes?
22 A.  Yes.
23 Q.  And do you remember the nature of the call?
24         MR. VIGLIOTTI: Just for the record,

23

1      in 2017 you're talking about?
2  Q.  The incident, September 25, 2017.
3  A.  That there was a ten-year-old autistic child out
4      of control.
5  Q.  Okay. And when you got the call, did you recall
6      if you had dealt with any autistic kids under the
7      age of ten who had been out of control?
8  A.  Prior to that incident?
9  Q.  Yes.
10 A.  I don't recall.
11 Q.  Okay. What part of the City were you working in
12     that day?
13 A.  It would have been the southwest part of the
14     City.
15 Q.  Tell me what happened when you got there?
16 A.  Upon arrival, I spoke with the parent of the
17     child. She told me that her child was out of
18     control. At which point I tried to interact with
19     this child.
20 Q.  When you -- where was he -- to what location did
21     you respond, do you remember?
22 A.  1256 Main Street, which is where Brite Cleaners
23     is located.
24 Q.  Okay. Where was her vehicle, where was her car

24

1      parked?
2  A.  In that parking lot.
3  Q.  It's a large parking lot?
4  A.  The parking lot for that particular business.
5  Q.  Describe that parking lot, how big it is, how
6      wide it is?
7  A.  I think that it's relative. I would say that
8      it's a large parking lot. I couldn't tell you
9      exact dimensions.
10 Q.  Would you say it's wider than 75 feet?
11 A.  I don't recall as far as an exact size.
12 Q.  Do you remember what type of car Ms. Beshai was
13     driving?
14 A.  To the best of my memory it was an SUV of some
15     sort.
16 Q.  Do you remember how the boy was dressed?
17 A.  So you're asking me how he was dressed?
18 Q.  Yes.
19 A.  I do not recall.
20 Q.  This was on September 25, '17, was it a warm day
21     or a cool fall day?
22 A.  I do not recall.
23 Q.  Okay.
24         MS. QUINN: Hector, can I take a

25

```
1    break for a second.
2              MR. PINEIRO:  Sure.
3              (Short recess.)
4    Q.  In which direction was her car facing?
5    A.  To the best of my knowledge, her vehicle was
6    facing the street in the parking lot.
7    Q.  How far was the front of her car from the
8    sidewalk?
9    A.  I do not recall exactly.
10   Q.  Okay. Were you the first officer to respond to
11   the call?
12   A.  Yes, I was.
13   Q.  At some point in time Officer McCarthy arrived to
14   back you up?
15   A.  Yes.
16   Q.  How much longer -- how many minutes or seconds
17   did it take him to respond to the call? Were you
18   there for five minutes before he arrived or less
19   than that?
20             MR. VIGLIOTTI:  Objection.
21   A.  I am unable to give you an exact time frame or an
22   approximation of how much time had elapsed.
23   Q.  At some point in time -- where did you park your
24   cruiser on the parking lot of Brite Cleaners?
```

26

```
1    A.  I don't remember where my vehicle was parked.
2    Q.  At some point in time you got out of your cruiser
3    and went to talk to the mother?
4    A.  Yes.
5    Q.  And by the time that you were out of the cruiser
6    was Mr. McCarthy present or not?
7    A.  To my knowledge, no.
8    Q.  Okay. Where was the mother when you first talked
9    to her?
10   A.  By her vehicle.
11   Q.  She was outside of the vehicle?
12   A.  To the best of my knowledge, yes.
13   Q.  Were there any other kids inside of the vehicle?
14   A.  I did not take into account or observe any other
15   occupants of the vehicle.
16   Q.  Tell me what -- what observations did you make of JT?
17       When I interacted with JT, he appeared to be very
18   A.  upset.
19       Okay. Before you interacted with him, did you
20   Q.  ask the mom what's going on with the kid or
21   something like that?
22       I don't remember my exact interaction with JT's
23   A.  mother.
24
```

27

```
1    Q.  If the call is a call responding to an autistic
2    child, would it be your custom and practice to
3    get some type of history from the parents or
4    relatives?
5              MR. VIGLIOTTI:  Objection.
6    A.  Again, every situation is different.
7    Q.  But here do you recall if you asked the mom,
8    What's going on?
9    A.  To the best of my knowledge, we did have a brief
10   conversation in regard to JT. As to the contents, I
11   can't really recall.
12   Q.  Did she say to you that he was an autistic child
13   or --
14   A.  I do not remember if she specifically told me
15   that information.
16   Q.  Did she say anything that he had never acted this
17   way before?
18   A.  I don't remember that being said.
19   Q.  Where was the child, where in the car did you
20   find him?
21   A.  The front passenger seat seated.
22   Q.  Door open or closed?
23   A.  Open.
24   Q.  Did you hear any -- strike that.
```

28

```
1             What was he doing when you -- did you
2    approach him?
3    A.  I did.
4    Q.  What was he doing when you approached him?
5    A.  He was seated in the vehicle. He was visibly
6    upset.
7    Q.  Was he saying anything that you understood?
8    A.  I don't recall anything he may have been saying
9    upon my approach.
10   Q.  Got you. And if he had said something, would you
11   have reflected what he said in your report?
12   A.  Could you repeat that, please.
13   Q.  If he said things, would you have reflected what
14   he said in your report?
15             MR. VIGLIOTTI:  Objection.
16   A.  So in my interaction with JT, I do recall trying
17   to speak with him, and he yelled an obscenity
18   or profanity to me. And I recall that. I do not
19   recall the exact word, but that it was a
20   profanity.
21   Q.  Do you remember exactly what he said?
22   A.  I do not.
23   Q.  What significance did you attach to the fact that
24   he used a profanity?
```

29

1   A.   **I did not have any significance towards him**
2        **saying that word or words.**
3   Q.   The fact that he was -- what tone of voice did he
4        use when he was using profanity?
5   A.   **He was yelling.**
6   Q.   How loud was he yelling?
7   A.   **Yelling can be -- I really don't know how to more**
8        **clearly articulate as to the volume of yelling.**
9   Q.   Did you interpret your first encounter with him
10       that he was having an autistic meltdown or
11       tantrum?
12            MR. VIGLIOTTI: Objection.
13  A.   **I observed him to be in some form of distress.**
14  Q.   What did you decide to do to deal with the call
15       that you were responding to?
16  A.   **I tried to speak to JT.**
17  Q.   How did you go about that?
18  A.   **I tried to ask him what his name was. I was met**
19       **with profanity and yelling.**
20  Q.   How did you react to how he responded to you?
21  A.   **I continued to try and speak with him.**
22  Q.   Okay. And he was -- where was he seated at this
23       point?
24  A.   **Yes.**

30

1   Q.   Where was he seated?
2   A.   **In the front passenger seat.**
3   Q.   The door open or --
4   A.   **Door open.**
5   Q.   Fully open or slightly ajar?
6   A.   **To the best of my memory the door was open fully.**
7   Q.   Fully open?
8   A.   **Yes.**
9   Q.   Did the mom tell you that he had calmed down
10       somehow or that he had calmed down from the
11       moment she made the call?
12  A.   **I do not remember any conversation with her in**
13       **regards to that.**
14  Q.   How far were you from JT when you tried to have
15       a conversation with him?
16  A.   **If I were to approximate, about three to**
17       **five feet.**
18  Q.   And were his feet inside of the vehicle?
19  A.   **Yes.**
20  Q.   How big was JT, how tall would you say he was?
21  A.   **I can't really approximate that because I don't**
22       **want to put a definitive number on his stature.**
23  Q.   At that point you knew he was a ten year old?
24  Q.

31

1   A.   **No.**
2   Q.   Well, I thought you said the dispatcher said it
3        was a ten-year-old autistic child?
4   A.   **Correct. But maybe I misunderstood what you said**
5        **as far as his appearing as a ten year old.**
6   Q.   He didn't look to you like a ten year old?
7   A.   **To my appearance, no, to my observation.**
8   Q.   You thought he was much -- he was older than
9        that?
10  A.   **He appeared to be older.**
11  Q.   Did you think that the call was misclassified or
12       anything like that? In other words, did you feel
13       you were dealing with an adult?
14  A.   **No.**
15  Q.   Okay. And you seem like a fairly soft spoken
16       guy. Were you talking to him in the tone that
17       you are talking to us now?
18  A.   **Correct.**
19  Q.   And what else did you see him do or say?
20  A.   **In my interaction with him, he became**
21       **increasingly agitated, began pounding his fists**
22       **on the seats and the areas surrounding him.**
23  Q.   What's he saying?
24  A.   **I don't recall what he's telling me at that**

32

1        point.
2   Q.   Was he making any sense to you what he was
3        saying?
4   A.   **I don't remember what he said if he said**
5        **anything.**
6   Q.   Did that reenforce to you the idea that this kid
7        was in distress?
8            MR. VIGLIOTTI: Objection.
9   A.   **His actions caused concern to me with the way**
10       **that he was acting for his own safety.**
11  Q.   Did his conduct concern you that it was in any --
12       criminal in nature?
13  A.   **JT did throw a trash bag at me during this**
14       **interaction.**
15  Q.   What type of trash bag did he throw at you, like,
16       how big was this bag?
17  A.   **For clarification it wasn't, like, a trash**
18       **receptacle bag. It was much smaller in size.**
19  Q.   Was it like a small potato chip bag?
20  A.   **To my recollection, it would have been that size**
21       **or possibly a little bit larger.**
22  Q.   Got it. Okay. And did he seem to purposely
23       throw the bag at you?
24  A.   **It appeared to me that he did.**

**33**

1  Q.  Did he hit you with the bag? In other words, did
2  the bag touch you?
3  A.  **I do not remember.**
4  Q.  Got it. Okay. Or did the bag fall on the floor?
5  MR. VIGLIOTTI:  Objection.
6  A.  **To my knowledge, I believe the bag exited the**
7  **vehicle, to my knowledge.**
8  Q.  And did he -- was he making eye contact with you
9  or verbalizing with you at the time?
10  A.  **To my knowledge, I did not appear to have eye**
11  **contact with him.**
12  Q.  Right. Based on your training did it concern to
13  you that, you know, he was reacting to how close
14  you were to him?
15  A.  **I'm unsure if my approximate location to him**
16  **would have prompted any responses from him due to**
17  **my proximity.**
18  Q.  Got it. How did he throw the bag, did he aim it
19  at you or --
20  A.  **It was forcefully thrown in my direction.**
21  Q.  But it didn't hit you or hurt you?
22  A.  **To my knowledge, I don't recall it striking me.**
23  Q.  And if it had, you would have probably reflected
24  that in your report?

**34**

1  A.  **Yes.**
2  Q.  As this conversation is going on and the child
3  throws whatever the type of bag it was, when did
4  Officer McCarthy arrive?
5  A.  **While I was interacting with JT --**
6  Q.  How long would you say you were --
7  A.  **I was going to complete that.**
8  Q.  Please do.
9  A.  **While I was interacting with JT in that particular**
10  **part of time, Officer McCarthy, to my knowledge,**
11  **was not on scene yet?**
12  Q.  How long would you say you interacted with the
13  kid, by that, I mean next to the passenger side
14  before Paul arrived?
15  MR. VIGLIOTTI:  Objection.
16  A.  **I do not recall exactly.**
17  Q.  When Paul got to the Brite Cleaners, did you have
18  a chat with him, This is what's going on, Paul?
19  A.  **No.**
20  Q.  What did you see Paul do?
21  A.  **To my knowledge, my first interaction with him**
22  **during this incident was when we were trying to**
23  **restrain JT.**
24  Q.  Okay. Where did Paul go, did you see where he

**35**

1  went to?
2  MS. QUINN:  Objection.
3  Q.  Was he next to you, was he somewhere else?
4  MR. VIGLIOTTI:  Objection.
5  A.  **So in the sequence of events here while I was**
6  **struggling with JT on the ground, I recall Officer**
7  **McCarthy being in front of us. Prior to that, I**
8  **don't have any memory of interaction with**
9  **Officer McCarthy.**
10  Q.  That's what I wanted to get. I appreciate that.
11  Did you pull him out of the car?
12  A.  **I did not.**
13  Q.  When did he come out of the car in relation to
14  when he threw this whatever type of bag he threw
15  in your direction?
16  A.  **In addition to throwing the bag, he also began**
17  **pulling at the rearview mirror of the vehicle and**
18  **the wires, which are also contained with that,**
19  **which prompted me to act for his safety in an**
20  **attempt to try and restrain him from harming**
21  **himself.**
22  Q.  What was he doing with the rearview mirror?
23  A.  **He was pulling at it.**
24  Q.  What was he saying when he was pulling at it?

**36**

1  A.  **I don't have a memory of any verbalization during**
2  **that.**
3  Q.  When he's doing that, you say to yourself this
4  kids is in crisis?
5  MR. VIGLIOTTI:  Objection.
6  Q.  Did that thought cross your mind?
7  MR. VIGLIOTTI:  Objection.
8  A.  **So JT was exhibiting the behaviors that prompted me**
9  **to act for his safety.**
10  Q.  So you decided to take him out of the car?
11  A.  **I attempted to restrain JT from potentially**
12  **hurting himself. I never actually got control of**
13  **JT, and he exited the vehicle. I did not pull**
14  **him out of the vehicle.**
15  Q.  So did you reach inside of the car to stop him
16  from what he was doing?
17  A.  **Yes.**
18  Q.  And did your hands or your body touch any parts
19  of his body at that time?
20  A.  **To the best of my knowledge, I tried to grab his**
21  **arms. As to how much contact I made with him, I**
22  **do not recall.**
23  Q.  Okay. And but after your hands touched him,
24  that's when he came out or he attempted to come

37

1   out?

2   A.   **While I was trying to restrain him, he was making**
3        **an effort to get away from me.**

4   Q.   And that's not unusual for autistic children;
5        right?

6                  MS. QUINN: Objection.

7                  MR. VIGLIOTTI: Objection.

8   A.   **Again, with autistic children or anyone with**
9        **mental illness, it's a case-by-case basis, and**
10       **everyone can potentially react differently.**

11  Q.   Okay. So let me understand, you put your hands
12       on him because you didn't want him pulling the
13       rearview mirror or because you wanted -- you felt
14       that things had risen to such a point that you
15       wanted him out of the car so that he wouldn't
16       hurt himself?

17                 MR. VIGLIOTTI: Objection.

18                 MS. QUINN: Objection.

19  A.   **JT's behavior and grabbing at the wires**
20       **prompted me that there was a potential safety**
21       **issue for the child, which at that point I was**
22       **trying to restrain him for his own safety.**

23  Q.   What was the safety issue that you considered at
24       the time?

38

1   A.   **He was pulling at the wires of the rearview**
2        **mirror, which could have electricity and**
3        **potentially cause harm to him.**

4   Q.   Was the car on, do you recall?

5   A.   **I do not recall the state of the car when I was**
6        **interacting with him.**

7   Q.   And then when you put your hands on him, does he
8        react to the touching or does he say anything to
9        you?

10  A.   **I do not recall any verbalization from JT at this**
11       **point in time. I can't speak to as if --**
12       **as to what prompted him to try and move away from**
13       **me at that point in time.**

14  Q.   But when he's trying to yank the rearview mirror,
15       both of his feet were inside of the car, yes?

16  A.   **To the best of my memory, yes.**

17  Q.   And you wanted to get him out so that he wouldn't
18       hurt himself?

19  A.   **Not necessarily get him out of the vehicle, but**
20       **try and restrain him from having use of his arms**
21       **to potentially harm himself.**

22  Q.   And he wanted no part of that.

23                 MR. VIGLIOTTI: Objection.

24  Q.   What did he do when you put your hands on him?

39

1   A.   **He made an effort to get away from me.**

2   Q.   And how did he do that?

3   A.   **He got out of the vehicle, passing the door,**
4        **which was already fully open, and going in the**
5        **direction of the street.**

6   Q.   So you were not blocking the door? I thought you
7        had put your hands on him? How did he get out?

8                  MR. VIGLIOTTI: Objection.

9   A.   **He gets past my reach and goes towards the street**
10       **after he passes the door.**

11  Q.   Okay. So when you went to stop him, the door is
12       open?

13  A.   **Correct.**

14  Q.   And you're blocking the door with -- right?

15  A.   **Not necessarily, no.**

16  Q.   How tall are you?

17  A.   **5'10", to my knowledge.**

18  Q.   How much did you weigh then?

19  A.   **To my knowledge, around 220 pounds.**

20  Q.   How much do you weigh now?

21  A.   **Approximately 235, 240.**

22  Q.   And he managed to go past you?

23  A.   **Correct.**

24  Q.   And at that point did you see whether Paul was

40

1        there or not?

2   A.   **To my knowledge, I don't remember seeing Paul.**

3   Q.   Now, are you interacting with the mother at this
4        point in time or no? Is she telling you anything
5        or are you saying anything to her?

6   A.   **To my knowledge, I'm interacting with JT.** And

7   Q.   what's your demeanor at this point when he tries to
8        get out of the car, are you upset or are
9        you yelling at him to stop?

10  A.   **I don't recall any verbalization to him in our**
11       **encounter.**

12  Q.   When he tries to get out, are you telling him,
13       Stop, don't come out, you can't?

14  A.   **I don't recall exactly what I would have said in**
15       **that moment.**

16  Q.   Would it be your custom and practice if you
17       wanted to restrain him to tell him to stop?

18                 MR. VIGLIOTTI: Objection.

19  A.   **It depends on the situation.**

20  Q.   You just don't recall one way or the other?

21  A.   **I don't recall.**

22  Q.   What happens next?

23  A.   **He starts running in the direction of the street,**
24       **all within the general area of that door.  At**

41

1  which point I grab him with my arms to prevent
2  him from going towards the street.
3  Q.  How did you -- you made like almost like a bear
4  hug, like, grabbing almost like a tackle?
5  MR. VIGLIOTTI: Objection.
6  A.  **I would not say it was a tackle.**
7  Q.  You brought him to the ground; right?
8  A.  **The momentum of him running away from me pulled**
9  **us to the ground.**
10 Q.  So were you facing, you know, when you said you
11 put your arms around him, was it the front part,
12 the side, the back?
13 A.  **To the best of my knowledge, JT's back was -- I**
14 **was looking at the back of JT.**
15 Q.  And then you said that the momentum brought the
16 two of you down to the ground?
17 A.  **Correct.**
18 Q.  I believe Mr. McCarthy said that the two of you
19 were a couple of feet away from the entrance of
20 the car, from the passenger side. How far do you
21 remember he landed on the ground?
22 MR. VIGLIOTTI: Objection.
23 MS. QUINN: Objection.
24 A.  **I don't recall an exact distance or how far we**

42

1  actually ended up in relation to the car.
2  Q.  Where was -- so his head was facing towards the
3  street?
4  A.  **I'm sorry.**
5  Q.  His head was facing towards the street, in the
6  direction of the street, of Main Street?
7  A.  **Correct.**
8  Q.  And where was his head in relation to the SUV,
9  the mother's SUV, on the passenger side door, the
10 rear tire, where?
11 MS. QUINN: Objection.
12 A.  **I recall us being in the parking lot. I don't**
13 **know exactly our relation to the vehicle.**
14 Q.  Do you know if it was more than two feet?
15 MR. VIGLIOTTI: Objection.
16 A.  **I'm not sure as to the exact distance from the**
17 **vehicle to where we ended up.**
18 Q.  How did he end up on the ground?
19 A.  **When I grabbed him, he was already in a running**
20 **motion. I was not, and when I grabbed him, his**
21 **momentum brought us to the ground.**
22 Q.  So how did he land on the ground?
23 A.  **I had my arms around him, and we both went to the**
24 **ground. I can't articulate or I don't recall**

43

1  exactly how or the manner in which we fell to the
2  ground.
3  Q.  Did he land on his belly?
4  A.  **I don't recall exactly how he fell to the ground.**
5  Q.  Did he land on his knees?
6  A.  **Again, I don't recall exactly what part of his**
7  **body made contact with the ground in the process**
8  **of us going to the ground.**
9  Q.  Did his head hit the ground?
10 A.  **I do not recall him -- his head hitting the**
11 **ground.**
12 Q.  So he landed on the ground because of the
13 momentum when you held him, he couldn't pull any
14 longer and the two of you landed on the ground?
15 MR. VIGLIOTTI: Objection.
16 Q.  Did the two of you land on the ground?
17 A.  **Yes, the two of us landed on the ground.**
18 Q.  Did you get hurt as you landed on the ground?
19 A.  **No.**
20 Q.  Did he get hurt as he landed on the ground?
21 A.  **To the best my knowledge, I'm unaware of any**
22 **injury he may have had in the process of us**
23 **falling.**
24 Q.  Did he complain to you when he landed on the

44

1  ground, My arm, my arm?
2  A.  **No. When we went to the ground, he did not**
3  **complain.**
4  Q.  What happens next?
5  A.  **He's violently moving his arms and feet trying to**
6  **get away from me.**
7  Q.  And what are you doing so that he doesn't hit you
8  with his hands or feet?
9  A.  **So I'm holding him on the ground.**
10 Q.  Are you, like, straddling him at this point?
11 A.  **To my knowledge, I'm to the side of him.**
12 Q.  Which side, closer to the car or away from the
13 car?
14 A.  **I was on the right side of his body towards his**
15 **feet.**
16 Q.  Okay. And so are any of your knees or your feet
17 in contact with his legs or his butt area, his
18 torso?
19 MS. QUINN: Objection.
20 A.  **I don't recall exactly what part of my body may**
21 **have been in contact with his body during that**
22 **part of the interaction.**
23 Q.  Once his momentum brings you down to the ground,
24 did you decide that you needed to put handcuffs

45

1  on him for his safety?
2  A.  **Yes.**
3  Q.  Okay. As you tried to -- when you touched him so
4     that he would calm down, had you made a decision
5     that you were going to put handcuffs on him?
6        MR. VIGLIOTTI:  Objection.
7  A.  **Can I have some clarification on that as far as**
8     **what part of this we're referring to?**
9  Q.  When he's still inside the car, you said you
10    touched him so he wouldn't hurt -- he wouldn't
11    keep acting or hurt himself. I'm not sure what
12    you said. But at that point in time did you say,
13    I need to put handcuffs on this kid?
14 A.  **To my knowledge, I was not at that point in time**
15    **going to put handcuffs on him contingent on**
16    **whatever action he would have responded with.**
17 Q.  Once he landed on the ground, did you land kind
18    of like on top of him?
19 A.  **To the best my knowledge, we both fell to the**
20    **ground.  I can't recall as to exactly what part**
21    **of my body landed on him or if in fact I actually**
22    **landed on him or not.**
23 Q.  Got it. If you were holding him from the back,
24    do you remember if your hands landed on the

46

1     ground, did you cut your arms or your hands, did
2     you have any scratches, any cuts?
3  A.  **To my knowledge, I did not have any lacerations.**
4  Q.  Once he's on the ground, you made a decision that
5     you have to put the handcuffs on him?
6  A.  **Correct.**
7  Q.  Yes?
8        MR. VIGLIOTTI:  Objection.
9  A.  **When we were on the ground, and he continued to**
10    **try and evade me with pounding his fists and his**
11    **feet, I needed to restrain him.**
12 Q.  So he was resisting your efforts to restrain him
13    at that time?
14 A.  **Yes.**
15 Q.  Okay. And at this point in time did you view his
16    actions to be criminal in nature or did you view
17    them in any other manner?
18 A.  **My primary concern was JT's safety and his ability**
19    **to hurt himself.**
20 Q.  Did you view his actions as being criminal in
21    nature?
22 A.  **While we were on the ground?**
23 Q.  Exactly. While he's kicking or trying to get
24    away from you?

47

1  A.  **No. It's not criminal.**
2  Q.  Okay. Got it. Now, you're on the ground and
3     you're on his right side at this point?
4  A.  **To my knowledge.**
5  Q.  And were you able to get your cuffs out?
6  A.  **Yes.**
7  Q.  And when is it that you see Paul?
8  A.  **To my knowledge, when I went to grab his left**
9     **arm, I do recall Paul being in the area.**
10 Q.  Okay.
11 A.  **Paul was in front of us. I had his left -- I**
12    **grabbed for JT's left arm.**
13 Q.  Okay.  And you were to his right?
14 A.  **Correct.**
15 Q.  And what did Paul -- was Paul able to assist you?
16 A.  **I asked Paul to assist me because I was unable to**
17    **gain control of the other arm.**
18 Q.  What exactly did you tell him to do?
19 A.  **I asked him to get JT's right arm and bring it in**
20    **towards his back, so that I could restrain him.**
21    In other words, you were having some difficulties
22    putting the cuffs on him?
23 A.  **Yes.**
24 A.

48

1  Q.  Did you use any pain compliance techniques on his
2     wrist or his fingers so that he would give you
3     his hand and allow you to handcuff him?
4  A.  **No, I did not.**
5  Q.  Were you telling him to calm down or --
6  A.  **To my knowledge, I don't recall anything that I**
7     **would have told him at that specific time.**
8  Q.  What did the boy say besides kicking, is he
9     verbalizing, is he saying anything, is he
10    screaming, yelling?
11 A.  **I do not -- to my knowledge, I don't remember**
12    **exactly what he would have said.**
13 Q.  Is he saying anything like, Get away from me?
14 A.  **I don't remember.**
15 Q.  Got it. And so how long did it take you, you and
16    Mr. McCarthy, Officer McCarthy, to be able to put
17    the handcuffs on him?
18 A.  **So the process of when I -- and this is for**
19    **clarification. From the point that we started to**
20    **the end of that part of the interaction?**
21 Q.  Yes.
22 A.  **I don't have an exact time.**
23 Q.  Okay.
24 A.  **The situation was unfolding rapidly.**

49

1   Q.   Are you a right-handed officer or left?
2   A.   **I'm a right-handed officer.**
3   Q.   So you have your cuffs on your right?
4   A.   **Not necessarily.**
5   Q.   Okay. Do you know what's your preference, do you
6        keep them on the left or right?
7   A.   **On my particular equipment my handcuffs would**
8        **have been on my right abdomen.**
9   Q.   From the minute that you pulled them out to the
10       moment that he was fully restrained with
11       handcuffs, how long would you say that process
12       took, would you say it took more than 30 seconds?
13            MR. VIGLIOTTI:  Objection.
14  A.   **To my knowledge, I couldn't give -- I couldn't**
15       **confirm or deny that time frame.**
16  Q.   Would you say it took you five minutes?
17            MR. VIGLIOTTI: Objection.
18  A.   **No. It did not take five minutes.**
19  Q.   Does it take more than a minute?
20  A.   **It's possible.**
21  Q.   Okay. So what did Paul do -- Paul was assisting
22       you putting the right handcuffs on?
23            MR. VIGLIOTTI:  Objection.
24  A.   **He was assisting me --**

50

1   Q.   What was he doing?
2   A.   **He brought the right arm of the child in.**
3   Q.   So Paul would have been to the left of the boy?
4            MS. QUINN:  Objection.
5   A.   **It's unclear to me as to his exact positioning**
6        **where he was standing in relation to us due to my**
7        **vantage point. I can't definitively tell you**
8        **exactly where he was standing, but he was in**
9        **front of us.**
10  Q.   What, if anything, did you see him do with the
11       boy's right hand?
12  A.   **He grabbed the arm and brought it in to where I**
13       **was trying to handcuff.**
14  Q.   How did he go about doing that?
15  A.   **He grabbed his arm and brought it back towards**
16       **where I was, and then bent it in a manner to try**
17       **and get in towards where the handcuff was.**
18  Q.   How did he bend the arm, can you explain?
19  A.   **He just bent his arm to get it behind his back to**
20       **get to where I was trying to handcuff him.**
21  Q.   Did he raise the arms up on the boy?
22  A.   **To my knowledge, I don't recall.**
23  Q.   Did you have to raise the arms of the boy so that
24       you could put the handcuffs on?

51

1            MR. VIGLIOTTI:  Objection.
2   A.   **I don't recall.**
3   Q.   During the process of putting the handcuffs, did
4        the boy complain of pain in his arm?
5   A.   **Yes.**
6   Q.   And this is before you completed putting the
7        handcuffs on him?
8   A.   **Yes.**
9   Q.   What did the boy say?
10  A.   **That he verbalized that his arm hurt.**
11  Q.   At this point when he verbalized that his arm
12       hurt, had you been able already to put the left
13       handcuff on, was it secured?
14            MS. QUINN:  Objection.
15  A.   **I don't recall exactly the sequence.**
16  Q.   Okay. You said that Paul manipulated his arm to
17       be able to put the right handcuff on; right?
18  A.   **Correct.**
19  Q.   Was the boy complaining as he did that or after
20       he did that?
21  A.   **I don't recall or to my knowledge exactly at**
22       **which point during that motion or interaction he**
23       **would have said that he was in pain.**
24  Q.   Okay. What happened next?

52

1   A.   **Due to him saying that his arm hurt, I tried to**
2        **put him in a position where -- I assured him that**
3        **I would move his arm in a manner to make it more**
4        **comfortable for him.**
5   Q.   Okay.
6   A.   **And an ambulance was called to our location.**
7   Q.   Did you call the ambulance?
8   A.   **Over the radio.**
9   Q.   You asked for an emergency assistance?
10            MR. VIGLIOTTI: Objection.
11  A.   **I asked for an ambulance.**
12  Q.   That's emergency assistance.
13            MR. VIGLIOTTI:  Objection.
14  Q.   Why did you call an ambulance?
15  A.   **That's what it is, an ambulance.**
16  Q.   Why did you call an ambulance, was it because of
17       the arm or was it for some other reason?
18  A.   **There was more than one reason why the ambulance**
19       **was called.**
20  Q.   Is that mentioned in your report? So what were
21       the reasons you called the ambulance?
22  A.   **I had made a determination to Section 12 the**
23       **child. And also he --**
24  Q.   What's a Section 12? I'm sorry. I didn't let

53

1   you finish. What's a Section 12?

2   A.   **A Section 12 is a form in which you complete in**

3       **order to get a mental health evaluation of an**

4       **individual.**

5   Q.   You felt he needed a mental health evaluation?

6   A.   **Yes.**

7   Q.   Because of the crisis he was undergoing?

8            MR. VIGLIOTTI:  Objection.

9   Q.   Did you believe the child was in crisis?

10  A.   **He was in -- yes.**

11  Q.   Do you believe that it was perhaps a mental

12      health issue that needed to be looked into?

13  A.   **Yes.**

14  Q.   Did you also believe that he needed to be

15      evaluated because you had heard that he was an

16      autistic child?

17           MR. VIGLIOTTI:  Objection.

18  A.   **To my knowledge, no.**

19  Q.   Did you associate in any shape or form the

20      behavior of the child with the behavior of an

21      autistic child in crisis based on the training

22      that you had received at the police department?

23  A.   **My reaction or my action for the Section 12 was**

24      **because of his behavior that prompted potential**

54

1       **harm to himself or other people.**

2   Q.   Got it. Did you speak with the paramedics?

3   A.   **When they got on scene, I told them the child was**

4       **out of the control, that he did mention that he**

5       **had some arm pain, and they went and tended to**

6       **him.**

7   Q.   Why is it that in your report you didn't say

8       anything about arm pain?

9   A.   **I didn't believe that there was any substantial**

10      **injury.**

11  Q.   The paramedics -- have you ever seen the

12      paramedic report in this case?

13  A.   **I'm sorry.**

14  Q.   Have you ever seen the paramedics report in this

15      case?

16  A.   **No, sir.**

17  Q.   The paramedics, I can show, it's an exhibit here,

18      whoever wrote the report said that, if memory

19      serves me right, he said he observed a deformity

20      on the boy's -- let me see the exact words that

21      he used -- right arm with slight deformity to

22      proximal humeral area.

23           Did you notice any type of deformity

24      in the boy's --

55

1   A.   **No.**

2   Q.   -- elbow or arm?

3   A.   **No.**

4   Q.   Eventually, you followed the ambulance and took

5       the child --

6   A.   **Yes.**

7   Q.   -- with the Section 12 paperwork --

8   A.   **Yes.**

9   Q.   -- for the child to be evaluated, yes?

10  A.   **Yes.**

11  Q.   Normally when that happens, would you interact

12      with the triage nurse or resident or an attending

13      doctor?

14           MR. VIGLIOTTI:  Objection.

15  Q.   What happens when you bring a person that is

16      being sectioned, do you give the hospital history

17      of what you saw and heard?

18  A.   **So in situations with Section 12s, we fill out**

19      **the Section 12 sheet and that sheet is handed to**

20      **a member of medical personnel at the hospital**

21      **with a brief description or summary of what**

22      **happened. It's on the form.**

23  Q.   Eventually, when you got to the hospital, did

24      doctors or nurses tell you they expect that he

56

1       had broken his elbow or right arm?

2            MR. VIGLIOTTI:  Objection.

3   A.   **No.**

4   Q.   When did you first learn that this child had a

5       fracture to his right elbow?

6   A.   **To my knowledge, it was well after I had -- I**

7       **believe it was the next day.**

8   Q.   You learned that the next day?

9   A.   **I believe.**

10  Q.   How did you learn that?

11  A.   **Some form of complaint was made.**

12  Q.   Okay. Did you ever update your report to talk

13      about what happened to the kid's right shoulder?

14           MR. VIGLIOTTI:  Objection.

15  A.   **I don't know what you're talking about in regards**

16      **to the shoulder.**

17  Q.   Were you ever interviewed by anyone in the Bureau

18      of Professional Standards?

19  A.   **No.**

20  Q.   The way that you communicated with them was

21      through answering the questions on the IDC?

22  A.   **Correct.**

23  Q.   And did you give to them more than one statement?

24  A.   **So I received an initial set of questions from**

57

1 **internal affairs, and then there was a follow-up**
2 **set of questions that was separate and further**
3 **down the line from the initial set of questions.**
4 Q. Okay. So you were asked two sets of questions,
5 to respond to two different sets of questions?
6 A. **There was the initial set of questions, and then**
7 **a follow-up set of questions.**
8 Q. What was the -- do you remember what you were
9 being asked in the follow-up questions?
10 A. **I don't remember unless I see it.**
11 Q. Is that a document that you reviewed in
12 preparation for today?
13 A. **I did review my paperwork.**
14 Q. When was the last time you reviewed the
15 paperwork?
16 A. **At some point this morning.**
17        MR. PINEIRO: I don't have a lot, but
18 let me ask Robin if he has any questions.
19        (Short recess.)
20        MR. PINEIRO: We will mark this as
21 Exhibit 1.
22        (Exhibit No. 1, interrogatories,
23        marked for identification.)
24 Q. Do you recognize this document, Officer Alers?

58

1 A. **This document in front of me?**
2 Q. Yes. Cover letter and the document past that
3 letter.
4 A. **Yes, I do recognize this document.**
5 Q. And this was a document that you signed on
6 October 12, 2021?
7 A. **Correct.**
8 Q. In response to Question No. 1, did you give us
9 all the information in terms of training that you
10 had with people that have autism, mental health
11 disorders, et cetera?
12 A. **To the best of my knowledge.**
13 Q. Did you ever have training with a group called or
14 by anyone that trained you on ALEC, a group
15 called ALEC, A-L-E-C?
16 A. **I don't recall. That's not coming to memory.**
17 Q. Question No. 3, can you read briefly through
18 Question No. 3, the answers that you gave to
19 Question No. 3, just read it to yourself.
20        Did you read it?
21 A. **Yes, sir.**
22 Q. The information that you gave in relation to with
23 regards to Answer No. 3, was that a fair and
24 accurate description of what you remember

59

1 happened that day?
2 A. **Yes, sir.**
3 Q. Is there anything else that you think needs to be
4 expanded or clarified?
5 A. **To my knowledge, at this point in time, I don't**
6 **believe so.**
7 Q. Okay. Thank you. And then I want to --
8        MR. PINEIRO: What was the last
9 document --
10        MR. VIGLIOTTI: Do you want to mark
11 it for his deposition?
12        MR. PINEIRO: We don't have to.
13        MR. SCOTT: This is Exhibit 6 from
14 Mr. McCarthy's deposition.
15 Q. Once Ms. Beshai filed a complaint, were you
16 notified of the outcome of the investigation?
17 A. **I received a notification in a letter-type**
18 **format.**
19 Q. Did they notify you that you had bene exonerated
20 of any charges?
21        MR. VIGLIOTTI: Objection.
22 Q. Do you remember what you were told in that
23 letter?
24 A. **I vaguely remember that it was  unsustained.**

60

1 Q. Okay. Can you take a look at Page 22.
2        MR. VIGLIOTTI: He's there, Hector.
3 He's on Page 22.
4 Q. Can you review, peruse through, Pages 22, 23, and
5 24.
6        MR. VIGLIOTTI: Just for
7 clarification, where it starts, request reports
8 Officer John Alers.
9        MR. PINEIRO: Yes.
10 A. **Where am I stopping again?**
11        MR. VIGLIOTTI: That page right
12 there.
13 Q. Page 22 through --
14 A. **25; correct?**
15 Q. Yes, sir.
16 A. **Yes, sir.**
17 Q. How do you recognize this document?
18 A. **The initial set of questions that was given to me**
19 **by internal affairs.**
20 Q. And Page 25 was not signed by you; correct?
21 A. **It's not reflected as signed in the copy.**
22 Q. If you go further down towards the end of this
23 exhibit, and go to City Document Response 65.
24 A. **Yes, sir.**

61

1 Q. First go to 60, please.
2       MR. VIGLIOTTI: 60?
3       MR. PINEIRO: Yes.
4 Q. Pages 60 through 62. Do you recognize that
5    document?
6 A. **Yes, sir.**
7 Q. How do you recognize it?
8 A. **This is also, again, the questions presented to**
9    **me from internal affairs.**
10 Q. And the only difference between those two is that
11    this document you signed it on Page 62?
12 A. **There is a signature, yes.**
13 Q. And when you responded to internal affairs, was
14    your response fair and accurate?
15 A. **Yes, sir.**
16 Q. If you take a look at page -- City Document
17    Response 63.
18 A. **Yes.**
19 Q. Is that your incident report?
20 A. **This is my initial report.**
21 Q. And your incident report was cosigned by your
22    supervisor?
23 A. **Correct.**
24 Q. And that was Gerald O'Connor?

62

1 A. **Correct.**
2 Q. And does that tell you when he cosigned this
3    report?
4 A. **Do you mean, like, a time stamp or something?**
5 Q. Yes, a time stamp?
6 A. **I don't recall exactly when the document was**
7    **signed, but it was signed by my supervisor.**
8 Q. You prepared this report on September 25, 2017 at
9    around ten o'clock in the morning?
10 A. **That's how it's time stamped, yes.**
11 Q. And again, this report doesn't say anything about
12    JT complaining of right arm pain?
13 A. **That is correct.**
14 Q. And if you can take a look at Page 65, do you
15    recognize Page 65 and 66?
16 A. **I do.**
17 Q. How do you recognize it?
18 A. **This is the report that I submitted upon request.**
19 Q. You talked about two IDC reports. This is the
20    last one that you submitted?
21 A. **Yes, because this one only has three questions,**
22    **and the initial had eight.**
23 Q. Okay. Do you know how JT broke his arm?
24

63

1 A. **I do not.**
2 Q. Do you know if it happened during the handcuffing
3    process?
4       MR. VIGLIOTTI:  Objection.
5 A. **I can't definitively tell you as to when it**
6    **actually occurred.**
7 Q. But he didn't complain about, if memory serves
8    correct, he complained of arm pain after he was
9    handcuffed --
10       MR. VIGLIOTTI:  Objection.
11 Q. -- or before he was handcuffed?
12       MR. VIGLIOTTI:  Objection.
13 A. **As to the actual sequence, I am not really sure**
14    **as far as time frame, but he did complain of arm**
15    **pain, yes.**
16 Q. He complained of arm pain once the handcuffs were
17    on his wrist?
18 A. **Yes.**
19 Q. Okay. But not before?
20 A. **To the best of my knowledge and recollection and**
21    **how it's reflected in my report.**
22 Q. In your interrogatories, you listed the names of
23    the paramedics. Did you know the paramedics?
24 A. **Did I know, like --**

64

1 Q. Did you know them by name?
2 A. **No. When I received the questions from internal**
3    **affairs, I retrieved that information so that it**
4    **could be accurate and present the information**
5    **that was there.**
6 Q. Got it. Okay. Where would you have gotten that
7    information if it's not in the report, the names
8    of the paramedics that are in the reports?
9 A. **I believe to my knowledge that it can be from the**
10    **dispatch. When dispatch -- I believe that**
11    **contact was made to the ambulance service to see**
12    **who was there on that particular incident.**
13 Q. After this event, did you receive any type of
14    additional training on dealing with autistic
15    children or people who suffer from autistic
16    spectrum disorder?
17 A. **To the best of my knowledge, we continue to have**
18    **in-service annually, and throughout the series of**
19    **however many in-services I've had between this**
20    **incident and now, there has been more training**
21    **for this -- individuals with autism and mental**
22    **illness.**
23 Q. Did you interact with Paul McCarthy on a frequent
24    basis in 2017?

65

1   A.   **To my knowledge, I interacted with Paul on a     work**

2        **capacity.**

3   Q.   Did you ever interact with him outside of work?

4   A.   **To my knowledge, not much, if at all.**

5   Q.   Did you respond to calls in common?

6   A.   **If I received a phone call, I believe I would have**

7        **answered that phone call.**

8   Q.   Is this the only time that you prepared IDC  or

9        Bureau of Professional Standards or have you  done

10       it on any other occasion?

11  A.   **So just for clarification, have I done any  IDCs**

12       **in any format?**

13  Q.   To the Bureau of Professional Standards besides

14       these two  others?

15  A.   **I would have to review my records. To my**

16       **knowledge, I'm not aware upon review of my**

17       **documentation.**

18              MR. PINEIRO: Okay. I'm all done.

19       Thank you so much. Good luck.

20              (Whereupon the deposition was

21              concluded.)

22

23

24

66

ERRAT A SHEET.

In accordance with the rules of procedure governing depositions, you are entitled to read and correct your deposition. Accordingly, please carefully read your deposition and, on this errata sheet, make any changes or corrections in form or substance to your deposition that you feel should be made.  PLEASE DO NOT MARK THE TRANSCRIPT.  After completing this procedure, sign at the conclusion of such changes/corrections (if any) and return it in accordance with your instructions.

PAGE LINE

_____ _____      CHANGE:_____

_____ _____      REASON:_____

_____ _____      CHANGE:_____

_____ _____      REASON:_____

_____ _____      CHANGE:_____

_____ _____      REASON:_____

_____ _____      CHANGE:_____

_____ _____      REASON:_____

_____ _____      CHANGE:_____

_____ _____      REASON:_____

_____ _____      CHANGE:_____

_____ _____      REASON:_____

_____ _____      CHANGE:_____

_____ _____      REASON:_____

_____ _____      CHANGE:_____

_____ _____      REASON:_____

_____ _____      CHANGE:_____

_____ _____      REASON:_____

_____ _____      CHANGE:_____

_____ _____      REASON:_____

_____ _____      CHANGE:_____

_____ _____      REASON:_____

DATE: _____

JOHN ALERS

67

Excerpt from Rule 30 (e):
Submission to Witness; Changes; Signing.

When the testimony is fully transcribed, the deposition shall be submitted to the witness for examination and shall be read to or by him/her, unless such examination and reading are waived by the witness and by the parties. Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them. This procedure must be accomplished within  30 days of receipt of the transcript.

*****************************************

I have read the foregoing, and it is a true transcript of the testimony given by me at the taking of the subject deposition.

_____

JOHN ALERS

_____

DATE

CASE NAME: Beshai Torres v. City of Worcester et al.

DATE TAKEN: January 19, 2022

68

Commonwealth of Massachusetts
Bristol, ss.

I, Melissa R. McKenzie, Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on  the 19th day of January, 2022, JOHN ALERS, who was satisfactorily identified and duly sworn by  me; that the ensuing examination upon oath of the said deponent was reported stenographically by me and transcribed into typewriting under my direction and control; and that the written transcript is a true record of  the  questions asked and answers given at said deposition.

I FURTHER CERTIFY that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken; and, further, that I am not a relative or employee of any attorney or financially interested in the outcome of the action.

IN WITNESS WHEREOF I have hereunto set my hand and affixed my seal of office this 16th day of February, 2022 at Attleboro.

_____

Melissa R.  McKenzie, CSR
Notary Public,
Commonwealth of Massachusetts My Commission Expires: 5/4/23

**'** - 1

**34** [1] - 5:5
**35** [1] - 5:5

**4**

**4** [2] - 2:16, 3:3
**420-CV-401157SH** [1]

- 1:2

**5**

**5'10** [1] - 39:17
**5/4/23** [1] - 68:19
**508** [5] - 1:23, 2:4, 2:8,
  2:13, 2:17
**57** [1] - 3:6

**6**

**6** [1] - 59:13
**60** [3] - 61:1, 61:2,
  61:4
**62** [2] - 61:4, 61:11
**63** [1] - 61:17
**65** [3] - 60:23, 62:14,
  62:15
**66** [1] - 62:15
**68** [1] - 3:8

**69** [1] - 1:22

**7**

**75** [1] - 24:10
**753-4131** [1] - 1:23
**754-7285** [1] - 2:17
**770-0600** [1] - 2:4
**799-1161** [2] - 2:8,
  2:13

**8**

**807** [2] - 1:17, 2:3

**A**

**abdomen** [1] - 49:8
**ability** [2] - 17:24,
  46:19
**able** [6] - 15:1, 47:5,
  47:15, 48:16, 51:12,
  51:17
**academy** [9] - 5:10,
  5:24, 6:4, 6:5, 6:6,
  6:16, 6:17, 6:20
**accomplished** [1] -
  67:7

**'07** [2] - 6:22, 7:4
**'13** [2] - 7:4, 7:6
**'17** [3] - 8:4, 8:23,
  24:20

**0**

**01608** [2] - 2:8, 2:12
**01609** [1] - 2:16
**01610** [1] - 2:3
**01721** [1] - 1:23

**1**

**1** [4] - 3:6, 57:21,
  57:22, 58:8
**12** [8] - 52:22, 52:24,
  53:1, 53:2, 53:23,
  55:7, 55:19, 58:6
**1256** [1] - 23:22
**12s** [1] - 55:18
**1445F97** [1] - 1:15
**16th** [1] - 68:15
**19** [2] - 1:19, 67:24
**19th** [1] - 68:5

**2**

**2007** [1] - 5:4
**2013** [3] - 5:11, 5:24,
  20:19
**2017** [7] - 18:5, 21:4,
  21:10, 23:1, 23:2,
  62:8, 64:24
**2021** [1] - 58:6
**2022** [4] - 1:19, 67:24,
  68:5, 68:15
**22** [4] - 60:1, 60:3,
  60:4, 60:13
**220** [1] - 39:19
**23** [1] - 60:4
**235** [1] - 39:21
**24** [1] - 60:5
**240** [1] - 39:21
**25** [6] - 18:5, 23:2,
  24:20, 60:14, 60:20,
  62:8
**25th** [3] - 8:4, 8:23,
  22:20

**3**

**3** [4] - 58:17, 58:18,

**accurate** [4] - 10:14,
  58:24, 61:14, 64:4
**act** [2] - 35:19, 36:9
**acted** [1] - 27:16
**acting** [3] - 13:6,
  32:10, 45:11
**action** [4] - 45:16,
  53:23, 68:11, 68:13
**ACTION** [1] - 1:2
**actions** [4] - 12:9,
  32:9, 46:16, 46:20
**actual** [2] - 8:12, 63:13
**addition** [2] - 22:10,
  35:16
**additional** [1] - 64:14
**adult** [2] - 13:18,
  31:13
**adults** [2] - 13:22,
  15:3
**advice** [1] - 19:19
**affairs** [8] - 16:22,
  17:6, 17:8, 57:1,
  60:19, 61:9, 61:13,
  64:3
**affected** [2] - 5:9, 7:11
**affixed** [1] - 68:15
**afternoon** [1] - 4:17
**afterwards** [1] - 5:21
**age** [1] - 23:7
**AGENCY** [1] - 1:22
**agitated** [1] - 31:21
**agree** [1] - 9:17
**agreed** [2] - 4:2, 4:9
**aim** [1] - 33:18
**ajar** [1] - 30:5
**AKERSON** [1] - 2:15
**al** [1] - 67:23
**ALEC** [3] - 58:14,
  58:15
**Alers** [5] - 2:18, 3:3,
  4:19, 57:24, 60:8
**ALERS** [6] - 1:6, 1:10,
  4:12, 66:22, 67:15,
  68:5
**allow** [1] - 48:3
**almost** [2] - 41:3, 41:4
**ambulance** [10] - 52:6,
  52:7, 52:11, 52:14,
  52:15, 52:16, 52:18,
  52:21, 55:4, 64:11
**AND** [1] - 1:7
**annually** [1] - 64:18
**Answer** [1] - 58:23
**answer** [9] - 9:12,
  9:23, 10:14, 11:19,
  13:1, 15:17, 16:12
**answered** [2] - 17:23,
  65:7
**answering** [2] - 20:4,
  56:21

**answers** [2] - 58:18,
  68:8
**appear** [1] - 33:10
**appearance** [1] - 31:7
**APPEARANCES** [1] -
  2:1
**appeared** [3] - 26:18,
  31:10, 32:24
**appearing** [1] - 31:5
**applicable** [1] - 1:12
**appreciate** [2] - 13:1,
  15:18, 35:10
**approach** [7] - 10:24,
  11:6, 11:8, 12:2,
  12:6, 28:2, 28:9
**approached** [1] - 28:4
**approximate** [4] - 6:3,
  30:16, 30:22, 33:15
**approximation** [1] -
  25:22
**area** [9] - 22:2, 40:24,
  44:17, 47:9, 54:22
**areas** [1] - 31:22
**arm** [28] - 44:1, 47:9,
  47:12, 47:17, 47:19,
  50:2, 50:12, 50:15,
  50:18, 50:19, 51:4,
  51:10, 51:11, 51:16,
  52:1, 52:3, 52:17,
  54:5, 54:8, 54:21,
  55:2, 56:1, 62:12,
  62:24, 63:8, 63:14,
  63:16
**arms** [9] - 36:21,
  38:20, 41:1, 41:11,
  42:23, 44:5, 46:1,
  50:21, 50:23
**arrival** [1] - 23:16
**arrive** [1] - 34:4
**arrived** [3] - 25:13,
  25:18, 34:14
**articulate** [2] - 29:8,
  42:24
**ASHLAND** [1] - 1:23
**assigned** [2] - 20:21,
  22:3
**assist** [2] - 47:15,
  47:16
**assistance** [3] - 22:16,
  52:9, 52:12
**ASSISTANT** [2] - 2:6,
  2:10
**assisting** [2] - 49:21,
  49:24
**associate** [1] - 53:19
**assured** [1] - 52:2
**attach** [1] - 28:23
**attempt** [1] - 35:20
**attempted** [2] - 36:11,
  36:24

**attend** [1] - 5:10
**attending** [1] - 55:12
**Attleboro** [1] - 68:15
**ATTORNEY** [1] - 3:7
**attorney** [3] - 17:2,
  68:10, 68:12
**autism** [27] - 6:12,
  6:13, 6:15, 7:10,
  7:12, 7:21, 8:7, 8:16,
  9:9, 9:17, 9:19,
  10:10, 10:16, 10:18,
  10:23, 11:4, 11:9,
  11:21, 12:3, 12:7,
  12:10, 13:23, 15:5,
  15:21, 58:10, 64:21
**autistic** [19] - 7:1,
  12:19, 13:5, 13:13,
  13:19, 14:1, 22:18,
  23:3, 23:6, 27:1,
  27:12, 29:10, 31:3,
  37:4, 37:8, 53:16,
  53:21, 64:14, 64:15
**aware** [1] - 65:16

**B**

**bag** [14] - 32:13,
  32:15, 32:16, 32:18,
  32:19, 32:23, 33:1,
  33:2, 33:4, 33:6,
  33:18, 34:3, 35:14,
  35:16
**based** [3] - 14:12,
  33:12, 53:21
**basis** [3] - 11:4, 37:9,
  64:24
**BAY** [1] - 1:22
**bear** [1] - 41:3
**bearing** [1] - 8:3
**became** [1] - 31:20
**began** [2] - 31:21,
  35:16
**beginning** [1] - 21:16
**behalf** [1] - 1:11
**behavior** [4] - 37:19,
  53:20, 53:24
**behaviors** [2] - 14:7,
  36:8
**behind** [1] - 50:19
**belly** [1] - 43:3
**bend** [1] - 50:18
**bene** [1] - 59:19

**bent** [2] - 50:16, 50:19
**BESHAI** [1] - 1:3
**Beshai** [4] - 16:14,

58:19, 58:23
**30** [4] - 4:5, 49:12,
  67:1, 67:7
**301** [2] - 2:7, 2:12
**32** [1] - 5:6

**accordance** [3] - 9:2,
  66:2, 66:7
**Accordingly** [1] - 66:3
**account** [1] - 26:14

24:12, 59:15, 67:23
**best** [21] - 14:20,
  15:16, 17:16, 17:24,
  19:21, 20:1, 20:11,
  21:3, 24:14, 25:5,

26:12, 27:9, 30:6, 36:20, 38:16, 41:13, 43:21, 45:19, 58:12, 63:20, 64:17
**better** [3] - 10:14, 16:12, 22:4
**between** [3] - 4:2, 61:10, 64:19
**big** [3] - 24:5, 30:20, 32:16
**bit** [1] - 32:21
**blocking** [2] - 39:6, 39:14
**body** [7] - 36:18, 36:19, 43:7, 44:14, 44:20, 44:21, 45:21
**boy** [8] - 24:16, 48:8, 50:3, 50:21, 50:23, 51:4, 51:9, 51:19
**boy's** [3] - 50:11, 54:20, 54:24
**BRAEBURN** [1] - 1:22
**break** [1] - 25:1
**brief** [2] - 27:9, 55:21
**briefly** [1] - 58:17
**bring** [2] - 47:19, 55:15
**brings** [2] - 8:3, 44:23
**Bristol** [1] - 68:2
**Brite** [3] - 23:22, 25:24, 34:17
**broke** [1] - 62:23
**broken** [1] - 56:1
**brought** [7] - 18:16, 41:7, 41:15, 42:21, 50:2, 50:12, 50:15
**Bureau** [4] - 16:23, 56:17, 65:9, 65:13
**Burncoat** [3] - 5:1, 5:12, 22:7
**business** [1] - 24:4
**butt** [1] - 44:17
**BY** [2] - 3:7, 4:16

## C

**calm** [7] - 11:10, 11:21, 14:22, 14:24, 15:1, 45:4, 48:5
**calmed** [2] - 30:9, 30:10
**cannot** [2] - 9:3, 13:23
**capacity** [2] - 22:17, 65:2
**car** [19] - 23:24, 24:12, 25:4, 25:7, 27:19, 35:11, 35:13, 36:10, 36:15, 37:15, 38:4, 38:5, 38:15, 40:8, 41:20, 42:1, 44:12,

44:13, 45:9
**career** [1] - 13:14
**carefully** [1] - 66:3
**CASE** [1] - 67:23
**case** [6] - 11:4, 37:9, 54:12, 54:15
**case-by-case** [2] - 11:4, 37:9
**caused** [1] - 32:9
**certain** [1] - 15:23
**CERTIFICATION** [1] - 3:8
**Certified** [1] - 1:14
**certify** [1] - 68:4
**CERTIFY** [1] - 68:10
**cetera** [1] - 58:11
**chance** [1] - 18:1
**CHANGE** [12] - 66:9, 66:10, 66:11, 66:12, 66:13, 66:14, 66:15, 66:16, 66:17, 66:18, 66:19, 66:20
**changed** [2] - 21:14, 21:15
**changes** [2] - 66:4, 67:5
**Changes** [1] - 67:1
**changes/corrections** [1] - 66:6
**charges** [1] - 59:20
**chat** [1] - 34:18
**checking** [1] - 22:1
**child** [22] - 13:6, 18:7, 23:3, 23:17, 23:19, 27:2, 27:12, 27:19, 31:3, 34:2, 37:21, 50:2, 52:23, 53:9, 53:16, 53:20, 53:21, 54:3, 55:5, 55:9, 56:4
**children** [7] - 12:19, 13:13, 15:4, 22:18, 37:4, 37:8, 64:15
**chip** [1] - 32:19

**circumstances** [3] - 15:23, 16:1, 16:3
**City** [10] - 2:7, 2:12, 4:19, 5:21, 22:6, 23:11, 23:14, 60:23, 61:16, 67:23
**CITY** [5] - 1:7, 2:6, 2:6, 2:10, 2:11
**CIVIL** [1] - 1:2
**Civil** [1] - 1:13
**claim** [1] - 16:14
**claimed** [2] - 16:22, 17:2
**clarification** [9] - 7:4, 10:20, 15:10, 21:14, 32:17, 45:7, 48:19,

60:7, 65:11
**clarified** [1] - 59:4
**clarify** [3] - 5:15, 9:8, 15:8
**Cleaners** [1] - 23:22, 25:24, 34:17
**clearly** [1] - 29:8
**close** [1] - 33:13
**closed** [1] - 27:22
**closer** [1] - 44:12
**collect** [1] - 10:4
**comfortable** [1] - 52:4
**coming** [2] - 5:23, 58:16
**Commission** [1] - 68:19
**common** [1] - 65:5
**COMMONWEALTH** [1] - 1:1
**Commonwealth** [4] - 1:16, 68:1, 68:4, 68:19
**communicated** [1] - 56:20
**complain** [5] - 43:24, 44:3, 51:4, 63:7, 63:14
**complained** [2] - 63:8, 63:16
**complaining** [2] - 51:19, 62:12
**complaint** [6] - 16:21, 17:14, 19:8, 19:14, 56:11, 59:15
**complete** [2] - 34:7, 53:2
**completed** [1] - 51:6
**completing** [1] - 66:5
**compliance** [1] - 48:1
**concept** [1] - 14:5
**concepts** [1] - 15:6
**concern** [4] - 32:9, 32:11, 33:12, 46:18
**concerned** [1] - 15:12
**concluded** [1] - 65:21
**conclusion** [1] - 66:6
**condition** [1] - 12:16
**conduct** [1] - 32:11
**confirm** [1] - 49:15
**considered** [1] - 37:23
**consult** [1] - 19:16
**contact** [12] - 13:20, 15:3, 16:6, 16:7, 22:14, 33:8, 33:11, 36:21, 43:7, 44:17, 44:21, 64:11
**contained** [1] - 35:18
**content** [1] - 20:16
**contents** [2] - 18:9, 27:11

**contingent** [1] - 45:15
**continue** [1] - 64:17
**continued** [2] - 29:21, 46:9
**control** [7] - 23:4, 23:7, 23:18, 36:12, 47:17, 54:4, 68:7
**conversation** [9] - 18:3, 18:9, 18:12, 18:16, 20:16, 27:10, 30:12, 30:15, 34:2
**cool** [1] - 24:21
**copy** [2] - 19:7, 60:21
**correct** [20] - 14:11, 22:15, 31:4, 31:18, 39:13, 39:23, 41:17, 42:7, 46:6, 47:14, 51:18, 56:22, 58:7, 60:14, 60:20, 61:23, 62:1, 62:13, 63:8, 66:3
**corrections** [1] - 66:4
**correlate** [1] - 22:9
**correlated** [1] - 10:9
**correspondence** [1] - 17:11
**corresponds** [1] - 21:8
**cosigned** [2] - 61:21, 62:2
**counsel** [2] - 4:2, 68:10
**couple** [3] - 21:18, 21:22, 41:19
**course** [2] - 6:20, 13:14
**COURT** [1] - 1:1
**cover** [1] - 58:2
**COVID** [1] - 5:8
**criminal** [4] - 32:12, 46:16, 46:20, 47:1
**crisis** [5] - 14:9, 36:4, 53:7, 53:9, 53:21
**cross** [1] - 36:6

**CROSS** [1] - 3:2
**cruiser** [3] - 25:24, 26:2, 26:5
**CSR** [1] - 68:18
**cuffs** [3] - 47:5, 47:23, 49:3
**custom** [1] - 27:2, 40:16
**cut** [1] - 46:1
**cuts** [1] - 46:2

## D

**date** [2] - 8:5, 9:4
**DATE** [3] - 66:22, 67:17, 67:24

**dates** [1] - 8:12
**Days** [2] - 20:24, 21:2
**days** [2] - 4:5, 67:7
**deal** [7] - 6:8, 6:11, 10:16, 10:23, 11:24, 14:13, 29:14
**dealing** [4] - 6:23, 14:19, 31:13, 64:14
**dealt** [3] - 12:21, 13:22, 23:6
**decide** [2] - 29:14, 44:24
**decided** [1] - 36:10
**decision** [2] - 45:4, 46:4
**deemed** [1] - 4:6
**Defendants** [3] - 1:8, 2:9, 2:14
**definitely** [1] - 12:23
**definitive** [4] - 9:12, 11:18, 21:7, 30:23
**definitively** [6] - 8:1, 10:8, 13:8, 13:17, 50:7, 63:5
**deformity** [3] - 54:19, 54:21, 54:23
**demeanor** [2] - 11:10, 40:7
**deny** [1] - 49:15
**department** [8] - 4:22, 5:17, 10:17, 16:15, 20:18, 20:20, 21:10, 53:22
**DEPARTMENT** [3] - 1:1, 2:7, 2:11
**Department** [1] - 6:7
**dependent** [2] - 11:6, 16:3
**deponent** [2] - 4:3, 68:6
**DEPOSITION** [1] - 1:10
**deposition** [13] - 4:4, 4:6, 59:11, 59:14, 65:20, 66:3, 66:3, 66:4, 67:3, 67:6, 67:12, 68:8, 68:11
**depositions** [1] - 66:2
**Depot** [1] - 5:20
**describe** [1] - 24:5
**DESCRIPTION** [1] - 3:5
**description** [2] - 55:21, 58:24
**designated** [1] - 22:1
**desires** [1] - 67:5
**determination** [1] - 52:22
**difference** [1] - 61:10
**different** [7] - 7:23,

11:18, 15:24, 16:1, 20:17, 27:6, 57:5
**differently** [1] - 37:10
**difficulties** [1] - 47:22
**dimensions** [1] - 24:9
**direct** [1] - 4:15
**DIRECT** [1] - 3:2
**direction** [7] - 25:4, 33:20, 35:15, 39:5, 40:23, 42:6, 68:7
**directly** [5] - 8:9, 9:4, 10:9, 13:23, 22:19
**disability** [6] - 6:24, 9:17, 9:21, 9:24, 10:1, 10:9
**disabled** [1] - 22:18
**disorder** [11] - 6:13, 6:15, 7:2, 7:11, 8:8, 10:18, 12:7, 14:2, 15:5, 15:22, 64:16
**disorders** [2] - 6:9, 58:11
**dispatch** [3] - 22:21, 64:10
**dispatcher** [3] - 5:22, 6:1, 31:2
**distance** [2] - 41:24, 42:16
**distress** [3] - 14:10, 29:13, 32:7
**DISTRICT** [1] - 1:1
**Division** [2] - 20:21, 20:22
**division** [1] - 7:19
**DO** [1] - 46:5
**doctor** [1] - 55:13
**doctors** [1] - 55:24
**Document** [2] - 60:23, 61:16
**document** [12] - 17:8, 57:11, 57:24, 58:1, 58:2, 58:4, 58:5, 59:9, 60:17, 61:5, 61:11, 62:6
**documentation** [2] - 8:12, 65:17
**done** [3] - 65:9, 65:11, 65:18
**door** [11] - 27:22, 30:3, 30:4, 30:6, 39:3, 39:6, 39:10, 39:11, 39:14, 40:24, 42:9
**down** [10] - 14:22, 15:1, 30:9, 30:10, 41:16, 44:23, 45:4, 48:5, 57:3, 60:22
**dressed** [2] - 24:16, 24:17
**driving** [1] - 24:13
**due** [4] - 7:7, 33:16,

50:6, 52:1
**duly** [2] - 4:13, 68:5
**during** [14] - 6:16, 6:17, 6:20, 11:15, 12:5, 13:13, 13:24, 32:13, 34:22, 36:1, 44:21, 51:3, 51:22, 63:2

## E

**effort** [2] - 37:3, 39:1
**efforts** [1] - 46:12
**eight** [1] - 62:22
**elapsed** [1] - 25:22
**elbow** [3] - 55:2, 56:1, 56:5
**electricity** [1] - 38:2
**emergency** [2] - 52:9, 52:12
**emphasize** [1] - 11:12
**employed** [4] - 4:19, 5:19, 5:21, 68:11
**employee** [1] - 68:12
**employment** [2] - 4:18, 5:13
**EMTs** [1] - 13:5
**encompassed** [1] - 8:17
**encounter** [2] - 29:9, 40:11
**end** [3] - 42:18, 48:20, 60:22
**ended** [2] - 42:1, 42:17
**enforcement** [1] - 15:3
**ensuing** [1] - 68:6
**entered** [1] - 67:5
**entitled** [1] - 66:2
**entrance** [1] - 41:19
**equipment** [1] - 49:7
**ERRATA** [1] - 66:1
**errata** [1] - 66:4
**ESQUIRE** [2] - 2:2, 2:15
**et** [2] - 58:11, 67:23
**evade** [1] - 46:10
**evaluated** [2] - 53:15, 55:9
**evaluation** [2] - 53:3, 53:5
**event** [11] - 24:10, 64:13
**events** [1] - 35:5
**eventually** [2] - 55:4, 55:23
**exact** [15] - 6:2, 8:9, 9:4, 9:10, 13:8, 24:9, 24:11, 25:21, 26:23, 28:19, 41:24, 42:16,

48:22, 50:5, 54:20
**exactly** [20] - 6:18, 6:21, 17:20, 25:9, 28:21, 34:16, 40:14, 42:13, 43:1, 43:4, 43:6, 44:20, 45:20, 46:23, 47:18, 48:12, 50:8, 51:15, 51:21, 62:6
**examination** [3] - 67:3, 67:4, 68:6
**examined** [1] - 4:14
**except** [1] - 4:10
**Excerpt** [1] - 67:1
**exhibit** [3] - 14:7, 54:17, 60:23
**Exhibit** [3] - 57:21, 57:22, 59:13
**exhibiting** [1] - 36:8
**EXHIBITS** [2] - 3:5, 3:7
**exited** [2] - 33:6, 36:13
**exonerated** [1] - 59:19
**expanded** [1] - 59:4
**expect** [1] - 55:24
**experience** [1] - 14:2
**experiencing** [2] - 14:13, 14:18
**Expires** [1] - 68:19
**explain** [2] - 22:5, 50:18
**eye** [2] - 33:8, 33:10

## F

**facing** [5] - 25:4, 25:6, 41:10, 42:2, 42:5
**fact** [3] - 28:23, 29:3, 45:21
**fair** [4] - 16:17, 16:19, 58:23, 61:14
**fairly** [1] - 31:15
**fall** [3] - 22:11, 24:21, 33:4
**falling** [1] - 43:23
**far** [10] - 8:12, 8:19, 24:11, 25:7, 30:14, 31:5, 41:20, 41:24, 45:7, 63:14
**February** [1] - 68:15
**feet** [11] - 24:10, 30:17, 30:18, 38:15, 41:19, 42:14, 44:5, 44:8, 44:15, 44:16, 46:11
**fell** [7] - 6:12, 9:2, 10:18, 15:4, 43:1, 43:4, 45:19
**felt** [2] - 37:13, 53:5
**filed** [2] - 16:14, 59:15

**fill** [3] - 19:20, 21:21, 55:18
**filling** [1] - 21:19
**financially** [1] - 68:12
**fingers** [1] - 48:2
**finish** [2] - 13:12, 53:1
**finishing** [1] - 5:12
**first** [6] - 25:10, 26:8, 29:9, 34:21, 56:4, 61:1
**fists** [2] - 31:21, 46:10
**five** [4] - 25:18, 30:17, 49:16, 49:18
**floor** [1] - 33:4
**follow** [3] - 57:1, 57:7, 57:9
**follow-up** [3] - 57:1, 57:7, 57:9
**followed** [1] - 55:4
**follows** [1] - 4:15
**force** [4] - 5:13, 6:22, 7:9, 9:14
**forcefully** [1] - 33:20
**foregoing** [1] - 67:11
**form** [10] - 4:10, 9:19, 12:13, 29:13, 53:2, 53:19, 55:22, 56:11, 66:4, 67:5
**format** [7] - 7:15, 17:7, 19:22, 20:6, 20:9, 59:18, 65:12
**FORMER** [1] - 1:6
**fracture** [1] - 56:5
**frame** [8] - 6:2, 8:10, 9:3, 9:10, 21:7, 25:21, 49:15, 63:14
**frequent** [1] - 64:23
**front** [8] - 25:7, 27:21, 30:2, 35:7, 41:11, 47:11, 50:9, 58:1
**full** [2] - 6:6, 21:23
**full-time** [2] - 6:6, 21:23
**fully** [6] - 30:5, 30:6, 30:7, 39:4, 49:10, 67:2
**FURTHER** [1] - 68:10

## G

**Gafney** [2] - 20:13, 20:14
**gain** [1] - 47:17
**general** [1] - 40:24
**Gerald** [1] - 61:24
**given** [8] - 6:20, 12:23, 60:18, 67:6, 67:11, 68:8
**governing** [1] - 66:2
**grab** [3] - 36:20, 41:1,

47:8
**grabbed** [5] - 42:19, 42:20, 47:12, 50:12, 50:15
**grabbing** [2] - 37:19, 41:4
**graduate** [1] - 5:3
**graduated** [2] - 5:1, 7:5
**ground** [32] - 35:6, 41:7, 41:9, 41:16, 41:21, 42:18, 42:21, 42:22, 42:24, 43:2, 43:4, 43:7, 43:8, 43:9, 43:11, 43:12, 43:14, 43:16, 43:17, 43:18, 43:20, 44:1, 44:2, 44:9, 44:23, 45:17, 45:20, 46:1, 46:4, 46:9, 46:22, 47:2
**group** [2] - 58:13, 58:14
**guy** [1] - 31:16

## H

**Half** [2] - 20:22, 20:24
**Hall** [2] - 2:7, 2:12
**hand** [4] - 20:2, 48:3, 50:11, 68:15
**handcuff** [4] - 48:3, 50:13, 50:17, 50:20, 51:13, 51:17
**handcuffed** [2] - 63:9, 63:11
**handcuffing** [1] - 63:2
**handcuffs** [13] - 44:24, 45:5, 45:13, 45:15, 46:5, 48:17, 49:7, 49:11, 49:22, 50:24, 51:3, 51:7, 63:16
**handed** [3] - 49:1, 49:2, 55:19
**handle** [1] - 10:23
**hands** [9] - 36:18, 36:23, 37:11, 38:7, 38:24, 39:7, 44:8, 45:24, 46:1
**harm** [3] - 38:3, 38:21, 54:1
**harming** [1] - 35:20
**head** [5] - 42:2, 42:5, 42:8, 43:9, 43:10
**health** [5] - 6:9, 53:3, 53:5, 53:12, 58:10
**hear** [1] - 27:24
**heard** [3] - 13:24, 53:15, 55:17

**HECTOR** [2] - 2:2, 2:2
**Hector** [3] - 1:17, 24:24, 60:2
hector@pineirolegal.com [1] - 2:4
**held** [5] - 8:19, 20:18, 21:9, 21:17, 43:13
**hereby** [1] - 68:4
**hereunto** [1] - 68:14
**high** [3] - 4:24, 5:16, 5:19
**High** [1] - 5:1
**him/her** [1] - 67:4
**himself** [8] - 35:21, 36:12, 37:16, 38:18, 38:21, 45:11, 46:19, 54:1
**hired** [1] - 5:17
**history** [2] - 27:3, 55:16
**hit** [4] - 33:1, 33:21, 43:9, 44:7
**hitting** [1] - 43:10
**holding** [2] - 44:9, 45:23
**home** [1] - 13:3
**Home** [1] - 5:19
**hospital** [3] - 55:16, 55:20, 55:23
**hour** [2] - 9:11
**house** [1] - 13:3
**hug** [1] - 41:4
**humeral** [1] - 54:22
**hurt** [11] - 33:21, 37:16, 38:18, 43:18, 43:20, 45:10, 45:11, 46:19, 51:10, 51:12, 52:1
**hurting** [1] - 36:12

## I

**IDC** [5] - 17:10, 17:12, 56:21, 62:19, 65:8
**IDCs** [1] - 65:11
**idea** [1] - 32:6
**identification** [1] - 57:23
**identified** [2] - 4:13, 68:5
**illness** [11] - 9:20, 9:24, 10:1, 10:3, 10:8, 10:11, 12:10, 12:14, 13:23, 37:9, 64:22
**immediate** [1] - 17:13
**important** [2] - 11:11, 11:20
**impressed** [1] - 11:14
**IN** [1] - 68:14

**in-service** [8] - 6:23, 7:10, 7:15, 8:1, 8:6, 8:20, 8:24, 64:18
**in-services** [1] - 64:19
**incident** [14] - 8:3, 9:2, 13:9, 17:6, 18:2, 18:24, 21:8, 23:2, 23:8, 34:22, 61:19, 61:21, 64:12, 64:20
**increasingly** [1] - 31:21
**indicating** [1] - 14:8
**individual** [9] - 11:5, 11:7, 11:17, 11:22, 14:21, 15:24, 16:2, 53:4
**individuals** [6] - 7:1, 11:3, 11:9, 12:22, 14:6, 64:21
**information** [6] - 27:15, 58:9, 58:22, 64:3, 64:4, 64:7
**initial** [4] - 56:24, 57:3, 57:6, 60:18, 61:20, 62:22
**injuries** [1] - 18:7
**injury** [2] - 43:22, 54:10
**inquired** [1] - 19:21
**inquiry** [1] - 20:2
**inside** [5] - 26:13, 30:18, 36:15, 38:15, 45:9
**instruct** [1] - 7:23
**instructions** [1] - 66:7
**instructor** [1] - 8:2
**instructors** [1] - 7:23
**interact** [5] - 11:1, 23:18, 55:11, 64:23, 65:3
**interacted** [9] - 12:18, 12:24, 13:12, 13:18, 22:17, 26:18, 26:20, 34:12, 65:1
**interacting** [5] - 34:5, 34:9, 38:6, 40:3, 40:6
**interaction** [10] - 11:17, 26:23, 28:16, 31:20, 32:14, 34:21, 35:8, 44:22, 48:20, 51:22
**interest** [1] - 14:20
**interested** [1] - 68:12
**intermediate** [1] - 21:18
**internal** [8] - 16:22, 17:5, 17:7, 57:1, 60:19, 61:9, 61:13, 64:2

**interpret** [1] - 29:9
**Interrogatories** [1] - 3:6
**interrogatories** [3] - 4:15, 57:22, 63:22
**interviewed** [1] - 56:17
**intradepartmental** [1] - 17:10
**investigated** [1] - 16:13
**investigation** [1] - 59:16
**involvement** [1] - 15:13
**issue** [3] - 37:21, 37:23, 53:12
**issues** [3] - 10:7, 13:4, 22:15

## J

**jacked** [1] - 5:7
**January** [4] - 1:19, 21:16, 67:24, 68:5
**JARED** [1] - 2:10
**JOHN** [7] - 1:6, 1:10, 2:15, 4:12, 66:22, 67:15, 68:5
**John** [4] - 2:18, 3:3, 4:19, 60:8
**joined** [3] - 6:22, 7:9, 20:19
**joining** [1] - 5:13
**JT** [21] - 12:18, 26:17, 26:18, 27:10, 28:16, 29:16, 30:14, 30:20, 32:13, 34:5, 34:9, 34:23, 35:6, 36:8, 36:11, 36:13, 38:10, 40:6, 41:14, 62:12, 62:23
    **JT's** [6] - 26:24, 37:19, 41:13, 46:18, 47:12, 47:19
**JOYCE** [1] - 2:15
**JT** [1] - 1:4
jvigliotti@rja [1] - 2:17
jvigliotti@rja-law.com [1] - 2:17

## K

**keep** [2] - 45:11, 49:6
**kicking** [2] - 46:23, 48:8
**kid** [4] - 26:21, 32:6, 34:13, 45:13
**kid's** [1] - 56:13

**kids** [3] - 23:6, 26:13, 36:4
**kind** [2] - 15:7, 45:17
**knees** [2] - 43:5, 44:16
**knowledge** [42] - 19:21, 20:1, 20:11, 21:3, 25:5, 26:7, 26:12, 27:9, 33:6, 33:7, 33:10, 33:22, 34:11, 34:21, 36:20, 39:17, 39:19, 40:2, 40:6, 41:13, 43:21, 44:11, 45:14, 45:19, 46:3, 47:4, 47:8, 48:6, 48:11, 49:14, 50:22, 51:21, 53:18, 56:6, 58:12, 59:5, 63:20, 64:9, 64:17, 65:1, 65:4, 65:16

## L

**lacerations** [1] - 46:3
**Lancaster** [1] - 2:16
**land** [5] - 42:22, 43:3, 43:5, 43:16, 45:17
**landed** [11] - 41:21, 43:12, 43:14, 43:17, 43:18, 43:20, 43:24, 45:17, 45:21, 45:22, 45:24
**LANE** [1] - 1:22
**large** [3] - 10:21, 24:3, 24:8
**larger** [1] - 32:21
**Last** [2] - 20:22, 20:23
**last** [7] - 8:5, 8:21, 14:15, 21:22, 57:14, 59:8, 62:20
**lasted** [1] - 9:7
**law** [1] - 15:3
**LAW** [3] - 2:2, 2:7, 2:11
**law.com** [1] - 2:17
**learn** [7] - 11:8, 11:11, 14:5, 14:12, 15:2, 56:4, 56:10
**learned** [3] - 13:19, 14:4, 56:8
**left** [7] - 47:8, 47:11, 47:12, 49:1, 49:6, 50:3, 51:12
**legs** [1] - 44:17
**less** [3] - 6:3, 9:11, 25:18
**letter** [4] - 58:2, 58:3, 59:17, 59:23
**letter-type** [1] - 59:17
**liaison** [1] - 21:15
**lieu** [1] - 5:16

**lieutenant** [3] - 20:11, 20:12, 20:13
**LINDSEY** [1] - 1:3
**LINE** [1] - 66:8
**line** [1] - 57:3
**listed** [2] - 6:19, 63:22
**located** [1] - 23:23
**location** [3] - 23:20, 33:15, 52:6
**look** [4] - 31:6, 60:1, 61:16, 62:14
**looked** [1] - 53:12
**looking** [1] - 41:14
**loud** [1] - 29:6
**luck** [1] - 65:19

## M

**MA** [5] - 1:23, 2:3, 2:8, 2:12, 2:16
**MADISON** [1] - 2:10
madisonj@worcesterma.gov [1] - 2:13
**Main** [4] - 1:17, 2:3, 23:22, 42:6
**managed** [1] - 39:22
**manipulated** [1] - 51:16
**manner** [7] - 11:6, 11:21, 14:24, 43:1, 46:17, 50:16, 52:3
**MARK** [1] - 66:5
**mark** [2] - 57:20, 59:10
**marked** [1] - 57:23
**MASSACHUSETTS** [1] - 1:1
**Massachusetts** [6] - 1:13, 1:16, 1:18, 68:1, 68:4, 68:19
**material** [1] - 10:21
**materials** [2] - 10:13, 16:11
**math** [1] - 5:9
**matter** [4] - 7:21, 9:5, 16:12, 16:13
**McCarthy** [12] - 18:1, 18:6, 25:13, 26:6, 34:4, 34:10, 35:7, 35:9, 41:18, 48:16, 64:23
**MCCARTHY** [1] - 1:7
**McCarthy's** [1] - 59:14
**McKenzie** [1] - 1:14, 68:3, 68:18
**mean** [2] - 34:13, 62:4
**meaning** [1] - 20:6
**medical** [1] - 55:20
**Melissa** [3] - 1:14, 68:3, 68:18

**meltdown** [4] - 14:1, 14:18, 14:20, 29:10
**meltdowns** [1] - 14:6
**member** [1] - 55:20
**members** [1] - 7:18
**memory** [10] - 13:11, 17:16, 24:14, 30:6, 35:8, 36:1, 38:16, 54:18, 58:16, 63:7
**mental** [15] - 6:9, 9:19, 9:24, 10:1, 10:3, 10:8, 10:10, 12:13, 13:22, 37:9, 53:3, 53:5, 53:11, 58:10, 64:21
**mention** [1] - 54:4
**mentioned** [1] - 52:20
**merged** [1] - 15:7
**met** [1] - 29:18
**mind** [2] - 8:3, 36:6
**minor** [1] - 1:4
**minute** [2] - 49:9, 49:19
**minutes** [4] - 25:16, 25:18, 49:16, 49:18
**mirror** [5] - 35:17, 35:22, 37:13, 38:2, 38:14
**misclassified** [1] - 31:11
**misunderstood** [1] - 31:4
**mom** [3] - 26:21, 27:7, 30:9
**moment** [4] - 10:4, 30:11, 40:15, 49:10
**momentum** [5] - 41:8, 41:15, 42:21, 43:13, 44:23
**month** [2] - 6:5, 9:5
**months** [2] - 21:18, 21:22
**morning** [2] - 57:16, 62:9
**mother** [4] - 26:3, 26:8, 26:24, 40:3
**mother's** [1] - 42:9
**motion** [2] - 42:20, 51:22
**motions** [2] - 4:10, 14:8
**move** [2] - 38:12, 52:3
**moving** [1] - 44:5
**MR** [72] - 4:16, 5:7, 5:8, 6:16, 6:17, 7:3, 9:18, 9:22, 10:12, 10:19, 11:2, 11:16, 12:12, 12:20, 13:7, 13:21, 14:15, 14:17, 16:9, 19:1, 20:5,

22:24, 25:2, 25:20, 27:5, 28:15, 29:12, 32:8, 33:5, 34:15, 35:4, 36:5, 36:7, 37:7, 37:17, 38:23, 39:8, 40:18, 41:5, 41:22, 42:15, 43:15, 45:6, 46:8, 49:13, 49:17, 49:23, 51:1, 52:10, 52:13, 53:8, 53:17, 55:14, 56:2, 56:14, 57:17, 57:20, 59:8, 59:10, 59:12, 59:13, 59:21, 60:2, 60:6, 60:9, 60:11, 61:2, 61:3, 63:4, 63:10, 63:12, 65:18
**MS** [11] - 11:13, 16:10, 24:24, 35:2, 37:6, 37:18, 41:23, 42:11, 44:19, 50:4, 51:14
**must** [1] - 67:7

**N**

**name** [6] - 4:17, 4:19, 6:18, 6:21, 29:18, 64:1
**NAME** [1] - 67:23
**names** [2] - 63:22, 64:7
**nature** [4] - 22:23, 32:12, 46:16, 46:21
**necessarily** [3] - 38:19, 39:15, 49:4
**need** [5] - 10:13, 15:10, 16:11, 22:16, 45:13
**needed** [5] - 44:24, 46:11, 53:5, 53:12, 53:14
**needs** [2] - 11:17, 59:3
**neurological** [1] - 12:15
**never** [2] - 27:16, 36:12
**next** [7] - 34:13, 35:3, 40:22, 44:4, 51:24, 56:7, 56:8
**nine** [1] - 9:14
**NO** [1] - 1:2
**normally** [1] - 55:11
**northeast** [1] - 22:5
**NOT** [1] - 66:5
**notary** [1] - 4:7
**Notary** [4] - 1:15, 4:14, 68:3, 68:18
**notice** [1] - 54:23
**notification** [1] - 59:17
**notified** [3] - 16:21,

17:14, 59:16
**notify** [1] - 59:19
**number** [1] - 30:23
**numerous** [1] - 22:4
**nurse** [1] - 55:12
**nurses** [1] - 55:24

**O**

**o'clock** [1] - 62:9
**O'Connor** [1] - 61:24
**oath** [1] - 68:6
**Objection** [1] - 37:18
**objection** [59] - 7:3, 9:18, 9:22, 10:12, 10:19, 11:2, 11:13, 11:16, 12:12, 12:20, 13:7, 13:21, 16:9, 16:10, 19:1, 20:5, 25:20, 27:5, 28:15, 29:12, 32:8, 33:5, 34:15, 35:2, 35:4, 36:5, 36:7, 37:6, 37:7, 37:17, 38:23, 39:8, 40:18, 41:5, 41:22, 41:23, 42:11, 42:15, 43:15, 44:19, 45:6, 46:8, 49:13, 49:17, 49:23, 50:4, 51:1, 51:14, 52:10, 52:13, 53:8, 53:17, 55:14, 56:2, 56:14, 59:21, 63:4, 63:10, 63:12
**objections** [1] - 4:10
**obscenity** [1] - 28:18
**observation** [1] - 31:7
**observations** [1] - 26:16
**observe** [1] - 26:14
**observed** [2] - 29:13, 54:19
**occasion** [1] - 19:4, 65:10
**occupants** [1] - 26:15
**occurred** [2] - 8:4, 63:6
**October** [1] - 58:6
**OF** [8] - 1:1, 1:7, 1:10, 2:2, 2:6, 2:11, 3:2, 3:8
**OFFICE** [1] - 2:2
**office** [1] - 68:15
**OFFICER** [2] - 1:16, 1:7
**Officer** [9] - 2:18, 25:13, 34:4, 34:10, 35:7, 35:9, 48:16, 57:24, 60:8
**officer** [13] - 4:20, 15:3, 15:20, 19:10,

21:11, 21:13, 21:15, 21:19, 22:16, 25:10, 49:1, 49:2, 67:6
**officers** [1] - 21:19
**offices** [1] - 1:17
**officials** [1] - 22:14
**old** [6] - 5:5, 23:3, 30:24, 31:3, 31:5, 31:6
**older** [2] - 31:8, 31:10
**once** [9] - 6:22, 7:9, 19:2, 19:6, 44:23, 45:17, 46:4, 59:15, 63:16
**one** [7] - 9:9, 19:4, 40:20, 52:18, 56:23, 62:20, 62:21
**open** [9] - 27:22, 27:23, 30:3, 30:4, 30:5, 30:6, 30:7, 39:4, 39:12
**Operation** [2] - 20:24, 21:2
**Operations** [2] - 20:23, 20:24
**opinions** [1] - 19:18
**opportunity** [1] - 14:21
**order** [1] - 53:3
**outcome** [2] - 59:16, 68:13
**outside** [2] - 26:11, 65:3
**own** [4] - 10:3, 11:5, 32:10, 37:22

**P**

**P.C** [3] - 1:17, 2:2, 2:15
**PAGE** [2] - 3:5, 66:8
**Page** [6] - 60:1, 60:3, 60:20, 61:11, 62:14, 62:15
**page** [3] - 60:11, 60:13, 61:16
**pages** [1] - 61:4
**Pages** [1] - 60:4
**pain** [9] - 48:1, 51:4, 51:23, 54:5, 54:8, 62:12, 63:8, 63:15, 63:16
**paperwork** [6] - 17:17, 17:22, 19:6, 55:7, 57:13, 57:15
**paramedic** [1] - 54:12
**paramedics** [7] - 54:2, 54:11, 54:14, 54:17, 63:23, 64:8
**parent** [1] - 23:16

**parents** [1] - 27:3
**park** [1] - 25:23
**parked** [2] - 24:1, 26:1
**parking** [8] - 24:2, 24:3, 24:4, 24:5, 24:8, 25:6, 25:24, 42:12
**part** [13] - 7:18, 22:10, 23:11, 23:13, 34:10, 38:22, 41:11, 43:6, 44:20, 44:22, 45:8, 45:20, 48:20
**participated** [3] - 6:4, 8:15, 8:22
**particular** [7] - 6:24, 7:20, 15:19, 24:4, 34:10, 49:7, 64:12
**parties** [3] - 4:3, 67:4, 68:11
**parts** [2] - 7:23, 36:18
**passenger** [5] - 27:21, 30:2, 34:13, 41:20, 42:9
**passes** [1] - 39:10
**passing** [1] - 39:3
**past** [3] - 39:9, 39:22, 58:2
**patrol** [2] - 20:23, 20:24
**Patrol** [2] - 21:1, 21:2
**Paul** [24] - 18:1, 18:5, 18:8, 18:23, 20:13, 34:14, 34:17, 34:18, 34:20, 34:24, 39:24, 40:2, 47:7, 47:9, 47:11, 47:15, 47:16, 49:21, 50:3, 51:16, 64:23, 65:1
**PAUL** [1] - 1:7
**people** [18] - 6:8, 6:11, 6:24, 7:11, 8:6, 10:17, 10:23, 11:20, 12:2, 12:6, 12:23, 14:1, 14:13, 14:17, 14:19, 54:1, 58:10, 64:15
**perhaps** [1] - 53:11
**period** [2] - 5:20, 5:22
**person** [5] - 12:8, 13:19, 15:21, 15:23, 55:15
**personnel** [1] - 55:20
**pertaining** [1] - 22:15
**peruse** [1] - 60:4
**phone** [2] - 65:6, 65:7
**physical** [3] - 15:2, 16:6, 16:7
**physically** [1] - 14:8
**piece** [1] - 7:7
**PINEIRO** [15] - 2:2,

2:2, 3:7, 4:16, 5:8, 6:17, 14:17, 25:2, 57:17, 57:20, 59:8, 59:12, 60:9, 61:3, 65:18
**Pineiro** [1] - 1:17
**place** [1] - 4:18
**Plaintiff** [3] - 1:4, 1:11, 2:5
**PLEASE** [1] - 66:5
**point** [33] - 6:19, 7:15, 7:17, 7:24, 8:13, 14:19, 21:3, 23:18, 25:13, 25:23, 26:2, 29:23, 30:24, 32:1, 37:14, 37:21, 38:11, 38:13, 39:24, 40:4, 40:7, 41:1, 44:10, 45:12, 45:14, 46:15, 47:3, 48:19, 50:7, 51:11, 51:22, 57:16, 59:5
**POLICE** [1] - 1:7
**Police** [1] - 6:7
**police** [18] - 4:20, 4:21, 5:13, 5:17, 5:23, 6:22, 7:9, 10:17, 13:5, 13:15, 15:13, 15:20, 16:14, 19:10, 20:18, 20:20, 22:20, 53:22
**portion** [1] - 10:21, 22:6
**position** [3] - 21:17, 21:20, 52:2
**positioning** [1] - 50:5
**positions** [2] - 20:17, 21:9
**possible** [1] - 49:20
**possibly** [1] - 32:21
**potato** [1] - 32:19
**potential** [2] - 37:20, 53:24
**potentially** [4] - 36:11, 37:10, 38:3, 38:21
**pounding** [2] - 31:21, 46:10
**pounds** [1] - 39:19
**power** [5] - 6:19, 7:15, 7:17, 7:24, 8:13
**PPA** [1] - 1:4
**practice** [2] - 27:2, 40:16
**practices** [1] - 8:20
**preference** [1] - 49:5
**preparation** [1] - 57:12
**prepared** [2] - 62:8, 65:8
**present** [3] - 8:18,

26:6, 64:4
**presentation** [2] - 6:19, 7:15
**presentations** [3] - 7:17, 7:24, 8:14
**presented** [2] - 16:4, 61:8
**presenting** [1] - 15:8
**prevent** [1] - 41:1
**primary** [1] - 46:18
**probability** [2] - 12:22, 13:16
**procedure** [3] - 66:2, 66:5, 67:7
**Procedure** [1] - 1:13
**process** [6] - 43:7, 43:22, 48:18, 49:11, 51:3, 63:3
**profanity** [5] - 28:18, 28:20, 28:24, 29:4, 29:19
**Professional** [4] - 16:23, 56:18, 65:9, 65:13
**program** [2] - 8:15, 9:6
**prompted** [6] - 33:16, 35:19, 36:9, 37:20, 38:12, 53:24
**provided** [4] - 8:11, 17:5, 17:16, 17:23
**provisions** [1] - 1:12
**proximal** [1] - 54:22
**proximity** [1] - 33:17
**Public** [7] - 1:15, 4:14, 22:7, 22:9, 22:11, 68:3, 68:18
**public** [1] - 4:8
**pull** [3] - 35:11, 36:14, 43:13
**pulled** [2] - 41:8, 49:9
**pulling** [1] - 35:17, 35:23, 35:24, 37:12, 38:1
**purposely** [1] - 32:22
**pursuant** [1] - 1:12
**put** [16] - 30:23, 37:11, 38:7, 38:24, 39:7, 41:11, 44:24, 45:5, 45:13, 45:15, 46:5, 48:16, 50:24, 51:12, 51:17, 52:2
**putting** [4] - 47:23, 49:22, 51:3, 51:6

### Q

**quadrant** [2] - 22:8, 22:9
**questions** [22] - 15:11,

17:3, 17:5, 17:21, 17:23, 19:23, 20:10, 56:21, 56:24, 57:2, 57:3, 57:4, 57:5, 57:6, 57:7, 57:9, 57:18, 60:18, 61:8, 62:21, 64:2, 68:8
**QUINN** [12] - 2:6, 11:13, 16:10, 24:24, 35:2, 37:6, 37:18, 41:23, 42:11, 44:19, 50:4, 51:14
**quinnwl@ci.worcester.ma.us** [1] - 2:9

### R

**radio** [1] - 52:8
**raise** [2] - 50:21, 50:23
**range** [1] - 6:12
**rapidly** [1] - 48:24
**reach** [2] - 36:15, 39:9
**react** [3] - 29:20, 37:10, 38:8
**reacting** [1] - 33:13
**reaction** [1] - 53:23
**read** [8] - 4:4, 58:17, 58:19, 58:20, 66:2, 66:3, 67:3, 67:11
**reading** [1] - 67:4
**really** [8] - 9:1, 11:4, 11:6, 16:2, 27:11, 29:7, 30:22, 63:13
**rear** [1] - 42:10
**REARDON** [1] - 2:15
**rearview** [1] - 35:17, 35:22, 37:13, 38:1, 38:14
**reason** [2] - 52:17, 52:18
**REASON** [12] - 66:9, 66:10, 66:11, 66:12, 66:13, 66:14, 66:15, 66:16, 66:17, 66:18, 66:19, 66:20
**reasons** [2] - 52:21, 67:6
**receipt** [2] - 4:5, 67:7
**receive** [1] - 64:13
**received** [7] - 8:10, 19:14, 53:22, 56:24, 59:17, 64:2, 65:6
**recently** [1] - 21:15
**receptacle** [2] - 32:18
**receptive** [1] - 11:22
**recess** [2] - 25:3, 57:19
**recognize** [1] - 57:24, 58:4, 60:17, 61:4,

61:7, 62:15, 62:17
**recollection** [3] - 22:19, 32:20, 63:20
**record** [2] - 22:24, 68:8
**records** [1] - 65:15
**RECROSS** [1] - 3:2
**REDIRECT** [1] - 3:2
**reenforce** [1] - 32:6
**refer** [3] - 10:13, 16:11, 22:7
**referring** [1] - 45:8
**reflected** [5] - 28:11, 28:13, 33:23, 60:21, 63:21
**regard** [1] - 27:10
**regarding** [1] - 10:16
**regards** [5] - 15:13, 17:6, 30:13, 56:15, 58:23
**region** [1] - 22:12
**related** [1] - 68:10
**relation** [6] - 35:13, 42:1, 42:8, 42:13, 50:6, 58:22
**relative** [1] - 24:7, 68:12
**relatives** [1] - 27:4
**remember** [29] - 7:20, 17:18, 18:10, 18:16, 18:19, 18:21, 20:8, 22:23, 23:21, 24:12, 24:16, 26:1, 26:23, 27:14, 27:18, 28:21, 30:12, 32:4, 33:3, 40:2, 41:21, 45:24, 48:11, 48:14, 57:8, 57:10, 58:24, 59:22, 59:24
**remembered** [1] - 18:2
**rep** [4] - 19:7, 19:10, 19:13, 19:16
**repeat** [3] - 7:7, 15:14, 28:12
**report** [19] - 19:20, 28:11, 28:14, 33:24, 52:20, 54:7, 54:12, 54:14, 54:18, 56:12, 61:19, 61:20, 61:21, 62:3, 62:8, 62:11, 62:18, 63:21, 64:7
**reported** [1] - 68:6
**REPORTER** [1] - 3:8
**Reporter** [1] - 1:15
**REPORTING** [1] - 1:22
**reports** [2] - 60:7, 62:19, 64:8
**request** [2] - 60:7, 62:18
**reserved** [1] - 4:11

**resident** [1] - 55:12
**resisting** [1] - 46:12
**resource** [2] - 21:11, 21:13
**respective** [1] - 4:3
**respond** [8] - 17:4, 20:6, 22:15, 23:21, 25:10, 25:17, 57:5, 65:5
**responded** [6] - 17:7, 17:9, 22:20, 29:20, 45:16, 61:13
**responding** [4] - 15:21, 20:9, 27:1, 29:15
**Response** [2] - 60:23, 61:17
**response** [2] - 58:8, 61:14
**responses** [2] - 20:2, 33:16
**responsibilities** [2] - 21:12, 21:24
**restrain** [10] - 34:23, 35:20, 36:11, 37:2, 37:22, 38:20, 40:17, 46:11, 46:12, 47:20
**restrained** [1] - 49:10
**RETAINED** [1] - 3:7
**retrieved** [1] - 64:3
**return** [1] - 66:6
**review** [5] - 57:13, 60:4, 65:15, 65:16
**reviewed** [3] - 17:23, 57:11, 57:14
**right-handed** [2] - 49:1, 49:2
**risen** [1] - 37:14
**Robin** [1] - 57:18
**role** [2] - 21:23, 21:24
**room** [2] - 2:7, 2:12
**Rule** [1] - 67:1
**rules** [1] - 66:2
**Rules** [1] - 1:13
**running** [3] - 40:23, 41:8, 42:19

### S

**safety** [8] - 32:10, 35:19, 36:9, 37:20, 37:22, 37:23, 45:1, 46:18
**satisfactorily** [2] - 4:13, 68:5
**saw** [1] - 55:17
**scene** [2] - 34:11, 54:3
**school** [11] - 4:24, 5:16, 5:19, 13:3, 21:11, 21:12, 21:15,

21:19, 22:13, 22:14
**School** [2] - 5:1, 22:11
**schools** [5] - 22:1,
22:3, 22:4, 22:8,
22:10
**Schools** [2] - 22:7,
22:9
**SCOTT** [1] - 59:13
**scratches** [1] - 46:2
**screaming** [1] - 48:10
**seal** [1] - 68:15
**seat** [2] - 27:21, 30:2
**seated** [4] - 27:21,
28:5, 29:22, 30:1
**seats** [1] - 31:22
**second** [1] - 25:1
**seconds** [2] - 25:16,
49:12
**Section** [8] - 52:22,
52:24, 53:1, 53:2,
53:23, 55:7, 55:18,
55:19
**sectioned** [1] - 55:16
**secured** [1] - 51:13
**see** [11] - 14:22, 18:2,
31:19, 34:20, 34:24,
39:24, 47:7, 50:10,
54:20, 57:10, 64:11
**seeing** [2] - 15:1, 40:2
**seek** [1] - 19:18
**seem** [2] - 31:15,
32:22
**Senior** [1] - 5:1
**sense** [1] - 32:2
**separate** [1] - 57:2
**September** [7] - 8:4,
8:23, 18:5, 22:20,
23:2, 24:20, 62:8
**sequence** [3] - 35:5,
51:15, 63:13
**series** [3] - 17:3, 17:5,
64:18
**serves** [2] - 54:19,
63:7
**service** [10] - 6:23,
7:10, 7:15, 8:1, 8:6,
8:20, 8:24, 13:20,
64:11, 64:18
**Service** [2] - 20:21,
20:22
**services** [1] - 64:19
**session** [2] - 11:15,
12:6
**set** [7] - 56:24, 57:2,
57:3, 57:6, 57:7,
60:18, 68:15

**sets** [2] - 57:4, 57:5
**setting** [1] - 13:4
**several** [2] - 7:22, 7:23
**shall** [4] - 4:4, 67:3,

67:3, 67:5
**shape** [1] - 53:19
**shear** [1] - 13:9
**sheet** [3] - 55:19, 66:4
**SHEET** [1] - 66:1
**short** [4] - 5:20, 5:22,
25:3, 57:19
**Shorthand** [1] - 1:14
**shoulder** [2] - 56:13,
56:16
**show** [1] - 54:17
**side** [8] - 34:13, 41:12,
41:20, 42:9, 44:11,
44:12, 44:14, 47:3
**sidewalk** [1] - 25:8
**sign** [3] - 4:4, 8:14,
66:6
**signature** [1] - 61:12
**Signature** [1] - 4:7
**signed** [7] - 4:7, 58:5,
60:20, 60:21, 61:11,
62:7
**significance** [2] -
28:23, 29:1
**signing** [1] - 8:18
**Signing** [1] - 67:1
**situation** [4] - 11:5,
27:6, 40:19, 48:24
**situations** [1] - 55:18
**six** [1] - 6:5
**six-month** [1] - 6:5
**size** [3] - 24:11, 32:18,
32:20
**skills** [1] - 5:9
**slight** [1] - 54:21
**slightly** [1] - 30:5
**small** [1] - 32:19
**smaller** [1] - 32:18
**soft** [1] - 31:15
**SOLICITOR** [2] - 2:6,
2:10
**sometimes** [1] - 14:2
**somewhere** [1] - 35:3
**sorry** [6] - 7:6, 16:18,
20:7, 42:4, 52:24,
54:13
**sort** [2] - 11:1, 24:15
**southwest** [1] - 23:13
**space** [1] - 14:22
**speaking** [2] - 11:3,
20:14
**specific** [3] - 13:2,
13:11, 48:7
**specifically** [1] - 27:14
**spectrum** [12] - 6:13,
6:15, 7:1, 7:11, 8:7,

10:18, 12:7, 14:2,
15:5, 15:21, 64:16
**spoken** [7] - 12:24,
18:4, 18:5, 18:23,

19:2, 19:4, 31:15
**SS** [1] - 1:1
**ss** [1] - 68:2
**staff** [1] - 7:18
**stamp** [2] - 62:4, 62:5
**stamped** [1] - 62:10

**Standards** [4] - 16:23,
56:18, 65:9, 65:13
**standing** [2] - 50:6,
50:8
**started** [1] - 48:19
**starts** [2] - 40:23, 60:7
**state** [2] - 5:15, 38:5
**STATE** [1] - 1:22
**statement** [2] - 56:23,
67:6
**stature** [1] - 30:23
**stenographically** [1] -
68:6
**still** [1] - 45:9
**Stop** [1] - 40:13
**stop** [4] - 36:15,
39:11, 40:9, 40:17
**stopping** [1] - 60:10
**straddling** [1] - 44:10
**street** [8] - 25:6, 39:5,
39:9, 40:23, 41:2,
42:3, 42:5, 42:6
**Street** [4] - 1:18, 2:3,
23:22, 42:6
**strike** [2] - 4:11, 27:24
**striking** [1] - 33:22
**struggling** [1] - 35:6
**students** [1] - 22:16
**subject** [2] - 7:21,
67:12
**Submission** [1] - 67:1
**submit** [1] - 19:22
**submitted** [2] - 62:18,
62:20, 67:3
**substance** [2] - 66:4,
67:5
**substantial** [1] - 54:9
**suffer** [3] - 11:20,
13:22, 64:15
**suffered** [1] - 7:1
**suffering** [1] - 8:7
**suggest** [1] - 16:5
**summary** [2] - 17:1,
55:21
**superiors** [1] - 19:19
**supervisor** [6] - 17:13,
17:15, 17:17, 17:18,
61:22, 62:7
**supposed** [1] - 19:22
**surrounding** [1] -

31:22
**sustained** [1] - 18:7
**SUV** [3] - 24:14, 42:8,

42:9
**sworn** [2] - 4:13, 68:5
**system** [1] - 22:11

---

## T

**tackle** [2] - 41:4, 41:6
**TAKEN** [1] - 67:24
**tall** [2] - 30:20, 39:16
**tantrum** [1] - 29:11
**taught** [2] - 12:1, 12:5
**techniques** [1] - 48:1
**ten** [7] - 23:3, 23:7,
30:24, 31:3, 31:5,
31:6, 62:9
**ten-year-old** [2] - 23:3,
31:3
**tended** [1] - 54:5
**term** [1] - 13:24
**terms** [3] - 15:22,
20:8, 58:9
**Terrace** [1] - 2:16
**testified** [1] - 4:14
**testimony** [2] - 67:2,
67:11
**TESTIMONY** [1] - 3:2
**THE** [4] - 1:7, 66:5
**thirty** [1] - 4:5
**thousands** [2] - 12:21
**three** [2] - 30:16,
62:21
**threw** [2] - 35:14
**throughout** [1] - 64:18
**throw** [4] - 32:13,
32:15, 32:23, 33:18
**throwing** [1] - 35:16
**thrown** [1] - 33:20
**throws** [1] - 34:3
**tire** [1] - 42:10
**title** [1] - 21:14
**today** [2] - 8:4, 57:12
**together** [1] - 15:7
**tone** [2] - 29:3, 31:16
**took** [4] - 49:12,
49:16, 55:4
**top** [1] - 45:18
**TORRES** [1] - 1:3
**Torres** [4] - 12:18,
26:17, 62:23, 67:23
**torso** [1] - 44:18
**touch** [4] - 15:22,
15:23, 33:2, 36:18
**touched** [3] - 36:23,
45:3, 45:10
**touching** [1] - 38:8
**towards** [10] - 29:1,

39:9, 41:2, 42:2,
42:5, 44:14, 47:20,
50:15, 50:17, 60:22
**trained** [5] - 6:15,

10:15, 10:22, 15:19,
58:14
**training** [28] - 6:8,
6:11, 6:23, 7:10,
7:14, 7:16, 7:18,
7:19, 8:6, 8:10, 8:15,
8:18, 8:19, 8:22, 9:3,
9:6, 11:15, 12:6,
14:1, 14:5, 14:12,
16:5, 33:12, 53:21,
58:9, 58:13, 64:14,
64:20
**trainings** [1] - 7:24
**transcribed** [2] - 67:2,
68:7
**transcript** [5] - 4:4,
4:6, 67:7, 67:11,
68:8
**TRANSCRIPT** [1] -
66:5
**trash** [3] - 32:13,
32:15, 32:17
**travel** [1] - 22:13
**triage** [1] - 55:12
**trial** [1] - 4:11
**trick** [1] - 15:15
**tried** [7] - 23:18,
29:16, 29:18, 30:14,
36:20, 45:3, 52:1
**tries** [2] - 40:8, 40:12
**true** [2] - 67:11, 68:8
**try** [9] - 11:22, 14:21,
16:5, 29:21, 35:20,
38:12, 38:20, 46:10,
50:16
**trying** [17] - 11:19,
11:23, 13:1, 13:2,
14:24, 15:15, 15:18,
16:6, 28:17, 34:22,
37:2, 37:22, 38:14,
44:5, 46:23, 50:13,
50:20
**twice** [1] - 8:24
**two** [13] - 15:6, 15:11,
41:16, 41:18, 42:14,
43:14, 43:16, 43:17,
57:4, 57:5, 61:10,
62:19, 65:14
**type** [13] - 5:13, 7:10,
7:14, 12:10, 14:9,
24:12, 27:3, 32:15,
34:3, 35:14, 54:23,
59:17, 64:13
**typewriting** [1] - 68:7
**typically** [1] - 8:24

---

## U

**unable** [3] - 9:23,
25:21, 47:16

**unavailable** [1] - 21:20
**unaware** [1] - 43:21
**unclear** [1] - 50:5
**under** [3] - 15:23, 23:6, 68:7
**undergoing** [1] - 53:7
**understood** [1] - 28:7
**unfolding** [1] - 48:24
**uniform** [1] - 18:14
**union** [4] - 19:7, 19:10, 19:13, 19:16
**unless** [2] - 57:10, 67:4
**unsure** [3] - 12:17, 21:7, 33:15
**unsustained** [1] - 59:24
**unusual** [1] - 37:4
**up** [9] - 5:7, 25:14, 42:1, 42:17, 42:18, 50:21, 57:1, 57:7, 57:9
**update** [1] - 56:12
**upset** [3] - 26:19, 28:6, 40:8

## V

**vaguely** [1] - 59:24
**vantage** [1] - 50:7
**variety** [1] - 10:7
**vehicle** [17] - 23:24, 25:5, 26:1, 26:10, 26:11, 26:13, 26:15, 28:5, 30:18, 33:7, 35:17, 36:13, 36:14, 38:19, 39:3, 42:13, 42:17
**verbalization** [3] - 36:1, 38:10, 40:10
**verbalized** [2] - 51:10, 51:11
**verbalizing** [2] - 33:9, 48:9
**view** [4] - 9:21, 46:15, 46:16, 46:20
**VIGLIOTTI** [59] - 2:15, 5:7, 6:16, 7:3, 9:18, 9:22, 10:12, 10:19, 11:2, 11:16, 12:12, 12:20, 13:7, 13:21, 14:15, 16:9, 19:1, 20:5, 22:24, 25:20, 27:5, 28:15, 29:12, 32:8, 33:5, 34:15, 35:4, 36:5, 36:7, 37:7, 37:17, 38:23, 39:8, 40:18, 41:5, 41:22, 42:15, 43:15,

45:6, 46:8, 49:13, 49:17, 49:23, 51:1, 52:10, 52:13, 53:8, 53:17, 55:14, 56:2, 56:14, 59:10, 59:21, 60:6, 60:11, 61:2, 63:4, 63:10, 63:12
**vIGLIOTTI** [1] - 60:2
**violently** [1] - 44:5
**visibly** [1] - 28:5
**vocalization** [1] - 14:7
**voice** [2] - 29:3
**volume** [3] - 12:23, 13:10, 29:8
**vs** [1] - 1:5

## W

**waived** [2] - 4:8, 67:4
**warm** [1] - 24:20
**Wednesday** [1] - 1:18
**weigh** [2] - 39:18, 39:20
**WENDY** [1] - 2:6
**WHEREOF** [1] - 68:14
**wide** [1] - 24:6
**wider** [1] - 24:10

**wires** [3] - 35:18, 37:19, 38:1
**witness** [5] - 1:11, 67:3, 67:4, 67:5, 67:6
**Witness** [1] - 67:1
**WITNESS** [1] - 68:14
**WORCESTER** [4] - 1:1, 1:7, 2:6, 2:11
**Worcester** [14] - 1:18, 2:3, 2:8, 2:12, 2:16, 4:20, 4:22, 6:7, 13:14, 22:6, 22:8, 22:11, 67:23
**word** [3] - 14:16, 28:19, 29:2
**words** [5] - 29:2, 31:12, 33:1, 47:22, 54:20
**wrist** [2] - 48:2, 63:17
**written** [2] - 17:3, 68:7
**wrote** [1] - 54:18

## Y

**yank** [1] - 38:14
**year** [8] - 5:3, 6:3, 8:24, 23:3, 30:24, 31:3, 31:5, 31:6
**years** [3] - 5:5, 9:15, 21:2
**yelled** [1] - 28:17
**yelling** [7] - 29:5, 29:6,

29:7, 29:8, 29:19, 40:9, 48:10
**yourself** [2] - 36:3, 58:19